# EXHIBIT D

| ROY CONRAD, Individually and On Behalf of All Others Similarly Situated, | AMERICAN ARBITRATION ASSOCIATION |
|---|---|
| **Claimants,** | |
| **V.** | **CASE NO. 01-17-0001-5075** |
| **SUN COAST RESOURCES, INC.,** | |
| **Respondent.** | |

## CLAIMANTS' MOTION FOR CLAUSE CONSTRUCTION DETERMINATION TO PERMIT COLLECTIVE ACTION ARBITRATION

Claimant Roy Conrad, individually and on behalf of all others similarly situated, (collectively, "Claimants")[1] files this motion for clause construction to permit collective action arbitration as follows.

## I.
## QUESTION PRESENTED

The sole issue to be decided by this motion is whether or not Sun Coast's arbitration agreement *excludes* collective action arbitration.[2]   If not, then this case *must* proceed as a collective action as authorized by Section 216(b) of the FLSA.  29 U.S.C. § 216(b).

As illustrated below, the Agreement does not exclude collective action arbitration.  To the contrary, it specifically authorizes it.  Therefore, Claimants request a Clause Construction order authorizing them to proceed with this arbitration on a collective action basis.[3]

---

[1] Larry Taylor, Eric Pettis, and Lucas Ubah all opted into this case by filing Notices of Consent per § 216(b).
[2] Sun Coast's arbitration agreement (hereinafter "the Agreement") is attached as Exhibit 1.
[3] Claimants will file a motion to conditionally certify the case after the Arbitrator rules on this motion.

## II.
## THE ARBITRATION AGREEMENT

While the entire Agreement is attached as Exhibit 1, the relevant provisions for purposes

of this motion concern the definition and meaning of the terms "controversy," "any claim," and

"cause of action," as they are used in the Agreement:

> As a condition of your employment at Sun Coast, you agree that **any controversy or claim arising out of or relating to your employment relationship with Sun Coast or the termination of that relationship** must be submitted for non-binding mediation before a third-party neutral mediator and, if necessary, for final and binding resolution by a private and impartial arbitrator, to be jointly selected by you and Sun Coast.[4]
>
> This agreement to submit to mediation and, if necessary, arbitration:
>
> i.  Covers any dispute concerning the arbitrability of any such controversy or claim; and
> ii. Includes, but is not limited to, **any claim that could be asserted in court** or before an administrative agency **or claims for which the employee has an alleged cause of action, including without limitation claims for…and/or claims for violation of any federal state or other governmental law, statute, regulation or ordinance, and whether based on statute or common law**.
>
> **Disputes covered by this Agreement include all such claims** whether made against Sun Coast, any of its subsidiary or affiliated entities, all benefit plans, the benefit plans' sponsors, Sun Coast's individual officers or directors (in an individual or personal capacity), and all successors and assigns of any of them.
>
> The burden of proof at an arbitration shall at all times be on the party seeking relief.   In reaching a decision, **the arbitrator shall apply the governing substantive law applicable to the claims(s), cause(s) of action and defense(s) asserted by the parties** as applicable in the state where the claims arise.  **The arbitrator shall have the power to award all remedies that could be awarded by a court or administrative agency in accordance with the governing and applicable substantive law**.

Notably, there is no limiting language in the Agreement that prohibits or excludes

collective action arbitration.   Nor is the term "dispute" defined in a way to exclude class or

collective actions, nor to limit the substantive right of Claimants to enforce their rights under

---

[4] The Parties attended mediation with Alan Levin on February 20, 2017.

Section 216(b) of the FLSA.  To the contrary, the Agreement clearly states that it covers **any and all claims and controversies** arising out of Claimants' employment relationship with Sun Coast.  The Agreement further *requires* that the Arbitrator apply the governing substantive law applicable to the claims and causes of action, and gives the Arbitrator the "power to award all remedies that could be awarded by a court." *Id.*  The Agreement could not be any more clear.

## III.
## SUN COAST'S ARGUMENTS

Despite the Agreement's clarity, Sun Coast offers six (6) reasons in its Answer why the Agreement *should not be interpreted* to permit collective action arbitration.[5]   Specifically, Sun Coast contends that:

1. "the applicable arbitration clause does not permit the arbitration to proceed on behalf of or against a class (or collective)."[6]

2. "the arbitration *should not proceed* as a class (or collective) arbitration because those claims, and each of them, fail to meet the necessary requirements of class certification, including, class ascertainability, typicality, commonality, numerosity, manageability, superiority, and adequacy of the class representative, and a lack of community of interest among the putative class."[7]

3. "separate arbitrations are not impracticable, questions affecting only individual members predominate over any questions of law or fact common to the members of the class, and class arbitration is not superior to other available methods for the fair and efficient adjudication of the controversy."[8]

4. "a class (or collective) arbitration *should not be maintained* considering the interest of members of the class in individually controlling the prosecution or defense of separate arbitrations…"[9]

5. "Collective or class action relief is not appropriate because failure to meet the requirements of the American Arbitration Association's Supplementary Rules for Class Arbitrations."[10]

---

[5] Notably, Sun Coast never says that the Agreement *excludes or prohibits* collective action arbitration. That is because it doesn't.  Rather, Sun Coast simply argues that the case *should not proceed* as a collective action arbitration.  This is a subtle, but significant, difference.

[6] Section III (8) of Sun Coast's answer, page 5.

[7] Section III (9) of Sun Coast's answer, page 5.

[8] Section III (10) of Sun Coast's answer, page 5.

[9] Section III (11) of Sun Coast's answer, pages 5 - 6.

[10] Section III (29) of Sun Coast's answer, page 6.

6. Collective or class action relief is not appropriate because individual liability and damages issues predominate over issues generally applicable to the class or collective action."[11]

None of these arguments is controlling or persuasive. To the contrary, they illustrate the weakness of Sun Coast's argument, as well as their apparent concession that the Agreement *they crafted* fails to exclude class (or collective) arbitration.

Look closely and you will see that Sun Coast's arguments revolve almost exclusively on the notion that: (i) Claimants cannot meet the commonality and numerosity requirements of Rule 23 class certification; (ii) individual arbitrations are preferred because of the individual defenses available; and (iii) the fact that Claimants' damages are individualized. In other words, five (5) of the six (6) reasons cited deal exclusively with the issue of whether or not Claimants can satisfy the "similarly situated" standard for purposes of conditionally certifying this case as a collective action.[12] These are matters for the Arbitrator to decide in connection with Claimants' soon-to-be-filed motion to conditionally certify this case as a collective action. These arguments have no place nor relevance to the instant clause construction debate. The standard for conditional certification is materially different than whether or not the Agreement prohibits collective action arbitration. The two should not be confused.

The only "defense" Sun Coast raises in support of its position is that "the applicable arbitration clause does not permit the arbitration to proceed on behalf of or against a class (or collective." *See,* Supra note 4. However, Sun Coast fails to advise us which provision in the Agreement prohibits collective action arbitration and why. The truth is that Sun Coast -- as the drafter of the Agreement -- could have included a collective action waiver in the Agreement if they intended to deprive their employees of such concerted activity. However, they failed to do

---

[11] Section III (30) of Sun Coast's answer, page 6.
[12] Sun Coast's objections concerning "numerosity," "commonality," etc. are misplaced as Claimants do not seek Rule 23 class certification.

4

so. The Arbitrator should not now insert such a prohibition into the Agreement where none exists.

## IV.
## THE ARBITRATOR'S AUTHORITY TO DECIDE

The Supreme Court has made clear that an Arbitrator's role is to interpret and construe the arbitration contract, and that the courts may not disturb the Arbitrator's decision simply because the Arbitrator made the wrong decision. *Oxford Health Plans LLC v. Sutter,* 133 S.Ct. 2064, 2069-71 (2013).

> "In sum, Oxford chose arbitration, and it must now live with that choice. Oxford agreed with Sutter that an arbitrator should determine what their contract meant, including whether its terms approved class arbitration. The arbitrator did what the parties requested: He provided an interpretation of the contract resolving that disputed issue. His interpretation went against Oxford, maybe mistakenly so. But still, Oxford does not get to rerun the matter in a court. Under § 10(a)(4), the question for a judge is not whether the arbitrator construed the parties' contract correctly, but whether he construed it at all. Because he did, and therefore did not 'exceed his powers,' we cannot give Oxford the relief it wants. We accordingly affirm the judgment of the Court of Appeals." *Id.*

Here, the Parties have expressly authorized the Arbitrator to decide "any dispute concerning the arbitrability of any such controversy or claim." *See*, Exhibit 1. Therefore, the Arbitrator's decision will not be disturbed.

Moreover, the Parties have expressly agreed that the Arbitrator "shall apply the governing substantive law applicable to the claims(s), cause(s) of action and defense(s) asserted by the parties as applicable in the state where the claims arise. The arbitrator shall have the power to award all remedies that could be awarded by a court or administrative agency in accordance with the governing and applicable substantive law." *Id.* Thus, the Arbitrator is fully empowered to decide this issue. And in doing so, the Parties have agreed that the Arbitrator **shall** "award all remedies" – including collective action certification – that could be awarded by

a court in accordance with the governing and applicable substantive law, i.e. Section 216(b) of the FLSA.

There can be no dispute but that Section 216(b) of the FLSA permits Claimants to bring this wage and hour lawsuit on behalf of themselves and those similarly situated. Similarly, there can be no *real* dispute but that a court could conditionally certify this case as a collective action, i.e. that is certainly a remedy available that would have been available to Claimants had Sun Coast not insisted that Claimants prosecute their claims in arbitration. Therefore, the Arbitrator should enter a Clause Construction order authorizing collective action arbitration.

## V.
## THE AGREEMENT SPECIFICALLY AUTHORIZES COLLECTIVE ACTION

Distilled to their essence, Sun Coast's arguments can be boiled down to a simple question: must an arbitration agreement specifically define the term "dispute" to <u>include</u> class or collective actions before an Arbitrator can order it?

Absolutely not. That is not, and never has been, the law. In fact, in a case with a remarkably similar arbitration agreement, the United States Supreme Court held that the Arbitrator acted properly in authorizing class arbitration. *Oxford Health Plans LLC v. Sutter*, 133 S. Ct. 2064, 2070 (2013). In that case, the arbitration agreement stated: "[n]o civil action concerning *any dispute* arising under this Agreement shall be instituted before any court, and all such disputes shall be submitted to final and binding arbitration in New Jersey, pursuant to the rules of the American Arbitration Association with one arbitrator." *Id.* at 2067 (italics added). Oxford filed, and the trial court granted, a motion to compel arbitration. However, once there, the Arbitrator reviewed the agreement and decided that it authorized class action arbitration. *Id.* at 2065.

Specifically, the Arbitrator "reasoned that the clause sent to the arbitration 'the same universal class of disputes' that it barred the parties from bringing 'as civil actions' in court: [t]he 'intent of the clause' was 'to vest in the arbitration process everything that is prohibited from the court process. And a class action, the [A]rbitrator continued, 'is plainly one of the possible forms of civil action that could be brought in a court' absent the agreement." *Id.* at 2067.

The Supreme Court agreed. And in a *unanimous* and well-reasoned opinion, held that the Arbitrator's decision permitting collective action arbitration would stand. *Id.* at 2071. The Arbitrator had "focused on the arbitration clause's text, analyzing (whether correctly or not makes no difference) the scope of both, what it barred from court and what it sent to arbitration" and "concluded, based on the that textual exegesis, that the clause 'on its face...expresses the parties' intent that class arbitration can be maintained." *Id.* at 2069.

*Oxford* is still the law and is not an aberration. Rather, most courts (and arbitrators) follow this *unanimous* opinion from our Supreme Court and have authorized class and/or collective action arbitrations unless the agreement specifically prohibits it. *See, e.g.* Exhibit 2 Case No. 57-160-00080-13: *Grande v. Lawrence Recruiting Specialists Inc.,* Clause Construction Award dated December 20, 2013 (holding that a broad agreement to arbitrate all claims between the parties which did not specifically discuss class or collective arbitration nonetheless included an agreement to allow class arbitration); Exhibit 3, Case No. 70-160-000270-13: *Gonzales v. Brand Energy,* Clause Construction Award dated October 15, 2013 (same); Exhibit 4, Case No. 33 523 00375 13: *Maldonado v. Callahan Express Delivery, Inc.* Clause Construction Award dated April 18, 2014 (same).

Simply stated, <u>in the absence of a specific class action waiver</u>, most arbitrators and courts have ruled that broad language subjecting "any dispute or claim" to arbitration is meant to

encompass FLSA collective actions or other class action claims.[13]  Claimants respectfully request that the Arbitrator make a similar determination here.

## VI.
## THE AGREEMENT SPECIFICALLY EXCLUDES CERTAIN CLAIMS

If that were not convincing enough, the Agreement itself enumerates four (4) types of claims that are <u>not</u> subject to mandatory arbitration, i.e. they are specifically excluded from coverage of the Agreement. *See*, Exhibit 1.  Specifically, the Agreement provides:

Claims covered by this Agreement do not include:

i.      A claim for workers' compensation benefits;

ii.     A claim for unemployment compensation benefits;

iii.    A claim by Sun Coast for injunctive and/or other equitable relief…; and

iv.     A claim based upon Sun Coast's current (successor or future) employment benefits and/or welfare plans…"

Notably, Sun Coast failed to identify "collective actions" in their list of excluded claims. Obviously, Sun Coast knew how to draft exclusionary language in their Agreement.  And yet they failed to do so.  The Arbitrator should not insert such an exclusionary provision where none exists.

## VII.
## THIS IS SIMPLE CONTRACT CONSTRUCTION

The Federal Arbitration Act (FAA) requires that "arbitration agreements, like other contracts, be enforced according to their terms and according to the intention of the parties." *First Options, Inc. v. Kaplan*, 514 U.S. 938, 947 (1995).  When construing an arbitration clause,

---

[13] *See, e.g., Passow v. Smith & Wollensky Restaurant Group, Inc.*, AAA 11 160 00357 08 (Jul. 28, 2011) (Van Gestel, Arb.) (Ex. 5), aff'd, *Smith & Wollensky Restaurant Group, Inc. v. Passow*, 831 F.Supp.2d 390 (D. Mass. Jan. 11, 2011) (same); *Sutter v. Oxford Health Plans, Inc.*, AAA 18 193 20593 02 (Jul. 6, 2010) (Barrett, Arb.) (Ex. 6); *Benson v. CSA-Credit Solutions of America, Inc.*, AAA 11 160 02281 08 (Jul. 6, 2010) (Meyerson, Arb.) (Ex. 7); *Frisari v. Dish Network LLC*, AAA 18-160-001431-12, 2013 WL 4494927 (May 30, 2013) (Dreier Arb.) (finding parties' arbitration agreement allowed for class-wide arbitration even though it made no express mention of class-wide procedures) (Ex. 8);

arbitrators must "give effect to the contractual rights and expectations of the parties." *Stolt-Nielsen*, 130 S. Ct. at 1773-74, *quoting Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989). The FAA mandates that agreements to arbitrate be enforced on the same basis as other contracts. 9 U.S.C. § 2. "Because an agreement to arbitrate is a creature of contract . . . the ultimate question of whether the parties agreed to arbitrate is determined by state law." *Bell v. Cendant Corp.*, 293 F.3d 563, 566 (2d Cir. 2002). Any questions regarding the scope of arbitrable issues are decided in favor of arbitration. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, (1985) 473 U.S. 614, 626.  In other words, "where [an] agreement contains what is argued to be an implicit agreement to submit to class arbitration, the arbitrator must necessarily look to state law principles of contract interpretation in order to divine whether such intent exists." *Jock v. Sterling Jewelry, Inc.*, 646 F.3d 113, 126 (2d Cir. 2011).

## A. <u>Texas Law Mandates Inclusion of the Collective Action Remedy</u>

Under Texas law, the Agreement is considered "broad" because it contains the phrase "any controversy or claim arising out of or relating to your employment relationship with Sun Coast." See, Exhibit 1.  *In re Complaint of Hornbeck Offshore Corp.*, 981 F.2d 752, 755 (5th Cir. 1993) ("We have held that arbitration clauses containing the 'any dispute' language, such as the one presently before us, are of the broad type."); *Pers. Sec. & Safety Sys. v. Motorola Inc.*, 297 F.3d 388, 393 (5th Cir. 2002) ("Where, as here, an arbitration provision purports to cover all disputes 'related to' or 'connected with' the agreement, we have held that the provision is 'not limited to claims that literally 'arise under the contract,' but rather embraces all disputes between the parties having a significant relationship to the contract regardless of the label attached to the dispute."); *Ford Motor Co. v. Ables*, 207 Fed. Appx. 443, 447 (5th Cir. 2006) ("An arbitration provision, such as the one here, that purports to cover all disputes "related to" the contract or any

resulting transaction or relationship is 'not limited to claims that literally "arise under the contract."' Rather, 'with such a broad arbitration clause, it is only necessary that the dispute "touch" matters covered by the [contract] to be arbitrable.'"). In fact, Texas courts have held that "it is difficult to imagine broader general language than that contained in the ... arbitration clause, '*any dispute*.'" *In re Complaint of Hornbeck Offshore Corp.*, 981 F.2d 752, 755 (5th Cir. 1993) (internal citations omitted) (emphasis added).

Because Sun Coast's Agreement is "broad," Texas law requires that it be given its broadest possible interpretation. *Frindar Megasoft Int'l, Inc. v. Telcordia Techs., Inc.*, 2006 WL 3063434 (W.D. Tex. 2006) ("If the court finds that the clause is broad, then any dispute between the parties falls within the scope of the clause if it is 'connected with' or 'related to' the contract."); *Colorado v. Pacificare of Texas*, 1998 WL 633658 (W.D. Tex. July 1, 1998) ("Broad arbitration clauses are not limited to claims that literally 'arise under the contract,' but rather embrace all disputes between the parties having a significant relationship to the contract regardless of the label attached to the dispute. With such a broad arbitration clause, it is only necessary that the dispute 'touch' matters related to employment to be arbitrable.")

Furthermore, Texas courts recognize a strong public policy in favor of arbitration. *ASW Allstate Painting & Constr. Co. v. Lexington Ins. Co.*, 188 F.3d 307, 310 (5th Cir. 1999) ("There is a strong presumption in Texas public policy favoring arbitration and upholding the parties' intentions, which is similar to the federal policy of ensuring the enforceability, according to their terms, of private agreements to arbitrate."); *Cantella & Co. v. Goodwin*, 924 S.W.2d 943, 944 (Tex. 1996) ("Federal and state law strongly favor arbitration. Indeed, a presumption exists in favor of agreements to arbitrate under the FAA. Courts must resolve any doubts about an agreement to arbitrate in favor of arbitration."); *Vetco Sales, Inc. v. Vinar*, 98 Fed. Appx. 264, 266 (5th Cir. 2004) (same). While the Texas Supreme Court in *In re Wood*, 140 S.W.3d 367,

10

369 (Tex. 2004) did not address whether Texas courts should apply the well-recognized presumption in favor of arbitration as a presumption in favor or class arbitration, such a reading is consistent with Texas case law, when, as here, the Agreement is broad. "*'The presumption of arbitrability is particularly applicable where the clause is broad*; that is, it provides for arbitration of--any dispute arising between the parties,' or--any controversy or claim arising out of or relating to the contract thereof,' or--any controversy concerning the interpretation, performance or application of the contract." *McReynolds v. Elston*, 222 S.W.3d 731, 740 (Tex. App. 2007) (emphasis added) (quoting *Babcock & Wilcox Co. v. PMAC, Ltd.*, 863 S.W.2d 225, 230 (Tex. App.—Houston [14th Dist.] 1993, writ denied)).

The Arbitrator should similarly resolve the collective action arbitration issue in favor of permitting such arbitration.

### B.   If the Agreement is Ambiguous, Such Ambiguity Permits Class Arbitration

Although it is clear from the plain language of the broadly-worded Agreement that the Agreement permits collective action arbitrations, in the unlikely event the Arbitrator believes the agreement is ambiguous on the matter, the Arbitrator should nevertheless find that a collective action arbitration is permitted. When ambiguity exists in a contract, relevant rules of contract construction should be applied. *In re D. Wilson Const. Co., et al.*, 196 S.W.3d 774, 781 (Tex. 2006). An ambiguity exists in a contract if it is susceptible to two or more reasonable interpretations, not merely because the parties disagree on its meaning. *See Seagull Energy E&P, Inc. v. Eland Energy, Inc.* 207 S.W.3d 342, 345 (Tex. 2006). In Texas, ambiguities in written contracts are construed against the drafter. *Amory Mfg. Co. v. Gulf C. & S.F. Ry. Co.*, 89 Tex. 419, 425, 37 S.W. 856, 857 (Tex. 1896); *see also, Gonzalez v. Mission Am. Ins. Co.*, 795 S.W.2d 734, 737 (Tex. 1990); *Wilson v. John Frantz Co.*, 723 S.W.2d 189, 192 (Tex.App.-Houston [1st Dist.] 1986, writ ref'd n.r.e.).

11

In this case, Sun Coast drafted the Agreement at issue and presented it to the Claimants (and all of their other employees) for their signature. The Agreement was not drafted by any of the Claimants, nor was it negotiated by any of the Claimants. Therefore, to the extent the Arbitrator determines the Agreement is vague as to collective action arbitration, this ambiguity must be construed against Sun Coast and in favor of Claimants.

## VIII.   CONCLUSION

For the forgoing reasons, Claimants respectfully requests the Arbitrator to enter a Clause Construction order to permit collective action arbitration.

Respectfully submitted,

SHELLIST | LAZARZ | SLOBIN LLP

By: _____
ROBERT R. DEBES, JR.
Texas Bar No. 05626150
bdebes@eeoc.net
RICARDO J. PRIETO
Texas Bar No. 24062947
rprieto@eeoc.net
11 Greenway Plaza, Suite 1515
Houston, Texas 77046
Telephone: (713) 621-2277
Facsimile: (713) 621-0993

ATTORNEYS FOR CLAIMANTS

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served on the 27th day of July 2017 as follows:

Via Email:
Cristina Portela Solomon
csolomon@gardere.com
Neil Martin
nmartin@gardere.com
Gardere Wynne Sewell LLP
1000 Louisiana Street, Suite 2000
Houston, Texas 77002

Robert R. Debes, Jr.

13

## MEDIATION AND ARBITRATION AGREEMENT

Although Sun Coast Resources, Inc. ("Sun Coast") hopes that employment disputes with its employees will not occur, Sun Coast believes that when these disputes do arise, it is in the mutual interest of all concerned to handle them promptly and with minimal disturbance to the operations of Sun Coast's businesses and the lives of its employees.

Accordingly, to provide for more expeditious resolution of certain employment-related disputes that may arise between Sun Coast and its employees, Sun Coast has instituted a mandatory mediation and arbitration procedure ("Procedure") for all employees. Under the Procedure, certain disputes that may arise from your employment with Sun Coast or the termination of your employment must, after appropriate attempts to resolve your dispute internally through Sun Coast management channels, be submitted for resolution by non-binding mediation and, if necessary, mandatory binding arbitration.

In agreeing to submit certain employment disputes for resolution by private mediation and, if necessary, arbitration, you acknowledge that this Agreement is given in exchange for rights to which you are not otherwise entitled, namely, your employment as a Sun Coast employee and the more expeditious resolution of employment disputes. In exchange for your agreement to submit these disputes to mediation and, if necessary, binding arbitration, Sun Coast likewise agrees to the use of mediation and arbitration as the exclusive forum for resolving certain employment disputes covered by this Agreement.

Hence, the parties shall be precluded from bringing or raising in court or another forum any dispute that was or could have been brought or raised under the procedures set forth in this Agreement. You will receive a copy of Sun Coast's Mediation and Arbitration Agreement at the same time you receive your Employee Handbook.

Sun Coast Mediation and Arbitration Procedure

**Scope of Mediation and Arbitration Procedure**: As a condition of your employment at Sun Coast, you agree that any controversy or claim arising out of or relating to your employment relationship with Sun Coast or the termination of that relationship must be submitted for non-binding mediation before a third-party neutral mediator and, if necessary, for final and binding resolution by a private and impartial arbitrator, to be jointly selected by you and Sun Coast.

*Claims Covered:* This agreement to submit to mediation and, if necessary, arbitration:

   i. Covers any dispute concerning the arbitrability of any such controversy or claim; and
   ii. Includes, but is not limited to, any claim that could be asserted in court or before an administrative agency or claims for which the employee has an alleged cause of action, including without limitation claims for breach of any contract or covenant (express or implied); tort claims; claims for discrimination (including, but not limited to, discrimination based on sex, pregnancy, race, national or ethnic origin, age, religion, creed, marital status, sexual orientation, mental or physical disability or medical condition, specifically including claims under The American With Disabilities Act, or any other applicable law, veteran status, or other characteristics protected by statute); claims for wrongful discharge; violations or the Family and Medical Leave Act (FMLA); and/or claims for violation of any federal , state or other governmental law, statute, regulation or ordinance, and whether based on statute or common law; and

Disputes covered by this Agreement include all such claims whether made against Sun Coast, any of its subsidiary or affiliated entities, all benefit plans, the benefit plans' sponsors, Sun Coast's individual officers or directors (in an official or personal capacity), and all successors and assigns of any of them.

Page 1 of 4

Exhibit 1

*Claims Not Covered:* Claims covered by this Agreement do not include:

   i. A claim for worker's compensation benefits;
   ii. A claim for unemployment compensation benefits;
   iii. A claim by Sun Coast for injunctive and/or other equitable relief, including without limitation claims for unfair competition and/or the use or unauthorized disclosure of trade secrets or confidential information, for which Sun Coast may seek and obtain relief from a court of competent jurisdiction; and
   iv. A claim based upon Sun Coast's current (successor or future) employee benefits and/or welfare plans that contain an appeal procedure or other procedure for the resolution of disputes under the plan.

**Internal Efforts:** As a prerequisite for submitting an employment dispute to mediation and, if necessary, arbitration, both you and Sun Coast agree to make good faith efforts at resolving any dispute internally on an informal basis through Sun Coast management channels appropriate to that particular dispute. Any employment dispute should be directed to the Director of Human Resources in an effort to resolve the dispute internally. Only when those internal efforts fail may an employment dispute be submitted to mediation and, if necessary, final and binding arbitration under the terms of the Procedure.

**Nonbinding Mediation:** If efforts at informal resolution fail, disputes arising under this Agreement must first be submitted for non-binding mediation before a neutral third party. The complainant may within six (6) months of the act or omission complained of (or a greater period of time, if allowed by the applicable statute of limitations), whichever is later, request that the matter be submitted to the Procedure. Mediation is an informal process where the parties to a dispute meet in an attempt to reach a voluntary resolution, using the third party as a facilitator. Mediation shall be conducted and administered by the American Arbitration Association (AAA) under its National Rules for Resolution of Employment Disputes, which are incorporated into this Procedure by reference, or as otherwise agreed between the parties.

**Binding Arbitration:** If a covered dispute remains unresolved at the conclusion of the mediation process, either party may submit the dispute for resolution by final binding confidential arbitration under the Procedure. The arbitration will be conducted under the National Rules for Resolution of Employment Disputes of the AAA, as amended and effective on January 1, 2001, as amended. These Rules, incorporated by reference into this Procedure, include, but are not limited to, the procedures for the joint selection of an impartial arbitrator and for the hearing of evidence before the arbitrator. The arbitrator shall have the authority to allow for appropriate discovery and exchange of information prior to a hearing, including, but not limited to, production of documents, information requests, depositions and subpoenas. A copy of the complete National Rules for Resolution of Employment Disputes may be obtained from the Director of Human Resources.

Any conflict between the rules and procedures set forth in the AAA rules and those set forth in this Agreement shall be resolved in favor of those in this Agreement. The burden of proof at an arbitration shall at all times be on the party seeking relief. In reaching a decision, the arbitrator shall apply the governing substantive law applicable to the claim(s), cause(s) of action and defense(s) asserted by the parties as applicable in the state where the claims arise. The arbitrator shall have the power to award all remedies that could be awarded by a court or administrative agency in accordance with the governing and applicable substantive law.

**Time Limits and Procedures:** The aggrieved party must give written notice of any claim to the other party within six (6) months of the date the aggrieved first knew or should have known of the facts giving rise to the claim (or a greater period of time, if allowed by an applicable statute of limitations), otherwise, the claim shall be deemed waived. The written notice shall describe the nature of all claims asserted and the facts upon which such claims are based and shall be mailed to the other party by certified or registered mail, return receipt requested. Any such notice mailed to Sun Coast shall be addressed to:

Sun Coast Resources, Inc.
Attn: Director of Human Resources
6405 Cavalcade, Building 1
Houston, TX 77026

Exhibit 1

Any mediation and/or arbitration conducted under this Agreement shall take place in Houston, Harris County, Texas, unless the Employee's regular place of business is more than 150 miles from the city limits of Houston, Texas, in which case an alternative location will be selected by Sun Coast that is within 150 miles of the employee's residence, or unless an alternative location is chosen be the mutual agreement of the parties. The arbitrator shall render a decision and award within thirty (30) days after the close of the arbitration hearing or at any later time on which the parties may agree. The award shall be in writing and signed and dated by the arbitrator and shall contain express findings of fact and the basis for the award.

The parties agree to share equally the AAA administrative fees and the arbitrator's fees and expenses. All other costs and expenses associated with the arbitration, including, without limitation, each party's respective attorney's fees, shall be borne by the party incurring the expense.

Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction. The award may be vacated or modified only on the grounds specified in the Federal Arbitration Act or other applicable law.

**No Retaliation/Employment At-Will:** Under no circumstances will a Sun Coast employee be retaliated against in any way for invoking the Procedure in good faith to seek the resolution of a dispute. Sun Coast managers who engage in such retaliation will be subject to discipline under the appropriate Sun Coast disciplinary procedures.

The Sun Coast Arbitration and Mediation Agreement does not, in any way, alter the at-will employment status of Sun Coast employees. Sun Coast and its employees are always free to terminate the employment relationship at any time for any lawful reason and employment is not for any specific or definite duration.

**Savings Clause:** In the event that any of the provisions of this Agreement are held to be unenforceable or invalid by any court of competent jurisdiction or as the result of any valid federal, state, local or other law, rule or regulation, the unenforceable or invalid provision shall be deemed to be automatically deleted from this Agreement and the validity and enforceability of the remaining provisions shall not be affected thereby and shall continue in full force and effect, if the essential terms and conditions of this Agreement for both Parties remain valid, legal and enforceable.

**Federal Arbitration Act Applies:** Except as provided in this Agreement, the Federal Arbitration Act shall govern interpretation, enforcement, and all proceedings pursuant to this Agreement. To the extent that the Federal Arbitration Act is inapplicable, state law pertaining to agreements to arbitrate will apply.

This Agreement sets forth the complete agreement of the parties on the subject of mediation and arbitration of the covered claims defined above and supersedes any prior or contemporaneous oral or written understanding on these subjects. No party is relying on any representations, oral or written, on the subject or the effect, enforceability or meaning of this Agreement, except as specifically set forth in this Procedure.

By providing your signature below, you indicate your agreement to the terms set forth above. By the provision of the signature of the Sun Coast Official named below, Sun Coast indicates its agreement, as well, to the terms set forth in this Procedure. Both parties understand that by agreeing to the terms in this Procedure, both are giving up any constitutional or statutory right they may possess to have covered claims decided in a court of law before a judge or a jury.

Exhibit 1

Page 4 of 4

By providing your electronic signature and clicking "Save & Continue" below, you indicate your agreement to the terms set forth above. You understand that by agreeing to the terms in this Procedure, you are giving up any constitutional or statutory right you may possess to have covered claims decided in a court of law before a judge or a jury. You further understand that providing your electronic signature and clicking "Save & Continue" below is the same as physically signing the document and Sun Coast may rely on your electronic signature as if it was your physical signature.

Electronically Signed: 1/28/2015 8:53 AM
By: Larry E Taylor (Portal User [LTaylor])
IP Address: 64.244.153.210
User Agent: Mozilla/5.0 (X11; Linux i686; rv:17.0) Gecko/20100101 Firefox/17.0
Signature: lt

Exhibit 1

**AMERICAN ARBITRATION ASSOCIATION**
**Employment and Class Action Arbitration Tribunal**

In the Matter of Arbitration Between:

Lynn Grande, on behalf of herself and all others similarly situated, Claimant

     And

Lawrence Recruiting Specialists Inc. d/b/a LRS Healthcare, Respondent

CASE NUMBER 57 160 00080 13

## CLAUSE CONSTRUCTION AWARD

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into by the above-named parties, and having been duly sworn and having duly heard the proofs, arguments, and allegations of the parties, do hereby issue this CLAUSE CONSTRUCTION AWARD as follows:

FACTUAL AND PROCEDURAL HISTORY

This matter is before the Arbitrator by demand for arbitration ("Demand") filed with the American Arbitration Association (AAA) by Lynn Grande, on behalf of herself and similarly situated workers of Lawrence Recruiting Specialists, Inc. d/b/a LRS Healthcare (LRS or "Respondent"). This demand was accompanied by a pleading asserting a "Class Action" whereby Ms. Grande (the "Claimant") sought to pursue actions against LRS on her own behalf and of the behalf of others, hired and employed by LRS who were similarly situated.

The claims of Ms. Grande arise from her employment by LRS pursuant to a contract (the "contract"). See Exhibits made part of the Demand. Ms. Grande, pursuant to this contract was to perform duties as a "Travelling Medical Professional" assigned to the Highland Hospital in Alameda California from August 20, 2012 through November 18, 2012. The contract described her wages, including over-time pay, and provided for reimbursement of certain expenses; provided that Nebraska law applies to the contract; and contained a clause ("arbitration clause" or "the clause") requiring arbitration. See Paragraph 16 of the contract. After Ms. Grande ended her work with LRS she claimed that LRS had failed to comply with the contract and raises several other claims against LRS on her own behalf and other LRS workers similarly situated.

Exhibit 2

Ms. Grande's substantive claims are summarized as follows:

1. That LRS failed to pay her properly for hours worked, under the California Labor Code, hereafter, the "Code";
2. That LRS failed to pay the required minimum wage under the Code;
3. That LRS failed to make proper payments for meal and rest periods under the Code;
4. That LRS was liable for "waiting time wages", under Section 203 of the Code;
5. That LRS violated the California Business and Professional laws;
6. That LRS's violations of law authorized her to file and pursue an action under the California Private Attorney General Act (PAGA); and
7. That LRS wrongfully terminated her employment in retaliation for filing a workers compensation claim for injuries she asserted arose out of her employment with LRS.

LRS filed a Motion to Dismiss Ms. Grande's claims asserting as follows:

1. The arbitration clause of the contract should be interpreted to limit Ms. Grande to processing her claims on an individual basis to the exclusion of processing her claims on behalf of herself and other LRS workers similarly situated;
2. That relevant and recent court rulings precluded processing of her claims as a class;
3. That Ms. Grande could process a PAGA action only as an individual;
4. That because Ms. Grande had sought and secured a recovery before the California Labor Board (CALB) for some of the same wage and hour claims made in her demand she should be precluded for pursuing those claims in arbitration and at least could not legally represent others in a class arbitration. [1]

This matter is basically a matter of law as to the construction of the clause with regard to class arbitration. The Parties agreed that there are no factual issues as to the construction of the clause. Thus, each Party filed legal briefs (Oct. 23, 2013) and reply briefs (Nov. 6, 2013) on the issue of conducting this arbitration as a class action. Oral argument was conducted on Nov.13, 2013 and each Party was represented by Counsel. Following this argument the Parties were provided the opportunity to file any supplemental authorities or cases. LRS filed a supplementary brief on Nov. 21, 2013 that dealt primarily with the issues surrounding the PAGA claims. Ms. Grande did not make any post argument filing. Thus, this matter is now before the Arbitrator for decision.

## ISSUES/ARGUMENTS

### INTRODUCTION

The Claimant contends that the contract itself and the arbitration clause evidence the agreement of the Parties to conduct the required arbitration as a class and that her PAGA claims as a representative action are likewise authorized. She argues that the clause which requires

arbitration of "any claim or controversy" allows her claims to be processed as a class action and that Respondent's attempt to limit her to an individual action should be rejected.

Respondent argues that the language in the arbitration clause, "between the parties to this Agreement", limits Ms. Grande to individual arbitration and precludes class arbitration. Alternatively, LRS argues the clause is silent and cannot be construed as an agreement to class arbitration. LRS agrees that Ms. Grande can arbitrate an "individual" PAGA action while contending she cannot arbitrate such an action on behalf of other LRS workers.

The issues raised in this case are summarized as follows:

    A. Have the Parties agreed to class arbitration in their contract and clause?
    B. Do the contract and arbitration clause allow Ms. Grande to arbitrate PAGA claims on behalf of herself and other workers similarly situated?

Following a review of the standards of law applicable to ruling on this matter, the Parties' arguments on these issues as stated above are discussed more fully below

APPLICABLE STANDARDS

In addressing the issues and defenses raised in this matter, it is important to recognize and apply the fundamental principles of arbitration. First, the basic responsibility and authority of the Arbitrator derives from and is bound by the contract and arbitration clause. Second, the goal of arbitration is to give effect to the contract of the Parties; to determine what the Parties intended to agree to in their contract; and to insure that they get exactly—no more or no less—than that which they bargained for in that agreement. See _Oxford Health Plans LLC v. Sutter_ (2013) 133 S.Ct. 2064, 2069-71, 186 L.Ed.2d 11. Finally, the primary objective and role of the Arbitrator is to interpret and construe the contract and in particular, the arbitration clause of the Parties as a contract and to give full effect to all of its terms so that the rights and expectations of the contracting parties are met and enforced. Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, at 220 (1985). In determining the intent of the Parties, the Arbitrator is to read and liberally construe the contract and clause in favor of the non-drafting party, here the Complainant. See Green Tree Financial Corp. v. Bazzle, 539 U.S. 444, 123 S.Ct. 2402 (2003).

As to applicable law, Paragraph 14 of the contract refers to Nebraska law.[2] Arbitration in Nebraska is governed by the Uniform Arbitration Act. Where the matter involves a contract in interstate commerce, the Federal Arbitration Act (FAA) applies. See Aramark Uniform & Career Apparel Inc. v. Hunan Inc. (2008) 276 Neb. 700, 757 N.W.2d 205. Here, the Parties do not dispute this contract involves interstate commerce, and thus, the FAA applies. Section 2 of the FAA makes agreements to arbitrate "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." (9 U.S.C. § 2.) This provision reflects a "'liberal federal policy favoring arbitration,' . . . and the 'fundamental principle that arbitration is a matter of contract. . . .'", citation omitted. Arbitration agreements, accordingly, are

enforced according to their terms, in the same manner as other contracts. (AT&T Mobility v. Concepcion, 131 S.Ct. 1740, at 1744, 1745 (2010).

Arbitrators, therefore, must:  Begin by reviewing the applicable decisions of state and federal courts, and the United States Supreme Court governing the interpretation of this contract and clause; apply that law; avoid imposing personal policy preferences; and determine whether this clause and contract support the conclusion that the Parties agreed to the conduct of arbitration on a class basis. These standards, laws and precedents provide the guidance for the discussion and decision that follows.

DISCUSSION OF ISSUES

    A.  Have the Parties agreed to class arbitration in their contract and arbitration clause?

Using the applicable standards, outlined above, to identify what the Parties agreed to in this case, we begin with a general review of this contract, the arbitration clause, and the facts in this case. It is important to note facts applicable to this matter:

- This contract is signed by one individual, Ms. Grande, and one company, LRS.
- This contract clearly contains an arbitration clause, which neither of the Parties has challenged as invalid or unenforceable.
- The words "class", "collective", or "representative" action do not appear in this contract.
- There has been no stipulation of the Parties on the issue of class arbitration.
- The Parties agree that interpretation of the contract and clause is within the authority and responsibility of the Arbitrator.
- The Parties actively <u>disagree</u> about the interpretation of this contract and clause.

This question presented for ruling, therefore, is the interpretation of the language of the arbitration clause, Paragraph 16 of the contract that states:

> 16. Arbitration. Except as specifically provided in this Agreement, ***any claim or controversy between the parties to this Agreement which arises out of or relates to the Agreement, the business of the Company, Professional's employment with Company, or any other relationship between Professional and the Company*** shall be settled in Douglas County, Nebraska, by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment upon an award rendered by the arbitrator or arbitrators may be entered in any court having jurisdiction thereof. (Emphasis added.)

The Respondent argues that the phrase "...between the parties to this agreement" in this clause shows the Parties agreed to only individual arbitration and that Ms. Grande is precluded from representing herself and others similarly situated in a class arbitration. Alternatively, LRS suggests that Ms. Grande will argue the clause is "silent" as to permitting or prohibiting class action arbitration and that "silence" must be interpreted as precluding class action arbitration.

Ms. Grande, on the other hand, points to the phrase "any claim or controversy…which arises out or relates to…the business of the Company…" in the clause is broad. She argues that this language shows agreement of the Parties to allow class arbitration, and does not limit her to individual arbitration.

Construction of this clause containing these phrases, as with construction of any contract, begins with reference to standard rules of contract construction, along with concepts relevant to the arbitration process.[3] Rulings of the Supreme Court clearly confirm the power of the Arbitrator to interpret an arbitration clause; instruct the Arbitrator to read and interpret the contract liberally; and to resolve any ambiguity as to the intent of the Parties in favor of the non-drafting party, here the Claimant. See Green Tree Financial Corp. v. Bazzle, supra.

LRS could have made the task of construing this clause easy by engaging in a contracting process that was exclusive to these "Parties"--LRS and Ms. Grande alone. From the outset of this contracting process, it is clear that LRS did not conceive, design, expect or intend this contract with Ms. Grande to be unique. LRS conceived, designed, expected, and intended this contract, while signed by one employee at a time, to establish rights and obligations of all workers similarly situated to Ms. Grande. There is no clear or conspicuous prohibition of class arbitration in these contracts conceived and executed collectively. These contracts and this contracting process (part of the "business of the company") provides a general basis for finding an agreement of the Parties to enable Ms. Grande to proceed to represent herself and other similarly situated employees on a class basis.

LRS could have made this interpretative task easy by inserting or amending this contract and clause to preclude class arbitration by using clear language. LRS did not avail itself of this opportunity either. When the time line of the development of the case law relating to class action arbitrations is reviewed, failure to amend this contract to include clear language on this point is especially telling. Some of these decisions raised "red flags" about how arbitration clauses were being construed and how clear language limiting class arbitrations could be included, upheld and enforced. For example, in 2010, Stolt-Nielsen, upon which Respondent relies to support its arguments, was decided by the United States Supreme Court. *Stolt-Nielsen S.A. v. AnimalFeeds International Corp.* (2010) 559 U.S. 662,130 S.Ct. 1758, 176 L.Ed.2d 605 ("*Stolt-Nielsen*"). Stolt-Nielsen was a "signal" that if a Party to a contract wanted to avoid class arbitration they could write a clause precluding class arbitration and that the Court would enforce such clauses even where state or federal law might render such "waiver" unenforceable. Then, the 2011 decision in AT&T Mobility v. Concepcion, supra, was issued. Concepcion was characterized by some as the final "death knell" or "nail in the coffin" of class action arbitration. See "Tsunami: AT&T Mobility LLC V. Concepcion Impedes Access to Justice", Jean R. Sternlight, Oregon Law Review, Vol. 90, 703 (2012). This case gave employers an open invitation to write contracts that would clearly foreclose class arbitrations.

5

Exhibit 2

These decisions provided a "road map" to follow to foreclose class arbitrations. Arbitration clauses limiting class arbitrations are enforceable. Ambiguous contract language relying on silence makes discerning the intent of the Parties difficult, or nearly impossible. Clear contract language does not need to rely on a stipulation of the Parties. Clear clauses limiting class arbitration will be enforced. LRS, however, in its August, 2012 contract with Ms. Grande did not follow this "road map" and made no modification or clarification to their contract or arbitration clause to deal with the question of class arbitration.[4]  LRS, then and now, relies on the ambiguous language "between the parties" as evidencing the Parties agreement or intention to limit class arbitration.

==This language simply lacks the clarity LRS could have given this subject. The language "between the Parties" does not evidence the intent on the part of the Parties to limit Ms. Grande to individual arbitration.== Here, LRS's reference to this language states the obvious---that the agreement here was only "between" LRS and Ms. Grande. This language—"between the Parties"—is descriptive, yet not convincing evidence that the Parties intended to agree to limit arbitration to individual as opposed to class action. This language provides little, if any, indication, of the Parties intention as to what type of arbitration (individual or class) is agreed to in this clause. LRS had every opportunity to use clear language regarding the any limitation to individual or any exclusion of class arbitration. Any clarity LRS asserts should be attributed to this language was surely within LRS's power to incorporate into this contract or clause. Such clarity cannot now be written into this contract, by interpretation of this language. LRS reliance on the "thin reed" of the phrase "between the parties" does not support its argument that the Parties did not agree to class arbitration or intended to preclude class arbitration.

The Respondent's reliance on <u>Stolt-Nielsen</u> is also unpersuasive.  In <u>Stolt-Nielsen</u>, the Parties had entered into a particular stipulation about the issue of class arbitration.  No such stipulation is present in this case and, thus, <u>Stolt-Nielsen</u> is inapplicable.  The case here is more directly aligned with the Supreme Court's ruling in <u>Oxford</u>, supra. In <u>Oxford</u>, Justice Kagan distinguished <u>Stolt-Nielsen</u>, finding the question of class arbitration to be the proper province of the arbitrator's interpretative authority. In upholding the decision of the Arbitrator to allow class arbitration, the Court held:

> Stolt–Nielsen did not establish a bright line rule that class arbitration is allowed only under an arbitration agreement that incants "class arbitration" or otherwise expressly provides for aggregate procedures. Stolt–Nielsen, 130 S.Ct. at 1776 n. 10; Jock v. Sterling Jewelers Inc., 646 F.3d 113, 124 (2d Cir.2011) (holding that an arbitrator did not exceed her powers by ruling that class arbitration was allowed under an agreement lacking an express class provision)….. Instead, Stolt–Nielsen established a default rule under the Federal Arbitration Act: "[A] party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so." *Id.* at 1775 (emphasis in original). Oxford, at_____.

Thus, in this case, the question is whether there is a contractual basis for concluding the parties agreed to class arbitration. On this question not only is the LRS argument discussed above unpersuasive, but the Claimant's position that the clause reflects an agreement to allow class arbitration is persuasive. Ms. Grande relies on the clause that requires arbitration of "any claim or controversy…which arises out of or relates to the business of the company". Ms. Grande asserts this substantive language of the clause more clearly reflects the scope and, therefore, the intent of the Parties' agreement. Such a position is consistent with standard contract interpretation requiring this clause to be read in its entirety so that the agreement of the parties can be given full effect and be interpreted against LRS, the drafter.

Here, LRS agreed to arbitrate any claim or controversy that "arises out of or relates to… the business of the company". Surely this broad language empowers Ms. Grande to bring any claim including those raising questions about a pattern or practice by which the "business of the company (LRS)" is conducted. Claims or controversies about the "business of the company" are broad and available to the Claimant in arbitration under this clause. Claims in this category are broad enough to involve more than one employee where that claim questions a pattern or practice of the business. Here, Ms. Grande makes claims under the California Business and Professional Act and asserts LRS did not comply with provisions of the California Labor Code as to payments due to its workers. These claims relate to the conduct of the business of the company and cannot be established on an individual basis alone. [5]

LRS wrote this clause and empowered Ms. Grande to arbitrate claims about their business operations but now seeks to limit her to individual arbitration. LRS cannot include such broad language and then argue that the clause should be narrowly interpreted to limit Ms. Grande to arbitrating solely as an individual. Ms. Grande, by this clause, is required to arbitrate claims that relate to the "business of the company". Adopting the selective interpretation urged by LRS would amount to rewriting this clause. This clause cannot be rewritten in this arbitration to benefit LRS or Ms. Grande. This clause is properly construed to provide the contractual basis for concluding the Parties agreed to arbitrate these claims on a class basis.

Finally, Ms. Grande also points to and relies on Oxford, Jock v. Sterling Jewelers Inc., (2nd Cir. 2011) 464 F.3d 113, cert. denied (U.S. 2012) 132 S.Ct. 1742, 182 L.Ed.2d 529 and two other cases--Southern Communication Services Inc. v. Thomas, 720 F.3d 1352 (11th Cir.2013) and Smith &Wollensky Restaurant Group, Inc. v. Passow, 831 F.Supp.2d 390 (D. Mass. 2011). LRS attempts to distinguish these rulings, arguing that the arbitration clauses in these cases do not contain "limiting language" such as the "between the parties" phrase LRS asserts is determinative on this question. First, as discussed above, this phrase does not indicate the Parties agreed to limit arbitration as LRS asserts. Second, the language present in the arbitration clause in dispute here in which the parties have agreed to arbitrate any and all disputes and controversies relating to the business of LRS does not appear in the cases LRS attempts to distinguish. Thus, these cases more support Ms. Grande than LRS, and provide direction about the law governing interpretation of this contract and clause. Of course, a party may not be compelled to submit to class arbitration unless there is a contractual basis for finding that a party agreed to such a process. Here, the "limiting language" LRS offers, along with attempts to distinguish these rulings are unpersuasive. Here, the Parties are bound by their own words. The

Parties agreed to a contract and an arbitration clause broad enough to encompass class arbitration rather than to limit arbitration to individual arbitration only. This contract and clause provide a contractual basis for concluding that the Parties agreed to class arbitration.

    A.  Do the contract and arbitration clause allow Ms. Grande to arbitrate PAGA claims on behalf of herself and other workers similarly situated?

The Respondent asserts that Ms. Grande may not process a PAGA claim on a representative basis, but only as an individual.[6] The Claimant, on the other hand, argues that

1. PAGA claims cannot be considered individual claims.
2. PAGA claims are more properly characterized as "proxy" claims, brought by an individual to seek justice, compliance, damages, and other relief as a "deputy" of sorts of the state, here California.[7]
3. The facts and findings about LRS's conduct with regard to Ms. Grande and other similar workers, in California, would be relevant under the PAGA as to the amount of damages, fines, and as a measure of damages as opposed to amounts to be recovered or shared with other LRS workers.
4. The general rules about notice to a class, binding rulings, etc. distinguish PAGA actions from typical class actions.
5. This contract and clause applies and compels arbitration of her PAGA claims; that she should not be deemed to have "waived" her right to pursue PAGA relief; and that arbitration is the proper forum for consideration of these claims.

Simply stated, there is nothing in this contract between these Parties that should be interpreted to preclude Ms. Grande from pursuing a PAGA representative action. LRS's counter arguments that PAGA actions are precluded are rejected.  LRS's arguments to the contrary conflate class or collective actions with representative PAGA actions. Representative PAGA actions are not a sub-species of class actions but are actions in which an individual pursues a claim on behalf of the state. *See Rockwell Intern. Corp. v. United States,* 549 U.S. 457, 462 n. 2, 127 S.Ct. 1397, 167 L.Ed.2d 190 (2007).  PAGA actions are neither class nor collective actions because they do not have the same procedural requirements[8] nor the same substantive results (others share in the fines, for example) or consequences as class or collective actions. Thus, just as the clause provides Ms. Grande with the right to pursue class arbitration, the same reasoning applies to find that she has the same right to pursue a representative PAGA action.

In addition the courts have found PAGA actions to be properly presented in arbitration.  See *Cunningham v. Leslie's Poolmart, Inc.* (C.D. Cal., June 25, 2013, CV 13-2122 CASCWX) 2013 WL 3233211. LRS argues that the question of maintaining a PAGA action in arbitration as other than an individual is an open one in the California Courts. Reading those cases shows the main concern of the Court is the characterization that a PAGA action processed as a class fundamentally changes the nature of arbitration.[9]  Here, however, LRS agreed to arbitrate "any claim...arising out of or relating to ...the business of the Company". LRS, by this language, not only authorizes, but requires the Parties to arbitrate claims, such as PAGA claims, which relate to

the business of the company. Here, the intent of the Parties is clear and cannot be ignored. LRS states that while Ms. Grande can arbitrate her PAGA claims on an individual basis they seek to preclude PAGA claims from class arbitration. Even if the question was Ms. Grande's ability to arbitrate PAGA claims on a class or representative versus an individual basis, having construed the clause to allow class arbitration, this conclusion would be equally applicable to representative PAGA claims. These PAGA claims are clearly subject to arbitration on a representative basis. Accordingly, as to these PAGA claims, subject to resolution of the procedural questions raised (See FN. 6, below) and the decision of Ms. Grande, as set forth in No. 5 of this Award, this contract and clause are construed to permit Ms. Grande's PAGA claims to proceed in arbitration on a representative basis.[10]

## CONCLUSIONS/AWARD

1. Based on the construction of the contract and clause, as set for the above, I find there is a contractual basis for finding the Parties intended to and did agree to provide for arbitration on a class basis.
2. Except as set forth in No. 4 below, this matter may proceed under the AAA Supplementary Rules for Class Arbitration.
3. The Motion to Dismiss this matter as a class action presented by LRS is DENIED.
4. The Motion of LRS to preclude Ms. Grande from seeking to represent herself and other LRS workers similarly situated, based on rulings or awards of the CALB is premature and held in abeyance, reserving to LRS the right to present this Motion at a later date.
5. Ms. Grande is entitled to pursue her PAGA claims on a representative basis which may be heard in conjunction with her other class action claims, in arbitration, or severed from these, at her option. Counsel for Ms. Grande is directed to advise the Case Manager if the Claimant requests the PAGA claims to be severed from her other class claims, processed separately, or stayed as provided for in the AAA, Supplementary Rules for Class Actions No. 3, as set forth below. This advice should be provided to the Case Manager within the same time frame as set forth in SRCA Rule No. 3, unless otherwise agreed to by the Parties or as may be established by further order of the Arbitrator.
6. Pursuant to SRCA Rule No. 3, I hereby stay all proceedings for thirty days to allow any party to move in court to confirm or vacate this Clause Construction Award.

DATE 12/30/13          _(signature)_

SANDRA S. CHRISTIANSON, ARBITRATOR

9

Exhibit 2

## ENDNOTES

[1] The Respondent filed a Motion to preclude Ms. Grande from representing others in a class action because she had filed and secured a ruling and award from the California Labor Commissioner (CALB) with regard to some of the claims she raises in this arbitration. This Motion is premature. The issue of Ms. Grande's suitability or lack of ability to represent others on this basis should be raised pursuant to AAA Supplementary Rules for Class Arbitrations (SRCA) *after* the Clause Construction phase of these proceedings. See SRCA N0.3 and 4. Accordingly, this Motion will be held in abeyance, to be reviewed, if and when the question of Ms. Grande's ability to act as a representative of any class, or the extent of that representation may be "ripe" for ruling.

[2] Accepting the premise that Nebraska law should apply to the clause construction phase of these proceedings, does not make this choice of law clear, compelling, or arguably controlling. Ms. Grande filed claims with the California Labor Board; LRS defended these claims in California; Ms. Grande secured a recovery on some of those claims and LRS even argues that this recovery precludes Ms. Grande from representing other workers similarly situated. Clearly, both Ms. Grande and LRS choose California law at various times for support or defense. Such actions raise questions of whether either Party is clearly committed to the "choice" of Nebraska.

[3] See Contract Paragraph 14 and Note 2, above.

[4] Counsel for LRS at oral argument on the issue of clause construction, acknowledged that LRS contracts were "standard" and not changed for individual employees, such as Ms. Grande.

[5] See Sternlight, supra, at p. 715, citing Chen-Oster V. Goldman Sachs & Co., W.L. 2671813 (S.D.N.Y. July 7, 2011.)

[6] The Respondent concedes Claimant's right to process a PAGA claim in arbitration on an individual basis. See LRS Brief of Nov.6, 2013, page 5, but asserts the presence of a class action "waiver" precludes her from conducting class arbitration. Because I find no "waiver" in this contract or clause, this assertion needs no further discussion.

[7] Not every provision of the PAGA will be cited here, but generally, see California Labor Code, Section 2698 et.seq.

[8] The question of the procedures required by the PAGA, for example, notice to the California Labor & Workforce Development Agency, allowing them the opportunity to investigate alleged violations and for the employer to "cure" violations, for example, raise questions about the administrative prerequisites to any PAGA arbitration proceedings. If these claims under the PAGA proceed in arbitration, these questions must be reviewed more fully.

[9] See cases at LRS Brief. Nov. 6, 2013, pages 3-4. Of particular note is the arbitration clause in Quevedo v. Macy, cited by LRS. The clause in that case clearly denied the arbitrator the power to hear a class or collective action allowing the Court to conclude that this bar to actions as a representative of a large group, with a common interest, seeking relief on behalf of the group was sufficient to preclude PAGA arbitration. No such language is present in this case and none can be interpreted into this contract or clause. To the contrary, see Discussion Part A, above as to the construction of this clause.

[10] Additionally, and in the same vein, the questions of violation of California Business Code may be pursued and are not precluded from arbitration by this contract or clause. This is especially clear in light of the clause referring to the Parties' agreement to arbitrate "any claim or controversy….arising out of or relating to the business of the Company." Surely, alleged violations of the "business" Code relate to the "business of the Company" and, thus, are not only allowed in arbitration, but are required to be arbitrated by the very words of the clause the Parties agreed to in this contract.

Exhibit 2

## AMERICAN ARBITRATION ASSOCIATION
## CLASS AND EMPLOYMENT ARBITRATION TRIBUNAL

| | |
|---|---|
| DANIEL GONZALES, PATRICK SMITH, and GREG CAMPOS on behalf of themselves and all others similarly situated,<br><br>    Claimants,<br><br>v.<br><br>BRAND ENERGY & INFRASTRUCTURE SERVICES, INC. f/k/a and/or d/b/a Brand Energy, Inc., BRAND SERVICES, LLC, BRAND ENERGY SOLUTIONS, LLC, BRAND SCAFFOLD SERVICES, LLC, and BRAND SCAFFOLD RENTAL AND ERECTION, LLC,<br><br>    Respondents. | **ORDER NO. 2**<br>**PARTIAL FINAL AWARD ON**<br>**THE CONSTRUCTION OF THE**<br>**ARBITRATION CLAUSE**<br><br>**("CLAUSE CONSTRUCTION AWARD")**<br><br>No. 70-160-000270-13<br><br>Michael D. Zimmerman, Arbitrator<br>Jonathan Weed, Case Manager |

I, the undersigned arbitrator, having been designated in accordance with the arbitration agreements entered into between the above-named parties, and this arbitration having been compelled pursuant to the order the Honorable Sim Lake of the United States District Court for the Southern District of Texas, Houston Division, in Civil Action No. H-12-1718, entered March 20, 2013, determining that the arbitration agreement entered into between the parties is valid and enforceable, and that all the issues in suit are arbitrable, and having been duly sworn, and having duly heard the proofs and allegations of the parties, do hereby find as follows:

----------

Pursuant to the Employment Arbitration Rules of the American Arbitration Association ("AAA"), a telephonic hearing on Claimants' Clause Construction Motion ("Motion") was held on August 27, 2013, before neutral arbitrator Michael D. Zimmerman. Appearing for the captioned Claimants were Scott E. Poynter, Esq. and Will T. Crowder, Esq. of Emerson Poynter, LLP, and James G. Stranch III, Esq. of Branstetter, Stranch & Jennings PLLC. Appearing for the captioned Respondents were Barham Lewis, Esq. and Robert A. Levy, Esq. of Ogletree, Deakin, Nash, Smoak & Stewart, P.C. Argument was heard and the matter was taken under advisement.

The arbitrator now renders this Clause Construction Award in accordance with Rule 3 of the AAA Supplementary Rules for Class Arbitrations and designates it as a partial final award. Pursuant to Rule 3, all proceedings in this arbitration are stayed for a period of at

least 30 days to permit any party to move a court of competent jurisdiction to confirm or to vacate the Clause Construction Award.

The Action

Claimants are three persons who were allegedly employed by one or more of the named Respondents (hereinafter referred collectively as "Brand") to do construction and refinery work. They brought suit in the United States District Court for the Southern District of Texas, Houston Division, asserting various claims arising out of what they allege were requirements imposed by Brand that they and similarly situated employees go through security checks and be transported from where their cars were parked to the worksite and back at the end of a shift, but were not compensated for the time spent performing the alleged "unpaid work activities"; rather, they and those similarly situated were compensated only for time actually spent at the worksite. As a consequence, Claimants assert that Brand violated federal wage and hour laws, including the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., and that under Texas law, the Claimants and those similarly situated are entitled to recover for unpaid wages on a theory of quantum meruit and unjust enrichment. Claimants sought to have the action certified as a collective action under section 16(b) of the FLSA, 29 U.S.C. § 216(b), pursuant to which members of the class could "opt-in" if they did want to be included in the action. As to the Texas common law claims, Claimants sought to have the action declared an "opt-out" class action under Rule 23 of the Federal Rules of Civil Procedure.

Respondents Brand denied the allegations and denied that the matter could be prosecuted in federal court because the Claimants had signed arbitration agreements. Brand also denied that the action could be maintained as a collective or class action because the form arbitration agreement entered into by Claimants and those alleged to be similarly situated does not provide for "collective or class actions but rather reflects that only [Claimants'] individual claims will be decided by the arbitrator." (Answer p. 12, 1st affirmative defense.) Brand then moved to dismiss the complaint and compel arbitration. Brand argued that all issues in dispute should be submitted to arbitration, and that the district court should declare that Claimants must arbitrate individually and not collectively or through a class action. Claimants opposed the motion.

The district court granted the motion to compel arbitration, finding the parties had entered into a binding agreement to arbitrate and that pursuant to the Federal Arbitration Act, ("FAA"), 9 U.S.C. § 1-16, that contractual agreement should be enforced and the pending action dismissed. The court also decided that it would not grant Brand's request to determine that the arbitration must proceed on an individual basis only. The court said that because the agreement to arbitrate did not explicitly foreclose collective or class arbitration, ". . . the arbitrator will decide what 'kind of arbitration proceeding'—i.e., a bilateral arbitration or a collective or class arbitration—the parties agreed to." (Mem. Op. 3/20/13 at 12.)

Before this arbitrator, Brand makes several arguments. First, it contends that the question of whether the parties to the arbitration agreement here intended to permit class

2

or collective action proceedings is a "question of arbitrability" and that it is for a court to decide, not an arbitrator. This is the same argument Brand made before the district court, which rejected it. Brand now contends that its assertion is supported by the recent United States Supreme Court decision in *Oxford Health Plans LLC v. Sutter*, 133 S. Ct. 2064 (2013). The arbitrator finds that position unpersuasive. Nothing in *Sutter* suggests that the nature of the proceeding before the arbitrator is a question not for the arbitrator, but for the district court, in the absence of a clearly expressed contractual intention to withhold that question from the arbitrator. Here, as the district court noted, there is no such intention expressed.

Moving beyond the arbitrability issue, Brand next argues that language in *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662 (2010) and *AT&T Mobility LLC v. Conception*, 131 S. Ct 1740, 563 U.S. ___ (2011), support the proposition that an arbitrator should be very cautious in inferring an agreement between the parties to permit collective or class proceedings in the absence of a clear statement to that effect because of the potential detrimental impact such proceedings can have in terms of heightened complexity and greater pressures on defendants to settle. And Brand further suggests that an arbitrator should be hesitant to rely on any presumption that would construe a standard form agreement against the drafter under Texas law if such a presumption might give rise to the evils of class or collective proceedings discussed in *Stolt-Nielsen* and *AT&T Mobility*. It is against this backdrop that Brand argues the agreement here cannot reasonably be construed as contemplating class or collective proceedings.

The arbitrator is mindful that under *Sutter*, *Stolt-Nielsen*, and *AT&T Mobility*, and consistent with the FAA, he is to entertain no presumption for or against class proceedings in analyzing an arbitration agreement. The arbitrator is to determine the question in accordance with governing state law principles of contract construction. Here, Texas law is the operative interpretive lens.

Under Texas law, when an agreement does not expressly address a matter, a court is to review the terms of the agreement in its entirety to determine the intent of the parties. *Lidawi v. Progressive Cnty. Mut. Ins. Co.*, 112 S.W.3d 725, 731-32 (Tex. App. 2003). Does the implied term flow from the language used by the parties or is it necessary to effectuate their purposes? *R.P. Fuller v. Phillips Petroleum Co.*, 872 F. 2d 655, 658 (5th Cir. 1989). When analysis of the direct language of the agreement does not resolve a question, it is permissible to resort to the rule of construing an agreement against the drafter. *Smith v. Davis*, 453 S.W.2d 340, 344 (Tex. App.—Ft. Worth 1970, writ ref'd n.r.e.). With these, and general contract interpretation principles, in mind, the agreement is addressed.

The agreement at issue is entitled the Brand Dispute Resolution Program for Employees ("DRPE").[1] The document submitted by the parties to the arbitrator consists of eleven pages. One page is an acknowledgment signed by the employee stating that they have "received, read and understand the [DRPE]." It also states that all disputes "arising out of or relating to my application or candidacy for employment, employment and/or

---

[1] Hereinafter, references to the DRPE are to the pagination of document 28-1.

3

cessation of employment" are to be resolved through the DRPE. It further states that "I understand that this Dispute Resolution Program provides for binding arbitration as the exclusive, final and required method to resolve all covered claims that I otherwise have a right to litigate in court." The DRPE contains a list of non-"covered" claims. They consist of six very particular types of claims, including, for example, workers compensation, antitrust, and patent claims, among others. None of the claims made here fall within these categories. *Id.* at 19-20. The other ten pages consist of a two-page summary of the program, a six-page description of the program, and two pages of questions and answers.

At no place in the DRPE is there a mention of collective or class procedures for handling claims of multiple employees, either positively or negatively. However, the DRPE is written and described in the broadest possible terms. Throughout the DRPE are statements consistent with the proposition that the DRPE is the exclusive, final and required method "for resolving all covered claims employees would otherwise have the right to litigate in court," *id.* at 14, 19, 22, 25, and that under the DRPE, "you may be awarded anything you might seek through a court of law." *Id.* at 15, 19, 22, 24. The consistent message of the DRPE document is that substituting arbitration before the AAA for a court proceeding is cheaper and quicker, and at the same time, an AAA arbitration in no way erodes any rights of the employee. There is no suggestion of any truncation in arbitration of procedural devices or substantive rights available in court.

For example, under the heading "What The Program Covers," it is stated that "[t]his Program governs legal disputes of every kind and nature *and is given the broadest possible construction.*" *Id.* at 19 (emphasis added). The document then lists eight types of claims as those included, without limitation of others. Among those listed are "employment discrimination and harassment claims based on, for example, age, race, sex, religion, national origin, veteran status, citizenship, disability or other characteristics protected by law," "claims for breach of contract or covenant (express or implied)," "tort claims, intentional torts, negligence, defamation, invasion of privacy, infliction of emotional distress, etc.," and "claims of violation of public policy." *Id.* At the end of this section of the DRPE is the following paragraph:

> This Program *merely* covers claims which the law recognizes, but changes the forum for resolving employee's rights (from the courts to arbitration). It does not add or subtract any substantive rights available under existing laws and does not change the at-will employment of employees or require Brand to meet a 'just cause' standard for its actions or for arbitration.

*Id.* at 20 (emphasis added).

Other statements in the document reinforce the notion that there is no diminution of any claim or entitlement or limitation that would erode the position of an employee in litigating with the company by reason of the employee's claim having to be brought in arbitration. Page 19 of the DRPE states, "[u]nder the terms of the Program, an arbitrator can award you anything you might seek through a court of law." And on page 15, in describing arbitration under the DRPE, it says that "all disputes must be resolved by

binding arbitration as provided in the Dispute Resolution Program and the Rules of the American Arbitration Association" and then goes on to say that the arbitration is "an orderly proceeding, governed by rules of procedure and legal standards of conduct." Again, on page 22 of the same document, in discussing arbitration, it states that "Just as you may recover anything you would otherwise be awarded in a court of law, you will have *the same rights as others in each jurisdiction*, however, arbitration under the Federal Arbitration Act will be the sole and exclusive remedy for covered harms." (Emphasis added.)

Finally, in the question and answer section, *id.* at 24, it poses the following question, and gives the following answer:

> **How does arbitration differ from a court trial?**
> With arbitration, the decision is final; except under rare circumstances, it may not be reversed by subsequent proceedings. With a court trial decision, an appeal may be filed causing lengthy delays. Also an arbitration proceeding is usually much more informal that a case in court. The arbitrator is usually a retired judge or lawyer who serves as a neutral on a part-time basis. The proceeding is held in private offices instead of a public courthouse. The biggest difference, however, lies in the reasonable cost of arbitration. Because arbitration is faster and less formal, it ends up costing much less to prepare the case.

Again, there is no mention of any limitation on the procedures available in arbitration, or that collective or class proceedings are unavailable.

From the foregoing, the arbitrator is led to several conclusions. First, any reasonable non-expert reader would conclude that under the DRPE, substituting an AAA arbitration forum for a court would not result in the sacrifice of any possible remedy or right that could be asserted in a state or federal court, other than the right to a jury trial. Nothing in the DRPE suggests any such loss, and its many reassurances that "an arbitrator can award you anything you might seek through a court of law" suggest precisely the contrary. The DRPE's silence in regard to what Brand now asserts the parties intended to foreclose is deafening in context. Given the importance of procedures by which individual claims can be aggregated to make them realistically pursuable, and as well as to assure that company-wide remedies can be obtained for company -wide misconduct, the fact that the DRPE does not hint that those procedures are foreclosed strongly suggests that under the terms of the agreement, the parties intended that they be available in arbitration.

Second, and bolstering this reasoning, is the express language of the DRPE which in fulsome terms describes the specific types of claims subject to resolution through the DRPE process. These include a number of types of claims that a reasonable person would anticipate would be at least as likely, if not more likely, to be brought against an employer on a class-wide basis rather than on an individual basis. And such a reasonable person would also anticipate that for such claims, class and company-wide remedies would be available. For example, among the types of claims specifically mentioned in the DRPE are claims for "employment discrimination and harassment claims based on, for example, age, race, sex, religion, national origin, veteran status, citizenship, disability or other

5

characteristics protected by law," "claims for breach of contract or covenant (express or implied)," and "claims of violation of public policy." *Id.* at 19. For such claims, the DRPE states that an arbitrator can award "anything you can obtain in a court of law". *Id.* at 15, 19, 22, 24. Texas law is entirely consistent with the arbitrator's conclusion that the parties intended that such processes would be available in arbitration. *Lidawi,* 112 S.W.3d at 732. This conclusion stands, even without resort to the Texas presumption that a form contract is to be construed against the drafter, a presumption that would appear fully applicable here. *Smith,* 453 S.W.2d at 344.

Brand certainly knew how to make it clear that class or collective action processes and remedies were not to be available under the DRPE. The arbitrator's role is not to rewrite the agreement to insert a provision that the drafter could have put in but did not. *Berman v. Rife,* 644 S.W.2d 574, 576 (Tex. App.—Fort Worth 1982, writ ref'd n.r.e.).

For the foregoing reasons, the arbitrator concludes that this broad form of arbitration agreement by its terms fairly implies an agreement between the company and its employees that class and collective actions are available in arbitration as they would be in court proceedings.

This Clause Construction Award is stayed pursuant to the AAA Supplementary Rules for Class Arbitrations, R. 3, "for a period of at least 30 days to permit any party to move a court of competent jurisdiction to confirm or vacate this Clause Construction Award. Once all parties inform the arbitrator in writing during the period of the stay that they do not intend to seek judicial review of the Clause Construction Award, or once the requisite time period expires without any party having informed the arbitrator that it has done so, the arbitrator may proceed with the arbitration on the basis stated in the Clause Construction Award. If any party informs the arbitrator within the period provided that it has sought judicial review, the arbitrator may stay further proceedings, or some part of them, until the arbitrator is informed of the ruling of the court."

It is so ordered:

DATED: October 15, 2013.

Michael D. Zimmerman, Arbitrator

6

**AMERICAN ARBITRATION ASSOCIATION**
**Commercial and Class Arbitration Tribunal**

In the Matter of Arbitration Between

Luis Maldonado, on behalf of himself and all other similarly situated, Claimants

    And

Callahan's Express Delivery, Inc., and

Patrick Callahan, individually, Respondents

CASE NUMBER 33 523 00375 13

## CLAUSE CONSTRUCTION AWARD

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into by the above-named parties, and having been duly sworn and having duly heard the proofs, arguments, and allegations of the parties, do hereby issue this CLAUSE CONSTRUCTION AWARD as follows:

<u>FACTUAL AND PROCEDURAL HISTORY</u>

This matter is before the Arbitrator by demand for arbitration ("Demand") filed with the American Arbitration Association (AAA) by Luis Maldonado, on behalf of himself and similarly situated workers of Callahan Express Delivery, Inc. and Patrick Callahan, individually ("Respondent" or "Respondents"). This demand was accompanied by a pleading asserting a "Class Action" whereby Mr. Maldonado ("Claimant") sought to pursue actions against Respondents on his own behalf and of the behalf of others allegedly similarly situated.

The claims at issue here arise from a contract ("contract"). See Exhibit A to the Demand. Claimant performed services under the Respondents' standard contract designated as "Independent Contractor's Agreement" (ICA) from November 13, 2010 through June 2012. The contract required Claimant serve as a driver, making deliveries for Respondents; described the amounts to be paid Claimant, a flat rate of $10.00 per delivery; stated that Claimant was responsible for all taxes and certain expenses; and identified Claimant as an "independent contractor". The contract contained a clause ("arbitration clause" or "clause") requiring arbitration. See Paragraph 15 of the contract. The Claimant contends that he acted as an employee, not an independent contractor, and Respondents failed to pay minimum wages and

Exhibit 4

overtime pay along with the several other claims on his own behalf and on behalf of other workers similarly situated that are summarized below:

1. That Respondents violated the Fair labor Standards Act (FLSA) and the Florida Constitution and laws relating to hourly and overtime wages.

2. That Respondents engaged in a knowing, willful and illegal pattern and practice of improperly classifying workers as independent contractors, entitling those workers to recovery of the wages owed along with liquidated damages.

3. That Respondents were unjustly enriched by failing to pay workers for services, such as loading, unloading, and driving, rendered on Respondents' behalf while not engaged in delivery work.

4. That Claimants are entitled to a declaratory judgment that as employees, they are entitled to proceed as a class and to recover interest, fees and costs, in addition to damages for the above violations.

Respondents argue that the Claimant was an independent contractor, not an employee; that the arbitration clause in this contract should be interpreted to prohibit Claimant from proceeding as a class or collective arbitration; that the arbitration clause of the contract should be interpreted under relevant and recent court rulings to limit processing these claims on an individual basis and precluding processing of these claims as a class.

The question of the proper interpretation of the arbitration clause in the contract as allowing, requiring or prohibiting the processing of this matter as a class or collective action is subject to the AAA Supplementary Rules for Class Action (SRCA). Under the SRCA, Rule No. 3, this threshold question is basically a matter of law as to the construction of the clause in this contract with regard to class arbitration. The Parties agreed that there are no factual issues as to the construction of the clause. Thus, each Party agreed to and filed initial briefs (Nov. 26, 2013) on the issue of the construction of the clause and on conducting this arbitration as a class action. Reply briefing was permitted. Claimant submitted a reply brief on December 10, 2013. Respondents were given the opportunity to file a reply brief, but declined to do so. The Parties declined the opportunity to present oral argument. Thus, this matter is now before the Arbitrator for decision.

## ISSUES/ARGUMENTS

### INTRODUCTION

The issue raised in this case is simple--Have the Parties agreed to class arbitration in their contract and/or clause? A review of the standards of law applicable to ruling on this matter and analysis of the Parties' arguments on this issue follows.

Exhibit 4

APPLICABLE STANDARDS

In addressing the issues and defenses raised in this matter, it is important to recognize and apply the fundamental principles of arbitration.  First, the basic responsibility and authority of the Arbitrator derives from and is bound by the contract and arbitration clause. Second, the goal of arbitration is to give effect to the contract of the Parties; to determine what the Parties intended to agree to in their contract; and to insure that they get exactly—no more and no less---than that which they bargained for in that agreement. See _Oxford Health Plans LLC v. Sutter_ (2013) 133 S.Ct. 2064, 2069-71, 186 L.Ed.2d 11.  Finally, the primary objective and role of the Arbitrator is to interpret and construe the contract and in particular, the arbitration clause of the Parties as a contract and to give full effect to all of its terms so that the rights and expectations of the contracting parties are met and enforced.  Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, at 220 (1985).  In determining the intent of the Parties, the Arbitrator is to read and liberally construe the contract and clause in favor of the non-drafting party, here the Claimant. See Green Tree Financial Corp. v. Bazzle, 539 U.S. 444, 123 S.Ct. 2402 (2003).   Basically, arbitration agreements are enforced according to their terms, in the same manner as other contracts. AT&T Mobility v. Concepcion, 131 S.Ct. 1740 at 1744, 1745 (2010).

Arbitrators, therefore, must:  Begin by reviewing the applicable decisions of state, federal courts, and the United States Supreme Court governing the interpretation of this contract and clause; apply that law; avoid imposing personal policy preferences; and determine whether this clause and contract support the conclusion that the Parties agreed to the conduct of arbitration on a class basis. These standards, laws and precedents provide the guidance for the discussion and decision that follows.

DISCUSSION OF ISSUES

    A.  Have the Parties agreed to class arbitration in their contract and arbitration clause?

Using the applicable standards, outlined above, to identify what the Parties agreed to in this case, we begin with a general review of this contract, the arbitration clause, and the facts in this case as follows:

- This contract clearly contains an arbitration clause, which the Parties have not challenged as invalid or unenforceable.
- The words "class", "collective", or "representative" action do not appear in this contract.
- There has been no stipulation of the Parties on the issue of class arbitration.
- The Parties understand that interpretation of the contract and clause is within the authority and responsibility of the Arbitrator.
- The Parties actively disagree about the interpretation of this contract and clause.

Exhibit 4

The question presented for ruling, therefore, is the interpretation of the language of the arbitration clause, Paragraph 15 of the contract that states:

> 15. Mediation and Arbitration. Any disputes between the parties hereto whether arising under this agreement or otherwise, which the parties cannot resolve between themselves using good faith shall be:
> 15.1 Referred to a court certified mediator of the Circuit Court in the County of the principal office of the Corporation, and any mediation shall be held in the County of the principal address of the Corporation. The parties shall share equally in the cost of said mediation.
> 15.2 In the event that said dispute is not resolved in mediation, the parties shall submit the dispute to a neutral arbitrator certified by the Circuit Court in the County of the principal office of the Corporation. The arbitration shall be held in the County of the principal office of the Corporation. The parties shall share equally in the cost of said arbitration. The parties further agree that discovery shall be allowed to each party of the arbitration and a written award shall be entered forthwith. Any and all types of relief that would be otherwise be available in Court shall be available to both parties in the arbitration. The decision of the arbitrator shall be final and binding. Arbitration shall be the exclusive remedy of the parties. Judgment upon the award may be entered in any court of competent jurisdiction pursuant to Florida Statutes Chapter 682 as amended, The Arbitration Code.

Respondents argue that the contract and this clause is silent on the question of conducting arbitration as a class action; does not contain an agreement of the Parties to submit to class arbitration; and, therefore, the Claimant can only represent himself and is precluded from representing others similarly situated in a class arbitration. The Claimant, on the other hand, argues the contract and clause is not silent on the question of conduct of class arbitration. Claimant points to the provision in Paragraph 15.2 that "Any and all types of relief that would otherwise be available in Court shall be available to both parties in arbitration" as evidence that the Parties agreed to class arbitration and that he is not limited to individual arbitration.

Construction of this clause and these phrases, as with construction of any contract, begins with reference to standard rules of contract construction, along with concepts relevant to the arbitration process. Rulings of the Supreme Court clearly confirm the power of the Arbitrator to interpret an arbitration clause; instruct the Arbitrator to read and interpret the contract liberally; and to resolve any ambiguity as to the intent of the Parties in favor of the non-drafting party, here the Claimant. See <u>Green Tree Financial Corp. v. Bazzle</u>, supra. [1]

Respondents could have made the task of construing this clause easy by including a clear, conspicuous prohibition of class arbitration, or stating that Claimant could only represent himself as an individual and not on behalf of others similarly situated on a class basis. Respondents, drafters of this contract, could have made this interpretative task easy by inserting or amending this contract and clause to preclude class arbitration, using clear language. Yet, Respondents did not avail themselves of either opportunity.

Exhibit 4

The recent case law relating to class action arbitrations makes Respondents' failure to write or amend this contract to include clear language on this point especially telling. Some of these decisions raised "red flags" about how arbitration clauses were being construed and how clear language limiting class arbitrations could be included, upheld and enforced. For example, in 2010, Stolt-Nielsen, upon which Respondents rely almost exclusively to support their arguments was decided by the United States Supreme Court in 2010. *Stolt-Nielsen S.A. v. AnimalFeeds International Corp.* (2010) 559 U.S. 662,130 S.Ct. 1758, 176 L.Ed.2d 605 ("*Stolt-Nielsen*"). Stolt-Nielsen signaled that a Party seeking to avoid class arbitration could write a clause "waiving" or precluding class arbitration that a Court would enforce even where state or federal law might otherwise render such "waiver" unenforceable. [2]

Then, Oxford, supra, was decided in 2013. In Oxford, the Supreme Court confirmed that the question of class arbitration is the proper province of the arbitrator's interpretative authority and upheld the decision of the Arbitrator to allow class arbitration, stating:

> Stolt–Nielsen did not establish a bright line rule that class arbitration is allowed only under an arbitration agreement that incants "class arbitration" or otherwise expressly provides for aggregate procedures. Stolt–Nielsen, 130 S.Ct. at 1776 n. 10; Jock v. Sterling Jewelers Inc., 646 F.3d 113, 124 (2d Cir.2011) (holding that an arbitrator did not exceed her powers by ruling that class arbitration was allowed under an agreement lacking an express class provision)….. Instead, *Stolt–Nielsen* established a default rule under the Federal Arbitration Act: "[A] party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so." *Id.* at 1775 (emphasis in original). Oxford, at_____.

These decisions provided a "road map" for those seeking to foreclose class arbitrations to follow. Clauses limiting class arbitrations can be written and enforced and described the standards by which an Arbitrator's allowance of class arbitration would be reviewed and upheld or rejected. Respondents, however, did not follow this "road map", made no modification or clarification to this arbitration clause, and rely on the asserted "silence" of this clause as evidencing the Parties' intention to preclude class arbitration.

Respondents' reliance on Stolt-Nielsen is especially unavailing because in Stolt-Nielsen, the Parties had entered into a particular stipulation about the issue of class arbitration. No such stipulation is present in this case and, thus, Stolt-Nielsen is inapplicable. The case here is more directly aligned with the Supreme Court's ruling in Oxford, supra, identifying that the basic question is whether there is a contractual basis for finding the Parties agreed to class arbitration.

Reviewing this contract and clause to determine if such a basis exists, it becomes clear that Respondents' reliance on "silence" is misplaced. This clause is not silent. It requires arbitration of any and all disputes "arising under this agreement". See contract, Paragraph 15. Further, Paragraph 15.2 specifically, clearly evidences the Parties' intent to agree to arbitrate "any and all

Exhibit 4

types of relief that would otherwise be available in Court shall be available to both parties in arbitration". Claimant would be entitled to pursue a class action in Court.[3]  Limiting Claimant to individual arbitration would fail to enforce the agreement of the Parties by refusing the same right Claimant would have to process a class action in court. Coincidentally, if Respondents' argument were to prevail, they would be precluded from raising claims or defenses to the processing of class arbitration that would be available to them in a court action. The clause requires, rather than precludes arbitration of actions, including conducting a class action, claims, or defenses available to both Parties in court and evidences the intent of the Parties to agree to allow the claims and defense of this matter to be presented in a class arbitration.[4]

Respondents wrote an agreement mandating Claimant arbitrate claims as would be allowed in Court. Claimant could bring a class or collective action in Court. Respondents cannot now limit Claimant to individual arbitration. Precluding Claimant from class arbitration or Respondent from any defenses available to Respondents in arbitration, as might be available in a court action, would amount to rewriting this clause. This clause cannot be rewritten in this arbitration to benefit either Party and, as written, provides a contractual basis for finding the Parties agreed to class arbitration.

Finally, the authorities cited by Claimant--Southern Communication Services Inc. v. Thomas, 720 F.3d 1352 (11th Cir.2013) and DIRECTV, LLC v. Arndt, 2013 WL 5718384 (11th Cir. Oct.22, 2013) provide additional support that the Parties agreed to class arbitration of "any disputes" to secure any and all types of relief available to both Parties in Court. Of course, a party may not be compelled to submit to class arbitration unless there is a contractual basis for finding that a party agreed to such a process.  There is no "limiting language" in this contract or clause and the Parties are bound by their own words. To the contrary, the Parties clearly agreed to an arbitration clause broad enough to encompass class arbitration of claims and defenses, as would be available in court.  Accordingly, this contract and clause are construed to provide the contractual basis whereby the Parties intended to allow Claimant to proceed and the Respondents to defend this arbitration on a class basis.

Exhibit 4

CONCLUSIONS/AWARD

1.  Based on the construction of the contract and clause, as set for the above, I find there is a contractual basis for finding the Parties intended to and did agree to provide for arbitration on a class basis.

2.  This matter may proceed under the AAA Supplementary Rules for Class Arbitration.

3.  The Arguments that this matter may only proceed as an individual action are rejected.

4.  Pursuant to Rules 3 of the SRCA, all proceedings in this matter are hereby stayed for thirty (30) days from the date of the issuance of this Clause Construction Award. Once all parties inform the arbitrator in writing during the period of the stay that they do not intend to seek judicial review of the Clause Construction Award, or once the requisite time period expires without any party having informed the arbitrator that it has done so, these proceedings will resume. If any party informs the arbitrator within the period provided that it has sought judicial review, the arbitrator may stay further proceedings upon an application from either side.

4/18/14
_____
Date

_____
Sandra S. Christianson, Esq.

Exhibit 4

## ENDNOTES

[1] The applicable state law, according to the contract, Paragraph 27, is that of the state of Florida.  The court decisions under Florida law relating to contract interpretation, reviewed and considered in this ruling, include those cited by Claimant. See Claimant's Brief filed November 26, 2013, pages 6-8.

[2] In 2010, as well, Concepcion, supra, was decided. Concepcion was characterized by some as the final "death knell" or "nail in the coffin" of class action arbitration and gave employers an open invitation to write—or amend-- contracts that would clearly foreclose class arbitrations. See "Tsunami: AT&T Mobility LLC V. Concepcion Impedes Access to Justice", Jean R. Sternlight, Oregon Law Review, Vol. 90, 703 (2012)

[3] Claimant raises claims under the FLSA, for example.  The FLSA allows collective actions in court to recover claims for wages, over-time pay, etc. See 29 U.S.C. Sec. 216 (b) and Fed. R. Civ. P. 23.

[4] Because there is a contractual basis for finding this clause allows class arbitration, there is no need to reach or resolve the issue of Claimant's assertion that an adverse ruling would violate the National Labor Relations Act.  See Claimant's Brief of November 26, 2012, pages 9-11. However, the cases cited there further substantiate the conclusion that rights conferred by and contained in federal law are considered within the scope of actions "otherwise available" in court and, thus, are subject to the mandatory arbitration provision of this clause.

Exhibit 4

AMERICAN ARBITRATION ASSOCIATION
AAA No. 11 160 00357 08

MARK PASSOW, ASTRID ALEXANDRA RAMIREZ,
REBECCA KILGALLON and DONA FRAENKEL

vs.

THE SMITH & WOLLENSKY RESTAURANT GROUP, INC.

MEMORANDUM AND ORDER REGARDING RECONSIDERATION
OF THE ARBITRATION CLAUSE CONSTRUCTION

Background

On July 2, 2008, the Arbitrator issued a Partial Final Award on Arbitration Clause

Construction (the "Clause Construction Award") determining that the arbitration clause in the

Dispute Resolution Agreement (the "DRA") executed by the Claimants herein permits this

arbitration to proceed on behalf of a class appropriately certified pursuant to AAA C.A.R.

Rule 4.[1]  In the Arbitrator's conclusion on the Clause Construction Award, the following is stated

as part of the reasoning:

> "In the face of the silence in the DRA as to whether class arbitration is permitted
> or prohibited, when read together with the Massachusetts and Federal law favoring both
> arbitration and class action proceedings, this Arbitrator concludes and rules that a
> prohibition on class arbitration cannot and should not be read *sub silencio* into the DRA
> in issue."

On April 27, 2010, the Supreme Court of the United States issued its decision in *Stolt-*

*Nielsen S.A., et al.* v. *AnimalFeeds International Corp.*, 559 U.S. ___, 103 S. Ct. 1798 (2010).[2]  In

---

[1] The class has yet to be determined and certified, basically at the specific behest of the
parties because of their pursuit of settlement and their extended discovery efforts on class action
issues. Settlement has not been achieved, and briefing on class certification is now almost
complete.

[2] In this ruling the Arbitrator will cite to the Slip Opinion in *Stolt-Nielsen*.

Exhibit 5

that decision the Court ruled, among other things, that "[a]n implicit agreement to authorize class-action arbitration . . . is not a term that the arbitrator may infer solely from the fact of the parties' agreement to arbitrate." Slip Op. at 21.

Discussion

This Arbitrator, having become concerned that his prior decision on the availability of class action arbitration in this matter may be inconsistent with the Supreme Court's recent ruling in *Stolt-Nielsen*, acceded to the request of The Smith & Wollensky Restaurant Group, Inc. ("S&W") to reconsider that decision, after appropriate briefing.[3]

Full familiarity with the July 2, 2008, Clause Construction Award and the reasoning contained therein is presumed.

The DRA executed by each of the Claimants here includes the following language:

> By accepting or continuing employment with the Company, you agree and understand that both you and the Company mutually agree to resolve and [sic] binding arbitration *any claim that, in the absence of this Agreement, would be resolved in a court of law under applicable state or federal law*. . . .

> By accepting or continuing employment with the Company, you and the Company both agree to resolve such claims through **final and binding arbitration**. *This includes*, but is not limited to . . . any claims under contract or tort law; *any claims for wages, compensation or benefits*; . . . .

> You and the Company agree that the dispute will be resolved by **final and binding arbitration.** You and the Company will select a single arbitrator. [Reference then is made to the AAA making the selection if the parties cannot agree and to the arbitration being conducted in accordance with rules of the AAA]. . . .

---

[3] The Arbitrator treats the request for this reconsideration by S&W, and the Claimants' participation therein without protest, as a waiver of any argument that, as to the July 2, 2008, Partial Final Award on Arbitration Clause Construction, this Arbitrator is now subject to the *functus officio* doctrine. See, e.g., *La Vale Plaza, Inc.* v. *R.S. Noonan, Inc.*, 378 F.2d 569, 572 (3d Cir. 1967); *National Mutual Insurance Company* v. *First State Insurance Company*, 213 F. Supp. 2d 10, 16-17 (D. Mass. 2002).

2

Exhibit 5

> *The arbitrator will decide all claims under the applicable local laws where you work or last worked for the Company. . . .*

(Bolding in original; italics added for emphasis.)

In their briefing leading up to the Clause Construction Award, the Claimants and S&W did not express any disagreement that the language quoted immediately above is, in fact, what appears in the DRA or that the DRA is the arbitration agreement under consideration.  Nor did the Claimants or S&W challenge that, by the DRA, the parties have agreed to arbitration.

It was the Claimants' contention in their initial Memorandum on Clause Construction that there is no language in the DRA that *precludes* class arbitration.  S&W, in its initial Memorandum of Law Regarding Clause Construction, asserted that the DRA contains no language that *permits* arbitration on a class-wide or multiple-claim basis.  The Arbitrator agreed with the parties in the Clause Construction Award that the DRA is silent as to specific language either permitting or prohibiting class arbitration.

The Claimants are waitstaff employees at S&W's restaurant in Boston, Massachusetts. They complain that S&W "has improperly taken a 'tip credit' against the minimum wage for its waitstaff employees and has thereby paid these employees less than the permissible standard minimum wage."  The Claimants make their Demand on behalf of themselves and all others similarly situated in S&W restaurants throughout the United States.

In the Clause Construction Award this Arbitrator recited his acceptance that:

> "his determination should be made applying generally applicable principles of contract interpretation as applied in the Commonwealth of Massachusetts. The DRA mandates that the Arbitrator will decide the claims 'under the applicable local laws where [the Claimants] work or last worked for [S&W].' Still further, in doing so, this Arbitrator accepts that 'if there is doubt about that matter – about the "scope of the arbitrable issues" – [the Arbitrator] should resolve that doubt 'in favor of arbitration.'"

3

Exhibit 5

The Arbitrator also made the following comments about Massachusetts contract law.

"In Massachusetts the interpretation of an unambiguous agreement is an issue of law for the court. *Bank* v. *Thermo Elemental Inc.*, 451 Mass. 638, 648 (2008); *Lumbermans Mut. Cas. Co.* v. *Zoltek Corp.*, 419 Mass. 704, 707 (1995). Here, of course, the Arbitrator stands in a place similar to that of a court. Contract language must be construed in its usual and ordinary sense. *116 Commonwealth Condominium Trust* v. *Aetna Cas. & Surety Co.*, 433 Mass. 373, 376 (2001); *Citation Ins. Co.* v. *Gomez*, 426 Mass. 379, 381 (1998). A contract provision is ambiguous 'only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.' *Citation Ins. Co.*, *supra*, 426 Mass. at 381. The mere fact that parties disagree on the proper construction of contractual language, however, does not necessarily establish ambiguity. *Lumbermans Mut. Cas. Co.* v. *Offices Unlimited, Inc.*, 419 Mass. 462, 466 (1995); *Jefferson Ins., Inc.* v. *Holyoke*, 23 Mass. App. Ct. 472, 475 (1987).

"Generally, '[t]he object of the [Arbitrator] is to construe the contract as a whole, in a reasonable and practical way, consistent with its language, background and purpose.' *USM Corp.* v. *Arthur D. Little Systems, Inc.*, 28 Mass. App. Ct. 108, 116 (1989). The Arbitrator must act in a way to give effect to an agreement as a rational instrument in order to carry out the intent of the parties. *Starr* v. *Fordham*, 420 Mass. 178, 192 (1990). Even in the case of an ambiguous agreement, interpretation is a matter of law for the Arbitrator except insofar as it may turn on facts in genuine dispute. *Gross* v. *Prudential Ins. Co. of America, Inc.*, 48 Mass. App. Ct. 115, 119 (1999).

"Justice, common sense and the probable intention of the parties upon consideration of the words in question are guides to the construction of a written contract. *City of Haverhill* v. *George Brox, Inc.*, 47 Mass. App. Ct. 717, 720 (1999)."

In the Clause Construction Award the Arbitrator disagreed that the silence in the DRA created an ambiguity that would allow the Arbitrator to read into it specific language permitting class arbitration. The Arbitrator concluded that no additional language permitting class arbitration was needed. The explanation given was that "[f]ederal law requires the vigorous enforcement of agreements to arbitrate. See *Mitsubishi Motors Corp.*, *supra*, 473 U.S. at 626, (quoting *Dean Witter Reynolds, Inc.* v. *Byrd*, 470 U.S. 213, 221 (1985)."

It was also observed that Massachusetts takes a similar approach.

4

Exhibit 5

"Arbitration is a creature of contract, and what we have before us is in essence a contract dispute. Four basic principles have guided our discussions of arbitration contracts. First, a party cannot be required to arbitrate any dispute that it has not by contract submitted to arbitration. Second, unless otherwise provided by the parties, the preliminary question whether a dispute is subject to arbitration is an issue for judicial determination. Third, when deciding whether a dispute is arbitrable, a court does not consider the merits of underlying claims. Fourth, when considering a broadly worded arbitration clause, there is a presumption that a contract dispute is encompassed by the clause unless it is clear that the dispute is excluded. See *Local Union No. 1710, Intern. Ass'n of Fire Fighters, AFL-CIO* v. *City of Chicopee*, 430 Mass. 417, 420-421 (1999), and cases cited. See also *AT & T Techs., Inc.* v. *Communications Workers*, 475 U.S. 643, 648-650 (1986).

*Commonwealth* v. *Philip Morris Incorporated*, 448 Mass. 836, 843-844 (2007)."

Additionally, the Arbitrator noted that "Massachusetts, like essentially all states and the Federal courts, has provisions for and approves of the resolution of appropriate kinds of cases as class actions. See Mass. R. Civ. P. Rule 23."

In this matter in particular the Arbitrator observed that the

"Claimants rely for legal support of their claims on the Fair Labor Standards Act and the Massachusetts wage and hour laws. These laws specifically allow for class action treatment where appropriate. See 29 U.S.C. § 216(b); Mass, G.L. c. 149, §§ 150, 152A."

The Arbitrator concluded that "[in] the face of the silence in the DRA as to whether class arbitration is permitted or prohibited, when read together with the Massachusetts and Federal law favoring both arbitration and class action proceedings . . . a prohibition on class arbitration cannot and should not be read *sub silencio* into the DRA in issue."

The majority opinion in *Stolt-Nielsen* opens with an explanation of the reason for its issuance. "We granted certiorari in this case to decide whether imposing class arbitration on parties whose arbitration clauses are 'silent' on that issue is consistent with the Federal Arbitration Act (FAA), 9 U.S.C. §1 *et seq.*" Slip Op. p. 1. Respectfully, a reading of the opinion that follows

5

Exhibit 5

provides an answer all too common to legal questions so posed: "it all depends."

Early in the opinion, the Court made this instructive comment:

> "Because the parties agreed their agreement was 'silent' in the sense that they had not reached any agreement on the issue of class arbitration, the arbitrators' proper task was to identify the rule of law that governs in that situation. Had they engaged in that undertaking, they presumably would have looked either to the FAA itself or to one of the two bodies of law that the parties claimed were governing, *i.e.*, either federal maritime law or New York law. But the panel did not consider whether the FAA provides the rule of decision in such a situation; nor did the panel attempt to determine what rule of law would govern under either maritime law or New York law in the case of a 'silent' contract."

Slip Op., p. 8.

The Supreme Court then faulted the panel in *Stolt-Nielsen* for not doing so. The Court

said:

> "Rather than inquiring whether the FAA, maritime law, or New York law contains a 'default rule' under which an arbitration clause is construed as allowing class arbitration in the absence of express consent, the panel proceeded as if it had the authority of a common-law court to develop what it viewed as the best rule to be applied in such a situation."

Slip Op., p. 9.

This point was repeated later when the Court said "instead of identifying and applying a

rule of decision derived from the FAA or either maritime or New York law, the arbitration panel

imposed its own policy choice and thus exceeded its powers." Slip Op., p. 12.

The *Stolt-Nielsen* Court emphasized a well recognized, and oft repeated, premise of

arbitration law. "While the interpretation of an arbitration agreement is generally a matter of state

law . . . the FAA imposes certain rules of fundamental importance, including the basic precept that

arbitration 'is a matter of consent, not coercion.'" Slip Op., p. 17. See, also, *First Options of

Chicago, Inc.* v. *Kaplan*, 514 U.S. 938, 944 (1995). The Court cites to *Volt Information Sciences,

Inc.* v. *Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989). "[P]rivate

6

Exhibit 5

agreements to arbitrate are enforced according to their terms." Slip Op., p. 18. "Whether

enforcing an agreement to arbitrate or construing an arbitration clause, courts and arbitrators must

'give effect to the contractual rights and expectations of the parties.'" *Id.*

The Court observed that "[N]othing in the [FAA] authorizes a court to compel arbitration

on any issues, *or by any parties*, that are not already covered in the agreement." *Id.* The Court

then pronounced that "a party may not be compelled under the FAA to submit to class arbitration

unless there is a contractual basis for concluding that the party *agreed* to do so." Slip Op., p. 20.

Having made these statements, this Arbitrator would have expected the Court in *Stolt-*

*Nielsen* to then abruptly close its opinion with words to the effect that because the arbitration

agreement in issue is silent on the issue of class-action arbitration, none can be compelled. But the

Court did not stop at this obvious juncture; and this leads this Arbitrator to read the Court's

decision as saying that under certain circumstances, even in the face of silence, class-arbitration

can be authorized. Indeed, the Court's words that follow make that clear.

> "In certain contexts, it is appropriate to presume that parties that enter into an
> arbitration agreement implicitly authorize the arbitrator to adopt such procedures as are
> necessary to give effect to the parties' agreement. Thus, we have said that ' " 'procedural'
> questions which grow out of the dispute and bear on its final disposition" are presumptively
> not for the judge, but for the arbitrator, to decide.'"

Slip Op., pp. 20-21.

> "'When the parties to a bargain sufficiently defined to be a contract have not agreed with
> respect to a term which is essential to a determination of their rights and duties, a term
> which is reasonable in the circumstances is supplied by the court.' Restatement (Second)
> of Contracts §204 (1979)."

Slip Op., p. 21.

> "An implicit agreement to authorize class-action arbitration, however, is not a term
> that the arbitrator may infer *solely* from the fact of the parties' agreement to arbitrate."

7

Exhibit 5

(Emphasis added.)

*Id.*

The Court went on to express its concern about the differences between bilateral and class-action arbitration and their effect on agreements to arbitrate. The Court said

"We think that the differences between bilateral and class-action arbitration are too great for arbitrators to presume, consistent with their limited powers under the FAA, that the parties' *mere* silence on the issue of class-action arbitration constitutes consent to resolve their disputes in class proceedings." (Emphasis added.)

Slip Op., p. 23.

This Arbitrator emphasizes the words "solely" and "mere" in the foregoing quotations because they clearly imply that something other than silence, if it exists, is not only required but, if present, could carry the day on the issue. In other words, silence alone does not either *permit* or *prohibit* class-action arbitration. And, significantly, the footnote, (fn. 10), that the Court added at the end of the last quotation above is telling. That footnote reads:

"We have no occasion to decide what contractual basis may support a finding that the parties agreed to authorize class-action arbitration. Here, as noted, the parties stipulated that there was 'no agreement' on the issue of class-action arbitration."

Slip Op., p. 23, n. 10.

Footnote 10's comments, attached to a pronouncement that "mere silence" cannot constitute consent to a class proceeding, surely signals that if something else exists, the parties' intent to pursue class-action arbitration can be found. Harkening back to the Court's own words at Slip Op. p. 20, class arbitration may be ordered "if there is a contractual basis for concluding that the part[ies] *agreed*" "to submit to class-arbitration."

It is with the foregoing background and analysis, and through the lens of the *Stolt-Nielsen*

8

Exhibit 5

decision, that the Arbitrator here has reexamined the Clause Construction Award.

There was silence in the DRA on the question of class-action arbitration.  Consequently, there must be more in the agreement and the underlying law – here, the Federal Fair Labor Standards Act ("FLSA") and the Massachusetts wage and hour laws – each of which provides the foundation for the Claimants' assertions that S&W has improperly taken tip credits against the minimum wage for its waitstaff employees and has thereby paid these employees less than the permissible standard minimum wage.

Looking first at the arbitration clause in the DRA, it cannot be seen as other than very broad in its reach.  It includes "any claim that, in the absence of this Agreement, would be resolved in a court of law under applicable state or federal law"; and "any claim" is defined to include "any claims for wages, compensation or benefits."

Both the FLSA and the Massachusetts wage and hour laws create causes of action which can be resolved in a court of law.  The FLSA authorizes an individual employee to bring a claim "for and in behalf of himself . . . and other employees similarly situated." 29 U.S.C. §216(b).  The Massachusetts wage and hour laws statutorily provide that an aggrieved employee may "institute and prosecute in his own name and on his own behalf, or for himself and others similarly situated, a civil action" to enforce the laws. G.L. c. 149, §150.

The DRA also expressly provides that the "Arbitrator may award any remedy and relief as a court could award on the same claim."  Under both of the applicable statutes a court could award class relief.

Since these two statutes were in existence when the DRA was executed, and they form the basis for the Claimants' wage and compensation claims, they must be considered as part of the

9

Exhibit 5

DRA even if not specifically quoted therein. "As a general rule, the law in existence at the time an agreement is executed necessarily becomes a part of the agreement." *Mayor of Salem* v. *Warner Amex Cable Communications, Inc.*, 392 Mass. 663, 666 (1984). See *Feakes* v. *Bozyczko*, 373 Mass. 633, 636 (1977). See also 4 S. Williston, Contracts §615 (3d ed. 1961). Consequently, the opportunity for a Claimant to proceed with wage claims "for and in behalf of himself . . . and other employees similarly situated" under 29 U.S.C. §216(b) or "for himself and others similarly situated, a civil action" to enforce the law under G.L. c. 149, §150 necessarily became parts of the DRA.

Unlike the admiralty-type proceedings under consideration in *Stolt-Nielsen,* wage and hour claims like those in play here are frequently pursued as class or collective actions, and both the Claimants and S&W must be deemed to understand that.

Also, both the Claimants and S&W, the latter of which drafted and insisted upon the DRA, are presumed by Massachusetts contract law to understand the plain meaning of the words chosen. See, e.g., *Cabot Corporation* v. *AVX Corporation*, 448 Mass. 629, 638 (2007).

Consequently, all parties must be deemed to have intended that class-action claims and class-action relief are contemplated and permitted by the DRA.

<u>Conclusion</u>

For all of the various reasons stated above, and included in the July 2, 2008, Partial Final Award on Arbitration Clause Construction, after full consideration of the thrust of the *Stolt-Nielsen* decision, the request by S&W to reverse that Partial Final Award is <u>DENIED</u>.

Further, this Arbitrator, given that he has not altered in any respect the Partial Final Award entered over two years ago, declines to further stay the proceedings in this matter for any court

10

Exhibit 5

review of this decision.  The parties are thus directed to proceed with the completion of their

briefing and argument, if requested, on the Claimants' motion for class certification.

DATED:        July 28, 2010                     Hon. Allan van Gestel (Ret.)
                                                Arbitrator

11

Exhibit 5

31a

## APPENDIX C

### AMERICAN ARBITRATION ASSOCIATION

Case No. 18 193 20593 02

JOHN IVAN SUTTER, M.D., ON BEHALF OF HIMSELF AND
ALL OTHERS SIMILARLY SITUATED, *Claimant*,

*v.*

OXFORD HEALTH PLANS, INC., *Respondent.*

### Procedural Order No. 18
### Determining Motion

### July 6, 2010

Oxford has moved for reconsideration of the
Memorandum and Order of September 23, 2003 (the
"Clause Construction Award")[1], which found that the
arbitration clause in the Agreement in this case allowed
for class action arbitration. The Clause Construction
Award is attached as Exhibit A; its findings and

---

[1] The Memorandum and Order is referred to in this Order as
the Clause Construction Award because at the time it was issued,
the Supplemental Rules for Class Action Arbitrations had not yet
been adopted by the American Arbitration Association. The
parties subsequently agreed that this case would proceed under
and be governed by these Rules. When the Class Determination
Award was entered, the Memorandum and Order was attached to
it and both were subject to motions to confirm and vacate in the
United States District Court for the District of New Jersey. The
awards were confirmed and the confirmation was affirmed by the
Third Circuit Court of Appeals.

Exhibit 6

32a

conclusions are incorporated in this memorandum. This case has proceeded as a class action since that time.

Oxford seeks redetermination of the Clause Construction Award under a recent decision of the United States Supreme Court, *Stolt-Nielsen S.A. v. Animal Feeds Int'l Corp.*, No 08-1198, 50 U.S.__, slip op. (April 27, 2010)  Oxford argues that the *Stolt-Nielsen* ruling has retroactive effect, and under the teaching of *Stolt-Nielsen*, the determination previously made in this case is incorrect, should be reversed and the class action proceedings discontinued.

For the reasons below, I agree with Oxford that *Stolt-Nielsen* has retroactive effect, but I find that it does not require vacating the previous ruling.

Background

Dr. Sutter originally brought this case in April 2002 as a class action case in the Superior Court of Essex County, New Jersey.  Dr. Sutter, a physician, was seeking from Oxford damages and other relief arising out of allegations that, under a Primary Care Physician Agreement between Dr. Sutter and Oxford (the "Agreement"), Oxford failed to pay claims and reduced payment on claims as a result of Oxford's allegedly improper claims processing.

Oxford moved in the Essex County Superior Court to stay Dr. Sutter's civil class action on the ground that the arbitration clause in the Agreement between Dr. Sutter and Oxford required that Dr. Sutter's claims be submitted to arbitration.  Oxford was successful in its application to the Court.  By order dated October 25, 2002, the Court ordered that Dr. Sutter's Amended Complaint be dismissed and that the matters raised

Exhibit 6

33a

should properly be referred to arbitration in accordance with the Agreement.

Thereafter, Dr. Sutter applied to the Superior Court for an order certifying the case as a class action and determining the class. That motion was denied by order dated November 21, 2002. The Court ordered that all procedural issues including but not limited to, the determination of class certification, be resolved by the arbitrator.

In March, 2003, when I had been appointed arbitrator in this case, *Green Tree Financial Corp, et al.* v. *Bazzle, et al.* (Docket No. 02-634) was pending before the Supreme Court of the United S[t]ates. It appeared sensible to take no action on the class action issues in this arbitration until the determination of the *Green Tree* case had been received and analyzed.

On June 23, 2003 the Supreme Court rendered a decision in the *Green Tree* case (539 U.S. 444). Pursuant to the agreement of the parties, each provided me with a letter outlining their respective views about the meaning of the *Green Tree* case for this arbitration. At a conference with the parties it was agreed that under the *Green Tree* case, I had to determine whether the parties' Agreement allows for class action arbitration. The parties agreed that I should proceed to make that determination *de novo*. Oxford then moved for a determination that this arbitration cannot be maintained as a class action. The parties provided extensive briefs on this issue.

I found, for the reasons discussed in the Clause Construction Award, that on its face, the arbitration clause in the Agreement expressed the parties' intent that class action arbitration could be maintained.

Exhibit 6

34a

## Discussion

Before discussing Oxford's present contentions in detail, it is necessary to note several points on which Oxford seems to me to be correct. First, this arbitration is governed by the Federal Arbitration Act ("FAA") and not by New Jersey procedural law. The FAA applies to all actions affecting commerce. See *Citizens Bank v. Alafabco, Inc., et al.*, 539 U.S. 52 (2003). The arguments made by the Class that this case is somehow an intra-New Jersey matter cannot be accepted. Although the members of the class are New Jersey physicians and health care providers, Oxford's operations including its payment processing and other aspects of its business are located in other states and are not all located in New Jersey. Moreover, the previous awards in this case have been referred to the Federal court in New Jersey for confirmation and an appeal from that court was taken to the United States Court of Appeals for the Third Circuit.

I also agree with Oxford that the ruling of the Supreme Court in *Stolt-Nielsen* should be given retroactive effect. I consider Oxford's motion in this case for reconsideration under the possible retroactive effect of *Stolt-Nielsen* on my prior ruling to be proper. It is accordingly necessary to proceed to the merits of Oxford's motion.

Oxford attacks the Clause Construction Award in this case on several grounds. First it says that because the Award concluded that the arbitration clause was unambiguous and silent on the issue of class arbitration, under *Stolt-Nielsen* there can only be one conclusion: the parties did not agree to authorize class arbitration. Second, Oxford says that the Award suggested that the broad scope of the arbitration clause, contrary to *Stolt-*

Exhibit 6

35a

*Nielsen*, implied an agreement by the parties to authorize class arbitration. Third, it says that the Award inferred agreement by the parties to authorize class arbitration due to the lack of a carve-out or prohibition of class proceedings, reasoning that has been expressly rejected by *Stolt-Nielsen*.

The *Stolt-Nielsen* court viewed the central inquiry to be "whether the parties agreed to authorize class arbitration." Moreover, the Supreme Court provided the following directives: 1) a clause that is unambiguous and silent on the issue of class arbitration can lead to "only one possible outcome"—a ruling that the parties did not agree to authorize class arbitration; 2) the substantive breath and 3) the lack of an express prohibition on class arbitration cannot be used to infer an implicit agreement between the parties to authorize class arbitration.

For several reasons, however, the *Stolt-Nielsen* case is not applicable to the determination previously made in this arbitration.

The facts of the *Stolt-Nielsen* arbitration are very different from those presented in this arbitration. The arbitrators in *Stolt-Nielsen* had decided to proceed with class arbitration not on the basis of clause construction but essentially for reasons of public policy and in reliance on determinations made in other arbitral awards. The Supreme Court specifically noted that the panel's reliance on these arbitration determinations confirmed that their award was not based on a finding of the parties' intent.

By contrast, the determination in this arbitration involved no such adventures into public policy but was rather concerned solely with the parties' intent as evidenced by the words of the arbitration clause itself.

Exhibit 6

36a

In the *Stolt-Nielsen* case, the Supreme Court found that the arbitrators had no reason to "ascertain the parties intent, because the parties had stipulated that they were in complete agreement regarding their intent."   The parties had stipulated that their agreement was "silent on whether [it] permitted or precluded class arbitration," but that the agreement was not ambiguous so as to call for parole evidence. The Supreme Court said that the stipulation of the parties left no room for inquiry by the arbitrators regarding the parties' intent, and any inquiry into that settled question would have been outside the panel's assigned task.

By contrast, the parties in this arbitration had entered into no such stipulation of agreement.  It was accordingly necessary to determine what the intent of the parties was.  I found that the arbitration clause unambiguously evinced an intention to allow class arbitration, indeed to require it.

Finally, this case differs from *Stolt-Nielsen* because of its procedural history prior to the arbitration.  The claimant in this case actually started a class-action in the New Jersey state court.  At the time it was one of many such class actions throughout the United States brought by medical providers against insurance companies, such as Oxford.  So far as I know, all of the rest of those cases were consolidated by the multidistrict panel and eventually tried in the United States District Court for the Southern District of Florida.  An appeal from the class determinations made by the court is referred to in the class certification award in this case.  Dr. Sutter's case was unique among all of those others in that Oxford had inserted into its provider agreement the arbitration clause that was subject to the earlier proceedings.

Exhibit 6

37a

By invoking the arbitration clause in this case, Oxford succeeded in obtaining an order from the New Jersey Court staying the class-action and referring Dr. Sutter's case to arbitration.

It seems to me that the foregoing matters are sufficient to distinguish this case from *StoltNielsen*. I do not believe that the ruling in that case is controlling here. Even if it were, however, I believe that the Clause Construction Award would withstand *Stolt-Nielsen* scrutiny.

Oxford's first contention is that the arbitration clause in this case was unambiguous and silent on the issue of class arbitration, from which Oxford draws the conclusion that the parties cannot have authorized class arbitration. Oxford is wrong on this issue for several reasons.

*Stolt-Ni[elson]* reaffirmed the bedrock proposition that the FAA was designed to place arbitration agreements on the same footing as other contracts. Thus, one would construe an arbitration clause in the same way as one would treat any other contractual provision. Oxford argues that since the clause in this case does not explicitly mention class action, the inquiry under the teaching of *Stolt-Nielson* is at an end. Oxford misinterprets both the holding in *Stolt-Nielson* and the words of its own arbitration clause.

First, the crucial fact in *Stolt-Nielson* was the parties' stipulation that the arbitration clause was silent with respect to class arbitration. There had been no meeting of minds on that point and hence no agreement as to class arbitration. There was nothing of the parties' intent for the arbitrators to discover and enforce. The parties themselves had stipulated that there was no intent regarding class arbitration. Since

Exhibit 6

38a

the Court went on to hold that where there is an absence of such intent to have class arbitration, agreement to have class arbitration cannot be inferred, and the determination of the arbitrators could not have been correct or within their powers.

This case could not be more different. There was no stipulation.  The issue of the meaning of the arbitration clause and what the parties intended by it came to the arbitrator *de novo*.  It was necessary to construe the arbitration clause in the ordinary way to glean the parties' intent.  It was not futile, as it would have been in *Stolt-Nielson*, in the face of the parties' stipulation. It was rather a vital exercise to determine what the parties intended by the clause regarding class arbitration. The Court in *Stolt-Nielson* said that it had no occasion to decide what contractual basis might support a finding that the parties agreed to authorize class action arbitration.

Second, Oxford simply announces that the clause is unambiguous and silent as to class arbitration. However, that conclusion is not for Oxford to make.  It is rather for the arbitrator, under *Greentree, Stolt-Nielson* itself, and the specific order of the New Jersey court that sent this case to arbitration.

Even assuming that *Stolt-Nielson* stands for the proposition that under the FAA, a class action arbitration can be maintained only if the arbitration clause authorizes such action, Oxford's argument still fails.

The arbitration clause in this case is as follows:

No civil action concerning any dispute arising under this agreement shall be instituted before any court, and all such disputes shall be

Exhibit 6

39a

submitted to final and binding arbitration in New Jersey, pursuant to the Rules of the American Arbitration Association with one arbitrator.

The arbitration clause speaks of "no civil action." No civil action, in my view, means no civil action, of any form whatsoever. Since a class action is a form of civil action, the clause can be paraphrased: "No class action concerning any dispute arising under this agreement shall be instituted before any court, and all such disputes shall be submitted ... to ... arbitration." "No civil action" simply cannot, as a matter of English, be read to exclude any particular civil proceeding, including a class action, from its coverage.

Therefore, the text of the clause itself authorizes, indeed requires, class-action arbitration.

Oxford argues that the Clause Construction Award relied on absence of specific exclusion of class-action arbitration from this clause to indicate that it was the intention of the parties to include class arbitration[.] If true, this reasoning would run afoul of *Stolt-Nielsen*. However, the Clause Construction Award was not based on such reasoning. The absence of such an exclusion was not something that had to be to be relied on to divine the meaning of the clause. It merely corroborated what was already obvious from the language of the clause itself. "All" means all. As noted in the Clause Construction Award, if it had been the parties' intention to exclude class actions from the clause, in the face of such sweeping language, normal drafting would have suggested a specific exclusion. Similarly, noting that the clause is extraordinarily broad is corroborative of the construction noted above, but not essential to it.

Exhibit 6

40a

Finally, if there were any doubt about what Oxford itself understood the clause to mean, its actions during the earlier court proceedings speak volumes. Dr. Sutter started a class action, not in arbitration but in court. Oxford itself moved in court successfully to invoke the arbitration clause to force Dr. Sutter's court case into arbitration. Under Oxford's own reading of the clause, it not only authorized a class action in arbitration, it required this particular class action to be sent to arbitration.

I find that there are two consequences from this. First, I think Oxford is judicially estopped from claiming that this case cannot proceed in arbitration as a class action. There is nothing in the *Stolt-Nielsen* case that would support a contrary interpretation. Second, Oxford's actions clearly demonstrate its own construction of its own clause.[2]

Oxford places considerable reliance on the briefing of the parties in connection with the Clause Construction Award. It uses various assertions to try to draw this clause into the cone of silence that *Stolt-Nielsen* suggests obviate intention of the parties to have class arbitration. It claims that parties' briefing made clear there had been no agreement reached on the issue of class arbitration. See Oxford's brief in support, footnote 16, quoting extensively from such sources. For, example, "Dr. Sutter does not point to

---

[2] The Clause Construction Award did not find it necessary to deal with the *contra proferentem* arguments raised by Claimants. However, it is obvious that Oxford drafted the arbitration clause; it was not a negotiated clause. Accordingly, it would be construed against Oxford. Oxford's original interpretation of what the clause means is consistent with this construction and must be considered highly persuasive, if not conclusive.

Exhibit 6

41a

any contract term that reasonably could be interpreted to provide for 'class arbitration,' or any evidence suggesting the parties intended to permit class arbitration?

These arguments, ingenious as they are, all founder on two immovable positions: First, Oxford persuaded the New Jersey court, using exactly the opposite argument made here, that Dr. Sutter's class action in court was required by the clause in question to be sent to arbitration.

Under Oxford's reading of the application of *Stolt-Nielsen* to this case, if the clause cannot permit Dr. Sutter's court class action to go to arbitration, then Dr. Sutter's original class action must be outside of the arbitration agreement altogether. Oxford would have to have misled the New Jersey court, and the court class action should be reinstated. This is another way of describing why Oxford should be judicially estopped from advancing this argument.

The second position is that the clause is not at all silent: It plainly says "No civil action ... and <u>all</u> (emphasis supplied) such disputes" are to go to arbitration. It was my task to construe that clause. "All," I found, and would find again, means all, without exception, the entire universe of actions that could possibly have been brought in any court, necessarily including class actions. This is, after all, Oxford's own clause, and we have Oxford's own interpretation of what its clause meant when it used it to require Dr. Sutter to bring this case in arbitration, when he very much wanted to be in court all along. Oxford quotes its own reply brief in the Clause Construction proceeding:

> "If large-scale class action disputes had in fact been contemplated, it is likely the parties

Exhibit 6

42a

"… would have opted for the courts, which have a well-developed body of procedural and substantive law to deal with class actions. Nothing of that sort was provided for in the contract."

Being in court, however, was what Dr. Sutter attempted; arbitration is where Oxford put him, using this clause.

In sum, we know what the clause plainly means and we know that in 2002, Oxford successfully persuaded a court of that same plain meaning.

For these reasons, I conclude that this case is distinguishable on the facts from the *Stolt-Nielsen* case and is not controlled by it.  Moreover, even if *Stolt-Nielsen* applied, the result would be the same because the parties' intent to have class arbitration is clear. Finally, Oxford's own construction of its own clause makes the arguments it advances here untenable; that alone would put this case outside the contemplation of *Stolt-Nielsen.*

On reconsideration, accordingly, I find that the Clause Construction Award of 2003 was and remains correct.

Oxford's motion is denied.


/s/ W.L.D. Barrett
W.L.D. Barrett, Arbitrator

Exhibit 6

1
2
3
4
5
6        **AMERICAN ARBITRATION ASSOCIATION**
         **Class and Employment Arbitration Tribunal**
7
8
9    **HERMAN BENSON, JR.,** individually       Case No.: **11-160-M-02281-08**
     and on behalf of all others similarly
10   situated,
                                                 **PARTIAL FINAL CLAUSE**
11              Claimant,                        **CONSTRUCTION AWARD**

12   vs.

13
14   **CSA-CREDIT SOLUTIONS OF**
     **AMERICA, INC.,**
15              Respondent.

16
17
18        I, THE UNDERSIGNED ARBITRATOR, having been designated in

19   accordance with the arbitration agreement entered into between the parties dated

20   January 9, 2008, and having been duly sworn, and having duly heard the proofs

21
     and allegations of the Parties, do hereby issue this PARTIAL FINAL CLAUSE
22
23   CONSTRUCTION AWARD, as follows:

24        A telephonic hearing was held on June 23, 2010, concerning Claimant's

25   request to obtain a determination that the arbitration agreement executed between

26
27
                                         1


Add83
Exhibit 7

the parties authorizes a class arbitration.[1]   Claimant was represented by Lee &

Braziel, L.L.P. and The Cochran Firm, PC.    Respondent was represented by

Seyfarth Shaw LLP.

### Background

Claimant and potential class members are current and former employees of

CSA-Credit Solutions of America, Inc. ("CSA"), a company which provides a

variety of debt solution products and services. Claimant initially brought this case

as a collective action under the Fair Labor Standards Act (the "FLSA") in the

United States District Court for the Northern District of Texas.   CSA moved to

stay the federal court proceeding and to compel arbitration.[2]

The arbitration agreement at issue provides as follows:

In the event of any dispute or claim relating to or arising out of the employment relationship or the termination of the employment relationship including, but not limited to, any claims of wrongful termination or age, sex, disability, race or other discrimination, you and Credit Solutions agree that all such disputes shall be fully, finally and exclusively resolved by binding arbitration conducted by the American Arbitration Association's Employment Arbitration Rules and Mediation Procedures in Texas and we both waive our rights to have such disputes tried by a court or jury. However, both agree that this arbitration provision shall not apply to any disputes or claims relating to, or arising out of, the misuse or misappropriation of your or the Company's trade secrets or proprietary information.

---

[1] Claimant also has sought a determination that his FLSA collective action may proceed on an opt-out basis rather than on an opt-in basis as provided for under federal law. The resolution of that issue will be reserved for a later time.

[2] In addition to his FLSA collective arbitration, Claimant has also brought a class arbitration under applicable provisions of the Texas Labor Code.

2

1   Because the arbitration agreement does not make explicit mention of class

2   arbitration it is necessary to interpret the agreement under applicable Texas law,

3   guided by the recent decision of the United States Supreme Court in *Stolt-Nielsen*

4   *S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758 (2010).

5                                            *Stolt-Nielsen*

6

7        In *Stolt-Nielsen*, the Court was called upon to consider whether an

8   arbitration agreement entered into between two parties in an arms-length

9   negotiation that made no reference to class arbitration nevertheless was properly

10  found by three arbitrators to permit a class arbitration.  In vacating the arbitration

11

12  award, the Court placed great weight on the fact that the parties stipulated they had

13  reached no agreement on whether their arbitration clause authorized a class

14  arbitration.  In light of the significant differences between class arbitration and

15  bilateral arbitration, the Court held that an "implicit agreement to authorize class

16
    arbitration" may not be inferred solely from the fact that parties have agreed to
17

18  arbitrate their disputes.  *Id.* at 1774.  Finally, the Court took issue with the

19  approach taken by the arbitrators, who, according to the Court, "did [nothing]

20  other than impose [their] own policy preference" for class arbitration.  *Id.* at 1770.

21
         Because parties' "mere silence on the issue of class-action arbitration"
22

23  cannot constitute "consent to resolve . . . disputes in class proceedings," the Court

24  held that it is necessary to determine whether the "parties *agreed to authorize* class

25  arbitration."  *Id.* at 1776 (emphasis in original).  According to the Court, this is

26

27

                                              3

1  properly done by giving "effect to the contractual rights and expectations of the

2  parties," *id.* at 1774 (citation omitted), and by considering the applicable rule of

3  law which would govern in such situations.  It is to this task that I now turn.

4  **Applicable Texas Law**

5  Although the parties' agreement contains no choice of law provision, the

6  parties executed the arbitration agreement in Texas, agreed to conduct this

7  arbitration in Texas, and both parties are domiciled in Texas.   The parties agree

8  that the substantive law of Texas applies to the interpretation of the arbitration

9  agreement.

10  

11  Because *Stolt-Nielsen* directs that it is not permissible to assume parties

12  agreed to class arbitration merely by entering into an arbitration agreement, it is

13  necessary to consider Texas rules of contract interpretation to answer the question

14  presented in this proceeding.  It is safe to assume that in this adhesion arbitration

15  

16  contract, the parties did not discuss whether their arbitration agreement would

17  authorize class arbitration.  Indeed, neither party has offered parole evidence on

18  this point.[3]

19  

20  Under these circumstances, I find that RESTATEMENT (SECOND) OF

21  CONTRACTS § 204 (1981) offers guidance.  This section sets forth the rule to be

22  applied where parties have not agreed to a term "essential to a determination of

23  their rights and duties."  Texas courts have adopted this section of the Restatement

24  

25  

26  _____

[3] Unlike in *Stolt-Nielsen*, the parties in this case did not stipulate that there was no

27  agreement to authorize a class arbitration.

4

1   and "will supply missing terms when necessary to effectuate the purposes of the

2   parties under the agreement." *Lidawi v. Progressive Cty. Mut. Ins. Co.*, 112

3   S.W.3d 725, 731-32 (Tex. App. 2003). "A missing term should be inferred when

4   it is necessary to effectuate the intent of parties." *Woodward v. Liberty Mut. Ins.*

5   *Co.*, 2010 WL 1186323, at *5 (N.D. Tex. Mar. 26, 2010). In describing Texas law

6

7   on this point, the Fifth Circuit Court of Appeals wrote that in "order for a court to

8   read additional provisions into the contract, the implication must clearly arise from

9   the language used, or be indispensable to effectuate the intent of the parties." *R.P.*

10  *Fuller v. Phillips Petroleum Co.*, 872 F.2d 655, 658 (5th Cir. 1989).

11

12         CSA has suggested that the Texas appellate decision in *Gamma Group, Inc.*

13  *v. Transatlantic Reinsurance Co.*, 242 S.W.3d 203 (Tex. App. 2007) states a

14  different principle of law. In that case, the parties' agreement set forth a specific

15  methodology for how certain losses would be reimbursed. Although neither party

16

17  contended their agreement was ambiguous, the trial court added a "covenant" that

18  payments must be "reasonable." The appellate court found that the trial court

19  erred by inserting the term reasonable where, among other things, it "was not

20  necessary to effectuate the parties' intent." *Id.* at 213. Unlike the situation in

21  *Gamma Group* where the parties' agreement actually covered the issue in dispute,

22

23  here the arbitration agreement is completely silent on the question of whether class

24  arbitration is permitted.

25

26

27

5

Add87
Exhibit 7

## Analysis

Applying applicable Texas law to this arbitration agreement, the inquiry which must be made can be stated as follows: Did the parties intend to arbitrate all disputes of every kind, even disputes that might involve a collective or class arbitration? For the following reasons, I conclude the parties in this case agreed to authorize collective and/or class arbitrations.

First, the parties have agreed to arbitrate "any dispute or claim relating to or arising out of the employment relationship." The Fifth Circuit Court of Appeals has held that an arbitration clause using the "any dispute" language is of the "broad type" and that it is "difficult to imagine broader language." *complaint of Hornbeck Offshore (1984) Corp. v. Coastal Carriers Corp.*, 981 F.2d 752, 755 (5th Cir. 1993) (citation omitted). Thus, supplying an omitted term regarding collective or class arbitration is consistent with the intent of the parties which demonstrably was to authorize arbitration in the broadest possible category of cases.

Second, the arbitration agreement specifically excludes one category of disputes—disputes pertaining to trade secrets and proprietary information. Like most jurisdictions, Texas courts recognize the doctrine of *expressio unius est exclusio alterius*, a contract interpretation doctrine that provides that the expression in a contract of one or more things of a class, implies the exclusion of all others not expressed. *Oxy USA, Inc. v. Southwestern Energy Prod. Co.*, 161

6

1  S.W.3d 277, 285 (Tex. App. 2005). Thus, the arbitration agreement may be fairly

2  interpreted to include all other categories of disputes, including collective and

3  class arbitrations.

4      CSA contends that such an interpretation is not proper because the

5
   exclusion for trade secret disputes refers to substantive claims, whereas collective
6
7  or class arbitrations are procedural devices, not substantive ones. Although CSA is

8  correct that there is a difference between a substantive claim and a procedural

9  right, the significance of the exclusion is simply that the drafter of the arbitration
10
   agreement, CSA, knew how to exclude certain disputes from the scope of the
11
12 arbitration agreement, but apparently chose not to exclude collective and class

13 arbitrations.

14     CSA's decision not to expressly exclude collective or class arbitrations is

15 significant because as of 2008 it was not uncommon for certain employers and
16
17 others to expressly restrict arbitration to individual claims.[4] *See, e.g., Pleasants v.*

18 *American Express Co.*, 541 F.3d 853, 855 (8th Cir. 2008) ("Further you and we

19 will not have the right to participate in a representative capacity or as a member of

20 any class of claimants pertaining to any claim subject to arbitration . . . .");

21
22 *Snowden v. CheckPoint Check Cashing*, 290 F.3d 631, 634 (4th Cir. 2002) ("There

23

24 [4] It is the position of CSA that the arbitration agreement not only limits employees' claims
   to bilateral arbitration, but also prohibits completely collective or class claims whether in
25 arbitration or in court. In light of my interpretation of the arbitration agreement it is
   unnecessary to consider whether the arbitration agreement interpreted as proffered by
26 CSA is unconscionable. *See Carter v. Countrywide Credit Indus., Inc.*, 362 F.3d 294
27 (5th Cir. 2004).

7

**Add89**
Exhibit 7

1   shall be no authority for any claims to be arbitrated on a class action basis . . . . An

2   arbitrator can only decide . . . your claim and may not consolidate or join the

3   claims of other persons who may have similar claims . . . .").

4

5   Third, CSA filed a motion in federal court to compel arbitration. Claimant

6   brought his complaint in federal court as a FLSA collective action. Although there

7   is nothing in CSA's motion wherein it agreed that a collective action may be

8   brought in arbitration, CSA knew that Claimant had brought a collective action.

9   Nevertheless, CSA sought to compel arbitration of that collective action without

10   making any distinction between Claimant's individual claim and his request to

11   proceed in a collective action under the FLSA. That position strongly suggests it

12   was CSA's view that all of the claims raised in the federal court complaint could

13

14   be brought in arbitration.

15   For the foregoing reasons and giving consideration to Texas rules of

16

17   contract interpretation, I conclude that with the limited exclusion of disputes over

18   trade secrets, it was the intent of the parties to arbitrate all disputes regarding

19   employment, of every kind whatsoever, and therefore I find that the arbitration

20   agreement in this case authorizes a collective and/or class arbitration.

21

22   The proceedings shall be stayed for 30 days from the date of this award to

23   permit any party to move a court of competent jurisdiction to confirm or vacate the

24   Clause Construction Award. Once all parties inform the undersigned in writing

25   during the period of the stay that they do not intend to seek judicial review of the

26

27

8

Clause Construction Award, or once the requisite time period expires without any party having informed the arbitrator that it has done so, this matter shall proceed to a determination of class certification. If any party informs the arbitrator within the period provided that it has sought judicial review, a further stay of the proceedings will be considered.

DATED this 6th day of July, 2010.

_____

Bruce E. Meyerson, Arbitrator

I, Bruce E. Meyerson, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Partial Final Clause Construction Award.

DATED this 6th day of July, 2010.

_____

Bruce E. Meyerson, Arbitrator

9

FRISARI, v. DISH NETWORK, L.L.C., 2013 WL 4494927 (2013)

2013 WL 4494927 (D.N.J.) (Arbitration Award)
United States District Court, D. New Jersey.

FRISARI,
v.
DISH NETWORK, L.L.C.

Nos. 12CV05495, 18-160-001431-12.
May 30, 2013.

Editor's Note: This document was acquired from a Court file.

**Case Type:** Labor
**Award Amount:** unknown
**Attorney for Petitioner:** Jonathan I. Nirenberg
**Attorney for Respondent:** Jeffrey F. Klamut
**Award Date:** 04/30/2013
**Arbitrator:** William A. Dreier

### Opinion, Order and Clause Construction Award

**Arbitrator:** William A. Dreier

Pursuant to the Commercial Arbitration Rules of the American Arbitration Association (AAA), and the Supplementary Rules for Class Arbitrations, a preliminary hearing on the Clause Construction issue was held on April 10, 2013, before the Arbitrator, Hon. William A. Dreier. Jonathan I. Nirenberg, Esq. (The Nirenberg Law Firm, attorneys) appeared for Claimants; Christian C. Anitkowiak, Esq. and John Goodman, Esq. (Buchanan, Ingersoll & Rooney, attorneys), appeared for Respondents. Although the caption names only the initial Claimant, Elizabeth Frisari, four other Claimants, Waqas Akhtar, Hassan Shahid, Raushan Simmons, and Mirela Muhic (the spelling of these names may be inaccurate) had joined the predecessor litigation that had been removed, and all are joined in this arbitration.

This Arbitration is held under the authority of the parties contractual agreement under which the Arbitrator has been duly appointed.

The parties have each submitted briefs and answering briefs on the issue of Clause Construction. The Clause Construction Phase of the arbitration constitutes a separate partial Award under the *AAA Supplementary Rules Governing Class Arbitrations* ("Supplementary Rules").
Section 3. Construction of the Arbitration Clause of the Supplementary Rules provides, in part, as follows:

**Upon appointment, the arbitrator shall determine as a threshold matter, in a reasoned, partial final award on the construction of the arbitration clause, whether the applicable arbitration clause permits the arbitration to proceed on behalf of or against a class (the "Clause Construction Award.")** ...

In construing the applicable arbitration clause, the arbitrator shall not consider the existence of these Supplementary Rules, or any other AAA rules, to be a factor either in favor of or against permitting the arbitration to proceed on a class basis.

(Emphasis added).

There is no question that the Federal Arbitration Act, 9 U.S.C. §§2-6, and the cases interpreting the Act, govern this issue. Although additional cases are pending before the United States Supreme Court, definitive language in *Stolt-Nielsen S.A. v.*

WestlawNext © 2015 Thomson Reuters  No claim to original U.S. Government Works

Exhibit 8

**FRISARI, v. DISH NETWORK, L.L.C., 2013 WL 4494927 (2013)**

*Animalfeeds Int'l Corp.,* 130 S.Ct. 1758, 1775-1776 (2010), and *AT&T Mobility, LLC v. Concepçion,* 131 S.Ct. 1740, 1746-1753 (2011), makes it clear that unless within the parties agreement there is an acceptance of class actions or other collective determination of Claimants claims, class status must be denied. Although the arbitration clause is initially examined, the arbitrator may view both the agreement as a whole and any controlling general contractual principles.

The Arbitration Clause in the parties April 6, 2012 Arbitration Agreement with Claimant Frisari (the same Agreements with the other Claimants bear dates of June 10, 2006, September 20, 2010, July 29, 2011 and August 1, 2011), provides:

> ... [The parties] agree that **any claim, controversy and/or dispute** between them, **arising out of and/or in any way related to Employee's** application for employment, **employment** and/or termination of employment, whenever or wherever brought, **shall be resolved by arbitration**. The Employee agrees that this Agreement is governed by the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq., and is fully enforceable.

(Emphasis added).

The Agreement further states:

Notwithstanding the foregoing, **this agreement to arbitrate all claims** shall not apply to Employee claims for statutory unemployment compensation benefits, statutory worker's compensation benefit, and claims for benefits from an [sic] Dish Network-sponsored "employee benefit plan," as that term is defined in 29 U.S.C. §1002(3)....

....

The right to a trial, to a trial by jury, and to common law claims for punitive and/or exemplary damages are of value and are waived pursuant to this agreement. **Other than potential rights to a trial, a jury trial, and common law claims or punitive and/or exemplary damages, nothing in this Agreement limits any statutory remedy to which the Employee may be entitled under law.**

(Emphasis added),

What do the Agreement's references to "any claim, controversy and/or dispute" and "all claims" signify, especially when the claims involve diverse causes of action? Certainly they encompass Claimants individual claims for unpaid time-and-a-half overtime under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 203(a)(1), and resultant damages, 29 U.S.C. § 216(b), and for similar violations of the New Jersey Wage and Hour Law, ("NJWHL") N.J.S.A. 34:11-56a(a), *et seq.,* for unpaid time-and-a-half overtime, The issue is whether they also include the collective claims of similarly situated employees.

Claimants argue that the agreement sanctions class action treatment as a "statutory remedy," along with the other relief requested, namely declaratory judgments, compensatory and statutory exemplary damages (as opposed to the common-law exemplary damages barred by the Agreement), injunctive relief, costs and attorneys fees, They further note that the Agreement permits "all claims" to be arbitrated, except certain statutory claims such as unemployment compensation, worker's compensation, and employee benefit claims under the company plan.

The Agreement, however, does not leave the issue of other statutory claims to chance. It contains a unique provision evincing the parties intentions, where it provides that "nothing in this Agreement limits *any statutory remedy* to which the Employee may be entitled under law," (Emphasis added). The Arbitrator must therefore examine the "statutory remed(ies)," that exist, and how such remedies reflect the parties intention concerning collective actions.

The first and most obvious of these statutes is the *Federal Rules of Civil Procedure,* which includes its Class Action Rule, *Fed. R.Civ. P. 23.* Whether this Rule creates a separate remedy requires an analysis of the nature of a class action as a "remedy." Given, however, the express other remedies in the Federal and State wage payment statutes, the class action procedural statute need not be reviewed in detail.

The claims under the *New Jersey Wage and Hour Law,* N.J.S.A. 34:11-56a *et seq.,* present an easier question. Here is an

express statutory basis for a Class Action. N.J.S.A. 34:11-56a25 provides:

> If any employee is paid by an employer less than the minimum fair wage to which such employee is entitled under the provisions of this act or by virtue of a minimum fair wage order such employee may recover in a civil action the full amount of such minimum wage less any amount actually paid to him or her by the employer together with costs and such reasonable attorney's fees as may be allowed by the court, and any agreement between such employee and the employer to work for less than such minimum fair wage shall be no defense to the action. **An employee shall be entitled to maintain such action for and on behalf of himself or other employees similarly situated, and such employee and employees may designate an agent or representative to maintain such action for and on behalf of all employees similarly situated.**

(Emphasis added).

The language, "nothing in this Agreement limits any statutory remedy to which the Employee may be entitled under law" incorporates this statute by reference. It covers both the minimum wage stated in the statute and overtime claims. *See Genarie v. PRD Management, Inc.,* 2006 WL 436733, at *17 (D.N.J. Feb. 17, 2006), where Judge Simandle, quoting the statute, stated that "[u]nder the NJWHL, every employer shall pay to each of his employees a certain minimum wage for 40 hours of working time in any week and 1 1/2 time such employee's regular hourly wage for each hour of working time in excess of 40 hours in any week.... N.J.S.A. 34:11-56a4." This Minimum Wage is inclusive of overtime pay. This statute, therefore, covers both regular and overtime pay. N.J.S.A. § 34:11-56a25 is the only New Jersey statute that creates a private cause of action for minimum wage and overtime claims. It provides the right to bring a civil suit for overtime. *See, Iiadis v. Wal-Mart Stores, Inc.,* 191 N.J. 88 (2007) (upholding a class action including overtime claims under the NJWHL).

==The statutory right to proceed collectively is part and parcel of this section. The collective remedy is integrated with the right of recovery. Without this collective right, the remedy would be meaningless for an employee whose deficient pay is small, but where the aggregate claims combined with others similarly situated make the claim financially practical.==

The Federal claims have a similar basis. The FLSA, in 29 U.S.C. §216(b), provides:
(b) Damages; right of action; attorney's fees and costs; termination of right of action.

Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. Any employer who violates the provisions of section 215(a)(3) of this title shall be liable for such legal or equitable relief as may be appropriate to effectuate the purposes of section 215(a)(3) of this title, including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages. An action to recover the liability prescribed in either of the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves **and other employees similarly situated.**

(Emphasis added. But note also that there is an opt-in rather than an opt-out requirement for parties plaintiffs.)

The United States Supreme Court has recently noted the difference between an FLSA "collective action" and a class action. *See, Genesis Healthcare Corp. v. Symczyk,* -- S.Ct. --, 2013 WL 1567370 at *5 (2013). This decision is inapplicable to the NJWHL claims that are more similar to the opt-out class action rules. The inescapable conclusion remains, however, that the parties have incorporated into their arbitration agreement the collective resolution rights of employees to assert wage claims. Thus, the arbitrator will continue to use the "class action" terminology, a reference which was not barred by the Supreme Court in *Genesis Healthcare. Id.* at *4, n. 1. ("[W]e do not express an opinion on the propriety of this use of class-action nomenclature....").

Respondent claims that Claimants invoked the Class Action Procedural Rule, not the Wage and Hour provision authorizing a collective remedy (and by implication the FLSA collective authorization). But they misperceive the interplay between the

Exhibit 8

FRISARI, v. DISH NETWORK, L.L.C., 2013 WL 4494927 (2013)

two, It may be argued that the Rule provides its own entry into a possible class action because of the "any statutory remedy" provision of the Agreement. It further could be argued that the "any claim, controversy and/or dispute" and "all claims" provisions themselves provide a basis for this case to be pass the clause construction test. *See Homa v. American Express Co,* 558 F.3d 225, 229-30 (3rd Cir., 2009), *and Sutter v. Oxford Health Plans, LLC,* 675 F.3d 215, 222-224 (3rd Cir.), *cert, granted,* ___ U.S. ___ (2012), and the numerous other cases cited by Claimants. But here there is clear pathway to interpret the arbitration provisions of the parties agreement: (1) the NJWHL (and FLSA) claims, (2) the contractual language giving Claimants the right to resort to the NJWHL (and FLSA) statutory remedies, (3) the express NJWHL (N.J.S.A. 34:11-56(a)), *et seq.* and FLSA 29 U.S.C. §216(b), statutory statements of rights to collective relief, all providing the possible procedural steps incorporated into the Agreement to implement the rights granted by the NJWHL and FLSA.

When this case was removed from the Federal court to the arbitration forum, the Stipulation of Dismissal contained a reservation of "all issues concerning the scope of the arbitration agreement for the arbitrator to decide, including whether Plaintiffs arbitration agreements authorize a class or collective action." The arbitration clause of the Agreement preserves the NJWHL and FLSA claims for potential collective treatment. The factual assertions for the two claims are the same, the legal standards likewise largely overlap (except for a different class definition because of the opt-in versus opt-out provisions), as do the asserted damages.

While the "any remedy" language by itself may provide the basis to include collective remedies, reading the Arbitration Agreement as a whole, with its acceptance of the NJWHL and FLSA statutes and their collective remedies, and the absence of contractual rejection in the listing of other acts not included in the arbitration ambit, shows a sufficient acceptance of the principles of collective relief. Accordingly, the only fair conclusion is that the parties agreed to have potential class treatment of the state and federal claims. *Cf. Lopez v. 5 De Mayo Bakery, Inc.,* 2010 WL 2869484, at *3-7 (N.J. App. Div. July 20, 2010) (Recognizing that an FLSA collective action for overtime compensation violations may be brought on behalf of "other employees similarly situated," a broader term than the Class Action but not the NJWHL statutes). Depending on the circumstances, all of the claims might be heard under the single umbrella of a potential class arbitration. But such a final determination is premature at this stage of these proceedings.

In this case, the Arbitrator need not reach the issues posed by *Stolt-Neilsen* or *Concepçion, supra,* or even those posed in the Supreme Court oral argument in the *Sutter* case. Where the collective arbitral rights of all members are not intruded upon, the right of each potential class member in this putative class action is also protected. If class treatment is permitted after a further examination of the facts, any individual class member dissatisfied with the process can opt out of this proceeding (or as to the FLSA, refuse to opt into the proceedings), engage different counsel or appear *pro se,* or seek individual or class relief elsewhere before another arbitrator. As this is but a preliminary determination, the permissibility of a class treatment of these claims is not yet determined. All of the considerations compiled in the AAA Class Arbitration Rules, incorporating most of the considerations of *Fed.R.Civ P.* 23, remain to be determined. The sole issue here is whether the Arbitration Clause, read in the context of this Agreement, permits class determination. The Arbitrator rules that it does.

For the foregoing reasons, the Arbitrator **DETERMINES,** and it is on this *30th day of April, 2013,* **ORDERED AND AWARDED** that the Arbitration Clauses in the parties agreements noted at the outset, read in the context of the agreement, envision and permit a potential class determination of the parties disputes as set forth in the Statement of Claim.

Rule 3 of the *AAA Rules for Class Arbitrations* provides for an automatic stay of at least thirty (30) day of the effect of this Clause Construction Award:

> The arbitrator shall stay all proceedings following the issuance of the Clause Construction Award for a period of at least 30 days to permit any party to move a court of competent jurisdiction to confirm or to vacate the Clause Construction Award, Once all parties inform the arbitrator in writing during the period of the stay that they do not intend to seek judicial review of the Clause Construction Award, or once the requisite time period expires without any party having informed the arbitrator that it has done so, the arbitrator may proceed with the arbitration on the basis stated in the Clause Construction Award. If any party informs the arbitrator within the period provided that it has sought judicial review, the arbitrator may stay further proceedings, or some part of them, until the arbitrator is informed of the ruling of the court.

Exhibit 8

**FRISARI, v. DISH NETWORK, L.L.C., 2013 WL 4494927 (2013)**

Pursuant to this provision, the effect of this Award is **STAYED** for the initial period of thirty (30) days from the date hereof.

All issues and/or arguments raised by the parties have been considered, but not all have been expressly addressed in this Partial Final Clause Construction Award, Any such arguments not so addressed are hereby rejected and denied.

Following any stay pursuant to this Order or as ordered by a Court of competent jurisdiction, counsel are directed to confer with the Case Manager to set up a conference call with the Arbitrator to discuss the terms of a further comprehensive Case Management and Scheduling Order for the Class Determination Phase of this putative class arbitration, to be implemented after Judicial Review or the waiver thereof.

**IT IS SO ORDERED AND AWARDED.**

<<signature>>

Hon. William A. Dreier, Arbitrator

I, Hon. William A. Dreier, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Partial Final Clause Construction Award.

<<signature>>

Hon. William A. Dreier, Arbitrator

---

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 8