# EXHIBIT E

| | |
|---|---|
| **ROY CONRAD, Individually and On Behalf of All Others Similarly Situated, Claimant,** | **AMERICAN ARBITRATION ASSOCIATION** |
| **V.** | |
| **SUN COAST RESOURCES, INC., Respondent.** | **CASE NO. 01-17-0001-5075** |

### RESPONDENT SUN COAST RESOURCES, INC.'S RESPONSE IN OPPOSITION TO CLAIMANTS' MOTION FOR CLAUSE CONSTRUCTION DETERMINATION TO PERMIT COLLECTIVE ACTION ARBITRATION

Respondent SUN COAST RESOURCES, INC. ("Sun Coast") files its Response in Opposition to Claimants' Motion for Clause Construction Determination to Permit Collective Action Arbitration.

## I.
## INTRODUCTION

The sole issue to be decided by the Arbitrator is *not* whether the arbitration agreement *excludes* collective arbitration, as the Claimants incorrectly frame the issue, but whether the parties *agreed to authorize* collective arbitration in the first place. Since the United States Supreme Court's decisions in *Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 130 S.Ct. 1758 (2010) and *AT&T Mobility LLC v. Concepcion,* 131 S.Ct. 1740 (2011), the overwhelming majority of federal courts and arbitrators have prohibited collective arbitration where authorization is absent from the agreement.

The authority and arbitration awards relied on by the Claimants would be persuasive and compelling on the issue of collective arbitration for those matters arising *before Stolt–Nielsen* and *Concepcion*, *but not afterwards.* Perhaps that is why the Claimants' pleading completely omits analysis of the controlling United States Supreme Court opinions, which reinforce the fundamental tenets of bilateral, informal arbitration agreements: informality, controlled risk,

procedural simplicity, and effective means of review.

Claimants' only hope to avoid the devastating, determining impact of *Stolt–Nielsen* and *Concepcion* on the effort to create collective arbitration is to **ignore** these decisions and hope that the Arbitrator does too. For this reason, these decisions are discussed in detail below.

## II.
## CONTROLLING LEGAL STANDARDS

### A. *Collective Action is Prohibited where Authorization is Absent from the Agreement*

The question is **not** whether the Agreement forbids collective arbitration, but whether the Agreement allows it. The United States Supreme Court, the Fifth Circuit, and numerous arbitration decisions in Texas have held that absent an agreement of the parties allowing for a collective arbitration, there is no basis to compel a party to collective arbitration.

In *Stolt–Nielsen,* the Supreme Court established the "standard to be applied by a decision maker in determining whether a contract may permissibly be interpreted to allow class arbitration." The Supreme Court held that a party may not be compelled under the Federal Arbitration Act ("FAA") to submit to collective arbitration "unless there is a contractual basis for concluding that the party **agreed** to do so." *Stolt–Nielsen,* 130 S.Ct. at 1772-75.

Texas arbitrators have followed the "rigorous standards" in *Stolt–Nielsen* to preclude collective arbitration where that term is absent from the agreement. *See Randall Ford, Inc., et al, v. Dealer Computer Servs., Inc.*, 2011 WL 7628925 (N.D.Tex.) (AAA Commercial and Class Action Arbitration Tribunal) (arbitrators followed *Stolt-Nielsen* to preclude collective arbitration) (Widman, Marshall, and Silverman, Arbs.); *Debose, v. Smith & Wollensky Rest. Grp., Inc.*, 2012 WL 5385054 (S.D.Tex.) (arbitrator followed *Stolt-Nielsen* to preclude collective arbitration) (Soussan, Arb.).

In *Stolt–Nielsen*, the arbitrators had erred by "impos[ing] class arbitration even though

the parties concurred that they had reached 'no agreement' on that issue." *Stolt–Nielsen*, 130 S.Ct. at 1775. In fact, the arbitrators had faulted the parties for failing to preclude class arbitration, and "regarded the agreement's silence on the question of class arbitration as dispositive." *Id.* The Supreme Court found that the arbitrators' conclusion was "fundamentally at war with the foundational FAA principle that arbitration is a matter of consent." *Id.*

Arbitration cannot be coerced.  The Supreme Court recognizes that parties are "generally free to structure their arbitration agreements as they see fit," and to "specify ***with whom*** they choose to arbitrate their disputes." *Id.* at 1774 (emphasis in original). Thus, *Stolt–Nielsen* makes clear that the absence of terms discussing class arbitration cannot be interpreted as consent that the parties intended to resolve their dispute in collective arbitration.

### B. *Significant Disadvantages in Collective Arbitration Give Reason to Doubt the Parties' Consent to Agree to Collective Arbitration*

In *Stolt–Nielsen*, the Supreme Court explained that "[a]n implicit agreement to authorize class-action arbitration ... is not a term that the arbitrator may infer solely from the fact of the parties' agreement to arbitrate." *Id.*

The Supreme Court decided that, "because class-action arbitration changes the nature of the arbitration to such a degree that it cannot be presumed the parties consented to it by simply agreeing to submit their disputes to an arbitrator." *Id.* The Supreme Court described the fundamental differences between bilateral and class arbitration. For example, in collective arbitration, the arbitrator: "no longer resolves a single dispute between the parties to a single agreement, but instead resolves many disputes between hundreds or perhaps even thousands of parties," and the presumption of privacy and confidentiality that applies in many bilateral arbitrations would not apply. *Id.* at 1776. Further, "[t]he arbitrator's award no longer purports to bind just the parties to a single arbitration agreement, but adjudicates the rights of absent parties

as well." *Id*. Additionally, although the stakes are similar to those in collective litigation, "the scope of judicial review is much more limited." *Id*. Thus, the Supreme Court concluded that these differences and disadvantages "***give reason to doubt*** the parties' mutual consent to resolve disputes through class-wide arbitration." *Id*. at 1775–76 (emphasis supplied). The Supreme Court stated that "the differences between bilateral and class-action arbitration are too great for arbitrators to presume, consistent with their limited powers under the FAA, that the parties' mere silence on the issue of class-action arbitration constitutes consent to resolve their disputes in class proceedings." *Id*. at 1776.

*Concepcion*, another landmark Supreme Court decision, is important because the Supreme Court explains what it meant in *Stolt–Nielsen* regarding arbitration being poorly suited to the higher stakes of collective litigation. The Supreme Court articulated, that collective arbitration: "includes absent parties, necessitating additional and different procedures and involving higher stakes. Confidentiality becomes more difficult. And while it is theoretically possible to select an arbitrator with some expertise relevant to the class-certification question, arbitrators are not generally knowledgeable in the often-dominant procedural aspects of certification ...." *Concepcion*, 131 S.Ct. at 1750.

The Supreme Court also emphasized three major disadvantages of collective arbitration. First, the switch from bilateral to class arbitration sacrifices the principal advantage of arbitration—its informality—and makes the process slower, more costly, and more likely to generate procedural morass than final judgment. *Id*. at 1751. Second, class arbitration *requires* procedural formality. *Id*. (emphasis in original). The Supreme Court found it "unlikely that in passing the FAA Congress meant to leave the disposition of these procedural requirements to an arbitrator." *Id*. Third, class arbitration greatly increases risks to defendants, including the risk of

being pressured into settling questionable claims. *Id.* at 1752.

Given these disadvantages, the Supreme Court found "it hard to believe that defendants" would agree to class arbitration and thereby "bet the company with no effective means of review." *Id.* As such, *Concepcion* held that collective arbitration, to the extent it is manufactured by state law rather than by consent, is inconsistent with the FAA. *Id.* at 1751–52.

C. ***Since Stolt–Nielsen and Concepcion the Overwhelming Majority of Federal Courts and Arbitrators Have Prohibited Collective Arbitration where Authorization is Absent from the Agreement***

The Third, Fifth, Sixth, and Ninth Circuits have followed *Stolt–Nielsen* and *Concepcion* in holding that the absence of any explicit mention of class arbitration in arbitration agreements weighs against a finding that it was authorized. *See Reed v. Fla. Metro. Univ., Inc.*, 681 F.3d 630, 643–44 (5th Cir. 2012), *abrogated on other grounds by Oxford Health Plans LLC v. Sutter*, 133 S. Ct. 2064 (2013); *see also Opalinski v. Robert Half Int'l*, 677 Fed.Appx. 738, 741 (3d Cir. 2017) ("the lack of a reference to class arbitration in the Agreement supports a construction that only contemplates bilateral arbitration"); *Eshagh v. Terminix Int'l Co.*, 588 Fed.Appx. 703, 704 (9th Cir. 2014) (affirming the district court's grant of a motion to strike class allegations, where the arbitration agreement did not mention class arbitration); *Reed Elsevier, Inc. ex rel. LexisNexis Div. v. Crockett*, 734 F.3d 594, 599 (6th Cir. 2013) ("The principal reason to conclude that this arbitration clause does not authorize classwide arbitration is that the clause nowhere mentions it.").

Similarly, since *Stolt–Nielsen* and/or *Concepcion*, the overwhelming majority of arbitrators, including Texas arbitrators, have decided that the absence of any explicit mention of class arbitration in arbitration agreements weighs against a finding that it was authorized. *See Randall Ford*, 2011 WL 7628925 (N.D.Tex.) (arbitrators followed *Stolt-Nielsen* in precluding

collective arbitration); *Debose*, 2012 WL 5385054 (S.D.Tex.) (same); *Determination of Respondent's Motion to Dismiss*, 2012 WL 2153430, at *8 (AAA) (June 12, 2012) (parties redacted) (arbitrator followed *Stolt–Nielsen* in precluding collective arbitration as provided in FLSA § 216(b)) (Sochynsky, Arb.); *Bernal et al, v. Burnett et al.*, 2010 WL 4025108 (D.Colo.) (AAA) (arbitrator followed *Stolt–Nielsen* in precluding collective arbitration) (Baker, Arb.); *DIRECTV, LLC, v. Arndt et al.*, 2012 WL 5385039 (N.D.Ga.) (AAA) (arbitrator followed *Stolt– Nielsen* and *Concepcion* in precluding collective arbitration) (Clark, Arb.); *Hiway 87 Stop, Inc. et al, v. Power Buying Dealers USA, Inc. et al.*, 2014 WL 7894630 (N.D.Ill.) (same) (Coar, Arb.); *Tenet Health Sys. Phila., Inc., v. Francis Rooney*, 2012 WL 1520830 (E.D.Pa.) (AAA) (arbitrator followed *Stolt–Nielsen* in precluding collective arbitration) (Hankinson, Arb.); *Sequoia Educ., Inc., v. Rivera*, 2011 WL 9369114 (Cal.Super.) (the arbitrator followed *Stolt– Nielsen* and *Concepcion* in precluding collective arbitration) (Fleming, Arb.); *Harrison, v. Legal Helpers Debt Resolution, LLC et al.*, 2014 WL 5284848 (D.Minn.) (AAA) (finding class action claims precluded under *Stolt-Nielsen*) (Dinneen, Arb.).

The Arbitrator should similarly resolve the collective action arbitration issue in favor of prohibiting such arbitration because the parties did not authorize it.

**D.  *The Oxford Case Does Not Apply to the Interpretation of the Agreement***

Claimants rely on *Oxford Health Plans LLC v. Sutter,* 133 S. Ct. 2064 (2013) to incorrectly assert that "in a case with a remarkably similar arbitration agreement, the United States Supreme Court held that the Arbitrator acted properly in authorizing class arbitration." *See* Claimants' Motion, at p. 6. However, upon closer inspection, the Supreme Court in *Oxford* neither validated nor approved of the underlying arbitrator's analysis that the agreement authorized collective arbitration.

The sole issue in *Oxford* was whether the arbitrator interpreted the parties' contract, ***not whether he construed it correctly***. *See Oxford*, 133 S.Ct. at 2068 ("So the sole question for us is whether the arbitrator (even arguably) interpreted the parties' contract, not whether he got its meaning right or wrong."). *Oxford* simply held that an arbitrator's decision to allow collective arbitration cannot be overturned if the decision was based on interpretation of the parties' contract. *Id.* at 2070. The Supreme Court stated clearly that nothing in its *Oxford* opinion "should be taken to reflect any agreement with the arbitrator's contract interpretation, or any quarrel with Oxford's contrary reading." *Id.*

*Oxford* does not support the argument that the interpretation of the parties' contract in that case was correct. Moreover, *Oxford* is not compelling authority upon which to confirm the clause award that Claimants' seek. Indeed, the only importance of *Oxford* to this dispute is that it ***does not overrule*** *Stolt–Nielsen*, *Concepcion,* or the Fifth Circuit's *Reed* decision on the merits. *See Debose v. Smith & Wollensky Rest. Grp., Inc.*, 2013 WL 5487939, at \*2 (S.D. Tex. 2013) ("The Supreme Court in *Oxford Health* did not, however, overrule the Fifth Circuit's decision in *Reed* on its merits. Instead, the Supreme Court overruled the Fifth Circuit because the circuit improperly applied § 10(a)(4) to allow a court to vacate an arbitration award.").

### E. *Texas Law Precludes Collective Arbitration where Authorization is Absent*

Texas law is consistent with *Stolt–Nielsen* and *Concepcion* in that arbitration is a consensual process. The FAA does not require parties to arbitrate when they have not agreed to do so, and its purpose is to make arbitration agreements "as enforceable as other contracts, but not more so." *In re Merrill Lynch Tr. Co. FSB*, 235 S.W.3d 185, 192 (Tex. 2007). Thus, in Texas, a party cannot be compelled to arbitrate a dispute unless he has agreed to do so. *See IHS Acquisition No. 131, Inc. v. Iturralde*, 387 S.W.3d 785, 791 (Tex.App.—El Paso 2012, no pet.);

*In re Bunzl USA, Inc.*, 155 S.W.3d 202, 209 (Tex.App.—El Paso 2004, orig. proceeding); *Ascendant Anesthesia PLLC v. Abazi*, 348 S.W.3d 454, 458 (Tex.App. —Dallas 2011, no pet.); *Ophthalmic Consultants of Tex., P.A. v. Morales*, 2015 WL 6119490, at *2 (Tex. App.—Corpus Christi 2015, no pet.) ("Arbitration involves matters of contract, and a party cannot be compelled to submit to arbitrate a dispute absent an agreement to do so.").

Texas Courts (and arbitrators) will not insert absent terms into an agreement in the name of interpretation. Texas courts "strive to honor the parties' agreement and not remake their contract by reading additional provisions into it." *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010). ***The parties' intent is governed by what is written in the contract, not by what one side contends it intended but failed to say***. *Id.* at 127; *see also Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 753 (Tex. 2006) ("[W]here the language is plain and unambiguous, courts must enforce the contract as made by the parties, and cannot make a new contract for them, nor change that which they have made under the guise of construction.").

### III.
### THE AGREEMENT DOES NOT AUTHORIZE COLLECTIVE ARBITRATION

It is undisputed that the terms "collective" and "class" are completely absent from the Agreement[1]. Neither party has asserted that the Agreement is ambiguous, nor is it. It is also undisputed that the Agreement contains no discussion on whether an individual claimant can assert claims on behalf of other employees in a collective arbitration. Also, there are no references to employee groups, putative class members, or other employees' claims or disputes. There is simply no contractual language, express or implied, that authorizes collective arbitration.

---

[1] [See Exhibit "A" - Mediation and Arbitration Agreement].

In an attempt to overcome this dispositive textual reality, Claimants make two equally weak and legally deficient arguments: (1) that the use of the general terms "any controversy or claim," "any claim," "dispute," and "remedies" in the Agreement is enough to infer that the parties agreed to authorize collective arbitration; and (2) the parties agreed to authorize collective arbitration because they did not expressly exclude it.

## A.   *The Breadth of an Arbitration Clause Cannot Support Collective Arbitration*

Claimants argue that the use of the general terms "any controversy or claim," "any claim," "dispute," and "remedies" in the Agreement is enough to infer that the parties agreed to authorize collective arbitration. Claimants' argument fails for a variety of reasons.

First, and most importantly, Claimants' argument has been continuously rejected by the courts and arbitrators *since* *Stolt–Nielsen, Concepcion*, and the Fifth Circuit's *Reed* decision.

Second, a collective arbitration is procedural, not a right itself.

Finally, the plain language of the Agreement does not support Claimants' argument. For example, "any controversy or claim" modifies "*your employment relationship* with Sun Coast" and "any claim" modifies "the employee." The terms Claimants' rely on actually modify and pertain to the *individual employee*. The language relied on by Claimants merely indicates that the parties agreed to arbitrate their disputes and says nothing about whether they agreed to collective arbitration proceedings.

In *Reed*, the Fifth Circuit held that the arbitrator improperly relied upon similar "any dispute or claim" language in authorizing collective arbitration. *Reed*, 681 F.3d at 642. The Fifth Circuit wrote: "[t]he 'any dispute' clause is a standard provision that may be found, in one form or another, in many arbitration agreements. *Id.* On its face, the "any dispute" clause merely reflects an agreement between the parties to arbitrate their disputes." *Id.* The Fifth Circuit added

that "*Stolt-Nielsen* makes clear, however, that an 'implicit agreement to authorize class arbitration ... is not a term that the arbitrator may infer solely from the fact of the parties' agreement to arbitrate.'" *Reed*, 681 F.3d at 642. The Fifth Circuit then held that this type of clause is therefore "not a valid contractual basis upon which to conclude that the parties agreed to submit to class arbitration." *Id.* at 643. Even in her dissenting opinion in *Stolt–Nielsen*, Justice Ginsburg recognized that "[t]he breadth of the arbitration clause ... will not [support collective arbitration]." *Stolt-Nielsen*, 130 S.Ct. at 1782 (Ginsburg, J. dissenting); *Reed*, 681 F.3d at 641.

*Stolt-Nielsen* and *Reed* are consistent with Texas law, which provides: "[f]or a court to read additional provisions into [a] contract, the implication must clearly arise from the language used, or be indispensable to effectuate the intent of the parties. It must appear that the implication was so clearly contemplated by the parties that they deem it unnecessary to express it." *Fuller v. Phillips Petroleum Co.*, 872 F.2d 655, 658 (5th Cir.1989); *see Danciger Oil & Ref. Co. of Tex. v. Powell*, 137 Tex. 484, 154 S.W.2d 632, 635 (1941).

Arbitrators examining similar language have rejected the Claimants' argument as well. In *Arndt*, the Claimants cited to language in the agreements that referred to "all claims or controversies, past, present or future, except claims identified in the Arbitration Procedure under the heading 'Claims Not Covered By The Agreement,' arising out of an employee's employment or its termination." *Arndt*, 2012 WL 5385039, at *10. Relying on *Stolt–Nielsen* and *Reed*, the arbitrator decided that the Claimants' "argument fails to recognize that the language cited from the Arbitration Agreements is a reference to substantive claims that are subject to arbitration and not to the procedures that are available to pursue such substantive claims and remedies." *Id.*; *see also Rooney*, 2012 WL 1520830, at *3 ("Language such as 'any and all claims and disputes' refers to the breadth of an arbitration clause and is routinely interpreted to mean that any dispute

arising out of the designated subject matter must be referred to arbitration. It says nothing about the procedural mechanism for resolving that claim or dispute.").

Claimants' also argue that based on the general "all remedies" language in the Agreement, the parties impliedly agreed to the same collective action procedure that would be available under FLSA §216(b) as if the matter were litigated in court. This argument has been expressly rejected.

In *Reed*, the Fifth Circuit held that the arbitrator improperly relied upon a similar "any remedy" clause. *Reed*, 681 F.3d at 643. The Fifth Circuit held that the "any remedy" clause "says nothing whatsoever about class arbitration," and does not constitute an agreement to authorize class arbitration. *Id.* (citing *Stolt–Nielsen*, 130 S.Ct. at 1776). The Fifth Circuit explained that a "remedy" is "anything a court can do for a litigant who has been wronged or is about to be wronged." *Id.* Remedies may include, for example, equitable relief such as an injunction held or restitution, or legal relief such as monetary damages. *Id.* In contrast, the Fifth Circuit has characterized a class action as "a procedural device." *Id.* (Citing *Sw. Ref. Co. v. Bernal*, 22 S.W.3d 425, 437 (Tex. 2000) (class action is a procedural device intended to advance judicial economy by trying claims together that lend themselves to collective treatment.)). Thus, while a collective action may lead to certain types of remedies or relief, a collective action is not itself a remedy. *Id.*

Also, arbitrators have routinely found that the general terms "remedy" and "relief" as commonly used and understood are not easily susceptible to an interpretation encompassing a collective action. *See Determination of Respondent's Motion to Dismiss*, 2012 WL 2153430, at *8 ("the terms "remedy" and "relief" as commonly used and understood are not easily susceptible to an interpretation that encompasses collective or class action."); *Burnett*, 2010 WL

4025108, *15 (arbitrator followed *Stolt–Nielsen* and found "that the reference to "any remedy" is most naturally read as referring to the different types of remedies such as damages, punitive damages, injunctive relief and the like-- and not to a procedural mechanism (*i.e.*, a class action) for obtaining that remedy."); *Arndt*, 2012 WL 5385039, at*14 (Conferring on the arbitrator the "ability to order legal or equitable remedies as could a court of general jurisdiction" does not justify an inference that class arbitration procedures are authorized because class arbitration procedures are not legal or equitable remedies).

In sum, courts and arbitrators hold that similar general "any dispute" "any claim" or "all remedies" clauses are insufficient to infer consent under *Stolt–Nielsen* and *Reed*. The Arbitrator should similarly reject Claimants' argument here and resolve the collective arbitration issue in favor of prohibiting such arbitration based on the plain language of the Agreement.

### B. *The Absence of Prohibiting Language Cannot Support Collective Arbitration*

Claimants argue that the parties agreed to authorize collective arbitration because they did not expressly exclude it. There is no end to what would be authorized in arbitration if the parties were required to specifically exclude everything that they did not want to contest in arbitration. Such a concept turns the term "knowing consent" on its head.

In *Reed,* the Fifth Circuit concluded that the arbitrator lacked a contractual basis upon which to conclude that the parties agreed to authorize collective arbitration. *Reed*, 681 F.3d at 644. The arbitrator suggested that the drafter of the agreement had an obligation to affirmatively state that the agreement precluded collective arbitration. *Id*. at 644. The Fifth Circuit found that the arbitrators' rationale was directly contrary to *Stolt–Nielsen* and the parties must "agree to authorize" class arbitration, not merely fail to bar such a proceeding. *Id*. (citing *Stolt–Nielsen*, 130 S.Ct. at 1776 (emphasis omitted)). The Fifth Circuit noted that "[a]t most, the agreement …

could support a finding that the parties did not preclude class arbitration, but under *Stolt–Nielsen* this is not enough." *Id.*

The Fifth Circuit concluded that "in light of the significant disadvantages of class arbitration as discussed in both *Stolt–Nielsen* and *Concepcion*, an arbitrator (or a court) should not conclude that parties—and defendants in particular—consented to such a proceeding absent a contractual basis for doing so." *Id.* at 640. *Stolt–Nielsen* and *Reed* require that the parties "agree to authorize class arbitration *not merely that they fail to bar such a proceeding*." *Id*. Again, even in dissent, Justice Ginsburg recognized in *Stolt–Nielsen* that "the absence of any provision waiving or banning class proceedings will not [support collective arbitration]." *Stolt–Nielsen*, 130 S.Ct. at 1782 (Ginsburg, J. dissenting).

Since *Stolt-Nielsen* and *Reed,* the arbitrators examining the issue agree that the absence of an exclusion of collective arbitration does not support collective arbitration. *See Arndt,* 2012 WL 5385039, at *12 (the agreements' silence with regard to class arbitration does not justify an inference that the drafter of the agreement must have intended to agree to class arbitration because it failed to expressly exclude class arbitration); *Randall Ford,* 2011 WL 7628925, at *5 (argument that class arbitration is permitted because it was not expressly barred is improper under *Stolt-Nielsen*); *Burnett,* 2010 WL 4025108, at *14 ("Mere silence on the subject of class arbitration (including the failure to put in a clause prohibiting class arbitration) is not sufficient. One must instead find evidence that the parties agreed to authorize class arbitration.").

At most, the Agreement in this case could support a finding that the parties did not preclude class arbitration, but under *Stolt-Nielsen* and *Reed*, this is not enough.

### C. *The Plain Language of the Agreement Calls for Individual Bilateral Arbitration*

The plain and unambiguous language of the Agreement clearly only contemplates individual bilateral arbitration.

First, the Agreement provides that any controversy or claim arising out of or relating to "*your employment relationship*" and "*your dispute*" must be confined to arbitration. This wording indicates that the claim must arise or relate to the individual's relationship with Sun Coast and not claims that arise or relate to any other individual's relationship with Sun Coast.

Second, the Agreement is a binding agreement between each individual employee and Sun Coast *i.e.* the "*parties*," "*both you and Sun Coast*" and no one else. There is no reference to employee groups, putative class members, or other employees' claims or disputes.

Third, covered disputes under the Agreement all modify "which *the employee* has an alleged cause of action" and reveals that the parties envisioned compulsory mediation and arbitration for claims belonging to the individual signatory. Significantly, the Agreement addresses what the parties intended by narrowing the scope of covered claims to "claims for which *the employee* has an alleged cause of action."

Fourth, throughout the Agreement, references are made with respect to the individual employee *i.e.* "*you*" in the singular, and as to his rights, duties, obligations, benefits.

Fifth, the Agreement expressly excludes only those type of claims that cannot be waived as a matter of law and thus would not include collective arbitration which can be arbitrated if the parties agreed to authorize it.

Sixth, the Agreement contemplates the mutual agreement between the parties in "exchange for rights to which you are not otherwise entitled, namely" *individual employment* and a "*more expeditious resolution of employment disputes*."

Seventh, any controversy or claim for alleged unpaid wages or overtime between Sun Coast and any other employee cannot arise or relate to the specific aggrieved individual employee claimant. Such alleged claims would belong to other employees and not to a class claimant representative.

Eighth, before any individual claimant can compel arbitration with Sun Coast, he/she must make "good faith efforts at resolving any dispute internally" and that effort must fail. Class members of any collective action failing or refusing to exhaust internal efforts individually cannot compel Sun Coast to hear their claims under the Agreement and cannot share in any award rendered in a proceeding involving another individual claimant. Likewise, the failure or refusal of any employee to participate in mediation precludes arbitration of their claims. The perils of holding class members who did not opt out of a class arbitration bound by an arbitral award or settlement is but one of several aspects of class arbitration that the majority opinion in *Concepcion* found to be of concern.

Ninth, the parties did not consider the issue of whether individual claimant could bring class actions. If both parties did not consider the issue, there is no meeting of the minds to allow individual claimants to bring class actions.

Tenth, the definition of "Claims Covered" states that the claims are those "for which the employee has an alleged cause of action" and those for which "*the aggrieved party* must give written notice" to the other "within six (6) months of the date the aggrieved first knew or should have known of the facts giving rise to the claim." Thus, the Parties contemplated individual action and limitations - not collective or class actions of employees that gave no written notice of a claim.

Lastly, the nature of the claims in this matter involve daily *per diem* rates and will require

individual determination of any liability and individual determination of any damages.

## IV.
## CONCLUSION

The plain language and context of the Agreement repeatedly demonstrates that the parties' intent was to arbitrate on an individual bilateral basis. Further, the lack of even a reference to collective arbitration in the Agreement supports a construction that only contemplates bilateral arbitration. Under the FAA and Texas law, the Agreement must be enforced according to its actual terms, not terms that do not exist and were not agreed to by the parties. Controlling Supreme Court precedent and Texas law mandate individual bilateral arbitration in this case. Since *Stolt–Nielsen, Concepcion,* and *Reed,* the overwhelming majority of arbitrators have prohibited collective arbitration in similar circumstances. Claimant has failed to point to any language in the Agreement where the parties agreed to collective arbitration. Accordingly, Claimants' Motion for Clause Construction Determination to Permit Collective Action Arbitration should be denied and arbitration should proceed on an individual basis in this case.

Respectfully submitted,

GARDERE WYNNE SEWELL LLP


*/s/ Cristina Portela Solomon*
CRISTINA PORTELA SOLOMON
Texas Bar No. 16143400
csolomon@gardere.com
NEIL MARTIN
Texas Bar No. 13096000
nmartin@gardere.com
JASON SHARP
Texas Bar No. 24039170
jsharp@gardere.com
2000 Wells Fargo Plaza
1000 Louisiana Street
Houston, Texas 77002
Telephone: (713) 276-5500
Facsimile: (713) 276-5555

ATTORNEYS FOR RESPONDENT
SUN COAST RESOURCES, INC.


## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served on this the 17th day of August, 2017, to:

ROBERT R. DEBES, JR.
Texas Bar No. 05626150
bdebes@eeoc.net
RICARDO J. PRIETO
Texas Bar No. 24062947
rprieto@eeoc.net
SHELLIST, LAZARZ, SLOBIN LLP
11 Greenway Plaza, Suite 1515
Houston, Texas 77046
Telephone: (713) 621-2277
Facsimile (713) 621-0993
ATTORNEYS FOR CLAIMANT
& CLASS MEMBERS

*/s/ Cristina Portela Solomon*
Cristina Portela Solomon

# EXHIBIT A

# Mediation and Arbitration Agreement

| | |
|---|---|
| Name | Roy Conrad |
| Employee ID | 4302 |
| Started | 11/22/2013 18:29:45 -06:00 |
| Electronically Signed & Submitted | 11/22/2013 18:30:29 -06:00 |
| Electronic Signature | Electronically signed by MyPay User [minleesboy@yahoo.com] on 11/22/2013 18:30:29 -06:00 from IP Address [172.7.186.249] User Agent: Mozilla/5.0 (X11; Linux i686; rv:17.0) Gecko/20100101 Firefox/17.0 |

## Mediation and Arbitration Agreement

### MEDIATION AND ARBITRATION AGREEMENT

Although Sun Coast Resources, Inc. ("Sun Coast") hopes that employment disputes with its employees will not occur, Sun Coast believes that when these disputes do arise, it is in the mutual interest of all concerned to handle them promptly and with minimal disturbance to the operations of Sun Coast's businesses and the lives of its employees.

Accordingly, to provide for more expeditious resolution of certain employment-related disputes that may arise between Sun Coast and its employees, Sun Coast has instituted a mandatory mediation and arbitration procedure ("Procedure") for all employees. Under the Procedure, certain disputes that may arise from your employment with Sun Coast or the termination of your employment must, after appropriate attempts to resolve your dispute internally through Sun Coast management channels, be submitted for resolution by non-binding mediation and, if necessary, mandatory binding arbitration.

In agreeing to submit certain employment disputes for resolution by private mediation and, if necessary, arbitration, you acknowledge that this Agreement is given in exchange for rights to which you are not otherwise entitled, namely, your employment as a Sun Coast employee and the more expeditious resolution of employment disputes. In exchange for your agreement to submit these disputes to mediation and, if necessary, binding arbitration, Sun Coast likewise agrees to the use of mediation and arbitration as the exclusive forum for resolving certain employment disputes covered by this Agreement.

Hence, the parties shall be precluded from bringing or raising in court or another forum any dispute that was or could have been brought or raised under the procedures set forth in this Agreement. You will receive a copy of Sun Coast's Mediation and Arbitration Agreement at the same time you receive your Employee Handbook.

Sun Coast Mediation and Arbitration Procedure

**Scope of Mediation and Arbitration Procedure**: As a condition of your employment at Sun Coast, you agree that any controversy or claim arising out of or relating to your employment relationship with Sun Coast or the termination of that relationship must be submitted for non-binding mediation before a third-party neutral mediator and, if necessary, for final and binding resolution by a private and impartial arbitrator, to be jointly selected by you and Sun Coast.

*Claims Covered:* This agreement to submit to mediation and, if necessary, arbitration:

i. Covers any dispute concerning the arbitrability of any such controversy or claim; and
ii. Includes, but is not limited to, any claim that could be asserted in court or before an administrative agency or claims for which the employee has an alleged cause of action, including without limitation claims for breach of any contract or covenant (express or implied); tort claims; claims for discrimination (including, but not limited to, discrimination based on sex, pregnancy, race, national or ethnic origin, age, religion, creed, marital status, sexual orientation, mental or physical disability or medical condition, specifically including claims under The American With Disabilities Act, or any other applicable law, veteran status, or other characteristics protected by statute); claims for wrongful discharge; violations or the Family and Medical Leave Act (FMLA); and/or claims for violation of any federal , state or other governmental law, statute, regulation or ordinance, and whether based on statute or common law; and

Disputes covered by this Agreement include all such claims whether made against Sun Coast, any of its subsidiary or affiliated entities, all benefit plans, the benefit plans' sponsors, Sun Coast's individual officers or directors (in an official or personal capacity), and all successors and assigns of any of them.

*Claims Not Covered:* Claims covered by this Agreement do not include:

i. A claim for worker's compensation benefits;
ii. A claim for unemployment compensation benefits;
iii. A claim by Sun Coast for injunctive and/or other equitable relief, including without limitation claims for unfair competition and/or the use or unauthorized disclosure of trade secrets or confidential information, for which Sun Coast may seek and obtain relief from a court of competent jurisdiction; and
iv. A claim based upon Sun Coast's current (successor or future) employee benefits and/or welfare plans that contain an appeal procedure or other procedure for the resolution of disputes under the plan.

**Internal Efforts:** As a prerequisite for submitting an employment dispute to mediation and, if necessary, arbitration, both you and Sun Coast agree to make good faith efforts at resolving any dispute internally on an informal basis through Sun Coast management channels appropriate to that particular dispute. Any employment dispute should be directed to the Director of Human Resources in an effort to resolve the dispute internally. Only when those internal efforts fail may an employment dispute be submitted to mediation and, if necessary, final and binding arbitration under the terms of the Procedure.

**Nonbinding Mediation:** If efforts at informal resolution fail, disputes arising under this Agreement must first be submitted for non-binding mediation before a neutral third party. The complainant may within six (6) months of the act or omission complained of (or a greater period of time, if allowed by the applicable statute of limitations), whichever is later, request that the matter be submitted to the Procedure. Mediation is an informal process where the parties to a dispute meet in an attempt to reach a voluntary resolution, using the third party as a facilitator. Mediation shall be conducted and administered by the American Arbitration Association (AAA) under its National Rules for Resolution of Employment Disputes, which are incorporated into this Procedure by reference, or as otherwise agreed

between the parties.

**Binding Arbitration:** If a covered dispute remains unresolved at the conclusion of the mediation process, either party may submit the dispute for resolution by final binding confidential arbitration under the Procedure. The arbitration will be conducted under the National Rules for Resolution of Employment Disputes of the AAA, as amended and effective on January 1, 2001, as amended. These Rules, incorporated by reference into this Procedure, include, but are not limited to, the procedures for the joint selection of an impartial arbitrator and for the hearing of evidence before the arbitrator. The arbitrator shall have the authority to allow for appropriate discovery and exchange of information prior to a hearing, including, but not limited to, production of documents, information requests, depositions and subpoenas. A copy of the complete National Rules for Resolution of Employment Disputes may be obtained from the Director of Human Resources.

Any conflict between the rules and procedures set forth in the AAA rules and those set forth in this Agreement shall be resolved in favor of those in this Agreement. The burden of proof at an arbitration shall at all times be on the party seeking relief. In reaching a decision, the arbitrator shall apply the governing substantive law applicable to the claim(s), cause(s) of action and defense(s) asserted by the parties as applicable in the state where the claims arise. The arbitrator shall have the power to award all remedies that could be awarded by a court or administrative agency in accordance with the governing and applicable substantive law.

**Time Limits and Procedures:** The aggrieved party must give written notice of any claim to the other party within six (6) months of the date the aggrieved first knew or should have known of the facts giving rise to the claim (or a greater period of time, if allowed by an applicable statute of limitations), otherwise, the claim shall be deemed waived. The written notice shall describe the nature of all claims asserted and the facts upon which such claims are based and shall be mailed to the other party by certified or registered mail, return receipt requested. Any such notice mailed to Sun Coast shall be addressed to:

Sun Coast Resources, Inc.
Attn: Director of Human Resources
6405 Cavalcade, Building 1
Houston, TX 77026

Any mediation and/or arbitration conducted under this Agreement shall take place in Houston, Harris County, Texas, unless the Employee's regular place of business is more than 150 miles from the city limits of Houston, Texas, in which case an alternative location will be selected by Sun Coast that is within 150 miles of the employee's residence, or unless an alternative location is chosen be the mutual agreement of the parties. The arbitrator shall render a decision and award within thirty (30) days after the close of the arbitration hearing or at any later time on which the parties may agree. The award shall be in writing and signed and dated by the arbitrator and shall contain express findings of fact and the basis for the award.

The parties agree to share equally the AAA administrative fees and the arbitrator's fees and expenses. All other costs and expenses associated with the arbitration, including, without limitation, each party's

respective attorney's fees, shall be borne by the party incurring the expense.

Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction. The award may be vacated or modified only on the grounds specified in the Federal Arbitration Act or other applicable law.

**No Retaliation/Employment At-Will:** Under no circumstances will a Sun Coast employee be retaliated against in any way for invoking the Procedure in good faith to seek the resolution of a dispute. Sun Coast managers who engage in such retaliation will be subject to discipline under the appropriate Sun Coast disciplinary procedures.

The Sun Coast Arbitration and Mediation Agreement does not, in any way, alter the at-will employment status of Sun Coast employees. Sun Coast and its employees are always free to terminate the employment relationship at any time for any lawful reason and employment is not for any specific or definite duration.

**Savings Clause:** In the event that any of the provisions of this Agreement are held to be unenforceable or invalid by any court of competent jurisdiction or as the result of any valid federal, state, local or other law, rule or regulation, the unenforceable or invalid provision shall be deemed to be automatically deleted from this Agreement and the validity and enforceability of the remaining provisions shall not be affected thereby and shall continue in full force and effect, if the essential terms and conditions of this Agreement for both Parties remain valid, legal and enforceable.

**Federal Arbitration Act Applies:** Except as provided in this Agreement, the Federal Arbitration Act shall govern interpretation, enforcement, and all proceedings pursuant to this Agreement. To the extent that the Federal Arbitration Act is inapplicable, state law pertaining to agreements to arbitrate will apply.

This Agreement sets forth the complete agreement of the parties on the subject of mediation and arbitration of the covered claims defined above and supersedes any prior or contemporaneous oral or written understanding on these subjects. No party is relying on any representations, oral or written, on the subject or the effect, enforceability or meaning of this Agreement, except as specifically set forth in this Procedure.

By clicking "Submit" below and providing your electronic signature, you indicate your agreement to the terms set forth above. You understand that by agreeing to the terms in this Procedure, you are giving up any constitutional or statutory right you may possess to have covered claims decided in a court of law before a judge or a jury. You further understand that clicking "Submit" below and providing your electronic signature is the same as physically signing the document and Sun Coast may rely on your electronic signature as if it was your physical signature.

Stolt-Nielsen S.A. v. AnimalFeeds International Corp., 559 U.S. 662 (2010)

130 S.Ct. 1758, 2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605...

130 S.Ct. 1758
Supreme Court of the United States

STOLT–NIELSEN S.A. et al., Petitioners,
v.
ANIMALFEEDS INTERNATIONAL CORP.

No. 08–1198.
|
Argued Dec. 9, 2009.
|
Decided April 27, 2010.

## Synopsis

**Background:** In consolidated actions, owners of parcel tankers moved to vacate arbitration award imposing class arbitration on charterers' class antitrust claims. The United States District Court for the Southern District of New York, Jed S. Rakoff, J., 435 F.Supp.2d 382, vacated the arbitration award, and charterer appealed. The United States Court of Appeals for the Second Circuit, Sack, Circuit Judge, 548 F.3d 85, reversed and remanded with instructions to deny the petition to vacate. Certiorari was granted.

**Holdings:** The Supreme Court, Justice Alito, held that:

[1] challenge to arbitration award was ripe for judicial review;

[2] arbitration panel exceeded its powers under the Federal Arbitration Act (FAA) by imposing its policy choice;

[3] vessel owners did not waive challenge to arbitration panel's award; and

[4] the parties could not be compelled to submit antitrust claims to class arbitration.

Reversed and remanded.

Justice Ginsburg filed a dissenting opinion in which Justice Stevens and Justice Breyer joined.

Justice Sotomayor took no part in the consideration or decision of the case.

West Headnotes (24)

[1] **Shipping**
    Arbitration of controversies

354 Shipping
354III Charters
354k39 Construction and Operation in General
354k39(7) Arbitration of controversies

Question of whether arbitration panel's award imposing class arbitration on charterers and vessel owners, whose arbitration clauses were "silent" on that issue, was consistent with the Federal Arbitration Act (FAA) was ripe for judicial review; the panel's award meant that owners had to submit to class determination proceedings before arbitrators who, if owners were correct, had no authority to require class arbitration absent the parties' agreement to resolve their disputes on that basis, and should owners refuse to proceed with what they maintained was essentially an ultra vires proceeding, they would almost certainly be subject to a petition to compel arbitration under the FAA. 9 U.S.C.A. § 1 et seq.

38 Cases that cite this headnote

[2] **Federal Courts**
    Presentation of Questions Below or on Review;Record;Waiver

170B Federal Courts
170BXVI Supreme Court
170BXVI(D) Presentation of Questions Below or on Review;Record;Waiver
170Bk3181 In general
    (Formerly 170Bk461)

Argument that the question on which certiorari was granted, namely whether arbitration panel's award imposing class arbitration on charterers and vessel owners, whose arbitration clauses were "silent" on that issue, was consistent with the Federal Arbitration Act (FAA), was prudentially unripe was waived before the Supreme Court, where argument was not pressed in, or

**Stolt-Nielsen S.A. v. AnimalFeeds International Corp., 559 U.S. 662 (2010)**

130 S.Ct. 1758, 2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605...

considered by, the courts below. 9 U.S.C.A. § 1 et seq.

21 Cases that cite this headnote

**[3]    Federal Courts**
    👈 Ripeness;Prematurity

**Federal Courts**
    👈 Prudential concerns

170B    Federal Courts
170BIII    Case or Controversy Requirement
170BIII(A)    In General
170Bk2118    Ripeness;Prematurity
170Bk2119    In general
        (Formerly 170Bk12.1)
170B    Federal Courts
170BIII    Case or Controversy Requirement
170BIII(A)    In General
170Bk2118    Ripeness;Prematurity
170Bk2122    Prudential concerns
        (Formerly 170Bk12.1)

"Ripeness" reflects constitutional considerations that implicate Article III limitations on judicial power, as well as prudential reasons for refusing to exercise jurisdiction.

24 Cases that cite this headnote

**[4]    Administrative Law and Procedure**
    👈 Finality;ripeness

15A    Administrative Law and Procedure
15AV    Judicial Review of Administrative Decisions
15AV(B)    Decisions and Acts Reviewable
15Ak704    Finality;ripeness

In evaluating a claim to determine whether it is ripe for judicial review, Supreme Court considers both the fitness of the issues for judicial decision and the hardship of withholding court consideration.

28 Cases that cite this headnote

**[5]    Alternative Dispute Resolution**
    👈 Mistake or Error

**Alternative Dispute Resolution**
    👈 Grounds for Impeachment or Vacation

25T    Alternative Dispute Resolution

25TII    Arbitration
25TII(G)    Award
25Tk327    Mistake or Error
25Tk328    In general
25T    Alternative Dispute Resolution
25TII    Arbitration
25TII(H)    Review, Conclusiveness, and Enforcement of Award
25Tk360    Impeachment or Vacation
25Tk362    Grounds for Impeachment or Vacation
25Tk362(1)    In general

In order to obtain relief vacating decision of arbitration panel, a party must clear a high hurdle, and it is not enough for the party to show that the panel committed an error, or even a serious error. 9 U.S.C.A. § 1 et seq.

146 Cases that cite this headnote

**[6]    Alternative Dispute Resolution**
    👈 Consistency and reasonableness;lack of evidence

25T    Alternative Dispute Resolution
25TII    Arbitration
25TII(G)    Award
25Tk324    Consistency and reasonableness;lack of evidence

It is only when an arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice that his decision may be unenforceable under the Federal Arbitration Act (FAA). 9 U.S.C.A. § 10(a)(4).

101 Cases that cite this headnote

**[7]    Alternative Dispute Resolution**
    👈 Nature and Extent of Authority

25T    Alternative Dispute Resolution
25TII    Arbitration
25TII(E)    Arbitrators
25Tk228    Nature and Extent of Authority
25Tk229    In general

The task of an arbitrator is to interpret and enforce a contract, not to make public policy. 9 U.S.C.A. § 1 et seq.

21 Cases that cite this headnote

**Stolt-Nielsen S.A. v. AnimalFeeds International Corp., 559 U.S. 662 (2010)**

130 S.Ct. 1758, 2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605...

**[8]    Shipping**
    ☞ Arbitration of controversies

354   Shipping
354III   Charters
354k39   Construction and Operation in General
354k39(7)   Arbitration of controversies

Arbitration panel exceeded its powers under the Federal Arbitration Act (FAA) by imposing its own policy choice in concluding that arbitration clauses in charter party agreements between charterers and vessel owners allowed for class arbitration of charterers' antitrust claims, despite the fact that the clauses were silent as to class arbitration; rather than inquiring whether the FAA, maritime law, or New York law contained a default rule under which an arbitration clause would be construed as allowing class arbitration in the absence of express consent, the panel perceived an emerging consensus among arbitrators that class arbitration was beneficial in a wide variety of settings, and the panel then considered only whether there was any good reason not to follow that consensus in this dispute. 9 U.S.C.A. § 10(a)(4).

80 Cases that cite this headnote

**[9]    Customs and Usages**
    ☞ Explanation of Contract

113   Customs and Usages
113k9   Application and Operation
113k15   Explanation of Contract
113k15(1)   In general

Under both New York law and general maritime law, evidence of custom and usage is relevant to determining the parties' intent when an express agreement is ambiguous.

6 Cases that cite this headnote

**[10]    Shipping**
    ☞ Arbitration of controversies

354   Shipping
354III   Charters
354k39   Construction and Operation in General
354k39(7)   Arbitration of controversies

Vessel owners, who sought to overturn arbitration panel's award imposing class arbitration on antitrust claims brought against them by charterers, did not waive, in the parties' supplemental agreement, any claim that the arbitrators could not construe the arbitration agreement to permit class arbitration, where the supplemental agreement expressly provided that it did not alter the scope of the parties' arbitration agreements in any charter party agreement, and it provided that neither the supplemental agreement itself, nor any of its terms, could be used to support or oppose any argument in favor of a class action arbitration, and nothing in the supplemental agreement conferred authority on the arbitrators to exceed the terms of the charter party agreements. 9 U.S.C.A. § 1 et seq.

164 Cases that cite this headnote

**[11]    Alternative Dispute Resolution**
    ☞ Construction

25T   Alternative Dispute Resolution
25TII   Arbitration
25TII(B)   Agreements to Arbitrate
25Tk136   Construction
25Tk137   In general

Courts are obliged to enforce the parties' agreement to arbitrate according to its terms. 9 U.S.C.A. § 1 et seq.

53 Cases that cite this headnote

**[12]    Federal Courts**
    ☞ Alternative dispute resolution

170B   Federal Courts
170BXV   State or Federal Laws as Rules of Decision;Erie Doctrine
170BXV(B)   Application to Particular Matters
170Bk3022   Procedural Matters
170Bk3053   Alternative dispute resolution
(Formerly 170Bk403)

While the interpretation of an arbitration agreement is generally a matter of state law, the Federal Arbitration Act (FAA) imposes certain rules of fundamental importance, including the basic precept that arbitration is

**Stolt-Nielsen S.A. v. AnimalFeeds International Corp., 559 U.S. 662 (2010)**

130 S.Ct. 1758, 2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605...

a matter of consent, not coercion. 9 U.S.C.A. § 1 et seq.

76 Cases that cite this headnote

**[13]    Alternative Dispute Resolution**
    Constitutional and statutory provisions and rules of court

25T   Alternative Dispute Resolution
25TII   Arbitration
25TII(A)   Nature and Form of Proceeding
25Tk114   Constitutional and statutory provisions and rules of court

The central or primary purpose of the Federal Arbitration Act (FAA) is to ensure that private agreements to arbitrate are enforced according to their terms. 9 U.S.C.A. § 1 et seq.

83 Cases that cite this headnote

**[14]    Alternative Dispute Resolution**
    Construction

**Contracts**
    Intention of Parties

25T   Alternative Dispute Resolution
25TII   Arbitration
25TII(B)   Agreements to Arbitrate
25Tk136   Construction
25Tk137   In general
95   Contracts
95II   Construction and Operation
95II(A)   General Rules of Construction
95k147   Intention of Parties
95k147(1)   In general

Whether enforcing an agreement to arbitrate or construing an arbitration clause, courts and arbitrators must give effect to the contractual rights and expectations of the parties, and in this endeavor, as with any other contract, the parties' intentions control. 9 U.S.C.A. § 1 et seq.

86 Cases that cite this headnote

**[15]    Alternative Dispute Resolution**
    Agreement or submission as determinative

25T   Alternative Dispute Resolution
25TII   Arbitration

25TII(E)   Arbitrators
25Tk228   Nature and Extent of Authority
25Tk230   Agreement or submission as determinative

An arbitrator derives his or her powers from the parties' agreement to forgo the legal process and submit their disputes to private dispute resolution. 9 U.S.C.A. § 1 et seq.

7 Cases that cite this headnote

**[16]    Alternative Dispute Resolution**
    Contractual or consensual basis

25T   Alternative Dispute Resolution
25TII   Arbitration
25TII(A)   Nature and Form of Proceeding
25Tk112   Contractual or consensual basis

Parties may specify with whom they choose to arbitrate their disputes. 9 U.S.C.A. § 1 et seq.

23 Cases that cite this headnote

**[17]    Alternative Dispute Resolution**
    Construction

**Alternative Dispute Resolution**
    Disputes and Matters Arbitrable Under Agreement

25T   Alternative Dispute Resolution
25TII   Arbitration
25TII(B)   Agreements to Arbitrate
25Tk136   Construction
25Tk137   In general
25T   Alternative Dispute Resolution
25TII   Arbitration
25TII(B)   Agreements to Arbitrate
25Tk142   Disputes and Matters Arbitrable Under Agreement
25Tk143   In general

It falls to courts and arbitrators to give effect to the parties' contractual limitations on arbitration, and when doing so, courts and arbitrators must not lose sight of the purpose of the exercise: to give effect to the intent of the parties. 9 U.S.C.A. § 1 et seq.

48 Cases that cite this headnote

**[18]    Shipping**
    Arbitration of controversies

Stolt-Nielsen S.A. v. AnimalFeeds International Corp., 559 U.S. 662 (2010)

130 S.Ct. 1758, 2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605...

354 Shipping

354III Charters

354k39 Construction and Operation in General

354k39(7) Arbitration of controversies

Charterer and vessel owners could not be compelled to submit charterer's class action antitrust claims to class arbitration, where the charterers and owners had not reached an agreement on class arbitration, and the arbitration clauses in their charter party agreements were silent on the question of class arbitration. 9 U.S.C.A. § 1 et seq.

258 Cases that cite this headnote

**[19]  Alternative Dispute Resolution**
    Contractual or consensual basis

25T  Alternative Dispute Resolution

25TII  Arbitration

25TII(A)  Nature and Form of Proceeding

25Tk112  Contractual or consensual basis

A party may not be compelled under the Federal Arbitration Act (FAA) to submit to class arbitration unless there is a contractual basis for concluding that the party agreed to do so. 9 U.S.C.A. § 1 et seq.

205 Cases that cite this headnote

**[20]  Alternative Dispute Resolution**
    Contractual or consensual basis

25T  Alternative Dispute Resolution

25TII  Arbitration

25TII(A)  Nature and Form of Proceeding

25Tk112  Contractual or consensual basis

The foundational Federal Arbitration Act (FAA) principle is that arbitration is a matter of consent. 9 U.S.C.A. § 1 et seq.

89 Cases that cite this headnote

**[21]  Alternative Dispute Resolution**
    Construction

25T  Alternative Dispute Resolution

25TII  Arbitration

25TII(B)  Agreements to Arbitrate

25Tk136  Construction

25Tk137  In general

In certain contexts, it is appropriate under the Federal Arbitration Act (FAA) to presume that parties that enter into an arbitration agreement implicitly authorize the arbitrator to adopt such procedures as are necessary to give effect to the parties' agreement; this recognition is grounded in the background principle that when the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court. 9 U.S.C.A. § 1 et seq.; Restatement (Second) of Contracts § 204.

18 Cases that cite this headnote

**[22]  Alternative Dispute Resolution**
    Construction

25T  Alternative Dispute Resolution

25TII  Arbitration

25TII(B)  Agreements to Arbitrate

25Tk136  Construction

25Tk137  In general

Under the Federal Arbitration Act (FAA), an implicit agreement to authorize class-action arbitration is not a term that the arbitrator may infer solely from the fact of the parties' agreement to arbitrate, because class-action arbitration changes the nature of arbitration to such a degree that it cannot be presumed the parties consented to it by simply agreeing to submit their disputes to an arbitrator, and the relative benefits of class-action arbitration are much less assured than the benefits of bilateral arbitration, giving reason to doubt the parties' mutual consent to resolve disputes through class-wide arbitration. 9 U.S.C.A. § 1 et seq.

386 Cases that cite this headnote

**[23]  Alternative Dispute Resolution**
    Nature, purpose, and right to arbitration in general

25T  Alternative Dispute Resolution

25TII  Arbitration

25TII(A)  Nature and Form of Proceeding

25Tk111  Nature, purpose, and right to arbitration in general

Stolt-Nielsen S.A. v. AnimalFeeds International Corp., 559 U.S. 662 (2010)

130 S.Ct. 1758, 2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605...

In bilateral arbitration, parties forgo the procedural rigor and appellate review of the courts in order to realize the benefits of private dispute resolution: lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes. 9 U.S.C.A. § 1 et seq.

20 Cases that cite this headnote

[24]    **Alternative Dispute Resolution**
         👉 Construction

25T    Alternative Dispute Resolution
25TII    Arbitration
25TII(B)    Agreements to Arbitrate
25Tk136    Construction
25Tk137    In general

The differences between bilateral and class-action arbitration are too great for arbitrators to presume, consistent with their limited powers under the Federal Arbitration Act (FAA), that the parties' mere silence on the issue of class-action arbitration constitutes consent to resolve their disputes in class proceedings. 9 U.S.C.A. § 1 et seq.

81 Cases that cite this headnote

**1761   *662   Syllabus** *

*

The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

Petitioner shipping companies serve much of the world market for parcel tankers—seagoing vessels with compartments that are separately chartered to customers, such as respondent (AnimalFeeds), who wish to ship liquids in small quantities. AnimalFeeds ships its goods pursuant to a standard contract known in the maritime trade as a charter party. The charter party that AnimalFeeds uses contains an arbitration clause. AnimalFeeds brought a class action antitrust suit against petitioners for price fixing, and that suit was consolidated with similar suits brought by other charterers, including

one in which the Second Circuit subsequently reversed a lower court ruling that the charterers' claims were not subject to arbitration. As a consequence, the parties in this case agree that they must arbitrate their antitrust dispute. AnimalFeeds sought arbitration on behalf of a class of purchasers of parcel tanker transportation services. The parties agreed to submit the question whether their arbitration agreement allowed for class arbitration to a panel of arbitrators, who would be bound by rules (Class Rules) developed by the American Arbitration Association following *Green Tree Financial Corp. v. Bazzle,* 539 U.S. 444, 123 S.Ct. 2402, 156 L.Ed.2d 414. One Class Rule requires an arbitrator to determine whether an arbitration clause permits class arbitration. The parties selected an arbitration panel, designated New York City as the arbitration site, and stipulated that their arbitration clause was "silent" on the class arbitration issue. The panel determined that the arbitration clause allowed for class arbitration, but the District Court vacated the award. It concluded that the arbitrators' award was made in "manifest disregard" of the law, for had the arbitrators conducted a choice-of-law analysis, they would have applied the rule of federal maritime law requiring contracts to be interpreted in light of custom and usage. The Second Circuit reversed, holding that because petitioners had cited no authority applying a maritime rule of custom and usage *against* class arbitration, the arbitrators' decision was not in manifest disregard of maritime law; and that the arbitrators had not manifestly **1762 disregarded New York law, which had not established a rule against class arbitration.

*663   *Held:*   Imposing class arbitration on parties who have not agreed to authorize class arbitration is inconsistent with the Federal Arbitration Act (FAA), 9 U.S.C. § 1 et seq. Pp. —— – ——.

(a) The arbitration panel exceeded its powers by imposing its own policy choice instead of identifying and applying a rule of decision derived from the FAA or from maritime or New York law. Pp. —— – ——.

(1) An arbitration decision may be vacated under FAA § 10(a)(4) on the ground that the arbitrator exceeded his powers, "only when [an] arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice,' " *Major League Baseball Players Assn. v. Garvey,* 532 U.S. 504, 509, 121 S.Ct. 1724, 149 L.Ed.2d 740 *(per*

Stolt-Nielsen S.A. v. AnimalFeeds International Corp., 559 U.S. 662 (2010)

130 S.Ct. 1758, 2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605...

*curiam),* for an arbitrator's task is to interpret and enforce a contract, not to make public policy. P. ——.

(2) The arbitration panel appears to have rested its decision on AnimalFeeds' public policy argument for permitting class arbitration under the charter party's arbitration clause. However, because the parties agreed that their agreement was "silent" on the class arbitration issue, the arbitrators' proper task was to identify the rule of law governing in that situation. Instead, the panel based its decision on post-*Bazzle* arbitral decisions without mentioning whether they were based on a rule derived from the FAA or on maritime or New York law. Rather than inquiring whether those bodies of law contained a "default rule" permitting an arbitration clause to allow class arbitration absent express consent, the panel proceeded as if it had a common-law court's authority to develop what it viewed as the best rule for such a situation. Finding no reason to depart from its perception of a post-*Bazzle* consensus among arbitrators that class arbitration was beneficial in numerous settings, the panel simply imposed its own conception of sound policy and permitted class arbitration. The panel's few references to intent do not show that the panel did anything other than impose its own policy preference. Thus, under FAA § 10(b), this Court must either "direct a rehearing by the arbitrators" or decide the question originally referred to the panel. Because there can be only one possible outcome on the facts here, there is no need to direct a rehearing by the arbitrators. Pp. —— – ——.

(b) *Bazzle* did not control resolution of the question whether the instant charter party permits arbitration to proceed on behalf of this class. Pp. —— – ——.

(1) No single rationale commanded a majority in *Bazzle,* which concerned contracts between a commercial lender and its customers that had an arbitration clause that did not expressly mention class arbitration. The plurality decided only the question whether the court or arbitrator should decide whether the contracts were "silent" on the class arbitration issue, concluding that it was the arbitrator. Justice STEVENS' **\*664** opinion bypassed that question, resting instead on his resolution of the questions of what standard the appropriate decisionmaker should apply in determining whether a contract allows class arbitration, and whether, under whatever standard is appropriate, class arbitration had been properly ordered in the case at hand. Pp. —— – ——.

(2) The *Bazzle* opinions appear to have baffled these parties at their arbitration proceeding. For one thing, the parties appear to have believed that *Bazzle* requires an arbitrator, not a court, to decide whether a contract permits class arbitration, **\*1763** a question addressed only by the plurality. That question need not be revisited here because the parties expressly assigned that issue to the arbitration panel, and no party argues that this assignment was impermissible. Both the parties and the arbitration panel also seem to have misunderstood *Bazzle* as establishing the standard to be applied in deciding whether class arbitration is permitted. However, *Bazzle* left that question open. Pp. —— – ——.

(c) Imposing class arbitration here is inconsistent with the FAA. Pp. —— – ——.

(1) The FAA imposes rules of fundamental importance, including the basic precept that arbitration "is a matter of consent, not coercion." *Volt v. Board of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468, 479, 109 S.Ct. 1248, 103 L.Ed.2d 488. The FAA requires that a "written provision in any maritime transaction" calling for the arbitration of a controversy arising out of such transaction "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract," 9 U.S.C. § 2, and permits a party to an arbitration agreement to petition a federal district court for an order directing that arbitration proceed "in the manner provided for in such agreement," § 4. Thus, this Court has said that the FAA's central purpose is to ensure that "private agreements to arbitrate are enforced according to their terms." *Volt,* 489 U.S., at 479, 109 S.Ct. 1248. Whether enforcing an agreement to arbitrate or construing an arbitration clause, courts and arbitrators must "give effect to the [parties'] contractual rights and expectations." *Ibid.* The parties' "intentions control," *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444, and the parties are "generally free to structure their arbitration agreements as they see fit," *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 57, 115 S.Ct. 1212, 131 L.Ed.2d 76. They may agree to limit the issues arbitrated and may agree on rules under which an arbitration will proceed. They may also specify *with whom* they choose to arbitrate their disputes. See *EEOC v. Waffle House, Inc.,* 534 U.S. 279, 289, 122 S.Ct. 754, 151 L.Ed.2d 755. Pp. —— – ——.

Stolt-Nielsen S.A. v. AnimalFeeds International Corp., 559 U.S. 662 (2010)

130 S.Ct. 1758, 2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605...

(2) It follows that a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so. Here, the arbitration panel imposed class arbitration despite the parties' stipulation that they had reached **\*665** "no agreement" on that issue. The panel's conclusion is fundamentally at war with the foundational FAA principle that arbitration is a matter of consent. It may be appropriate to presume that parties to an arbitration agreement implicitly authorize the arbitrator to adopt those procedures necessary to give effect to the parties' agreement. See *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84, 123 S.Ct. 588, 154 L.Ed.2d 491. But an implicit agreement to authorize class action arbitration is not a term that the arbitrator may infer solely from the fact of an agreement to arbitrate. The differences between simple bilateral and complex class action arbitration are too great for such a presumption. Pp. ——— – ———.

548 F.3d 85, reversed and remanded.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C.J., and SCALIA, KENNEDY, and THOMAS, JJ., joined. GINSBURG, J., filed a dissenting opinion, in which STEVENS and BREYER, JJ., joined. SOTOMAYOR, J., took no part in the consideration or decision of the case.

## Attorneys and Law Firms

**\*\*1764** Seth P. Waxman, Washington, DC, for petitioners.

Cornelia T.L. Pillard, Washington, DC, for respondent.

Christopher M. Curran, J. Mark Gidley, Peter J. Carney, Eric Grannon, Charles C. Moore, White & Case LLP, Washington, DC, for Stolt-Nielsen petitioners.

Seth P. Waxman, Counsel of Record, Edward C. DuMont, Steven F. Cherry, Leon B. Greenfield, Christopher E. Babbitt, Daniel S. Volchok, Francesco Valentini, Wilmer Cutler Pickering, Hale and Dorr LLP, Washington, DC, for Odfjell petitioners.

Richard J. Rappaport, Amy B. Manning, Tammy L. Adkins, Angelo M. Russo, McGuireWoods LLP, Chicago, IL, Richard L. Jarashow, McGuireWoods LLP, New York, NY, for Jo Tankers petitioners.

Richard C. Siefert, Garvey Schubert Barer, Seattle, WA, Richard D. Gluck, Paul S. Hoff, Garvey Schubert Barer, Washington, DC, for petitioner Tokyo Marine Co., Ltd.

Bernard Persky, Kellie Lerner, Labaton Sucharow LLP, New York, NY, Cornelia T.L. Pillard, Counsel of Record, c/o Georgetown University Law Center, Washington, DC, J. Douglas Richards, Benjamin D. Brown, Christopher J. Cormier, Cohen Milstein Sellers & Toll PLLC, Washington, DC, Michael J. Freed, Steven A. Kanner, William H. London, Michael E. Moskovitz, Freed Kanner London & Millen LLC, Bannockburn, IL, Michael D. Hausfeld, Hilary K. Ratway, Hausfeld LLP, Washington, DC, Solomon B. Cera, Thomas C. Bright, Gold Bennett Cera & Sidener LLP, San Francisco, CA, W. Joseph Bruckner, Lockridge Grindal Nauen LLP, Minneapolis, MN, Aaron F. Biber Gray, Plant, Mooty, Mooty & Bennett, PA, Minneapolis, MN, for respondent.

## Opinion

Justice ALITO delivered the opinion of the Court.

**\*666** We granted certiorari in this case to decide whether imposing class arbitration on parties whose arbitration clauses are "silent" on that issue is consistent with the Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq.*

I

A

Petitioners are shipping companies that serve a large share of the world market for parcel tankers—seagoing vessels with compartments that are separately chartered to customers wishing to ship liquids in small quantities. One of those customers is AnimalFeeds International Corp. (hereinafter AnimalFeeds), which supplies raw ingredients, such as fish oil, to animal-feed producers around the world. AnimalFeeds ships its goods pursuant to a standard contract known in the maritime trade as a charter party. [1] Numerous charter parties are in regular use, and the charter party that AnimalFeeds uses is known as the "Vegoilvoy" charter party. Petitioners assert, without contradiction, that charterers **\*667** like AnimalFeeds, or their agents—not the shipowners—typically select the particular **\*\*1765** charter party that governs their shipments. Accord, Trowbridge, Admiralty

Stolt-Nielsen S.A. v. AnimalFeeds International Corp., 559 U.S. 662 (2010)

130 S.Ct. 1758, 2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605...

Law Institute: Symposium on Charter Parties: The History, Development, and Characteristics of the Charter Concept, 49 Tulane L.Rev. 743, 753 (1975) ("Voyage charter parties are highly standardized, with many commodities and charterers having their own specialized forms").

1    "[C]harter parties are commonly drafted using highly standardized forms specific to the particular trades and business needs of the parties." Comment, A Comparative Analysis of Charter Party Agreements "Subject to" Respective American and British Laws and Decisions ... It's All in the Details, 26 Tulane Mar. L.J. 291, 294 (2001–2002); see also 2 T. Schoenbaum, Admiralty and Maritime Law § 11–1, p. 200 (3d ed.2001).

Adopted in 1950, the Vegoilvoy charter party contains the following arbitration clause:

"Arbitration. Any dispute arising from the making, performance or termination of this Charter Party shall be settled in New York, Owner and Charterer each appointing an arbitrator, who shall be a merchant, broker or individual experienced in the shipping business; the two thus chosen, if they cannot agree, shall nominate a third arbitrator who shall be an Admiralty lawyer. Such arbitration shall be conducted in conformity with the provisions and procedure of the United States Arbitration Act [i.e., the FAA], and a judgment of the Court shall be entered upon any award made by said arbitrator." App. to Pet. for Cert. 69a.

In 2003, a Department of Justice criminal investigation revealed that petitioners were engaging in an illegal price-fixing conspiracy. When AnimalFeeds learned of this, it brought a putative class action against petitioners in the District Court for the Eastern District of Pennsylvania, asserting antitrust claims for supracompetitive prices that petitioners allegedly charged their customers over a period of several years.

Other charterers brought similar suits. In one of these, the District Court for the District of Connecticut held that the charterers' claims were not subject to arbitration under the applicable arbitration clause, but the Second Circuit reversed. See *668 JLM Industries, Inc. v. Stolt–Nielsen S.A., 387 F.3d 163, 183 (2004). While that appeal was pending, the Judicial Panel on Multidistrict Litigation ordered the consolidation of then-pending actions against petitioners, including AnimalFeeds' action, in the District

of Connecticut. See In re Parcel Tanker Shipping Services Antitrust Litigation, 296 F.Supp.2d 1370, 1371, and n. 1 (JPML 2003). The parties agree that as a consequence of these judgments and orders, AnimalFeeds and petitioners must arbitrate their antitrust dispute.

B

In 2005, AnimalFeeds served petitioners with a demand for class arbitration, designating New York City as the place of arbitration and seeking to represent a class of "[a]ll direct purchasers of parcel tanker transportation services globally for bulk liquid chemicals, edible oils, acids, and other specialty liquids from [petitioners] at any time during the period from August 1, 1998, to November 30, 2002." 548 F.3d 85, 87 (C.A.2 2008) (internal quotation marks omitted). The parties entered into a supplemental agreement providing for the question of class arbitration to be submitted to a panel of three arbitrators who were to "follow and be bound by Rules 3 through 7 of the American Arbitration Association's Supplementary Rules for Class Arbitrations (as effective Oct. 8, 2003)." App. to Pet. for Cert. 59a. These rules (hereinafter Class Rules) were developed by the American Arbitration Association (AAA) after our decision in Green Tree Financial Corp. v. Bazzle, 539 U.S. 444, 123 S.Ct. 2402, 156 L.Ed.2d 414 (2003), and Class Rule 3, in accordance with the plurality opinion in that case, requires an arbitrator, as a threshold matter, to determine "whether the applicable arbitration clause permits the arbitration to proceed on behalf of or against a class." App. 56a.

**1766 The parties selected a panel of arbitrators and stipulated that the arbitration clause was "silent" with respect to class arbitration. Counsel for AnimalFeeds explained to the arbitration panel that the term "silent" did not simply mean that *669 the clause made no express reference to class arbitration. Rather, he said, "[a]ll the parties agree that when a contract is silent on an issue there's been no agreement that has been reached on that issue." Id., at 77a.

After hearing argument and evidence, including testimony from petitioners' experts regarding arbitration customs and usage in the maritime trade, the arbitrators concluded that the arbitration clause allowed for class arbitration. They found persuasive the fact that other arbitrators

Stolt-Nielsen S.A. v. AnimalFeeds International Corp., 559 U.S. 662 (2010)

130 S.Ct. 1758, 2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605...

ruling after *Bazzle* had construed "a wide variety of clauses in a wide variety of settings as allowing for class arbitration," but the panel acknowledged that none of these decisions was "exactly comparable" to the present dispute. See App. to Pet. for Cert. 49a–50a. Petitioners' expert evidence did not show an "inten[t] to preclude class arbitration," the arbitrators reasoned, and petitioners' argument would leave "no basis for a class action absent express agreement among all parties and the putative class members." *Id.,* at 51a.

The arbitrators stayed the proceeding to allow the parties to seek judicial review, and petitioners filed an application to vacate the arbitrators' award in the District Court for the Southern District of New York. See 9 U.S.C. § 10(a)(4) (authorizing a district court to "make an order vacating the award upon the application of any party to the arbitration ... where the arbitrators exceeded their powers"); Petition to Vacate Arbitration Award, No. 1:06–CV–00420–JSR (SDNY) in App. in No. 06–3474-cv (CA2), p. A–17, ¶ 16 (citing § 10(a)(4) as a ground for vacatur of the award); see also *id.,* at A–15 to A–16, ¶ 9 (invoking the District Court's jurisdiction under 9 U.S.C. § 203 and 28 U.S.C. §§ 1331 and 1333). The District Court vacated the award, concluding that the arbitrators' decision was made in "manifest disregard" of the law insofar as the arbitrators failed to conduct a choice-of-law analysis. 435 F.Supp.2d 382, 384–385 (S.D.N.Y.2006). See *Wilko v. Swan,* 346 U.S. 427, 436–437, 74 S.Ct. 182, 98 L.Ed. 168 (1953) ("[T]he interpretations of the law by the arbitrators *670 in contrast to manifest disregard are not subject, in the federal courts, to judicial review for error in interpretation"); see also Petition to Vacate Arbitration Award, *supra,* at A–17, ¶ 17 (alleging that the arbitration panel "manifestly disregarded the law"). Had such an analysis been conducted, the District Court held, the arbitrators would have applied the rule of federal maritime law requiring that contracts be interpreted in light of custom and usage. 435 F.Supp.2d, at 385–386.

AnimalFeeds appealed to the Court of Appeals, which reversed. See 9 U.S.C. § 16(a)(1)(E) ("An appeal may be taken from ... an order ... vacating an award"). As an initial matter, the Court of Appeals held that the "manifest disregard" standard survived our decision in *Hall Street Associates, L.L.C. v. Mattel, Inc.,* 552 U.S. 576, 128 S.Ct. 1396, 170 L.Ed.2d 254 (2008), as a "judicial gloss" on the enumerated grounds for vacatur of arbitration awards under 9 U.S.C. § 10. 548 F.3d, at

94. Nonetheless, the Court of Appeals concluded that, because petitioners had cited no authority applying a federal maritime rule of custom and usage *against* class arbitration, the arbitrators' decision was not in manifest disregard of federal maritime law. *Id.,* at 97–98. Nor had the arbitrators manifestly disregarded New York law, the Court of Appeals continued, since nothing in New York case law **1767 established a rule against class arbitration. *Id.,* at 98–99.

[1] [2] [3] [4] We granted certiorari. 557 U.S. 903, 129 S.Ct. 2793, 174 L.Ed.2d 289 (2009). [2]

[2]  Invoking an argument not pressed in or considered by the courts below, the dissent concludes that the question presented is not ripe for our review. See *post,* at —, ——–—— (opinion of GINSBURG, J.). In so doing, the dissent offers no clear justification for now embracing an argument "we necessarily considered and rejected" in granting certiorari. *United States v. Williams,* 504 U.S. 36, 40, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992). Ripeness reflects constitutional considerations that implicate "Article III limitations on judicial power," as well as "prudential reasons for refusing to exercise jurisdiction." *Reno v. Catholic Social Services, Inc.,* 509 U.S. 43, 57, n. 18, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993). In evaluating a claim to determine whether it is ripe for judicial review, we consider both "the fitness of the issues for judicial decision" and "the hardship of withholding court consideration." *National Park Hospitality Assn. v. Department of Interior,* 538 U.S. 803, 808, 123 S.Ct. 2026, 155 L.Ed.2d 1017 (2003). To the extent the dissent believes that the question on which we granted certiorari is constitutionally unripe for review, we disagree. The arbitration panel's award means that petitioners must now submit to class determination proceedings before arbitrators who, if petitioners are correct, have no authority to require class arbitration absent the parties' agreement to resolve their disputes on that basis. See Class Rule 4(a) (cited in App. 57a); Brief for American Arbitration Association as *Amicus Curiae* 17. Should petitioners refuse to proceed with what they maintain is essentially an ultra vires proceeding, they would almost certainly be subject to a petition to compel arbitration under 9 U.S.C. § 4. Cf. *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 143, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974) ("Where the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed

provisions will come into effect"). We think it is clear on these facts that petitioners have demonstrated sufficient hardship, and that their question is fit for our review at this time. To the extent the dissent believes that the question is prudentially unripe, we reject that argument as waived, *Sprietsma v. Mercury Marine,* 537 U.S. 51, 56, n. 4, 123 S.Ct. 518, 154 L.Ed.2d 466 (2002), and we see no reason to disregard the waiver. We express no view as to whether, in a similar case, a federal court may consider a question of prudential ripeness on its own motion. See *National Park Hospitality Assn., supra, at* 808, 123 S.Ct. 2026 ("[E]ven in a case raising only prudential concerns, the question of ripeness may be considered on a court's own motion").

*671 II

A

[5] [6] [7] Petitioners contend that the decision of the arbitration panel must be vacated, but in order to obtain that relief, they must clear a high hurdle. It is not enough for petitioners to show that the panel committed an error —or even a serious error. See *Eastern Associated Coal Corp, v. Mine Workers,* 531 U.S. 57, 62, 121 S.Ct. 462, 148 L.Ed.2d 354 (2000); *Paperworkers v. Misco, Inc.,* 484 U.S. 29, 38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). "It is only when [an] arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice' that his decision may be unenforceable." *Major League Baseball Players Assn. v. Garvey,* 532 U.S. 504, 509, 1015, 121 S.Ct. 1724, 149 L.Ed.2d 740 (2001) *(per curiam)* (quoting *Steelworkers v. Enterprise Wheel & Car *672 Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)). In that situation, an arbitration decision may be vacated under § 10(a)(4) of the FAA on the ground that the arbitrator "exceeded [his] powers," for the task of an arbitrator is to interpret and enforce a contract, not to make public policy. In this case, we must conclude that what the arbitration panel did was simply to impose its own view of sound **1768 policy regarding class arbitration. [3]

---

[3]  We do not decide whether " 'manifest disregard' " survives our decision in *Hall Street Associates, L.L.C. v. Mattel, Inc.,* 552 U.S. 576, 585, 128 S.Ct. 1396, 170 L.Ed.2d 254 (2008), as an independent ground for review or as a judicial gloss on the

enumerated grounds for vacatur set forth at 9 U.S.C. § 10. AnimalFeeds characterizes that standard as requiring a showing that the arbitrators "knew of the relevant [legal] principle, appreciated that this principle controlled the outcome of the disputed issue, and nonetheless willfully flouted the governing law by refusing to apply it." Brief for Respondent 25 (internal quotation marks omitted). Assuming, *arguendo,* that such a standard applies, we find it satisfied for the reasons that follow.

B

1

[8]  In its memorandum of law filed in the arbitration proceedings, AnimalFeeds made three arguments in support of construing the arbitration clause to permit class arbitration:

"The parties' arbitration clause should be construed to allow class arbitration because (a) the clause is silent on the issue of class treatment and, without express prohibition, class arbitration is permitted under *Bazzle*; *(b) the clause should be construed to permit class arbitration as a matter of public policy;* and (c) the clause would be unconscionable and unenforceable if it forbade class arbitration." App. in No. 06–3474–cv (CA2), at A–308 to A–309 (emphasis added).

The arbitrators expressly rejected AnimalFeeds' first argument, see App. to Pet. for Cert. 49a, and said nothing about the third. Instead, the panel appears to have rested *673 its decision on AnimalFeeds' public policy argument. Because the parties agreed their agreement was "silent" in the sense that they had not reached any agreement on the issue of class arbitration, the arbitrators' proper task was to identify the rule of law that governs in that situation. Had they engaged in that undertaking, they presumably would have looked either to the FAA itself or to one of the two bodies of law that the parties claimed were governing, *i.e.,* either federal maritime law or New York law. But the panel did not consider whether the FAA provides the rule of decision in such a situation; nor did the panel attempt to determine what rule would govern under either maritime or New York law in the case of a "silent" contract. Instead, the panel based its decision on post-*Bazzle* arbitral decisions that "construed a wide variety of clauses in a wide variety of settings as allowing

**Stolt-Nielsen S.A. v. AnimalFeeds International Corp.**, 559 U.S. 662 (2010)

130 S.Ct. 1758, 2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605...

for class arbitration." App. to Pet. for Cert. 49a–50a. The panel did not mention whether any of these decisions were based on a rule derived from the FAA or on maritime or New York law. [4]

[4]     The panel's reliance on these arbitral awards confirms that the panel's decision was not based on a determination regarding the parties' intent. All of the arbitral awards were made under the AAA's Class Rules, which were adopted in 2003, and thus none was available when the parties here entered into the Vegoilvoy charter party during the class period ranging from 1998 to 2002. See *548 F.3d 85, 87 (C.A.2 2008)* (defining the class period). Indeed, at the hearing before the panel, counsel for AnimalFeeds conceded that "[w]hen you talk about expectations, virtually every one of the arbitration clauses that were the subject of the 25 AAA decisions were drafted before *[Bazzle].* So therefore, if you are going to talk about the parties' intentions, pre-*[Bazzle]* class arbitrations were not common, post *[Bazzle]* they are common." App. 87a. Moreover, in its award, the panel appeared to acknowledge that none of the cited arbitration awards involved a contract between sophisticated business entities. See App. to Pet. for Cert. 50a.

**[9]**    Rather than inquiring whether the FAA, maritime law, or New York law contains **1769 a "default rule" under which an arbitration clause is construed as allowing class arbitration in the absence of express consent, the panel proceeded as if it *674 had the authority of a common-law court to develop what it viewed as the best rule to be applied in such a situation. Perceiving a post-*Bazzle* consensus among arbitrators that class arbitration is beneficial in "a wide variety of settings," the panel considered only whether there was any good reason not to follow that consensus in this case. App. to Pet. for Cert. 49a–50a. The panel was not persuaded by "court cases denying consolidation of arbitrations," [5] by undisputed evidence that the Vegoilvoy charter party had "never been the basis of a class action," or by expert opinion that "sophisticated, multinational commercial parties of the type that are sought to be included in the class would never intend that the arbitration clauses would permit a class arbitration." [6] *675 *Id.,* at 50a–51a. Accordingly, finding no convincing ground for departing from the post-*Bazzle* arbitral consensus, the panel held that class arbitration was permitted in this case. App. to Pet. for Cert. 52a. The conclusion is inescapable that

the panel simply imposed its own conception of sound policy. [7]

[5]     See *Government of United Kingdom v. Boeing Co.,* 998 F.2d 68, 71, 74 (C.A.2 1993); see also *Glencore, Ltd. v. Schnitzer Steel Prods. Co.,* 189 F.3d 264, 268 (C.A.2 1999); *Champ v. Siegel Trading Co.,* 55 F.3d 269, 275 (C.A.7 1995). Unlike the subsequent arbitration awards that the arbitrators cited, these decisions were available to the parties when they entered into their contracts.

[6]     Petitioners produced expert evidence from experienced maritime arbitrators demonstrating that it is customary in the shipping business for parties to resolve their disputes through bilateral arbitration. See, *e.g.,* App. 126a (expert declaration of John Kimball) ("In the 30 years I have been practicing as a maritime lawyer, I have never encountered an arbitration clause in a charter party that could be construed as allowing class action arbitration"); *id.,* at 139a (expert declaration of Bruce Harris) ("I have been working as a maritime arbitrator for thirty years and this matter is the first I have ever encountered where the issue of a class action arbitration has even been raised"). These experts amplified their written statements in their live testimony, as well. See, *e.g.,* App. 112a, 113a (Mr. Kimball) (opining that the prospect of a class action in a maritime arbitration would be "quite foreign" to overseas shipping executives and charterers); *id.,* at 111a–112a (Mr. Harris) (opining that in the view of the London Corps of International Arbitration, class arbitration is "inconceivable").

       Under both New York law and general maritime law, evidence of "custom and usage" is relevant to determining the parties' intent when an express agreement is ambiguous. See *Excess Ins. Co. v. Factory Mut. Ins. Co.,* 3 N.Y.3d 577, 590–591, 789 N.Y.S.2d 461. 822 N.E.2d 768, 777 (2004) ("Our precedent establishes that where there is ambiguity in a reinsurance certificate, the surrounding circumstances, including industry custom and practice, should be taken into consideration"); *Lopez v. Consolidated Edison Co. of N. Y.,* 40 N.Y.2d 605, 609, 389 N.Y.S.2d 295, 357 N.E.2d 951, 954–955 (1976) (where contract terms were ambiguous, parol evidence of custom and practice was properly admitted to show parties' intent); *407 East 61st Garage, Inc. v. Savoy Fifth Avenue Corp.,* 23 N.Y.2d 275, 281, 296 N.Y.S.2d 338, 244 N.E.2d 37, 41 (1968) (contract was "not so free from ambiguity to preclude extrinsic evidence" of

Stolt-Nielsen S.A. v. AnimalFeeds International Corp., 559 U.S. 662 (2010)

130 S.Ct. 1758, 2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605...

industry "custom and usage" that would "establish the correct interpretation or understanding of the agreement as to its term"). See also *Great Circle Lines, Ltd. v. Matheson & Co.,* 681 F.2d 121, 125 (C.A.2 1982) ("Certain long-standing customs of the shipping industry are crucial factors to be considered when deciding whether there has been a meeting of the minds on a maritime contract"); *Samsun Corp. v. Khozestan Mashine Kar Co.,* 926 F.Supp. 436, 439 (S.D.N.Y.1996) ("[W]here as here the contract is one of charter party, established practices and customs of the shipping industry inform the court's analysis of what the parties agreed to"); Hough, *Admiralty Jurisdiction—Of Late Years,* 37 Harv. L.Rev. 529, 536 (1924) (noting that "maritime law is a body of sea customs" and the "custom of the sea ... includes a customary interpretation of contract language").

7   The dissent calls this conclusion "hardly fair," noting that the word " 'policy' is not so much as mentioned in the arbitrators' award." *Post,* at 1780. But just as merely saying something is so does not make it so, cf. *United States v. Morrison,* 529 U.S. 598, 614, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000), the arbitrators need not have said they were relying on policy to make it so. At the hearing before the arbitration panel, one of the arbitrators recognized that the body of post-*Bazzle* arbitration awards on which AnimalFeeds relied involved "essentially consumer non-value cases." App. 82a. In response, counsel for AnimalFeeds defended the applicability of those awards by asserting that the "vast majority" of the claimants against petitioners "have negative value claims ... meaning it costs more to litigate than you would get if you won." *Id.,* at 82a–83a. The panel credited this body of awards in concluding that petitioners had not demonstrated the parties' intent to preclude class arbitration, and further observed that if petitioners' anticonsolidation precedents controlled, then "there would appear to be no basis for a class action absent express agreement among all parties and the putative class members." App. to Pet. for Cert. 50a, 51a.

**\*676   \*\*1770**  2

It is true that the panel opinion makes a few references to intent, but none of these shows that the panel did anything other than impose its own policy preference. The opinion states that, under *Bazzle,* "arbitrators must look to the language of the parties' agreement to ascertain the

parties' intention whether they intended to permit or to preclude class action," and the panel added that "[t]his is also consistent with New York law." App. to Pet. for Cert. 49a. But the panel had no occasion to "ascertain the parties' intention" in the present case because the parties were in complete agreement regarding their intent. In the very next sentence after the one quoted above, the panel acknowledged that the parties in this case agreed that the Vegoilvoy charter party was "silent on whether [it] permit[ted] or preclude[d] class arbitration," but that the charter party was "not ambiguous so as to call for parol evidence." *Ibid.* This stipulation left no room for an inquiry regarding the parties' intent, and any inquiry into that settled question would have been outside the panel's assigned task.

The panel also commented on the breadth of the language in the Vegoilvoy charter party, see *id.,* at 50a, but since the only task left for the panel, in light of the parties' stipulation, was to identify the governing rule applicable in a case in which neither the language of the contract nor any other evidence established that the parties had reached any agreement on the question of class arbitration, the particular wording of the charter party was quite beside the point.

In sum, instead of identifying and applying a rule of decision derived from the FAA or either maritime or New York **\*677** law, the arbitration panel imposed its own policy choice and thus exceeded its powers. As a result, under § 10(b) of the FAA, we must either "direct a rehearing by the arbitrators" or decide the question that was originally referred to the panel. Because we conclude that there can be only one possible outcome on the facts before us, we see no need to direct a rehearing by the arbitrators.

### III

#### A

The arbitration panel thought that *Bazzle* "controlled" the "resolution" of the question whether the Vegoilvoy charter party "permit[s] this arbitration to proceed on behalf of a class," App. to Pet. for Cert. 48a–49a, but that understanding was incorrect.

Stolt-Nielsen S.A. v. AnimalFeeds International Corp., 559 U.S. 662 (2010)

130 S.Ct. 1758, 2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605...

**\*\*1771** *Bazzle* concerned contracts between a commercial lender (Green Tree) and its customers. These contracts contained an arbitration clause but did not expressly mention class arbitration. Nevertheless, an arbitrator conducted class arbitration proceedings and entered awards for the customers.

The South Carolina Supreme Court affirmed the awards. *Bazzle v. Green Tree Financial Corp.,* 351 S.C. 244, 569 S.E.2d 349 (2002). After discussing both Seventh Circuit precedent holding that a court lacks authority to order classwide arbitration under § 4 of the FAA, see *Champ v. Siegel Trading Co.,* 55 F.3d 269 (1995), and conflicting California precedent, see *Keating v. Superior Court of Alameda Cty.,* 31 Cal.3d 584, 183 Cal.Rptr. 360, 645 P.2d 1192 (1982), the State Supreme Court elected to follow the California approach, which it characterized as permitting a trial court to "order class-wide arbitration under adhesive but enforceable franchise contracts," 351 S.C., at 259, 266, 569 S.E.2d, at 357, 360. Under this approach, the South Carolina court observed, a trial judge must "[b]alanc[e] the potential inequities and inefficiencies" **\*678** of requiring each aggrieved party to proceed on an individual basis against "resulting prejudice to the drafting party" and should take into account factors such as "efficiency" and "equity." *Id.,* at 260, and n. 15, 569 S.E.2d, at 357, and n. 15.

Applying these standards to the case before it, the South Carolina Supreme Court found that the arbitration clause in the Green Tree contracts was "silent regarding class-wide arbitration." *Id.,* at 263, 569 S.E.2d, at 359 (emphasis deleted). The Court described its holding as follows:

> "[W]e ... hold that class-wide arbitration may be ordered when the arbitration agreement is silent if it would serve efficiency and equity, and would not result in prejudice. If we enforced a mandatory, adhesive arbitration clause, but prohibited class actions in arbitration where the agreement is silent, the drafting party could effectively prevent class actions against it without having to say it was doing so in the agreement." *Id.,* at 266, 569 S.E.2d, at 360 (footnote omitted).

When *Bazzle* reached this Court, no single rationale commanded a majority. The opinions of the Justices who joined the judgment—that is, the plurality opinion and Justice STEVENS' opinion—collectively addressed three separate questions. The first was which decision maker (court or arbitrator) should decide whether the contracts

in question were "silent" on the issue of class arbitration. The second was what standard the appropriate decision maker should apply in determining whether a contract allows class arbitration. (For example, does the FAA entirely preclude class arbitration? Does the FAA permit class arbitration only under limited circumstances, such as when the contract expressly so provides? Or is this question left entirely to state law?) The final question was whether, under whatever standard is appropriate, class arbitration had been properly ordered in the case at hand.

**\*679** The plurality opinion decided only the first question, concluding that the arbitrator and not a court should decide whether the contracts were indeed "silent" on the issue of class arbitration. The plurality noted that, "[i]n certain limited circumstances," involving "gateway matters, such as whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy," it is assumed "that the parties intended courts, not arbitrators," to make the decision. 539 U.S., at 452, 123 S.Ct. 2402. But the plurality opined that the question whether **\*\*1772** a contract with an arbitration clause forbids class arbitration "does not fall into this narrow exception." *Ibid.* The plurality therefore concluded that the decision of the State Supreme Court should be vacated and that the case should be remanded for a decision by the arbitrator on the question whether the contracts were indeed "silent." The plurality did not decide either the second or the third question noted above.

Justice STEVENS concurred in the judgment vacating and remanding because otherwise there would have been "no controlling judgment of the Court," but he did not endorse the plurality's rationale. *Id.,* at 455, 123 S.Ct. 2402 (opinion concurring in judgment and dissenting in part). He did not take a definitive position on the first question, stating only that "*[a]rguably* the interpretation of the parties' agreement should have been made in the first instance by the arbitrator." *Ibid.* (emphasis added). But because he did not believe that Green Tree had raised the question of the appropriate decision maker, he preferred not to reach that question and, instead, would have affirmed the decision of the State Supreme Court on the ground that "the decision to conduct a class-action arbitration was correct as a matter of law." *Ibid.* Accordingly, his analysis bypassed the first question noted above and rested instead on his resolution of the second

Case 4:17-cv-03042   Document 1-5   Filed on 10/11/17 in TXSD   Page 38 of 173

Stolt-Nielsen S.A. v. AnimalFeeds International Corp., 559 U.S. 662 (2010)

130 S.Ct. 1758, 2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605...

and third questions. Thus, *Bazzle* did not yield a majority decision on any of the three questions.

### *680 B

Unfortunately, the opinions in *Bazzle* appear to have baffled the parties in this case at the time of the arbitration proceeding. For one thing, the parties appear to have believed that the judgment in *Bazzle* requires an arbitrator, not a court, to decide whether a contract permits class arbitration. See App. 89a (transcript of argument before arbitration panel) (counsel for Stolt–Nielsen states: "What *[Bazzle]* says is that the contract interpretation issue is left up to the arbitrator, that's the rule in *[Bazzle]* "). In fact, however, only the plurality decided that question. But we need not revisit that question here because the parties' supplemental agreement expressly assigned this issue to the arbitration panel, and no party argues that this assignment was impermissible.

**[10]   [11]** Unfortunately, however, both the parties and the arbitration panel seem to have misunderstood *Bazzle* in another respect, namely, that it established the standard to be applied by a decisionmaker in determining whether a contract may permissibly be interpreted to allow class arbitration. The arbitration panel began its discussion by stating that the parties "differ regarding *the rule of interpretation* to be gleaned from [the *Bazzle* ] decision." App. to Pet. for Cert. 49a (emphasis added). The panel continued:

> "Claimants argue that *Bazzle* requires clear language that forbids class arbitration in order to bar a class action. The Panel, however, agrees with Respondents that the test is a more general one—arbitrators must look to the language of the parties' agreement to ascertain the parties' intention whether they intended to permit or to preclude class action." *Ibid.*

As we have explained, however, *Bazzle* did not establish the rule to be applied in deciding whether class arbitration is *681 permitted.[8] The decision in *Bazzle* left that question open, and we turn to it now.

[8]     AnimalFeeds invokes the parties' supplemental agreement as evidence that petitioners "waived" any claim that the arbitrators could not construe the arbitration agreement to permit class

arbitration. Brief for Respondent 15. The dissent concludes, likewise, that the existence of the parties' supplemental agreement renders petitioners' argument under § 10(a)(4) "scarcely debatable." *Post*, at 1780. These arguments are easily answered by the clear terms of the supplemental agreement itself. The parties expressly provided that their supplemental agreement "*does not alter* the scope of the Parties' arbitration agreements in any Charter Party Agreement," and that "[n]either the fact of this Agreement nor any of its terms may be used to support or oppose *any argument in favor of a class action arbitration* ... and may not be relied upon by the Parties, any arbitration panel, *any court,* or any other tribunal for such purposes." App. to Pet. for Cert. 62a–63a (emphasis added). As with any agreement to arbitrate, we are obliged to enforce the parties' supplemental agreement "according to its terms." *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 58, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995). The question that the arbitration panel was charged with deciding was whether the arbitration clause in the Vegoilvoy charter party allowed for class arbitration, and nothing in the supplemental agreement conferred authority on the arbitrators to exceed the terms of the charter party itself. Thus, contrary to AnimalFeeds' argument, these statements show that petitioners did *not* waive their argument that *Bazzle* did not establish the standard for the decisionmaker to apply when construing an arbitration clause.

### **1773 IV

**[12]** While the interpretation of an arbitration agreement is generally a matter of state law, see *Arthur Andersen LLP v. Carlisle,* 556 U.S. 624, ——, 129 S.Ct. 1896, 1901–02, 173 L.Ed.2d 832 (2009); *Perry v. Thomas,* 482 U.S. 483, 493, n. 9, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987), the FAA imposes certain rules of fundamental importance, including the basic precept that arbitration "is a matter of consent, not coercion," *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468, 479, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989).

### A

**[13]** In 1925, Congress enacted the United States Arbitration Act, as the FAA was formerly known, for the express purpose *682 of making "valid and enforceable

Stolt-Nielsen S.A. v. AnimalFeeds International Corp., 559 U.S. 662 (2010)

130 S.Ct. 1758, 2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605...

written provisions or agreements for arbitration of disputes arising out of contracts, maritime transactions, or commerce among the States or Territories or with foreign nations." 43 Stat. 883. Reenacted and codified in 1947, see 61 Stat. 669,[9] the FAA provides, in pertinent part, that a "written provision in any maritime transaction" calling for the arbitration of a controversy arising out of such transaction "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract," 9 U.S.C. § 2. Under the FAA, a party to an arbitration agreement may petition a United States district court for an order directing that "arbitration proceed in the manner provided for in such agreement." § 4. Consistent with these provisions, we have said on numerous occasions that the central or "primary" purpose of the FAA is to ensure that "private agreements to arbitrate are enforced according to their terms." *Volt, supra,* at 479, 109 S.Ct. 1248; *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 57, 58, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995); see also *Doctor's Associates, Inc. v. Casarotto,* 517 U.S. 681, 688, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996). See generally 9 U.S.C. § 4.

[9]    See generally Sturges & Murphy, Some Confusing Matters Relating to Arbitration Under the United States Arbitration Act, 17 Law & Contemp. Prob. 580, 580–581, n. 1 (1952) (recounting the history of the United States Arbitration Act and its 1947 reenactment and codification).

**[14]    [15]** Whether enforcing an agreement to arbitrate or construing an arbitration clause, courts and arbitrators must **\*\*1774** "give effect to the contractual rights and expectations of the parties." *Volt, supra,* at 479, 109 S.Ct. 1248. In this endeavor, "as with any other contract, the parties' intentions control." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). This is because an arbitrator derives his or her powers from the parties' agreement to forgo the legal process and submit their disputes to private dispute resolution. See *AT & T Technologies, Inc. v. Communications Workers,* 475 U.S. 643, 648–649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) ("[A]rbitrators derive **\*683** their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration"); *Mitsubishi Motors, supra,* at 628, 105 S.Ct. 3346 ("By agreeing to arbitrate ..., [a party] trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration"); see also

*Steelworkers v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 581, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960) (an arbitrator "has no general charter to administer justice for a community which transcends the parties" but rather is "part of a system of self-government created by and confined to the parties" (internal quotation marks omitted)).

Underscoring the consensual nature of private dispute resolution, we have held that parties are " 'generally free to structure their arbitration agreements as they see fit.' " *Mastrobuono, supra,* at 57, 115 S.Ct. 1212; see also *AT & T Technologies, supra,* at 648–649, 106 S.Ct. 1415. For example, we have held that parties may agree to limit the issues they choose to arbitrate, see *Mitsubishi Motors, supra,* at 628, 105 S.Ct. 3346, and may agree on rules under which any arbitration will proceed, *Volt, supra,* at 479, 109 S.Ct. 1248. They may choose who will resolve specific disputes. *E.g.,* App. 30a; *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 57, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); *Burchell v. Marsh,* 58 U.S. 344, 17 How. 344, 349, 15 L.Ed. 96 (1855); see also *International Produce, Inc. v. A/S Rosshavet,* 638 F.2d 548, 552(CA2) ("The most sought-after arbitrators are those who are prominent and experienced members of the specific business community in which the dispute to be arbitrated arose"), cert. denied, 451 U.S. 1017, 101 S.Ct. 3006, 69 L.Ed.2d 389 (1981).

**[16]    [17]** We think it is also clear from our precedents and the contractual nature of arbitration that parties may specify *with whom* they choose to arbitrate their disputes. See *EEOC v. Waffle House, Inc.,* 534 U.S. 279, 289, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002) ("[N]othing in the [FAA] authorizes a court to compel arbitration of any issues, *or by any parties,* that are not already covered in the agreement" (emphasis added)); *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.,* 460 U.S. 1, 20, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) ("[A]n arbitration agreement must be enforced notwithstanding **\*684** the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement"); *Steelworkers, supra,* at 581, 80 S.Ct. 1358 (an arbitrator "has no general charter to administer justice for a community which transcends the parties" (internal quotation marks omitted)); accord, *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) ( "[A]rbitration is simply a matter of contract *between the parties*; it is a way to resolve those disputes—but only those disputes—that the *parties* have

Stolt-Nielsen S.A. v. AnimalFeeds International Corp., 559 U.S. 662 (2010)

130 S.Ct. 1758, 2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605...

agreed to submit to arbitration" (emphasis added)). It falls to courts and arbitrators to give effect to these contractual limitations, and when doing so, courts and arbitrators must not lose sight of the purpose of the **1775 exercise: to give effect to the intent of the parties. *Volt*, 489 U.S., at 479, 109 S.Ct. 1248.

## B

**[18]   [19]   [20]**   From these principles, it follows that a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so. In this case, however, the arbitration panel imposed class arbitration even though the parties concurred that they had reached "no agreement" on that issue, see App. 77a. The critical point, in the view of the arbitration panel, was that petitioners did not "establish that the parties to the charter agreements intended to *preclude* class arbitration." App. to Pet. for Cert. 51a. Even though the parties are sophisticated business entities, even though there is no tradition of class arbitration under maritime law, and even though AnimalFeeds does not dispute that it is customary for the shipper to choose the charter party that is used for a particular shipment, the panel regarded the agreement's silence on the question of class arbitration as dispositive. The panel's conclusion is fundamentally at war with the foundational FAA principle that arbitration is a matter of consent.

**[21]**   In certain contexts, it is appropriate to presume that parties that enter into an arbitration agreement implicitly authorize **\*685** the arbitrator to adopt such procedures as are necessary to give effect to the parties' agreement. Thus, we have said that " ' "procedural" questions which grow out of the dispute and bear on its final disposition' are presumptively not for the judge, but for an arbitrator, to decide." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002) (quoting *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 557, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964)). This recognition is grounded in the background principle that "[w]hen the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court." Restatement (Second) of Contracts § 204 (1979).

**[22]   [23]**   An implicit agreement to authorize class-action arbitration, however, is not a term that the arbitrator may infer solely from the fact of the parties' agreement to arbitrate. This is so because class-action arbitration changes the nature of arbitration to such a degree that it cannot be presumed the parties consented to it by simply agreeing to submit their disputes to an arbitrator. In bilateral arbitration, parties forgo the procedural rigor and appellate review of the courts in order to realize the benefits of private dispute resolution: lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes. See *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 31, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991); *Mitsubishi Motors*, 473 U.S., at 628, 105 S.Ct. 3346; see also *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, ——, 129 S.Ct. 1456, 1463–65, 173 L.Ed.2d 398 (2009) ("Parties generally favor arbitration precisely because of the economics of dispute resolution") (citing *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 123, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001)); *Gardner–Denver, supra*, at 57, 94 S.Ct. 1011 ("Parties usually choose an arbitrator because they trust his knowledge and judgment concerning the demands and norms of industrial relations"). But the relative benefits of class-action arbitration are much less assured, giving reason to doubt the parties' mutual consent to resolve **\*686** disputes through class- **\*\*1776** wide arbitration. Cf. *First Options, supra*, at 945, 115 S.Ct. 1920 (noting that "one can understand why courts might hesitate to interpret silence or ambiguity on the 'who should decide arbitrability' point as giving the arbitrators that power, for doing so might too often force unwilling parties to arbitrate" contrary to their expectations).

**[24]**   Consider just some of the fundamental changes brought about by the shift from bilateral arbitration to class-action arbitration. An arbitrator chosen according to an agreed-upon procedure, see, *e.g., supra*, at ——, no longer resolves a single dispute between the parties to a single agreement, but instead resolves many disputes between hundreds or perhaps even thousands of parties. See App. 86a ("[W]e believe domestic class members could be in the hundreds" and that "[t]here could be class members who ship to and from the U.S. who are not domestic who we think would be covered"); see also, *e.g., Bazzle*, 351 S.C., at 251, 569 S.E.2d, at 352–353 (involving a class of 1,899 individuals that was awarded damages, fees, and costs of more than $14 million by a single

Stolt-Nielsen S.A. v. AnimalFeeds International Corp., 559 U.S. 662 (2010)

130 S.Ct. 1758, 2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605...

arbitrator). Under the Class Rules, "the presumption of privacy and confidentiality" that applies in many bilateral arbitrations "shall not apply in class arbitrations," see Addendum to Brief for American Arbitration Association as *Amicus Curiae* 10a (Class Rule 9(a)), thus potentially frustrating the parties' assumptions when they agreed to arbitrate. The arbitrator's award no longer purports to bind just the parties to a single arbitration agreement, but adjudicates the rights of absent parties as well. Cf. *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 846, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999) (noting that "the burden of justification rests on the exception" to the general rule that "one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process" (internal quotation marks omitted)). And the commercial stakes of class-action arbitration are comparable to those of class-action litigation, cf. App. in No. 06–3474–cv (CA2), at A–77, A–79, ¶¶ 30, 31, 40, even **\*687** though the scope of judicial review is much more limited, see *Hall Street,* 552 U.S., at 588, 128 S.Ct. 1396. We think that the differences between bilateral and class-action arbitration are too great for arbitrators to presume, consistent with their limited powers under the FAA, that the parties' mere silence on the issue of class-action arbitration constitutes consent to resolve their disputes in class proceedings. [10]

[10]    We have no occasion to decide what contractual basis may support a finding that the parties agreed to authorize class-action arbitration. Here, as noted, the parties stipulated that there was "no agreement" on the issue of class-action arbitration. App. 77a.

The dissent minimizes these crucial differences by characterizing the question before the arbitrators as being merely what "procedural mode" was available to present AnimalFeeds' claims. *Post,* at 1781. If the question were that simple, there would be no need to consider the parties' intent with respect to class arbitration. See *Howsam, supra,* at 84, 123 S.Ct. 588 (committing "procedural questions" presumptively to the arbitrator's discretion (internal quotation marks omitted)). But the FAA requires more. Contrary to the dissent, but consistent with our precedents emphasizing the consensual basis of arbitration, we see the question as being whether the parties *agreed to authorize* class arbitration. Here, where the parties stipulated that there was "no agreement" on this question, it follows that the parties cannot be compelled to submit their dispute to class arbitration.

**\*\*1777 V**

For these reasons, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

**\*688**    Justice GINSBURG, with whom Justice STEVENS and Justice BREYER join, dissenting.

When an arbitration clause is silent on the question, may arbitration proceed on behalf of a class? The Court prematurely takes up that important question and, indulging in *de novo* review, overturns the ruling of experienced arbitrators. [1]

[1]    All three panelists are leaders in the international-dispute-resolution bar. See Brief for Respondent 8–9.

The Court errs in addressing an issue not ripe for judicial review. Compounding that error, the Court substitutes its judgment for that of the decisionmakers chosen by the parties. I would dismiss the petition as improvidently granted. [2]  Were I to reach the merits, I would adhere to the strict limitations the Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq.,* places on judicial review of arbitral awards. § 10. Accordingly, I would affirm the judgment of the Second Circuit, which rejected petitioners' plea for vacation of the arbitrators' decision.

[2]    Alternatively, I would vacate with instructions to dismiss for lack of present jurisdiction. See Reply to Brief in Opposition 12, n. 6.

I

As the Court recounts, *ante,* at —— – ——, this case was launched as a class action in federal court charging named ocean carriers (collectively, Stolt–Nielsen) with a conspiracy to extract supracompetitive prices from their customers (buyers of ocean-transportation services). That court action terminated when the Second Circuit held, first, that the parties' transactions were governed by contracts (charter parties) with enforceable arbitration clauses, and second, that the antitrust claims were

Stolt-Nielsen S.A. v. AnimalFeeds International Corp., 559 U.S. 662 (2010)
130 S.Ct. 1758, 2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605...

arbitrable. *JLM Industries, Inc. v. Stolt–Nielsen S.A.,* 387 F.3d 163, 175, 181 (2004).

Cargo-shipper AnimalFeeds International Corp. (AnimalFeeds) thereupon filed a demand for class arbitration of the **\*689** antitrust-conspiracy claims. [3] STOLT–NIELSen contested animalfeeds' righT to pRoceed on behalf of a class, but agreed to submission of that threshold dispute to a panel of arbitrators. Thus, the parties entered into a supplemental agreement to choose arbitrators and instruct them to "follow ... Rul[e] 3 ... of the American Arbitration Association's Supplementary Rules for Class Arbitrations." App. to Pet. for Cert. 59a. Rule 3, in turn, directed the panel to "determine ... whether the applicable arbitration clause permits the arbitration to proceed on behalf of ... a class." App. 56a.

[3]   Counsel for AnimalFeeds submitted in arbitration that "[i]t would cost ... the vast majority of absent class members, and indeed the current claimants, ... more to litigate the matter on an individual basis than they could recover. An antitrust case, particularly involving an international cartel[,] ... is extraordinarily difficult and expensive to litigate." App. 82a (paragraph break omitted).

After receiving written submissions and hearing arguments, the arbitration panel rendered a clause-construction award. It decided unanimously—and only—that the "arbitration claus[e] [used in the parties' standard-form shipping contracts] permit[s] this ... arbitration to proceed as a class arbitration." App. to Pet. for Cert. 52a. Stolt–Nielsen petitioned for court review urging vacatur of the clause-construction **\*\*1778** award on the ground that "the arbitrators [had] exceeded their powers." § 10(a)(4). The Court of Appeals upheld the award: "Because the parties specifically agreed that the arbitration panel would decide whether the arbitration claus[e] permitted class arbitration," the Second Circuit reasoned, "the arbitration panel did not exceed its authority in deciding that issue—irrespective of whether it decided the issue correctly." 548 F.3d 85, 101 (2008).

## II

I consider, first, the fitness of the arbitrators' clause-construction award for judicial review. The arbitrators decided the issue, in accord with the parties' supplemental **\*690** agreement, "as a threshold matter." App. 56a.

Their decision that the charter-party arbitration clause permitted class arbitration was abstract and highly interlocutory. The panel did not decide whether the particular claims AnimalFeeds advanced were suitable for class resolution, see App. to Pet. for Cert. 48a–49a; much less did it delineate any class or consider whether, "if a class is certified, ... members of the putative class should be required to 'opt in' to th[e] proceeding," *id.,* at 52a.

The Court, *ante,* at ——, n. 2, does not persuasively justify judicial intervention so early in the game or convincingly reconcile its adjudication with the firm final-judgment rule prevailing in the federal court system. See, *e.g.,* 28 U.S.C. § 1257 (providing for petitions for certiorari from "[f]inal judgments or decrees" of state courts); § 1291 (providing for Court of Appeals review of district court "final decisions"); *Catlin v. United States,* 324 U.S. 229, 233, 65 S.Ct. 631, 89 L.Ed. 911 (1945) (describing "final decision" generally as "one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment").

We have equated to "final decisions" a slim set of "collateral orders" that share these characteristics: They "are conclusive, [they] resolve important questions separate from the merits, and [they] are effectively unreviewable on appeal from the final judgment in the underlying action." *Mohawk Industries, Inc. v. Carpenter,* 558 U.S. 100, ——, 130 S.Ct. 599, 601, 175L.Ed.2d 458 (2009) (quoting *Swint v. Chambers County Comm'n,* 514 U.S. 35, 42, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995)). "[O]rders relating to class certification" in federal court, it is settled, do not fit that bill. *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 470, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978). [4]

[4]   Federal Rule of Civil Procedure 23(f), adopted in response to *Coopers & Lybrand,* gives Courts of Appeals discretion to permit an appeal from an order granting or denying class-action certification. But the rule would not permit review of a preliminary order of the kind at issue here, *i.e.,* one that defers decision whether to grant or deny certification.

**\*691** Congress, of course, can provide exceptions to the "final-decision" rule. Prescriptions in point include § 1292 (immediately appealable " [i]nterlocutory decisions"); § 2072(c) (authorizing promulgation of rules defining when a district court ruling is final for purposes of appeal under § 1291); Fed. Rule Civ. Proc. 23(f) (pursuant to § 1292(e), accords Courts of Appeals discretion to permit appeals

Stolt-Nielsen S.A. v. AnimalFeeds International Corp., 559 U.S. 662 (2010)

130 S.Ct. 1758, 2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605...

from district court orders granting or denying class-action certification); Fed. Rule Civ. Proc. 54(b) (providing for "entry of a final judgment as to one or more, but fewer than all, of the claims or parties"). Did Congress provide for immediate review of the preliminary ruling in question here?

**1779 Section 16 of the FAA, governing appellate review of district court arbitration orders, lists as an appealable disposition a district court decision "confirming or denying confirmation of an award or partial award." 9 U.S.C. § 16(a)(1)(D). Notably, the arbitrators in the matter at hand labeled their decision "Partial Final Clause Construction Award." App. to Pet. for Cert. 45a. It cannot be true, however, that parties or arbitrators can gain instant review by slicing off a preliminary decision or a procedural order and declaring its resolution a "partial award." Cf. Hall Street Associates, L.L.C. v. Mattel, Inc., 552 U.S. 576, 588, 128 S.Ct. 1396, 170 L.Ed.2d 254 (2008) (FAA §§ 9–11, which provide for expedited review to confirm, vacate, or modify arbitration awards, "substantiat[e] a national policy favoring arbitration with just the limited review needed to maintain arbitration's essential virtue of resolving disputes straightaway.").

Lacking this Court's definitive guidance, some Courts of Appeals have reviewed arbitration awards "finally and definitely dispos[ing] of a separate independent claim." E.g., Metallgesellschaft A.G. v. M/V Capitan Constante, 790 F.2d 280, 283 (C.A.2 1986).[5] Others have considered "partial *692 award [s]" that finally "determin[e] liability, but ... not ... damages." E.g., Hart Surgical, Inc. v. Ultracision, Inc., 244 F.3d 231, 234 (C.A.1 2001).[6] Another confirmed an interim ruling on a " separate, discrete, independent, severable issue." Island Creek Coal Sales Co. v. Gainesville, 729 F.2d 1046, 1049 (C.A.6 1984) (internal quotation marks omitted), abrogated on other grounds by Cortez Byrd Chips, Inc. v. Bill Harbert Constr. Co., 529 U.S. 193, 120 S.Ct. 1331, 146 L.Ed.2d 171 (2000).

[5]     See Metallgesellschaft A.G., 790 F.2d, at 283, 284 (Feinberg, C.J., dissenting) (describing exception for separate and independent claims as "creat[ing], in effect, an arbitration analogue to [Fed. Rule Civ. Proc.] 54(b)").

[6]     But see Liberty Mut. Ins. Co. v. Wetzel, 424 U.S. 737, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1976) (district court order determining liability but reserving decision on damages held not immediately appealable).

Receptivity to review of preliminary rulings rendered by arbitrators, however, is hardly universal. See Dealer Computer Servs., Inc. v. Dub Herring Ford, 547 F.3d 558 (C.A.6 2008) (arbitration panel's preliminary ruling that contract did not bar class proceedings held not ripe for review; arbitrators had not yet determined that arbitration should proceed on behalf of a class); Metallgesellschaft A.G., 790 F.2d, at 283, 285 (Feinberg, C.J., dissenting) ("[Piecemeal review] will make arbitration more like litigation, a result not to be desired. It would be better to minimize the number of occasions the parties to arbitration can come to court; on the whole, this benefits the parties, the arbitration process and the courts.").

While lower court opinions are thus divided, this much is plain: No decision of this Court, until today, has ever approved immediate judicial review of an arbitrator's decision as preliminary as the "partial award" made in this case.[7]

[7]     The parties agreed that the arbitrators would issue a "partial final award," and then "stay all proceedings ... to permit any party to move a court of competent jurisdiction to confirm or to vacate" the award. App. 56a. But an arbitration agreement, we have held, cannot "expand judicial review" available under the FAA. Hall Street Associates, L.L.C. v. Mattel, Inc., 552 U.S. 576, 587, 128 S.Ct. 1396, 170 L.Ed.2d 254 (2008).

*693 III

Even if Stolt–Nielsen had a plea ripe for judicial review, the Court should reject it on the merits. Recall that the parties **1780 jointly asked the arbitrators to decide, initially, whether the arbitration clause in their shipping contracts permitted class proceedings. See supra, at —. The panel did just what it was commissioned to do. It construed the broad arbitration clause (covering "[a]ny dispute arising from the making, performance or termination of this Charter Party," App. to Pet. for Cert. 47a) and ruled, expressly and only, that the clause permitted class arbitration. The Court acts without warrant in allowing Stolt–Nielsen essentially to repudiate

**Stolt-Nielsen S.A. v. AnimalFeeds International Corp., 559 U.S. 662 (2010)**

130 S.Ct. 1758, 2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605...

its submission of the contract-construction issue to the arbitration panel, and to gain, in place of the arbitrators' judgment, this Court's *de novo* determination.

## A

The controlling FAA prescription, § 10(a),[8] authorizes a court to vacate an arbitration panel's decision "only in very unusual circumstances." *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 942, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). The four grounds for vacatur **\*694** codified in § 10(a) restate the longstanding rule that, "[i]f [an arbitration] award is within the submission, and contains the honest decision of the arbitrators, after a full and fair hearing of the parties, a court ... will not set [the award] aside for error, either in law or fact." *Burchell v. Marsh,* 58 U.S. 344, 349, 17 How. 344, 349, 15 L.Ed. 96 (1855).

8    Title 9 U.S.C. § 10(a) provides:
     "In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—
     "(1) where the award was procured by corruption, fraud, or undue means;
     "(2) where there was evident partiality or corruption in the arbitrators, or either of them;
     "(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
     "(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."

The sole § 10 ground Stolt–Nielsen invokes for vacating the arbitrators' decision is § 10(a)(4). The question under that provision is "whether the arbitrators had the power, based on the parties' submissions or the arbitration agreement, to reach a certain issue, not whether the arbitrators correctly decided that issue." *DiRussa v. Dean Witter Reynolds Inc.,* 121 F.3d 818, 824 (C.A.2 1997); *Comprehensive Accounting Corp. v. Rudell,* 760 F.2d 138, 140 (C.A.7 1985). The parties' supplemental agreement, referring the class-arbitration issue to an arbitration panel, undoubtedly empowered the arbitrators

to render their clause-construction decision. That scarcely debatable point should resolve this case.

## B

The Court's characterization of the arbitration panel's decision as resting on "policy," not law, is hardly fair comment, for "policy" is not so much as mentioned in the arbitrators' award. Instead, the panel tied its conclusion that the arbitration clause permitted class arbitration, App. to Pet. for Cert. 52a, to New York law, federal maritime law, and decisions made by other panels pursuant to Rule 3 of the American Arbitration Association's Supplementary Rules for Class Arbitrations. *Id.,* at 49a–50a.

At the outset of its explanation, the panel rejected the argument, proffered by AnimalFeeds, that this Court's decision in **\*\*1781** *Green Tree Financial Corp. v. Bazzle,* 539 U.S. 444, 123 S.Ct. 2402, 156 L.Ed.2d 414 (2003), settled the matter by "requir[ing] clear language that *forbids* class arbitration in order to bar a class action." App. to Pet. for Cert. 49a (emphasis added). Agreeing with Stolt–Nielsen in this regard, the panel said that the test it **\*695** employed looked to the language of the particular agreement to gauge whether the parties "intended to permit or to preclude class action[s]." *Ibid.* Concentrating on the wording of the arbitration clause, the panel observed, is "consistent with New York law as articulated by the [New York] Court of Appeals ... and with federal maritime law." *Ibid.*[9]

9    On New York law, the panel referred to *Evans v. Famous Music Corp.,* 1 N.Y.3d 452, 775 N.Y.S.2d 757, 807 N.E.2d 869 (2004).

Emphasizing the breadth of the clause in question —" 'any dispute arising from the making, performance or termination of this Charter Party' shall be put to arbitration," *id.,* at 50a—the panel noted that numerous other partial awards had relied on language similarly comprehensive to permit class proceedings "in a wide variety of settings." *Id.,* at 49a–50a. The panel further noted "that many of the other panels [had] rejected arguments similar to those advanced by [Stolt–Nielsen]." *Id.,* at 50a.

Stolt-Nielsen S.A. v. AnimalFeeds International Corp., 559 U.S. 662 (2010)

130 S.Ct. 1758, 2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605...

The Court features a statement counsel for AnimalFeeds made at the hearing before the arbitration panel, and maintains that it belies any argument that the clause in question permits class arbitration: "All the parties agree that when a contract is silent on an issue there's been no agreement that has been reached on that issue." *Ante*, at 1766 (quoting App. 77a); see *ante*, at ——, —— – ——, ——, ——, and n. 10. The sentence quoted from the hearing transcript concluded: "therefore there has been *no agreement to bar class arbitrations*." App. 77a (emphasis added). Counsel quickly clarified his position: "It's also undisputed that the arbitration clause here contains broad language and this language should be interpreted to permit class arbitrations." *Id.*, at 79a. See also *id.*, at 80a (noting consistent recognition by arbitration panels that "a silent broadly worded arbitration clause, just like the one at issue here, should be construed to permit class arbitration"); *id.*, at 88a ("[B]road ... language ... silent as to class proceedings should be interpreted to permit a class proceeding.").

**\*696** Stolt–Nielsen, the panel acknowledged, had vigorously argued, with the support of expert testimony, that "the bulk of international shippers would never intend to have their disputes decided in a class arbitration." App. to Pet. for Cert. 52a. That concern, the panel suggested, might be met at a later stage; "if a class is certified," the panel noted, class membership could be confined to those who affirmatively " 'opt in' " to the proceeding. *Ibid.*

The question properly before the Court is not whether the arbitrators' ruling was erroneous, but whether the arbitrators "exceeded their powers." § 10(a)(4). The arbitrators decided a threshold issue, explicitly committed to them, see *supra*, at ——, about the procedural mode available for presentation of AnimalFeeds' antitrust claims. Cf. *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 559 U.S. 393, ——, 130 S.Ct. 1431, 1443, 176 L.Ed.2d 311 (2010) (plurality opinion) ("[R]ules allowing multiple claims (and claims by or against multiple parties) to be litigated together ... neither change plaintiffs' separate entitlements to relief nor abridge defendants' rights; they alter **\*\*1782** only how the claims are processed."). That the arbitrators endeavored to perform their assigned task honestly is not contested. "Courts ... do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts." *Paperworkers v.*

*Misco, Inc.*, 484 U.S. 29, 38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). The arbitrators here not merely "arguably," but certainly, "constru[ed] ... the contract" with fidelity to their commission. *Ibid.* This Court, therefore, may not disturb the arbitrators' judgment, even if convinced that "serious error" infected the panel's award. *Ibid.*

C

The Court not only intrudes on a decision the parties referred to arbitrators. It compounds the intrusion by according the arbitrators no opportunity to clarify their decision and thereby to cure the error the Court perceives. **\*697** Section 10(b), the Court asserts, invests in this tribunal authority to "decide the question that was originally referred to the panel." *Ante*, at 1770. The controlling provision, however, says nothing of the kind. Section 10(b) reads, in full: "If an award is vacated and the time within which the agreement required the award to be made has not expired, the court may, in its discretion, *direct a rehearing by the arbitrators*." (Emphasis added.) Just as § 10(a)(4) provides no justification for the Court's disposition, see *supra*, at —— —— and this page, so, too, § 10(b) provides no grounding for the Court's peremptory action.

IV

A

For arbitrators to consider whether a claim should proceed on a class basis, the Court apparently demands contractual language one can read as affirmatively authorizing class arbitration. See *ante*, at —— ("[A] party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so."); *ante*, at ——. The breadth of the arbitration clause, and the absence of any provision waiving or banning class proceedings, [10] will not do. *Ante*, at —— — ——.

10    Several courts have invalidated contractual bans on, or waivers of, class arbitration because proceeding on an individual basis was not feasible in view of the high costs entailed and the slim benefits achievable. See, *e.g.*, *In re American Express Merchants' Litigation,*

Stolt-Nielsen S.A. v. AnimalFeeds International Corp., 559 U.S. 662 (2010)

130 S.Ct. 1758, 2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605...

554 F.3d 300, 315–316, 320 (C.A.2 2009); *Kristian v. Comcast Corp.,* 446 F.3d 25, 55, 59 (C.A.1 2006); *Discover Bank v. Superior Court,* 36 Cal.4th 148, 162–163, 30 Cal.Rptr.3d 76, 113 P.3d 1100, 1110 (2005); *Leonard v. Terminix Int'l Co., LP,* 854 So.2d 529, 539 (Ala.2002). Were there no right to proceed on behalf of a class in the first place, however, a provision banning or waiving recourse to this aggregation device would be superfluous.

The Court ties the requirement of affirmative authorization to "the basic precept that arbitration 'is a matter of consent, **\*698** not coercion.' " *Ante,* at —— (quoting *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468, 479, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989)). Parties may "specify *with whom* they choose to arbitrate," the Court observes, just as they may "limit the issues they choose to arbitrate." *Ante,* at 1774. But arbitrators, in delineating an appropriate class, need not, and should not, disregard such contractual constraints. In this case, for example, AnimalFeeds proposes to pursue, on behalf of a class, only "claims ... arising out of [any charter party agreement] ... *that provides for arbitration.*" App. to Pet. for Cert. 56a (emphasis added). Should the arbitrators certify the proposed class, they would adjudicate only the rights of persons "with whom" **\*\*1783** Stolt–Nielsen agreed to arbitrate, and only "issues" subject to arbitration. *Ante,* at —— (emphasis omitted).

The Court also links its affirmative-authorization requirement to the parties' right to stipulate rules under which arbitration may proceed. See *ibid.* The question, however, is the proper default rule when there is no stipulation. Arbitration provisions, this Court has noted, are a species of forum-selection clauses. See *Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 519, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974). Suppose the parties had chosen a New York *judicial forum* for resolution of "any dispute" involving a contract for ocean carriage of goods. There is little question that the designated court, state or federal, would have authority to conduct claims like AnimalFeeds' on a class basis. Why should the class-action prospect vanish when the "any dispute" clause is contained in an arbitration agreement? Cf. *Connecticut General Life Ins. Co. v. Sun Life Assurance Co. of Canada,* 210 F.3d 771, 774–776 (C.A.7 2000) (reading contract's authorization to arbitrate "[a]ny dispute" to permit consolidation of arbitrations). If the Court is right that arbitrators ordinarily are not equipped to manage class proceedings,

see *ante,* at —— – ——, then the claimant should retain its right to proceed in that format in court.

**\*699 B**

When adjudication is costly and individual claims are no more than modest in size, class proceedings may be "the thing," *i.e.,* without them, potential claimants will have little, if any, incentive to seek vindication of their rights. *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 617, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Carnegie v. Household Int'l, Inc.,* 376 F.3d 656, 661 (C.A.7 2004) ("The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30."). Mindful that disallowance of class proceedings severely shrinks the dimensions of the case or controversy a claimant can mount, I note some stopping points in the Court's decision.

First, the Court does not insist on express consent to class arbitration. Class arbitration may be ordered if "there is a contractual basis for concluding that the part[ies] *agreed*" "to submit to class arbitration". *Ante,* at ——; see *ante,* at ——, n. 10 ("We have no occasion to decide what contractual basis may support a finding that the parties agreed to authorize class-action arbitration."). Second, by observing that "the parties [here] are sophisticated business entities," and "that it is customary for the shipper to choose the charter party that is used for a particular shipment," the Court apparently spares from its affirmative-authorization requirement contracts of adhesion presented on a take-it-or-leave-it basis. *Ante,* at ——. While these qualifications limit the scope of the Court's decision, I remain persuaded that the arbitrators' judgment should not have been disturbed.

\* \* \*

For the foregoing reasons, I would dismiss the petition for want of a controversy ripe for judicial review. Were I to reach the merits, I would affirm the Second Circuit's judgment confirming the arbitrators' clause-construction decision.

**Stolt-Nielsen S.A. v. AnimalFeeds International Corp., 559 U.S. 662 (2010)**

130 S.Ct. 1758, 2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 176 L.Ed.2d 605...

**All Citations**

559 U.S. 662, 130 S.Ct. 1758, 176 L.Ed.2d 605, 2010 A.M.C. 913, 93 Empl. Prac. Dec. P 43,878, 78 USLW 4328, 2010-1 Trade Cases P 76,982, 10 Cal. Daily Op. Serv. 5144, 2010 Daily Journal D.A.R. 6107, 22 Fla. L. Weekly Fed. S 269

---

**End of Document**                                  © 2017 Thomson Reuters. No claim to original U.S. Government Works.

AT&T Mobility LLC v. Concepcion, 563 U.S. 333 (2011)

131 S.Ct. 1740, 179 L.Ed.2d 742, 79 USLW 4279, 161 Lab.Cas. P 10,368...

131 S.Ct. 1740
Supreme Court of the United States

AT&T MOBILITY LLC, Petitioner,
v.
Vincent CONCEPCION et ux.

No. 09–893.
|
Argued Nov. 9, 2010.
|
Decided April 27, 2011.

**Synopsis**

**Background:** Customers brought putative class action against telephone company, alleging that company's offer of a free phone to anyone who signed up for its cellphone service was fraudulent to the extent that the company charged the customer sales tax on the retail value of the free phone. The United States District Court for the Southern District of California, Dana M. Sabraw, J., 2008 WL 5216255, denied company's motion to compel arbitration. Company appealed. The United States Court of Appeals for the Ninth Circuit, Carlos T. Bea, Circuit Judge, 584 F.3d 849, affirmed. Certiorari was granted.

**[Holding:]** The Supreme Court, Justice Scalia, held that the Federal Arbitration Act preempts California's judicial rule regarding the unconscionability of class arbitration waivers in consumer contracts, abrogating *Discover Bank v. Superior Court*, 36 Cal.4th 148, 30 Cal.Rptr.3d 76, 113 P.3d 1100.

Reversed and remanded.

Justice Thomas filed a concurring opinion.

Justice Breyer filed a dissenting opinion, in which Justices Ginsburg, Sotomayor, and Kagan, joined.

West Headnotes (13)

**[1]** **Alternative Dispute Resolution**

☞ Constitutional and statutory provisions and rules of court

25T Alternative Dispute Resolution
25TII Arbitration
25TII(A) Nature and Form of Proceeding
25Tk114 Constitutional and statutory provisions and rules of court

The provision of the Federal Arbitration Act (FAA) stating that arbitration agreements in maritime transactions or contracts evidencing transactions involving commerce are valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract, reflects both a liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract. 9 U.S.C.A. § 2.

821 Cases that cite this headnote

**[2]** **Alternative Dispute Resolution**

☞ Constitutional and statutory provisions and rules of court

25T Alternative Dispute Resolution
25TII Arbitration
25TII(A) Nature and Form of Proceeding
25Tk114 Constitutional and statutory provisions and rules of court

In light of the liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract, which are reflected in the provision of the Federal Arbitration Act (FAA) stating that arbitration agreements in maritime transactions or contracts evidencing transactions involving commerce are valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract, courts must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms. 9 U.S.C.A. § 2.

1087 Cases that cite this headnote

**[3]** **Alternative Dispute Resolution**
☞ Preemption

**States**

AT&T Mobility LLC v. Concepcion, 563 U.S. 333 (2011)

131 S.Ct. 1740, 179 L.Ed.2d 742, 79 USLW 4279, 161 Lab.Cas. P 10,368...

☞ Particular cases, preemption or supersession

25T   Alternative Dispute Resolution
25TII   Arbitration
25TII(A)   Nature and Form of Proceeding
25Tk117   Preemption
360   States
360I   Political Status and Relations
360I(B)   Federal Supremacy;Preemption
360k18.15   Particular cases, preemption or supersession

The Federal Arbitration Act (FAA) preempts California's judicial rule stating that a class arbitration waiver is unconscionable under California law if it is found in a consumer contract of adhesion in a setting in which disputes between the contracting parties predictably involve small amounts of damages, and if it is alleged that the party with superior bargaining power has carried out a scheme to deliberately cheat large numbers of consumers out of individually small sums of money, because that rule stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in enacting the FAA, which include ensuring the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings; abrogating *Discover Bank v. Superior Court*, 36 Cal.4th 148, 30 Cal.Rptr.3d 76, 113 P.3d 1100. 9 U.S.C.A. § 2; West's Ann.Cal.Civ.Code §§ 1668, 1670.5(a).

159 Cases that cite this headnote

**[4]    Alternative Dispute Resolution**
    ☞ Validity

**Alternative Dispute Resolution**
    ☞ Validity of assent

**Alternative Dispute Resolution**
    ☞ Unconscionability

25T   Alternative Dispute Resolution
25TII   Arbitration
25TII(B)   Agreements to Arbitrate
25Tk131   Requisites and Validity
25Tk134   Validity
25Tk134(1)   In general
25T   Alternative Dispute Resolution
25TII   Arbitration
25TII(B)   Agreements to Arbitrate

25Tk131   Requisites and Validity
25Tk134   Validity
25Tk134(3)   Validity of assent
25T   Alternative Dispute Resolution
25TII   Arbitration
25TII(B)   Agreements to Arbitrate
25Tk131   Requisites and Validity
25Tk134   Validity
25Tk134(6)   Unconscionability

Under the saving clause in the provision of the Federal Arbitration Act (FAA) stating that arbitration agreements in maritime transactions or contracts evidencing transactions involving commerce are valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract, arbitration agreements may be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability, but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue. 9 U.S.C.A. § 2.

1046 Cases that cite this headnote

**[5]    Contracts**
    ☞ Procedural unconscionability

**Contracts**
    ☞ Substantive unconscionability

95   Contracts
95I   Requisites and Validity
95I(A)   Nature and Essentials in General
95k1.8   Unreasonable or Oppressive Contracts
95k1.11   Unconscionable Contracts
95k1.11(2)   Procedural unconscionability (Formerly 95k1)
95   Contracts
95I   Requisites and Validity
95I(A)   Nature and Essentials in General
95k1.8   Unreasonable or Oppressive Contracts
95k1.11   Unconscionable Contracts
95k1.11(3)   Substantive unconscionability (Formerly 95k1)

Under California law, a finding that a contract is unconscionable requires a procedural and a substantive element, the former focusing on oppression or surprise due to unequal bargaining power, the latter

Case 4:17-cv-03042   Document 1-5   Filed on 10/11/17 in TXSD   Page 50 of 173

AT&T Mobility LLC v. Concepcion, 563 U.S. 333 (2011)

131 S.Ct. 1740, 179 L.Ed.2d 742, 79 USLW 4279, 161 Lab.Cas. P 10,368...

on overly harsh or one-sided results. West's Ann.Cal.Civ.Code §§ 1668, 1670.5(a).

60 Cases that cite this headnote

**[6]    Alternative Dispute Resolution**
   👉 Preemption
   **States**
   👉 Particular cases, preemption or supersession

   25T  Alternative Dispute Resolution
   25TII  Arbitration
   25TII(A)  Nature and Form of Proceeding
   25Tk117  Preemption
   360  States
   360I  Political Status and Relations
   360I(B)  Federal Supremacy;Preemption
   360k18.15  Particular cases, preemption or supersession
   When state law prohibits outright the arbitration of a particular type of claim, the conflicting state rule is displaced by the Federal Arbitration Act (FAA). 9 U.S.C.A. § 2.

   147 Cases that cite this headnote

**[7]    Alternative Dispute Resolution**
   👉 Preemption
   **States**
   👉 Particular cases, preemption or supersession

   25T  Alternative Dispute Resolution
   25TII  Arbitration
   25TII(A)  Nature and Form of Proceeding
   25Tk117  Preemption
   360  States
   360I  Political Status and Relations
   360I(B)  Federal Supremacy;Preemption
   360k18.15  Particular cases, preemption or supersession
   In light of the preemptive effect of the Federal Arbitration Act (FAA), a court may not rely on the uniqueness of an agreement to arbitrate as a basis for a state-law holding that enforcement would be unconscionable, for this would enable the court to effect what the state legislature cannot. 9 U.S.C.A. § 2.

188 Cases that cite this headnote

**[8]    Alternative Dispute Resolution**
   👉 Constitutional and statutory provisions and rules of court

   25T  Alternative Dispute Resolution
   25TII  Arbitration
   25TII(A)  Nature and Form of Proceeding
   25Tk114  Constitutional and statutory provisions and rules of court
   While the saving clause, in the provision of the Federal Arbitration Act (FAA) stating that arbitration agreements in maritime transactions or contracts evidencing transactions involving commerce are valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract, preserves generally applicable contract defenses, nothing in it suggests an intent to preserve state-law rules that stand as an obstacle to the accomplishment of the FAA's objectives. 9 U.S.C.A. § 2.

   321 Cases that cite this headnote

**[9]    States**
   👉 Congressional intent

   360  States
   360I  Political Status and Relations
   360I(B)  Federal Supremacy;Preemption
   360k18.11  Congressional intent
   A federal statute's preemption saving clause cannot in reason be construed as allowing a common law right, the continued existence of which would be absolutely inconsistent with the provisions of the act; in other words, the act cannot be held to destroy itself.

   5 Cases that cite this headnote

**[10]   Alternative Dispute Resolution**
   👉 Constitutional and statutory provisions and rules of court

   25T  Alternative Dispute Resolution
   25TII  Arbitration
   25TII(A)  Nature and Form of Proceeding

AT&T Mobility LLC v. Concepcion, 563 U.S. 333 (2011)

131 S.Ct. 1740, 179 L.Ed.2d 742, 79 USLW 4279, 161 Lab.Cas. P 10,368...

25Tk114  Constitutional and statutory
provisions and rules of court

The principal purpose of the Federal
Arbitration Act (FAA) is to ensure that
private arbitration agreements are enforced
according to their terms. 9 U.S.C.A. §§ 2–4.

287 Cases that cite this headnote

**[11]**  **Alternative Dispute Resolution**
☞ Nature, purpose, and right to arbitration
in general

25T  Alternative Dispute Resolution
25TII  Arbitration
25TII(A)  Nature and Form of Proceeding
25Tk111  Nature, purpose, and right to
arbitration in general

In bilateral arbitration, parties forgo the
procedural rigor and appellate review of
the courts in order to realize the benefits of
private dispute resolution: lower costs, greater
efficiency and speed, and the ability to choose
expert adjudicators to resolve specialized
disputes.

10 Cases that cite this headnote

**[12]**  **Judgment**
☞ Persons represented by parties

228  Judgment
228XIV  Conclusiveness of Adjudication
228XIV(B)  Persons Concluded
228k677  Persons represented by parties

For a class-action money judgment to bind
absentees in litigation, class representatives
must at all times adequately represent absent
class members, and absent members must be
afforded notice, an opportunity to be heard,
and a right to opt out of the class.

18 Cases that cite this headnote

**[13]**  **Alternative Dispute Resolution**
☞ Contractual or consensual basis

**Alternative Dispute Resolution**
☞ Constitutional and statutory provisions
and rules of court

25T  Alternative Dispute Resolution
25TII  Arbitration

25TII(A)  Nature and Form of Proceeding
25Tk112  Contractual or consensual basis
25T  Alternative Dispute Resolution
25TII  Arbitration
25TII(A)  Nature and Form of Proceeding
25Tk114  Constitutional and statutory
provisions and rules of court

Arbitration is a matter of contract, and
the Federal Arbitration Act (FAA) requires
courts to honor parties' expectations. 9
U.S.C.A. § 1 et seq.

161 Cases that cite this headnote

**West Codenotes**

**Limited on Preemption Grounds**
West's Ann.Cal.Civ.Code §§ 1668, 1670.5(a).

**\*\*1742 \*333 Syllabus** *

\*    The syllabus constitutes no part of the opinion of
the Court but has been prepared by the Reporter
of Decisions for the convenience of the reader. See
*United States v. Detroit Timber & Lumber Co.,* 200
U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

The cellular telephone contract between respondents
(Concepcions) and petitioner (AT & T) provided for
arbitration of all disputes, but did not permit classwide
arbitration. After the Concepcions were charged sales
tax on the retail value of phones provided free
under their service contract, they sued AT & T in
a California Federal District Court. Their suit was
consolidated with a class action alleging, *inter alia,*
that AT & T had engaged in false advertising and
fraud by charging sales tax on "free" phones. The
District Court denied AT & T's motion to compel
arbitration under the Concepcions' contract. Relying
on the California Supreme Court's *Discover Bank* decision,
it found the arbitration provision unconscionable because
it disallowed classwide proceedings. The Ninth Circuit
agreed that the provision was unconscionable under
California law and held that the Federal Arbitration
Act (FAA), which makes arbitration agreements "valid,
irrevocable, and enforceable, save upon such grounds
as exist at law or in equity for the revocation of any
contract," 9 U.S.C. § 2, did not preempt its ruling.

AT&T Mobility LLC v. Concepcion, 563 U.S. 333 (2011)

131 S.Ct. 1740, 179 L.Ed.2d 742, 79 USLW 4279, 161 Lab.Cas. P 10,368...

*Held:* Because it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581, California's *Discover Bank* rule is pre-empted by the FAA. Pp. 1745 – 1753.

(a) Section 2 reflects a "liberal federal policy favoring arbitration," *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765, and the "fundamental principle that arbitration is a matter of contract," *Rent–A–Center, West, Inc. v. Jackson,* 561 U.S. ——, ——, 130 S.Ct. 2772, 177 L.Ed.2d 403 (2010). Thus, courts must place arbitration agreements on an equal footing with other contracts, *Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 443, 126 S.Ct. 1204, 163 L.Ed.2d 1038, and enforce them according to their terms, *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468, 478, 109 S.Ct. 1248, 103 L.Ed.2d 488. Section 2's saving clause permits agreements to be invalidated by "generally applicable contract defenses," but not by defenses that apply **1743 only to arbitration or derive their meaning from the fact that an agreement to arbitrate is at issue. *Doctor's Associates, Inc. v. Casarotto,* 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902. Pp. 1745 –1746.

(b) In *Discover Bank,* the California Supreme Court held that class waivers in consumer arbitration agreements are unconscionable if the **334 agreement is in an adhesion contract, disputes between the parties are likely to involve small amounts of damages, and the party with inferior bargaining power alleges a deliberate scheme to defraud. Pp. 1745 – 1747.

(c) The Concepcions claim that the *Discover Bank* rule is a ground that "exist[s] at law or in equity for the revocation of any contract" under FAA § 2. When state law prohibits outright the arbitration of a particular type of claim, the FAA displaces the conflicting rule. But the inquiry is more complex when a generally applicable doctrine is alleged to have been applied in a fashion that disfavors or interferes with arbitration. Although § 2's saving clause preserves generally applicable contract defenses, it does not suggest an intent to preserve state-law rules that stand as an obstacle to the accomplishment of the FAA's objectives. Cf. *Geier v. American Honda Motor Co.,* 529 U.S. 861, 872, 120 S.Ct. 1913, 146 L.Ed.2d 914. The FAA's overarching purpose is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate informal, streamlined proceedings. Parties may agree to limit the issues subject to arbitration, *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444, to arbitrate according to specific rules, *Volt, supra,* at 479, 109 S.Ct. 1248, and to limit with whom they will arbitrate, *Stolt–Nielsen, supra,* at ——. Pp. 1746 – 1750.

(d) Class arbitration, to the extent it is manufactured by *Discover Bank* rather than consensual, interferes with fundamental attributes of arbitration. The switch from bilateral to class arbitration sacrifices arbitration's informality and makes the process slower, more costly, and more likely to generate procedural morass than final judgment. And class arbitration greatly increases risks to defendants. The absence of multilayered review makes it more likely that errors will go uncorrected. That risk of error may become unacceptable when damages allegedly owed to thousands of claimants are aggregated and decided at once. Arbitration is poorly suited to these higher stakes. In litigation, a defendant may appeal a certification decision and a final judgment, but 9 U.S.C. § 10 limits the grounds on which courts can vacate arbitral awards. Pp. 1750 – 1753.

584 F.3d 849, reversed and remanded.

SCALIA, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, THOMAS, and ALITO, JJ., joined. THOMAS, J., filed a concurring opinion. BREYER, J., filed a dissenting opinion, in which GINSBURG, SOTOMAYOR, and KAGAN, JJ., joined.

**Attorneys and Law Firms**

Andrew J. Pincus, Washington, DC, for Petitioner.

Deepak Gupta, for Respondents.

Donald M. Falk, Mayer Brown LLP, Palo Alto, CA, Neal Berinhout, Atlanta, GA, Kenneth S. Geller, Andrew J. Pincus, Evan M. Tager, Archis A. Parasharami, Kevin Ranlett, Mayer Brown LLP, Washington, DC, for Petitioner.

## Opinion

**\*\*1744** Justice SCALIA delivered the opinion of the Court.

**\*336** Section 2 of the Federal Arbitration Act (FAA) makes agreements to arbitrate "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. We consider whether the FAA prohibits States from conditioning the enforceability of certain arbitration agreements on the availability of classwide arbitration procedures.

### I

In February 2002, Vincent and Liza Concepcion entered into an agreement for the sale and servicing of cellular telephones with AT & T Mobility LCC (AT & T).[1] The contract provided for arbitration of all disputes between the parties, but required that claims be brought in the parties' "individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding." App. to Pet. for Cert. 61a.[2] The agreement authorized AT & T to make unilateral amendments, which it did to the arbitration provision on several occasions. The version at issue in this case reflects revisions made in December 2006, which the parties agree are controlling.

[1]   The Conceptions' original contract was with Cingular Wireless. AT & T acquired Cingular in 2005 and renamed the company AT & T Mobility in 2007. *Laster v. AT & T Mobility LLC,* 584 F.3d 849, 852, n. 1 (C.A.9 2009).

[2]   That provision further states that "the arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding." App. to Pet. for Cert. 61a.

The revised agreement provides that customers may initiate dispute proceedings by completing a one-page Notice of Dispute form available on AT & T's Web site. AT & T may **\*337** then offer to settle the claim; if it does not, or if the dispute is not resolved within 30 days, the customer may invoke arbitration by filing a separate Demand for Arbitration, also available on AT & T's Web site. In the event the parties proceed to arbitration, the agreement specifies that AT & T must pay all costs for nonfrivolous claims; that arbitration must take place in the county in which the customer is billed; that, for claims of $10,000 or less, the customer may choose whether the arbitration proceeds in person, by telephone, or based only on submissions; that either party may bring a claim in small claims court in lieu of arbitration; and that the arbitrator may award any form of individual relief, including injunctions and presumably punitive damages. The agreement, moreover, denies AT & T any ability to seek reimbursement of its attorney's fees, and, in the event that a customer receives an arbitration award greater than AT & T's last written settlement offer, requires AT & T to pay a $7,500 minimum recovery and twice the amount of the claimant's attorney's fees.[3]

[3]        The guaranteed minimum recovery was increased in 2009 to $10,000. Brief for Petitioner 7.

The Concepcions purchased AT & T service, which was advertised as including the provision of free phones; they were not charged for the phones, but they were charged $30.22 in sales tax based on the phones' retail value. In March 2006, the Concepcions filed a complaint against AT & T in the United States District Court for the Southern District of California. The complaint was later consolidated with a putative class action alleging, among other things, that AT & T had engaged in false advertising and fraud by charging sales tax on phones it advertised as free.

In March 2008, AT & T moved to compel arbitration under the terms of its contract **\*\*1745** with the Concepcions. The Concepcions opposed the motion, contending that the arbitration agreement was unconscionable and unlawfully exculpatory **\*338** under California law because it disallowed classwide procedures. The District Court denied AT & T's motion. It described AT & T's arbitration agreement favorably, noting, for example, that the informal dispute-resolution process was "quick, easy to use" and likely to "promp[t] full or ... even excess payment to the customer *without* the need to arbitrate or litigate"; that the $7,500 premium functioned as "a substantial inducement for the consumer to pursue the claim in arbitration" if a dispute was not resolved informally; and that consumers who were members of a class would likely be worse off. *Laster v. T–Mobile USA, Inc.,* 2008 WL 5216255, \*11–\*12 (S.D.Cal., Aug.11, 2008). Nevertheless, relying on the California Supreme Court's

decision in *Discover Bank v. Superior Court,* 36 Cal.4th 148, 30 Cal.Rptr.3d 76, 113 P.3d 1100 (2005), the court found that the arbitration provision was unconscionable because AT & T had not shown that bilateral arbitration adequately substituted for the deterrent effects of class actions. *Laster,* 2008 WL 5216255, *14.

The Ninth Circuit affirmed, also finding the provision unconscionable under California law as announced in *Discover Bank. Laster v. AT & T Mobility LLC,* 584 F.3d 849, 855 (2009). It also held that the *Discover Bank* rule was not preempted by the FAA because that rule was simply "a refinement of the unconscionability analysis applicable to contracts generally in California." 584 F.3d, at 857. In response to AT & T's argument that the Concepcions' interpretation of California law discriminated against arbitration, the Ninth Circuit rejected the contention that " 'class proceedings will reduce the efficiency and expeditiousness of arbitration' " and noted that " '*Discover Bank* placed arbitration agreements with class action waivers on the *exact same footing* as contracts that bar class action litigation outside the context of arbitration.' " *Id.,* at 858 (quoting *Shroyer v. New Cingular Wireless Services, Inc.,* 498 F.3d 976, 990 (C.A.9 2007)).

We granted certiorari, 560 U.S. 923, 130 S.Ct. 3322, 176 L.Ed.2d 1218 (2010).

### *339 II

**[1]   [2]**   The FAA was enacted in 1925 in response to widespread judicial hostility to arbitration agreements. See *Hall Street Associates, L.L.C. v. Mattel, Inc.,* 552 U.S. 576, 581, 128 S.Ct. 1396, 170 L.Ed.2d 254 (2008). Section 2, the "primary substantive provision of the Act," *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), provides, in relevant part, as follows:

"A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

We have described this provision as reflecting both a "liberal federal policy favoring arbitration," *Moses H. Cone, supra,* at 24, 103 S.Ct. 927, and the "fundamental principle that arbitration is a matter of contract," *Rent–A-Center, West, Inc. v. Jackson,* 561 U.S. —, ——, 130 S.Ct. 2772, 2776, 177 L.Ed.2d 403 (2010). In line with these principles, courts must place arbitration agreements on an equal footing with other contracts, *Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 443, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006), and enforce them according to their terms, *Volt Information Sciences, Inc. v. **1746 Board of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468, 478, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989).

**[3]   [4]**   The final phrase of § 2, however, permits arbitration agreements to be declared unenforceable "upon such grounds as exist at law or in equity for the revocation of any contract." This saving clause permits agreements to arbitrate to be invalidated by "generally applicable contract defenses, such as fraud, duress, or unconscionability," but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue. *Doctor's Associates, Inc. v. Casarotto,* 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996); see also *Perry v. Thomas,* 482 U.S. 483, 492–493, n. 9, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987). *340 The question in this case is whether § 2 preempts California's rule classifying most collective-arbitration waivers in consumer contracts as unconscionable. We refer to this rule as the *Discover Bank* rule.

**[5]**   Under California law, courts may refuse to enforce any contract found "to have been unconscionable at the time it was made," or may "limit the application of any unconscionable clause." Cal. Civ.Code Ann. § 1670.5(a) (West 1985). A finding of unconscionability requires "a 'procedural' and a 'substantive' element, the former focusing on 'oppression' or 'surprise' due to unequal bargaining power, the latter on 'overly harsh' or 'one-sided' results." *Armendariz v. Foundation Health Psychcare Servs., Inc.,* 24 Cal.4th 83, 114, 99 Cal.Rptr.2d 745, 6 P.3d 669, 690 (2000); accord, *Discover Bank,* 36 Cal.4th, at 159–161, 30 Cal.Rptr.3d 76, 113 P.3d, at 1108.

In *Discover Bank,* the California Supreme Court applied this framework to class-action waivers in arbitration agreements and held as follows:

AT&T Mobility LLC v. Concepcion, 563 U.S. 333 (2011)

131 S.Ct. 1740, 179 L.Ed.2d 742, 79 USLW 4279, 161 Lab.Cas. P 10,368...

"[W]hen the waiver is found in a consumer contract of adhesion in a setting in which disputes between the contracting parties predictably involve small amounts of damages, and when it is alleged that the party with the superior bargaining power has carried out a scheme to deliberately cheat large numbers of consumers out of individually small sums of money, then ... the waiver becomes in practice the exemption of the party 'from responsibility for [its] own fraud, or willful injury to the person or property of another.' Under these circumstances, such waivers are unconscionable under California law and should not be enforced." *Id.,* at 162, 30 Cal.Rptr.3d 76, 113 P.3d, at 1110 (quoting Cal. Civ.Code Ann. § 1668).

California courts have frequently applied this rule to find arbitration agreements unconscionable. See, *e.g., Cohen v. DirecTV, Inc.,* 142 Cal.App.4th 1442, 1451–1453, 48 Cal.Rptr.3d 813, 819–821 (2006); *Klussman v. Cross Country* **\*341** *Bank,* 134 Cal.App.4th 1283, 1297, 36 Cal.Rptr.3d 728, 738–739 (2005); *Aral v. EarthLink, Inc.,* 134 Cal.App.4th 544, 556–557, 36 Cal.Rptr.3d 229, 237–239 (2005).

### III

### A

The Concepcions argue that the *Discover Bank* rule, given its origins in California's unconscionability doctrine and California's policy against exculpation, is a ground that "exist[s] at law or in equity for the revocation of any contract" under FAA § 2. Moreover, they argue that even if we construe the *Discover Bank* rule as a prohibition on collective-action waivers rather than simply an application of unconscionability, the rule would still be applicable to all dispute-resolution contracts, since California prohibits waivers of class litigation as well. See *America Online, Inc. v. Superior* **\*\*1747** *Ct.,* 90 Cal.App.4th 1, 17–18, 108 Cal.Rptr.2d 699, 711–713 (2001).

[6]   [7]   When state law prohibits outright the arbitration of a particular type of claim, the analysis is straightforward: The conflicting rule is displaced by the FAA. *Preston v. Ferrer,* 552 U.S. 346, 353, 128 S.Ct. 978, 169 L.Ed.2d 917 (2008). But the inquiry becomes more complex when a doctrine normally thought to be generally applicable, such as duress or, as relevant here, unconscionability, is alleged to have been applied in a fashion that disfavors arbitration. In *Perry v. Thomas,* 482 U.S. 483, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987), for example, we noted that the FAA's preemptive effect might extend even to grounds traditionally thought to exist " 'at law or in equity for the revocation of any contract.' " *Id.,* at 492, n. 9, 107 S.Ct. 2520 (emphasis deleted). We said that a court may not "rely on the uniqueness of an agreement to arbitrate as a basis for a state-law holding that enforcement would be unconscionable, for this would enable the court to effect what ... the state legislature cannot." *Id.,* at 493, n. 9, 107 S.Ct. 2520.

An obvious illustration of this point would be a case finding unconscionable or unenforceable as against public policy **\*342** consumer arbitration agreements that fail to provide for judicially monitored discovery. The rationalizations for such a holding are neither difficult to imagine nor different in kind from those articulated in *Discover Bank.* A court might reason that no consumer would knowingly waive its right to full discovery, as this would enable companies to hide their wrongdoing. Or the court might simply say that such agreements are exculpatory—restricting discovery would be of greater benefit to the company than the consumer, since the former is more likely to be sued than to sue. See *Discover Bank, supra,* at 161, 30 Cal.Rptr.3d 76, 113 P.3d, at 1109 (arguing that class waivers are similarly one-sided). And, the reasoning would continue, because such a rule applies the general principle of unconscionability or public-policy disapproval of exculpatory agreements, it is applicable to "any" contract and thus preserved by § 2 of the FAA. In practice, of course, the rule would have a disproportionate impact on arbitration agreements; but it would presumably apply to contracts purporting to restrict discovery in litigation as well.

Other examples are easy to imagine. The same argument might apply to a rule classifying as unconscionable arbitration agreements that fail to abide by the Federal Rules of Evidence, or that disallow an ultimate disposition by a jury (perhaps termed "a panel of twelve lay arbitrators" to help avoid preemption). Such examples are not fanciful, since the judicial hostility towards arbitration that prompted the FAA had manifested itself in "a great variety" of "devices and formulas" declaring arbitration against public policy. *Robert Lawrence Co.*

AT&T Mobility LLC v. Concepcion, 563 U.S. 333 (2011)

131 S.Ct. 1740, 179 L.Ed.2d 742, 79 USLW 4279, 161 Lab.Cas. P 10,368...

v. Devonshire Fabrics, Inc., 271 F.2d 402, 406 (C.A.2 1959). And although these statistics are not definitive, it is worth noting that California's courts have been more likely to hold contracts to arbitrate unconscionable than other contracts. Broome, An Unconscionable Applicable of the Unconscionability Doctrine: How the California Courts are Circumventing the Federal Arbitration Act, 3 Hastings Bus. L.J. 39, 54, 66 (2006); Randall, **343** Judicial Attitudes Toward Arbitration and the Resurgence of Unconscionability, 52 Buffalo L.Rev. 185, 186–187 (2004).

The Concepcions suggest that all this is just a parade of horribles, and no genuine worry. "Rules aimed at destroying arbitration" or "demanding procedures incompatible with arbitration," they concede, **1748** "would be preempted by the FAA because they cannot sensibly be reconciled with Section 2." Brief for Respondents 32. The "grounds" available under § 2's saving clause, they admit, "should not be construed to include a State's mere preference for procedures that are incompatible with arbitration and 'would wholly eviscerate arbitration agreements.' " Id., at 33 (quoting Carter v. SSC Odin Operating Co., LLC, 237 Ill.2d 30, 50, 340 Ill.Dec. 196, 927 N.E.2d 1207, 1220 (2010)). [4]

[4] The dissent seeks to fight off even this eminently reasonable concession. It says that to its knowledge "we have not ... applied the Act to strike down a state statute that treats arbitrations on par with judicial and administrative proceedings," post, at 10 (opinion of BREYER, J.), and that "we should think more than twice before invalidating a state law that ... puts agreements to arbitrate and agreements to litigate 'upon the same footing' " post, at 4–5.

**[8] [9]** We largely agree. Although § 2's saving clause preserves generally applicable contract defenses, nothing in it suggests an intent to preserve state-law rules that stand as an obstacle to the accomplishment of the FAA's objectives. Cf. Geier v. American Honda Motor Co., 529 U.S. 861, 872, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000); Crosby v. National Foreign Trade Council, 530 U.S. 363, 372–373, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). As we have said, a federal statute's saving clause " 'cannot in reason be construed as [allowing] a common law right, the continued existence of which would be absolutely inconsistent with the provisions of the act. In other words, the act cannot be held to destroy itself.' " American Telephone & Telegraph Co. v. Central Office Telephone,

Inc., 524 U.S. 214, 227–228, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998) (quoting Texas & Pacific R. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 446, 27 S.Ct. 350, 51 L.Ed. 553 (1907)).

**344** We differ with the Concepcions only in the application of this analysis to the matter before us. We do not agree that rules requiring judicially monitored discovery or adherence to the Federal Rules of Evidence are "a far cry from this case." Brief for Respondents 32. The overarching purpose of the FAA, evident in the text of §§ 2, 3, and 4, is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings. Requiring the availability of classwide arbitration interferes with fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA.

B

**[10]** The "principal purpose" of the FAA is to "ensur[e] that private arbitration agreements are enforced according to their terms." Volt, 489 U.S., at 478, 109 S.Ct. 1248; see also Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. ——, ——, 130 S.Ct. 1758, 1763, 176 L.Ed.2d 605 (2010). This purpose is readily apparent from the FAA's text. Section 2 makes arbitration agreements "valid, irrevocable, and enforceable" as written (subject, of course, to the saving clause); § 3 requires courts to stay litigation of arbitral claims pending arbitration of those claims "in accordance with the terms of the agreement"; and § 4 requires courts to compel arbitration "in accordance with the terms of the agreement" upon the motion of either party to the agreement (assuming that the "making of the arbitration agreement or the failure ... to perform the same" is not at issue). In light of these provisions, we have held that parties may agree to limit the issues subject to arbitration, Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc., 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985), **1749** to arbitrate according to specific rules, Volt, supra, at 479, 109 S.Ct. 1248, and to limit with whom a party will arbitrate its disputes, Stolt–Nielsen, supra, at ——, 130 S.Ct. at 1773.

The point of affording parties discretion in designing arbitration processes is to allow for efficient, streamlined procedures tailored to the type of dispute. It can be specified, **345** for example, that the decisionmaker be a

AT&T Mobility LLC v. Concepcion, 563 U.S. 333 (2011)

131 S.Ct. 1740, 179 L.Ed.2d 742, 79 USLW 4279, 161 Lab.Cas. P 10,368...

specialist in the relevant field, or that proceedings be kept confidential to protect trade secrets. And the informality of arbitral proceedings is itself desirable, reducing the cost and increasing the speed of dispute resolution. *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, ——, 129 S.Ct. 1456, 1460, 173 L.Ed.2d 398 (2009); *Mitsubishi Motors Corp., supra*, at 628, 105 S.Ct. 3346.

The dissent quotes *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 219, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985), as " 'reject[ing] the suggestion that the overriding goal of the Arbitration Act was to promote the expeditious resolution of claims.' " *Post*, at 4 (opinion of BREYER, J.). That is greatly misleading. After saying (accurately enough) that "the overriding goal of the Arbitration Act was [not] to promote the expeditious resolution of claims," but to "ensure judicial enforcement of privately made agreements to arbitrate," 470 U.S., at 219, 105 S.Ct. 1238, *Dean Witter* went on to explain: "This is not to say that Congress was blind to the potential benefit of the legislation for expedited resolution of disputes. Far from it ...." *Id.*, at 220, 105 S.Ct. 1238. It then quotes a House Report saying that "the costliness and delays of litigation ... can be largely eliminated by agreements for arbitration." *Ibid.* (quoting H.R.Rep. No. 96, 68th Cong., 1st Sess., 2 (1924)). The concluding paragraph of this part of its discussion begins as follows:

"We therefore are not persuaded by the argument that the conflict between two goals of the Arbitration Act— enforcement of private agreements and encouragement of efficient and speedy dispute resolution—must be resolved in favor of the latter in order to realize the intent of the drafters." 470 U.S., at 221, 105 S.Ct. 1238.

In the present case, of course, those "two goals" do not conflict—and it is the dissent's view that would frustrate *both* of them.

Contrary to the dissent's view, our cases place it beyond dispute that the FAA was designed to promote arbitration. *346 They have repeatedly described the Act as "embod[ying] [a] national policy favoring arbitration," *Buckeye Check Cashing*, 546 U.S., at 443, 126 S.Ct. 1204, and "a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary," *Moses H. Cone*, 460 U.S., at 24, 103 S.Ct. 927; see also *Hall Street Assocs.*, 552 U.S., at 581, 128 S.Ct. 1396. Thus, in *Preston v. Ferrer*, holding preempted a state-law rule requiring exhaustion

of administrative remedies before arbitration, we said: "A prime objective of an agreement to arbitrate is to achieve 'streamlined proceedings and expeditious results,' " which objective would be "frustrated" by requiring a dispute to be heard by an agency first. 552 U.S., at 357–358, 128 S.Ct. 978. That rule, we said, would "at the least, hinder speedy resolution of the controversy." *Id.*, at 358, 128 S.Ct. 978. [5]

5    Relying upon nothing more indicative of congressional understanding than statements of witnesses in committee hearings and a press release of Secretary of Commerce Herbert Hoover, the dissent suggests that Congress "thought that arbitration would be used primarily where merchants sought to resolve disputes of fact ... [and] possessed roughly equivalent bargaining power." *Post*, at 6. Such a limitation appears nowhere in the text of the FAA and has been explicitly rejected by our cases. "Relationships between securities dealers and investors, for example, may involve unequal bargaining power, but we [have] nevertheless held ... that agreements to arbitrate in that context are enforceable." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 33, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991); see also *id.*, at 32–33, 111 S.Ct. 1647 (allowing arbitration of claims arising under the Age Discrimination in Employment Act of 1967 despite allegations of unequal bargaining power between employers and employees). Of course the dissent's disquisition on legislative history fails to note that it contains nothing—not even the testimony of a stray witness in committee hearings—that contemplates the existence of class arbitration.

**1750 California's *Discover Bank* rule similarly interferes with arbitration. Although the rule does not *require* classwide arbitration, it allows any party to a consumer contract to demand it *ex post*. The rule is limited to adhesion contracts, *Discover Bank*, 36 Cal.4th, at 162–163, 30 Cal.Rptr.3d 76, 113 P.3d, at 1110, but the times in which consumer contracts were anything *347 other than adhesive are long past. [6] *Carbajal v. H & R Block Tax Servs., Inc.*, 372 F.3d 903, 906 (7th Cir.2004); see also *Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1149 (C.A.7 1997). The rule also requires that damages be predictably small, and that the consumer allege a scheme to cheat consumers. *Discover Bank, supra*, at 162–163, 30 Cal.Rptr.3d 76, 113 P.3d, at 1110. The former requirement, however, is toothless and malleable (the Ninth Circuit has held that damages of $4,000 are sufficiently small, see *Oestreicher v. Alienware Corp.*, 322

AT&T Mobility LLC v. Concepcion, 563 U.S. 333 (2011)

131 S.Ct. 1740, 179 L.Ed.2d 742, 79 USLW 4279, 161 Lab.Cas. P 10,368...

Fed.Appx. 489, 492 (2009) (unpublished), and the latter has no limiting effect, as all that is required is an allegation. Consumers remain free to bring and resolve their disputes on a bilateral basis under *Discover Bank,* and some may well do so; but there is little incentive for lawyers to arbitrate on behalf of individuals when they may do so for a class and reap far higher fees in the process. And faced with inevitable class arbitration, companies would have less incentive to continue resolving potentially duplicative claims on an individual basis.

6       Of course States remain free to take steps addressing the concerns that attend contracts of adhesion—for example, requiring class-action-waiver provisions in adhesive arbitration agreements to be highlighted. Such steps cannot, however, conflict with the FAA or frustrate its purpose to ensure that private arbitration agreements are enforced according to their terms.

Although we have had little occasion to examine classwide arbitration, our decision in *Stolt–Nielsen* is instructive. In that case we held that an arbitration panel exceeded its power under § 10(a)(4) of the FAA by imposing class procedures based on policy judgments rather than the arbitration agreement itself or some background principle of contract law that would affect its interpretation. 559 U.S., at ——, 130 S.Ct. at 1773–1776. We then held that the agreement at issue, which was silent on the question of class procedures, could not be interpreted to allow them because the "changes brought about by the shift from bilateral arbitration to class-action arbitration" are "fundamental." *Id.,* at ——, 130 S.Ct. at 1776. This is obvious as a **\*348** structural matter: Classwide arbitration includes absent parties, necessitating additional and different procedures and involving higher stakes. Confidentiality becomes more difficult. And while it is theoretically possible to select an arbitrator with some expertise relevant to the class-certification question, arbitrators are not generally knowledgeable in the often-dominant procedural aspects of certification, such as the protection of absent parties. The conclusion follows that **\*\*1751** class arbitration, to the extent it is manufactured by *Discover Bank* rather than consensual, is inconsistent with the FAA.

[11]    First, the switch from bilateral to class arbitration sacrifices the principal advantage of arbitration—its informality—and makes the process slower, more costly, and more likely to generate procedural morass than final judgment. "In bilateral arbitration, parties forgo the

procedural rigor and appellate review of the courts in order to realize the benefits of private dispute resolution: lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes." 559 U.S., at ——, 130 S.Ct. at 1775. But before an arbitrator may decide the merits of a claim in classwide procedures, he must first decide, for example, whether the class itself may be certified, whether the named parties are sufficiently representative and typical, and how discovery for the class should be conducted. A cursory comparison of bilateral and class arbitration illustrates the difference. According to the American Arbitration Association (AAA), the average consumer arbitration between January and August 2007 resulted in a disposition on the merits in six months, four months if the arbitration was conducted by documents only. AAA, Analysis of the AAA's Consumer Arbitration Caseload, online at http://www.adr.org/ si.asp?id=5027 (all Internet materials as visited Apr. 25, 2011, and available in Clerk of Court's case file). As of September 2009, the AAA had opened 283 class arbitrations. Of those, 121 remained active, and 162 had been settled, withdrawn, or dismissed. Not a single one, however, had **\*349** resulted in a final award on the merits. Brief for AAA as *Amicus Curiae* in *Stolt–Nielsen,* O.T.2009, No. 08–1198, pp. 22–24. For those cases that were no longer active, the median time from filing to settlement, withdrawal, or dismissal—not judgment on the merits—was 583 days, and the mean was 630 days. *Id.,* at 24.[7]

7       The dissent claims that class arbitration should be compared to class litigation, not bilateral arbitration. *Post,* at 6–7. Whether arbitrating a class is more desirable than litigating one, however, is not relevant. A State cannot defend a rule requiring arbitration-by-jury by saying that parties will still prefer it to trial-by-jury.

[12]    Second, class arbitration *requires* procedural formality. The AAA's rules governing class arbitrations mimic the Federal Rules of Civil Procedure for class litigation. Compare AAA, Supplementary Rules for Class Arbitrations (effective Oct. 8, 2003), online at http://www.adr.org/ sp.asp?id=21936, with Fed. Rule Civ. Proc. 23. And while parties can alter those procedures by contract, an alternative is not obvious. If procedures are too informal, absent class members would not be bound by the arbitration. For a class-action money judgment to bind absentees in litigation, class representatives must at all times adequately represent absent class members, and

AT&T Mobility LLC v. Concepcion, 563 U.S. 333 (2011)

131 S.Ct. 1740, 179 L.Ed.2d 742, 79 USLW 4279, 161 Lab.Cas. P 10,368...

absent members must be afforded notice, an opportunity to be heard, and a right to opt out of the class. *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 811–812, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). At least this amount of process would presumably be required for absent parties to be bound by the results of arbitration.'

We find it unlikely that in passing the FAA Congress meant to leave the disposition of these procedural requirements to an arbitrator. Indeed, class arbitration was not even envisioned by Congress when it passed the FAA in 1925; as the California Supreme Court admitted in *Discover Bank,* class arbitration is a "relatively recent development." 36 Cal.4th, at 163, 30 Cal.Rptr.3d 76, 113 P.3d, at 1110. And it **1752 is at the very *350 least odd to think that an arbitrator would be entrusted with ensuring that third parties' due process rights are satisfied.

Third, class arbitration greatly increases risks to defendants. Informal procedures do of course have a cost: The absence of multilayered review makes it more likely that errors will go uncorrected. Defendants are willing to accept the costs of these errors in arbitration, since their impact is limited to the size of individual disputes, and presumably outweighed by savings from avoiding the courts. But when damages allegedly owed to tens of thousands of potential claimants are aggregated and decided at once, the risk of an error will often become unacceptable. Faced with even a small chance of a devastating loss, defendants will be pressured into settling questionable claims. Other courts have noted the risk of "in terrorem" settlements that class actions entail, see, *e.g., Kohen v. Pacific Inv. Management Co. LLC,* 571 F.3d 672, 677–678 (C.A.7 2009), and class arbitration would be no different.

Arbitration is poorly suited to the higher stakes of class litigation. In litigation, a defendant may appeal a certification decision on an interlocutory basis and, if unsuccessful, may appeal from a final judgment as well. Questions of law are reviewed *de novo* and questions of fact for clear error. In contrast, 9 U.S.C. § 10 allows a court to vacate an arbitral award *only* where the award "was procured by corruption, fraud, or undue means"; "there was evident partiality or corruption in the arbitrators"; "the arbitrators were guilty of misconduct in refusing to postpone the hearing ... or in refusing to hear evidence pertinent and material to the controversy[,] or of any other misbehavior by which the rights of any party

have been prejudiced"; or if the "arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award ... was not made." The AAA rules do authorize judicial review of certification decisions, but this review is unlikely to have much effect given these limitations; review under § 10 focuses on misconduct *351 rather than mistake. And parties may not contractually expand the grounds or nature of judicial review. *Hall Street Assocs.,* 552 U.S., at 578, 128 S.Ct. 1396. We find it hard to believe that defendants would bet the company with no effective means of review, and even harder to believe that Congress would have intended to allow state courts to force such a decision.[8]

[8]      The dissent cites three large arbitration awards (none of which stems from classwide arbitration) as evidence that parties are willing to submit large claims before an arbitrator. *Post,* at 7–8. Those examples might be in point if it could be established that the size of the arbitral dispute was predictable when the arbitration agreement was entered. Otherwise, all the cases prove is that arbitrators can give huge awards—which we have never doubted. The point is that in class-action arbitration huge awards (with limited judicial review) will be entirely predictable, thus rendering arbitration unattractive. It is not reasonably deniable that requiring consumer disputes to be arbitrated on a classwide basis will have a substantial deterrent effect on incentives to arbitrate.

[13]      The Concepcions contend that because parties may and sometimes do agree to aggregation, class procedures are not necessarily incompatible with arbitration. But the same could be said about procedures that the Concepcions admit States may not superimpose on arbitration: Parties *could* agree to arbitrate pursuant to the Federal Rules of Civil Procedure, or pursuant to a discovery process rivaling that in litigation. Arbitration is a matter of contract, and the FAA requires courts to honor parties' expectations. *Rent–A–* **1753 *Center, West,* 561 U.S., at ——, 130 S.Ct. 2772, 2774. But what the parties in the aforementioned examples would have agreed to is not arbitration as envisioned by the FAA, lacks its benefits, and therefore may not be required by state law.

The dissent claims that class proceedings are necessary to prosecute small-dollar claims that might otherwise slip through the legal system. See *post,* at 9. But States cannot require a procedure that is inconsistent with the FAA, even if it is desirable for unrelated reasons. Moreover, the

AT&T Mobility LLC v. Concepcion, 563 U.S. 333 (2011)
131 S.Ct. 1740, 179 L.Ed.2d 742, 79 USLW 4279, 161 Lab.Cas. P 10,368...

claim here was most unlikely to go unresolved. As noted earlier, the arbitration agreement provides that AT & T will **352** pay claimants a minimum of $7,500 and twice their attorney's fees if they obtain an arbitration award greater than AT & T's last settlement offer. The District Court found this scheme sufficient to provide incentive for the individual prosecution of meritorious claims that are not immediately settled, and the Ninth Circuit admitted that aggrieved customers who filed claims would be "essentially guarantee[d]" to be made whole, 584 F.3d, at 856, n. 9. Indeed, the District Court concluded that the Concepcions were *better off* under their arbitration agreement with AT & T than they would have been as participants in a class action, which " could take months, if not years, and which may merely yield an opportunity to submit a claim for recovery of a small percentage of a few dollars." *Laster,* 2008 WL 5216255, at *12.

* * *

<mark>Because it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941), California's *Discover Bank* rule is preempted by the FAA. The judgment of the Ninth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.</mark>

*It is so ordered.*

Justice THOMAS, concurring.

Section 2 of the Federal Arbitration Act (FAA) provides that an arbitration provision "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The question here is whether California's *Discover Bank* rule, see *Discover Bank v. Superior Ct.,* 36 Cal.4th 148, 30 Cal.Rptr.3d 76, 113 P.3d 1100 (2005), is a "groun[d] ... for the revocation of any contract."

It would be absurd to suggest that § 2 requires only that a defense apply to "any contract." If § 2 means anything, it **353** is that courts cannot refuse to enforce arbitration agreements because of a state public policy against arbitration, even if the policy nominally applies to "any contract." There must be some additional limit on the contract defenses permitted by § 2. Cf. *ante,* at

17 (opinion of the Court) (state law may not require procedures that are "not arbitration as envisioned by the FAA" and "lac[k] its benefits"); *post,* at 5 (BREYER, J., dissenting) (state law may require only procedures that are "consistent with the use of arbitration").

I write separately to explain how I would find that limit in the FAA's text. As I would read it, the FAA requires that an agreement to arbitrate be enforced unless a party successfully challenges the formation of the arbitration agreement, such as by proving fraud or duress. 9 U.S.C. §§ 2, 4. Under this reading, I would reverse the Court of Appeals because a district court cannot follow both the FAA and the *Discover Bank* rule, which does not relate to defects in the making of an agreement.

**1754** This reading of the text, however, has not been fully developed by any party, cf. Brief for Petitioner 41, n. 12, and could benefit from briefing and argument in an appropriate case. Moreover, I think that the Court's test will often lead to the same outcome as my textual interpretation and that, when possible, it is important in interpreting statutes to give lower courts guidance from a majority of the Court. See *US Airways, Inc. v. Barnett,* 535 U.S. 391, 411, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002) (O'Connor, J., concurring). Therefore, although I adhere to my views on purposes-and-objectives pre-emption, see *Wyeth v. Levine,* 555 U.S. 555, ——, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009) (opinion concurring in judgment), I reluctantly join the Court's opinion.

I

The FAA generally requires courts to enforce arbitration agreements as written. Section 2 provides that "[a] written provision in ... a contract ... to settle by arbitration a controversy thereafter arising out of such contract ... shall **354** be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." Significantly, the statute does not parallel the words "valid, irrevocable, and enforceable" by referencing the grounds as exist for the " invalidation, revocation, or nonenforcement" of any contract. Nor does the statute use a different word or phrase entirely that might arguably encompass validity, revocability, and enforce-ability. The use of only "revocation" and the conspicuous omission of "invalidation" and "nonenforcement" suggest that the

AT&T Mobility LLC v. Concepcion, 563 U.S. 333 (2011)

131 S.Ct. 1740, 179 L.Ed.2d 742, 79 USLW 4279, 161 Lab.Cas. P 10,368...

exception does not include all defenses applicable to any contract but rather some subset of those defenses. See *Duncan v. Walker,* 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001) ("It is our duty to give effect, if possible, to every clause and word of a statute" (internal quotation marks omitted)).

Concededly, the difference between revocability, on the one hand, and validity and enforceability, on the other, is not obvious. The statute does not define the terms, and their ordinary meanings arguably overlap. Indeed, this Court and others have referred to the concepts of revocability, validity, and enforceability interchangeably. But this ambiguity alone cannot justify ignoring Congress' clear decision in § 2 to repeat only one of the three concepts.

To clarify the meaning of § 2, it would be natural to look to other portions of the FAA. Statutory interpretation focuses on "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.,* 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). "A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme ... because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *United Sav. Assn. of Tex. v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

Examining the broader statutory scheme, § 4 can be read to clarify the scope of § 2's exception to the enforcement of *355 arbitration agreements. When a party seeks to enforce an arbitration agreement in federal court, § 4 requires that "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue," the court must order arbitration "in accordance with the terms of the agreement."

Reading §§ 2 and 4 harmoniously, the "grounds ... for the revocation" preserved in § 2 would mean grounds related to the **1755 making of the agreement. This would require enforcement of an agreement to arbitrate unless a party successfully asserts a defense concerning the formation of the agreement to arbitrate, such as fraud, duress, or mutual mistake. See *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 403–404, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967) (interpreting § 4 to permit federal

courts to adjudicate claims of "fraud in the inducement of the arbitration clause itself" because such claims "g[o] to the 'making' of the agreement to arbitrate"). Contract defenses unrelated to the making of the agreement—such as public policy—could not be the basis for declining to enforce an arbitration clause. [*]

[*] The interpretation I suggest would be consistent with our precedent. Contract formation is based on the consent of the parties, and we have emphasized that "[a]rbitration under the Act is a matter of consent." *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468, 479, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989).

The statement in *Perry v. Thomas,* 482 U.S. 483, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987), suggesting that § 2 preserves all state-law defenses that "arose to govern issues concerning the validity, revocability, and enforceability of contracts generally," *id.,* at 493, n. 9, 107 S.Ct. 2520, is dicta. This statement is found in a footnote concerning a claim that the Court "decline[d] to address." *Id.,* at 493, n. 9, 107 S.Ct. 2520. Similarly, to the extent that statements in *Rent–A–Center, West, Inc. v. Jackson,* 561 U.S. ——, ——, n. 1, 130 S.Ct. 2772, 2778 n. 1 (2010), can be read to suggest anything about the scope of state-law defenses under § 2, those statements are dicta, as well. This Court has never addressed the question whether the state-law "grounds" referred to in § 2 are narrower than those applicable to any contract.

Moreover, every specific contract defense that the Court has acknowledged is applicable under § 2 relates to contract formation. In *Doctor's Associates, Inc. v. Casarotto,* 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996), this Court said that fraud, duress, and unconscionability "may be applied to invalidate arbitration agreements without contravening § 2." All three defenses historically concern the making of an agreement. See *Morgan Stanley Capital Group Inc. v. Public Util. Dist. No. 1 of Snohomish Cty.,* 554 U.S. 527, 547, 128 S.Ct. 2733, 171 L.Ed.2d 607 (2008) (describing fraud and duress as "traditional grounds for the abrogation of [a] contract" that speak to "unfair dealing at the contract formation stage"); *Hume v. United States,* 132 U.S. 406, 411, 414, 10 S.Ct. 134, 33 L.Ed. 393 (1889) (describing an unconscionable contract as one "such as no man in his senses and not under delusion would make" and suggesting that there may be "contracts so extortionate and unconscionable on their face

Case 4:17-cv-03042   Document 1-5   Filed on 10/11/17 in TXSD   Page 62 of 173

AT&T Mobility LLC v. Concepcion, 563 U.S. 333 (2011)
131 S.Ct. 1740, 179 L.Ed.2d 742, 79 USLW 4279, 161 Lab.Cas. P 10,368...

as to raise the presumption of fraud in their inception" (internal quotation marks omitted)).

**\*356** II

Under this reading, the question here would be whether California's *Discover Bank* rule relates to the making of an agreement. I think it does not.

In *Discover Bank,* 36 Cal.4th 148, 30 Cal.Rptr.3d 76, 113 P.3d 1100, the California Supreme Court held that "class action waivers are, under certain circumstances, unconscionable as unlawfully exculpatory." *Id.,* at 65, 30 Cal.Rptr.3d 76, 113 P.3d, at 1112; see also *id.,* at 161, 30 Cal.Rptr.3d 76, 113 P.3d, at 1108 ("[C]lass action waivers [may be] substantively unconscionable inasmuch as they may operate effectively as exculpatory contract clauses that are contrary to public policy"). The court concluded that where a class-action waiver is found in an arbitration agreement in certain consumer contracts of adhesion, such waivers "should not be enforced." *Id.,* at 163, 30 Cal.Rptr.3d 76, 113 P.3d, at 1110. In practice, the court explained, such agreements "operate to insulate a party from liability that otherwise would be imposed under California law." *Id.,* at 161, 30 Cal.Rptr.3d 76, 113 P.3d, at 1108, 1109. The court did not conclude that a customer would sign such an agreement only if under **\*\*1756** the influence of fraud, duress, or delusion.

The court's analysis and conclusion that the arbitration agreement was exculpatory reveals that the *Discover Bank* rule does not concern the making of the arbitration agreement. Exculpatory contracts are a paradigmatic example of contracts that will not be enforced because of public policy. **\*357** 15 G. Giesel, Corbin on Contracts §§ 85.1, 85.17, 85.18 (rev. ed.2003). Indeed, the court explained that it would not enforce the agreements because they are " 'against the policy of the law.' " 36 Cal.4th, at 161, 30 Cal.Rptr.3d 76, 113 P.3d, at 1108 (quoting Cal. Civ.Code Ann. § 1668); see also 36 Cal.4th, at 166, 30 Cal.Rptr.3d 76, 113 P.3d, at 1112 ("Agreements to arbitrate may not be used to harbor terms, conditions and practices that undermine public policy" (internal quotation marks omitted)). Refusal to enforce a contract for public-policy reasons does not concern whether the contract was properly made.

Accordingly, the *Discover Bank* rule is not a "groun[d] ... for the revocation of any contract" as I would read § 2

of the FAA in light of § 4. Under this reading, the FAA dictates that the arbitration agreement here be enforced and the *Discover Bank* rule is pre-empted.

Justice BREYER, with whom Justice GINSBURG, Justice SOTOMAYOR, and Justice KAGAN join, dissenting.

The Federal Arbitration Act says that an arbitration agreement "shall be valid, irrevocable, and enforceable, *save upon such grounds as exist at law or in equity for the revocation of any contract.*" 9 U.S.C. § 2 (emphasis added). California law sets forth certain circumstances in which "class action waivers" in *any* contract are unenforceable. In my view, this rule of state law is consistent with the federal Act's language and primary objective. It does not "stan[d] as an obstacle" to the Act's "accomplishment and execution." *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941). And the Court is wrong to hold that the federal Act pre-empts the rule of state law.

I

The California law in question consists of an authoritative state-court interpretation of two provisions of the California Civil Code. The first provision makes unlawful all contracts "which have for their object, directly or indirectly, to exempt anyone from responsibility for his own ... violation of law." **\*358** Cal. Civ.Code Ann. § 1668 (West 1985). The second provision authorizes courts to "limit the application of any unconscionable clause" in a contract so "as to avoid any unconscionable result." § 1670.5(a).

The specific rule of state law in question consists of the California Supreme Court's application of these principles to hold that "some" (but not "all") "class action waivers" in consumer contracts are exculpatory and unconscionable under California "law." *Discover Bank v. Superior Ct.,* 36 Cal.Rptr.3d 148, 160, 162, 30 Cal.Rptr.3d 76, 113 P.3d 1100, 1108, 1110 (2005). In particular, in *Discover Bank* the California Supreme Court stated that, when a class-action waiver

"is found in a consumer contract of adhesion in a setting in which disputes between the contracting parties predictably involve small amounts of damages, and when it is alleged that the party with the

Case 4:17-cv-03042    Document 1-5    Filed on 10/11/17 in TXSD    Page 63 of 173

AT&T Mobility LLC v. Concepcion, 563 U.S. 333 (2011)
131 S.Ct. 1740, 179 L.Ed.2d 742, 79 USLW 4279, 161 Lab.Cas. P 10,368...

superior bargaining power has carried out a scheme to deliberately cheat large numbers of consumers out of individually small sums of money, then ... the waiver becomes in practice the exemption of the party 'from responsibility for [its] own fraud, or willful injury **1757 to the person or property of another.' " *Id., at 162–163, 30 Cal.Rptr.3d 76, 113 P.3d, at 1110.*

In such a circumstance, the "waivers are unconscionable under California law and should not be enforced." *Id., at 163, 30 Cal.Rptr.3d 76, 113 P.3d, at 1110.*

The *Discover Bank* rule does not create a "blanket policy in California against class action waivers in the consumer context." *Provencher v. Dell, Inc., 409 F.Supp.2d 1196, 1201 (C.D.Cal.2006).* Instead, it represents the "application of a more general [unconscionability] principle." *Gentry v. Superior Ct., 42 Cal.4th 443, 457, 64 Cal.Rptr.3d 773, 165 P.3d 556, 564 (2007).* Courts applying California law have enforced class-action waivers where they satisfy general unconscionability standards. See, *e.g., *359 Walnut Producers of Cal. v. Diamond Foods, Inc., 187 Cal.App.4th 634, 647–650, 114 Cal.Rptr.3d 449, 459–462 (2010); Arguelles–Romero v. Superior Ct., 184 Cal.App.4th 825, 843–845, 109 Cal.Rptr.3d 289, 305–307 (2010); Smith v. Americredit Financial Servs., Inc., No. 09cv1076, 2009 WL 4895280 (S.D.Cal., Dec.11, 2009);* cf. *Provencher, supra, at 1201* (considering *Discover Bank* in choice-of-law inquiry). And even when they fail, the parties remain free to devise other dispute mechanisms, including informal mechanisms, that, in context, will not prove unconscionable. See *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ., 489 U.S. 468, 479, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989).*

## II

### A

The *Discover Bank* rule is consistent with the federal Act's language. It "applies equally to class action litigation waivers in contracts without arbitration agreements as it does to class arbitration waivers in contracts with such agreements." *36 Cal.4th, at 165–166, 30 Cal.Rptr.3d 76, 113 P.3d, at 1112.* Linguistically speaking, it falls directly within the scope of the Act's exception permitting courts to refuse to enforce arbitration agreements on grounds that

exist "for the revocation of *any* contract." *9 U.S.C. § 2* (emphasis added). The majority agrees. *Ante,* at 9.

### B

The *Discover Bank* rule is also consistent with the basic "purpose behind" the Act. *Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 219, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985).* We have described that purpose as one of "ensur[ing] judicial enforcement" of arbitration agreements. *Ibid.;* see also *Marine Transit Corp. v. Dreyfus, 284 U.S. 263, 274, n. 2, 52 S.Ct. 166, 76 L.Ed. 282 (1932)* (" 'The purpose of this bill is to make *valid and enforceable* agreements for arbitration' " (quoting H.R.Rep. No. 96, 68th Cong., 1st Sess., 1 (1924); emphasis added)); 65 Cong. Rec.1931 (1924) ( "It creates no new legislation, grants no new rights, except a remedy to enforce an agreement in commercial contracts and in *360 admiralty contracts"). As is well known, prior to the federal Act, many courts expressed hostility to arbitration, for example by refusing to order specific performance of agreements to arbitrate. See S.Rep. No. 536, 68th Cong., 1st Sess., 2 (1924). The Act sought to eliminate that hostility by placing agreements to arbitrate " *upon the same footing as other contracts.' " Scherk v. Alberto–Culver Co., 417 U.S. 506, 511, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974)* (quoting H.R.Rep. No. 96, at 2; emphasis added).

Congress was fully aware that arbitration could provide procedural and cost advantages. The House Report emphasized the "appropriate[ness]" of making arbitration **1758 agreements enforceable "at this time when there is so much agitation against the costliness and delays of litigation." *Id.,* at 2. And this Court has acknowledged that parties may enter into arbitration agreements in order to expedite the resolution of disputes. See *Preston v. Ferrer, 552 U.S. 346, 357, 128 S.Ct. 978, 169 L.Ed.2d 917 (2008)* (discussing "prime objective of an agreement to arbitrate"). See also *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc., 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985).*

But we have also cautioned against thinking that Congress' primary objective was to guarantee these particular procedural advantages. Rather, that primary objective was to secure the "enforcement" of agreements to arbitrate. *Dean Witter, 470 U.S., at 221, 105 S.Ct.*

Case 4:17-cv-03042 Document 1-5 Filed on 10/11/17 in TXSD Page 64 of 173

AT&T Mobility LLC v. Concepcion, 563 U.S. 333 (2011)
131 S.Ct. 1740, 179 L.Ed.2d 742, 79 USLW 4279, 161 Lab.Cas. P 10,368...

1238. See also *id.,* at 219, 105 S.Ct. 1238 (we "reject the suggestion that the overriding goal of the Arbitration Act was to promote the expeditious resolution of claims"); *id.,* at 219, 217–218, 105 S.Ct. 1238 ("[T]he intent of Congress" requires us to apply the terms of the Act without regard to whether the result would be "possibly inefficient"); cf. *id.,* at 220, 105 S.Ct. 1238 (acknowledging that "expedited resolution of disputes" might lead parties to prefer arbitration). The relevant Senate Report points to the Act's basic purpose when it says that "[t]he purpose of the [Act] is *clearly set forth in section 2,*" S.Rep. No. 536, at 2 (emphasis added), namely, the section that says that an arbitration agreement "shall be valid, irrevocable, **\*362** and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract," 9 U.S.C. § 2.

Thus, insofar as we seek to implement Congress' intent, we should think more than twice before invalidating a state law that does just what § 2 requires, namely, puts agreements to arbitrate and agreements to litigate "upon the same footing."

### III

The majority's contrary view (that *Discover Bank* stands as an "obstacle" to the accomplishment of the federal law's objective, *ante,* at 9–18) rests primarily upon its claims that the *Discover Bank* rule increases the complexity of arbitration procedures, thereby discouraging parties from entering into arbitration agreements, and to that extent discriminating in practice against arbitration. These claims are not well founded.

For one thing, a state rule of law that would sometimes set aside as unconscionable a contract term that forbids class arbitration is not (as the majority claims) like a rule that would require "ultimate disposition by a jury" or "judicially monitored discovery" or use of "the Federal Rules of Evidence." *Ante,* at 8, 9. Unlike the majority's examples, class arbitration is consistent with the use of arbitration. It is a form of arbitration that is well known in California and followed elsewhere. See, *e.g., Keating v. Superior Ct.,* 109 Cal.App.3d 784, 167 Cal.Rptr. 481, 492 (1980) (officially depublished); American Arbitration Association (AAA), Supplementary Rules for Class Arbitrations (2003), http://www.adr.org/sp.asp?id=21936 (as visited Apr. 25, 2011, and available in Clerk of Court's

case file); JAMS, The Resolution Experts, Class Action Procedures (2009). Indeed, the AAA has told us that it has found class arbitration to be "a fair, balanced, and efficient means of resolving class disputes." Brief for AAA as *Amicus Curiae* in *Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.,* O.T.2009, No. 08–1198, p. 25 (hereinafter AAA *Amicus* Brief). And unlike the majority's examples, the *Discover Bank* rule imposes equivalent limitations on litigation; hence it cannot **\*\*1759** fairly be characterized as a targeted attack on arbitration.

Where does the majority get its contrary idea—that individual, rather than class, arbitration is a "fundamental attribut[e]" of arbitration? *Ante,* at 9. The majority does not explain. And it is unlikely to be able to trace its present view to the history of the arbitration statute itself.

When Congress enacted the Act, arbitration procedures had not yet been fully developed. Insofar as Congress considered detailed forms of arbitration at all, it may well have thought that arbitration would be used primarily where merchants sought to resolve disputes of fact, not law, under the customs of their industries, where the parties possessed roughly equivalent bargaining power. See *Mitsubishi Motors, supra,* at 646, 105 S.Ct. 3346 (Stevens, J., dissenting); Joint Hearings on S. 1005 and H.R. 646 before the Subcommittees of the Committees on the Judiciary, 68th Cong., 1st Sess., 15 (1924); Hearing on S. 4213 and S. 4214 before a Subcommittee of the Senate Committee on the Judiciary, 67th Cong., 4th Sess., 9–10 (1923); Dept. of Commerce, Secretary Hoover Favors Arbitration—Press Release (Dec. 28, 1925), Herbert Hoover Papers—Articles, Addresses, and Public Statements File—No. 536, p. 2 (Herbert Hoover Presidential Library); Cohen & Dayton, The New Federal Arbitration Law, 12 Va. L.Rev. 265, 281 (1926); AAA, Year Book on Commercial Arbitration in the United States (1927). This last mentioned feature of the history —roughly equivalent bargaining power—suggests, if anything, that California's statute is consistent with, and indeed may help to further, the objectives that Congress had in mind.

Regardless, if neither the history nor present practice suggests that class arbitration is fundamentally incompatible with arbitration itself, then on what basis can the majority hold California's law pre-empted?

**\*363** For another thing, the majority's argument that the *Discover Bank* rule will discourage arbitration rests critically upon the wrong comparison. The majority compares the complexity of class arbitration with that of bilateral arbitration. See *ante,* at 14. And it finds the former more complex. See *ibid.* But, if incentives are at issue, the *relevant* comparison is not "arbitration with arbitration" but a comparison between class arbitration and judicial class actions. After all, in respect to the relevant set of contracts, the *Discover Bank* rule similarly and equally sets aside clauses that forbid class procedures —whether arbitration procedures or ordinary judicial procedures are at issue.

Why would a typical defendant (say, a business) prefer a judicial class action to class arbitration? AAA statistics "suggest that class arbitration proceedings take more time than the average commercial arbitration, but may take *less time* than the average class action in court." AAA *Amicus* Brief 24 (emphasis added). Data from California courts confirm that class arbitrations can take considerably less time than in-court proceedings in which class certification is sought. Compare *ante,* at 14 (providing statistics for class arbitration), with Judicial Council of California, Administrative Office of the Courts, Class Certification in California: Second Interim Report from the Study of California Class Action Litigation 18 (2010) (providing statistics for class-action litigation in California courts). And a single class proceeding is surely more efficient than thousands of separate proceedings for identical claims. Thus, if speedy resolution of disputes were all that mattered, then the *Discover Bank* rule would reinforce, **\*\*1760** not obstruct, that objective of the Act.

The majority's related claim that the *Discover Bank* rule will discourage the use of arbitration because "[a]rbitration is poorly suited to ... higher stakes" lacks empirical support. *Ante,* at 16. Indeed, the majority provides no convincing reason to believe that parties are unwilling to submit High-Stake disputes to Arbitration. and There are numerous counterexamples. Loftus, Rivals Resolve Dispute Over Drug, Wall Street Journal, Apr. 16, 2011, p. B2 (discussing $500 million settlement in dispute submitted to arbitration); Ziobro, Kraft Seeks Arbitration In Fight With Starbucks Over Distribution, Wall Street Journal, Nov. 30, 2010, p. B10 (describing initiation of an arbitration in which the payout "could be higher" than $1.5 billion); Markoff, Software Arbitration Ruling Gives I.B.M. $833 Million From Fujitsu, N.Y. Times, Nov. 30,

1988, p. A1 (describing both companies as "pleased with" resolving a licensing dispute).

Further, even though contract defenses, *e.g.,* duress and unconscionability, slow down the dispute resolution process, federal arbitration law normally leaves such matters to the States. *Rent–A–Center, West, Inc. v. Jackson,* 561 U.S. ——, ——, 130 S.Ct. 2772, 2775 (2010) (arbitration agreements "may be invalidated by 'generally applicable contract defenses' " (quoting *Doctor's Associates, Inc. v. Casarotto,* 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996))). A provision in a contract of adhesion (for example, requiring a consumer to decide very quickly whether to pursue a claim) might increase the speed and efficiency of arbitrating a dispute, but the State can forbid it. See, *e.g., Hayes v. Oakridge Home,* 122 Ohio St.3d 63, 67, 2009–Ohio–2054, ¶ 19. 908 N.E.2d 408, 412 ("Unconscionability is a ground for revocation of an arbitration agreement"); *In re Poly–America, L. P.,* 262 S.W.3d 337, 348 (Tex.2008) ("Unconscionable contracts, however—whether relating to arbitration or not—are unenforceable under Texas law"). The *Discover Bank* rule amounts to a variation on this theme. California is free to define unconscionability as it sees fit, and its common law is of no federal concern so long as the State does not adopt a special rule that disfavors arbitration. Cf. *Doctor's Associates, supra,* at 687. See also *ante,* at 4, n. (THOMAS, J., concurring) (suggesting that, under certain circumstances, California might remain free to apply its unconscionability doctrine).

**\*365** Because California applies the same legal principles to address the unconscionability of class arbitration waivers as it does to address the unconscionability of any other contractual provision, the merits of class proceedings should not factor into our decision. If California had applied its law of duress to void an arbitration agreement, would it matter if the procedures in the coerced agreement were efficient?

Regardless, the majority highlights the disadvantages of class arbitrations, as it sees them. See *ante,* at 15–16 (referring to the "greatly increase[d] risks to defendants"; the "chance of a devastating loss" pressuring defendants "into settling questionable claims"). But class proceedings have countervailing advantages. In general agreements that forbid the consolidation of claims can lead small-dollar claimants to abandon their claims rather than to litigate. I suspect that it is true even here, for as the

AT&T Mobility LLC v. Concepcion, 563 U.S. 333 (2011)

131 S.Ct. 1740, 179 L.Ed.2d 742, 79 USLW 4279, 161 Lab.Cas. P 10,368...

Court of Appeals recognized, AT & T can avoid the $7,500 payout (the payout that supposedly makes the Concepcions' arbitration worthwhile) simply by paying the claim's face value, such that "the maximum gain to a customer for the hassle of arbitrating a $30.22 dispute is still just $30.22." *Laster v. AT & T Mobility* **1761 *LLC, 584 F.3d 849, 855, 856 (C.A.9 2009).*

What rational lawyer would have signed on to represent the Concepcions in litigation for the possibility of fees stemming from a $30.22 claim? See, *e.g., Carnegie v. Household Int'l, Inc.,* 376 F.3d 656, 661 (C.A.7 2004) ("The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30"). In California's perfectly rational view, nonclass arbitration over such sums will also sometimes have the effect of depriving claimants of their claims (say, for example, where claiming the $30.22 were to involve filling out many forms that require technical legal knowledge or waiting at great length while a call is placed on hold). *Discover Bank* sets forth circumstances in which the California courts believe that the terms of consumer contracts can be manipulated to **366 insulate an agreement's author from liability for its own frauds by "deliberately cheat[ing] large numbers of consumers out of individually small sums of money." 36 Cal.4th, at 162–163, 30 Cal.Rptr.3d 76, 113 P.3d, at 1110. Why is this kind of decision—weighing the pros and cons of all class proceedings alike—not California's to make?

Finally, the majority can find no meaningful support for its views in this Court's precedent. The federal Act has been in force for nearly a century. We have decided dozens of cases about its requirements. We have reached results that authorize complex arbitration procedures. *E.g., Mitsubishi Motors,* 473 U.S., at 629, 105 S.Ct. 3346 (antitrust claims arising in international transaction are arbitrable). We have upheld nondiscriminatory state laws that slow down arbitration proceedings. *E.g., Volt Information Sciences,* 489 U.S., at 477–479, 109 S.Ct. 1248 (California law staying arbitration proceedings until completion of related litigation is not pre-empted). But we have not, to my knowledge, applied the Act to strike down a state statute that treats arbitrations on par with judicial and administrative proceedings. Cf. *Preston,* 552 U.S., at 355–356, 128 S.Ct. 978 (Act pre-empts state law that vests primary jurisdiction in state administrative board).

At the same time, we have repeatedly referred to the Act's basic objective as assuring that courts treat arbitration agreements "like all other contracts." *Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 447, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006). See also, *e.g., Vaden v. Discover Bank,* 556 U.S. 49, ——, 129 S.Ct. 1262, 1273–1274, 173 L.Ed.2d 206 (2009);; *Doctor's Associates, supra,* at 687, 116 S.Ct. 1652; *Allied–Bruce Terminix Cos. v. Dobson,* 513 U.S. 265, 281, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995); *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 483–484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989); *Perry v. Thomas,* 482 U.S. 483, 492–493, n. 9, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987); *Mitsubishi Motors, supra,* at 627, 105 S.Ct. 3346. And we have recognized that "[t]o immunize an arbitration agreement from judicial challenge" on grounds applicable to all other contracts "would be to elevate it over other forms of contract." *367 *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 404, n. 12, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967); see also *Marchant v. Mead–Morrison Mfg. Co.,* 252 N.Y. 284, 299, 169 N.E. 386, 391 (1929) (Cardozo, C.J.) ("Courts are not at liberty to shirk the process of [contractual] construction under the empire of a belief that arbitration is beneficent any more than they may shirk it if their belief happens to be the contrary"); Cohen & Dayton, 12 Va. L.Rev., at 276 (the Act "is no infringement upon the right of each State to decide for itself what **1762 contracts shall or shall not exist under its laws").

These cases do not concern the merits and demerits of class actions; they concern equal treatment of arbitration contracts and other contracts. Since it is the latter question that is at issue here, I am not surprised that the majority can find no meaningful precedent supporting its decision.

IV

By using the words "save upon such grounds as exist at law or in equity for the revocation of any contract," Congress retained for the States an important role incident to agreements to arbitrate. 9 U.S.C. § 2. Through those words Congress reiterated a basic federal idea that has long informed the nature of this Nation's laws. We have often expressed this idea in opinions that set forth presumptions. See, *e.g., Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) ("[B]ecause the States are independent sovereigns in our federal system, we have long presumed that Congress does

**AT&T Mobility LLC v. Concepcion, 563 U.S. 333 (2011)**

131 S.Ct. 1740, 179 L.Ed.2d 742, 79 USLW 4279, 161 Lab.Cas. P 10,368...

not cavalierly pre-empt state-law causes of action"). But federalism is as much a question of deeds as words. It often takes the form of a concrete decision by this Court that respects the legitimacy of a State's action in an individual case. Here, recognition of that federalist ideal, embodied in specific language in this particular statute, should lead us to uphold California's law, not to strike it down. We do not honor federalist principles in their breach.

With respect, I dissent.

19 NO. 4 Westlaw Journal Class Action 319 NO. 4 Westlaw Journal Class Action 319 NO. 4 Westlaw Journal Class Action 319 NO. 4 Westlaw Journal Class Action 3

**All Citations**

563 U.S. 333, 131 S.Ct. 1740, 179 L.Ed.2d 742, 79 USLW 4279, 161 Lab.Cas. P 10,368, 11 Cal. Daily Op. Serv. 4842, 2011 Daily Journal D.A.R. 5846, 52 Communications Reg. (P&F) 1179, 22 Fla. L. Weekly Fed. S 957

---

End of Document

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:17-cv-03042   Document 1-5   Filed on 10/11/17 in TXSD   Page 68 of 173

RANDALL FORD, INC., et al, v. DEALER COMPUTER..., 2011 WL 7628925...

2011 WL 7628925 (N.D.Tex.) (Arbitration Award)
United States District Court, N.D. Texas.

RANDALL FORD, INC., et al,

v.

DEALER COMPUTER SERVICES, INC.

Nos. 11CV00825, 11117Y00278806, 54117Y0164906.
April 20, 2011.

Editor's Note: This document was acquired from a Court file.

**Case Type: Contract**
**Award Amount: $0**
**Attorney for Petitioner:** James D. Blume
**Attorney for Respondent:** John C. Allen
**Award Date: 06/03/2008**
**Arbitrator: Stuart M. Widman, John McClellan Marshall, Peter R. Silverman**

**Award**

Arbitrator: Stuart M. Widman, John McClellan Marshall, Peter R. Silverman

**AMERICAN ARBITRATION ASSOCIATION COMMERCIAL**
**AND CLASS ACTION ARBITRATION TRIBUNAL**

**PRE-HEARING ORDER NO. 21**

**Ruling On Claimants' Motion For Reconsideration Of Clause Construction Award And Supplemental Partial Final Clause Construction Award**

, this Panel issued the Partial Final Clause Construction Award ("Clause Award") pursuant to Rule 3 of the American Arbitration Association's Supplementary Rules for Class Arbitrations ("Supplementary Rules"). This Panel concluded that the parties' multiple arbitration agreements permittted class arbitration "under rules of contract construction, Supreme Court precedent, and to preserve the benefits and policies of arbitration." (Clause Award, p. 6.)

On April 27, 2010, the United States Supreme Court issued its decision in *Stolt-Nielsen S.A., et al. v. AnimalFeeds International Corp.,* 559 U.S. ___, 130 S. Ct. 1758 (2010). *Stolt-Nielsen* addressed the question whether imposing class arbitration on parties whose arbitration clauses are silent on that issue is consistent with the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, et. seq. Stolt-Nielsen held that class arbitration is permissible, provided there is some contractual basis, rule of law, or rule of decision that either shows that the parties intended to engage in class arbitration or that is otherwise applicable to the case to justify class arbitration.

Because the parties' arbitration clauses here were silent with respect to class actions (Clause Award, pp. 4-5), on June 11, 2010, Claimants submitted a Motion for Reconsideration of the Clause Award in light of the *Stolt-Nielsen* decision. The parties submitted briefs and supplemental authority into August 2010.

RANDALL FORD, INC., et al, v. DEALER COMPUTER..., 2011 WL 7628925...

Having considered the parties' submissions and argument, the Panel finds that (1) the Panel has jurisdiction to consider the Motion for Reconsideration, and (2) the Clause Award does not satisfy the rigorous standards set forth in *Stolt-Nielsen*. Accordingly, the Panel grants Claimants' request to reconsider the Clause Award, vacates the Clause Award, and enters this Pre-Hearing Order No. 21 as a Supplemental Partial Final Clause Construction Award. in doing so, the Panel now finds that the parties' arbitration provisions do not permit the matter to proceed as a class arbitration.

### The Clause Award

Although the Panel discussed many rationales offered in favor of and against class arbitration, the Panel based the Clause Award on just two grounds: (1) applying state rules of contract construction, "class arbitration is permitted under these arbitration clauses because it was not expressly barred," and (2) the goals of speed, privacy and efficiency of arbitration, coupled with the "economics of class actions make its use here sensible and justified." (Clause Award, pp. 7-9.)

The Panel rejected many other reasons proffered to support or prevent a finding that the arbitration clauses permitted class arbitration. The Panel ruled: (1) that state court rules of civil procedure did not apply to support class arbitration (Clause Award, p. 6.); (2) that the Deceptive Trade Practices Acts of Texas and Michigan did not grant the right to bring and participate in class arbitration (Clause Award, pp. 6-7.); (3) that the parties' broad "all disputes" arbitration clauses did not include procedural mechanisms such as class actions (Clause Award, p. 7.); (4) that the AAA Supplementary Rules on Class Arbitrations applied here but cannot be considered in the clause award analysis (Clause Award, pp. 9-10.); (5) that other terms of the arbitration clauses -- such as arbitrator selection, number and qualification; a 60-day hearing limit; privacy rights; rights of negotiation; and the lack of a uniform arbitration agreement -- do not bar the use of class arbitration here (Clause Award, p. 10.); and (6) other unconfirmed arbitration awards are not precedent which this Panel must follow in its analysis. (Clause Award, p. 11.)

### Dicussion

### *Stolt-Nielsen* Applies Retroactively To This Case

A threshold issue is whether *Stolt-Nielsen* applies retroactively. The parties did not discuss this, but rather presumed that *Stolt* did apply retroactively. In any event, the Panel concludes that *Stolt-Nielsen* applies retroactively. [1]

---

[1]   The Panel disagrees with Respondents that Stolt-Nielsen, a business-to-business case, should not be applied here because these dealer agreements were allegedly contracts of adhesion. (Resp., p. 15.) All parties here were businesses, not individual consumers. Additionally, Respondents' pending Second Amended Counterclaim and Demand for Class Arbitration makes no allegations of adhesion contracts.

The issue of retroactivity is resolved by *Henry Harper, et al. v. Virginia Department of Taxation*, 509 U.S. 86 113 S. Ct. 2510 (1993), which held that a rule of federal law is retroactive when the Supreme Court applies it to the parties before it. In that event, the decision "must be given full retroactive effect in all cases still open on direct review and also to all events...." *Id.* at 97. *See also, Reynoldsville Casket Co., et al. v. Hyde*, 514 U.S. 749, 115 S. Ct. 1745 (1995), applying Harper and discounting the litigant's claimed reliance as "insufficient." *Id.* at 1749.

There is no question that the *Stolt-Nielsen* decision was applied to the parties before it. Also, this arbitration is still open on direct (albeit limited) review. Indeed, Stolt-Nielsen has been applied to prior pending cases, including at least one arbitration clause construction award. *Fensterstock v. Education Finance Partners*, 2010 WL 2729759 (2nd Cir. 2010); *Jock, et al. v. Sterling Jewelers, Inc.*, 2010 WL 2898294 (S.D.N. Y. 2010), and Order (August 6, 2010) (vacating arbitrator's clause award). Accordingly, under Supreme Court guidelines, Stolt-Nielsen applies to this arbitration and the challenged Clause Award.

Case 4:17-cv-03042   Document 1-5   Filed on 10/11/17 in TXSD   Page 70 of 173

RANDALL FORD, INC., et al, v. DEALER COMPUTER..., 2011 WL 7628925...

This Panel Has Jurisdiction To Reconsider The Clause Award

*The AAA Commercial Rules Allow Reconsideration.* Our analysis begins with the parties' contracts, which determine our powers. In the dispute resolution clauses in the parties' contracts, the parties chose to resolve their disputes "in accordance with the Commercial Rules of the American Arbitration Association." Thus we determine whether we have the power to reconsider the Clause Award by construing our powers under the Commercial Rules.

Claimants posit that various procedural rules allow this Panel to reconsider the Clause Award. They cite AAA Commercial Rule R-46, arguing that an arbitrator is barred from redetermining only "the merits of any claim," and contending that the Clause Award can be reconsidered because it is not a merits determination. In opposition, Respondents argue that AAA Rule R-46 precludes reconsideration. They argue that the Clause Award was a decision on the merits of a claim, and therefore redetermination is barred. Rule 46 states: "The arbitrator is not empowered to redetermine the merits of any claim already decided."

While the Clause Award may be an integral building block of any final award that decides whether to grant relief to the Randall class, this Panel finds that the Clause Award does not rise to the level of a "merits" determination as contemplated by Rule 46. Rather, this Panel concludes that, as used in Rule 46, "merits" refers to the substantive claims, such as breach of contract, anticipatory repudiation, and declaratory judgment that the Randall class identifies as "causes of action" in its November 2008 Second Amended Counterclaim and Demand for Class Arbitration. In contrast, the Clause Award is a preliminary procedural determination which, while construing the contract language, does not reach the issue of the parties' ultimate liability in damages. Indeed, AAA. Supplementary Rule 3 specifically refers to the Clause Award as a determination of a "threshold matter," in contrast with AAA Supplementary Rule 7, which refers to the "final award on the merits in a class arbitration." Accordingly, this Panel concludes that AAA Rule R-46, standing alone, does not preclude reconsideration.

The Panel's conclusion is not inconsistent with that part of Supplementary Rule 3 which calls the clause construction decision "a partial final award." The likely meaning of the term "partial final award" in this context appears to relate to the Rule's anticipation that the award would have sufficient finality to allow for limited judicial review. The same terminology is used to describe the class certification award (Supp. R. 5(a)) and likewise appears to relate to that Rule's anticipation that the award would have sufficient finality to allow for limited judicial review. In neither case, though, do the Rules suggest that the classification of the awards as "partial final" converts them into a claim on the merits, as that term is used in Rule 46. Thus the Panel concludes that Supplementary Rule 3, read in conjunction with Rule 46, does not preclude redetermination of our decision.

Having concluded that the applicable AAA Rules do not bar us from reconsidering the Clause Award, the question remains whether the Rules actually empower the Panel to do so. While we can find no rule specifically authorizing us to reconsider non-merits decisions, the existence of this power makes sense in light of the generally understood principle that all tribunals have the inherent power to reconsider non-merits determinations. In *Glass, Molders, Pottery, Plastics & Allied Workers Int'l Union, AFL-CIO, CLC, Local 182B v. Excelsior Foundry Co.*, 56 F.3d 844, 847 (7th Cir. 1995), Judge Posner described why that principle also applies to arbitrators:

> In recognition of the fallibility of earthly lawgivers, every court, and every administrative agency that exercises adjudicative authority, has been understood to have all the inherent power to reconsider its decisions within a reasonable time. [citations omitted]. Arbitrators are no more infallible than judges.

Further, arbitrators' inherent power to reconsider is implicitly recognized in the Rules. If arbitrators lacked the power to reconsider decisions, Rule 46 would not have needed to state the limits of that power -- that determinations on the merits of any claim may not be reconsidered. Rule 46's limitation would make no sense absent the general power to reconsider.

Case 4:17-cv-03042   Document 1-5   Filed on 10/11/17 in TXSD   Page 71 of 173

RANDALL FORD, INC., et al, v. DEALER COMPUTER..., 2011 WL 7628925...

Accordingly, the Panel concludes that it has the power under the Commercial Rules to reconsider the Clause Award. [2]

[2]  *Since Stolt-Nielsen* applies here, the rigor imposed by it upon arbitrators to have a contractual basis or rule of law for their decisions, and especially clause construction awards, is also required for this motion to reconsider. This Panel concludes that the Glass holding and Rule 46 satisfy the requirement for the contractual basis or rule of law that permits this Panel to reconsider the Clause Award.

*The Clause Award Is Not Final And Thus Can Be Reconsidered.* The parties strongly disagree whether the *functus officio* doctrine applies to bar this Panel's reconsideration of the Clause Award. Although the application of functus officio has been less than consistent, there is general consensus that a panel can only clarify, not reconsider, the merits of a final award. *Ottley v. Schwartzberg,* 819 F. 2d 373 (2nd Cir. 1987); *Green v. Ameritech Corp.,* 200 F. 3d 967 (6th Cir. 2000); *Rich v. Spartus,* 516 F. 3d 75 (2nd Cir. 2008). Thus, functus officio, if applicable, would preclude this Panel's reconsideration of the Clause Award if the Clause Award were deemed final. Both sides cite *Jock, et al. v. Sterling Jewelers, Inc.,* 2010 WL 2898294, fn. 4 (S.D.N.Y. 2010), contending that it supports their respective views of functus officio here.

Here, the Clause Award is expressly called a "Partial Final Award," as required by AAA Supplementary Rule 3. Thus, the title itself indicates that the Panel did not intend the Clause Award to be "final" for purposes of the *functus officio* doctrine. *United States Life Insurance Co. v. Superior National Insurance Co.,* 591 F. 3d 1167, 1177, fn. 11 (9th Cir. 2010). Clearly, the Clause Award did not decide any issue of liability or damages, the usual benchmarks for deciding a "claim" of the parties to an arbitration. Nonetheless, the Panel did originally intend that the Clause Award would be the last word of the Panel on that separate phase of the case. (See AAA Supplementary Rule 3, calling the clause construction phase a separate "threshold matter.")

On the other hand, the Panel did not intend that the Clause Award would be the Panel's last word on the entire case, or even the last word on class certification. Certainly, the Panel -- as well as the parties -- understood that the Clause Award was merely an initial step toward the ultimate determination of the merits, and merely a predicate step to the class certification decision under AAA Supplementary Rule 4. (AAA Supplementary Rule 4: "If the arbitrator is satisfied that the arbitration clause permits the arbitration to proceed as a class arbitration, as provided in Rule 3,...") Unquestionably, everyone -- the Panel and the parties -- knew that significant additional work and decisions were necessary to conclude the case. *Bosack v. Soward,* 2009 WL 2182898 at *3 (9th Cir. 2009) (interim award is final for *functus officio* purpose if arbitrator intends so.)

Further, Rule 46 appears to be the Commercial Rules' statement governing finality, and it is limited to merits determinations. *Bosack, supra* at *2 (AAA Rule 46 "essentially codifies the common law doctrine of functus officio....") While the *functus officio* doctrine may govern when a panel can reconsider a merits determination, *see, e.g., Excelsior, supra,* it has no application to a threshold matter like the Clause Award. Thus, the Panel concludes that *functus officio* - standing alone or implied in Rule 46 - does not bar reconsideration because the Clause Award is not a final award.

Our reasoning is buttressed by the reasoning in cases that have decided that a clause construction award is "not ripe" for judicial review, although those cases did not expressly conclude that a clause construction award is not final for purposes of either judicial review under FAA Section 10 or the application of the functus officio doctrine. *Dealer Computer Services, Inc. v. Dub Herring Ford, et al.* 547 F. 3d 558 (6th Cir. 2008), *reiterated in Dealer Computer Services, Inc. v. Fox Valley Ford,* 2009 WL 361666 (6th Cir. 2009); *Dealer Computer Services, Inc. v. Dub Herring ford Lincoln Mercury, Inc., et al.,* 2009 WL 1508210 (E.D. Mich. 2009) (concluding that class determination award also is "not ripe for judicial review" pursuant to the prior Sixth Circuit Dealer Computer Services cases); *Marron, et al. v. Snap-On Tools, Co., LLC, et al,* 2006 U.S. Dist. Lexis 523 (D. N.J. 2006) (discussing ripeness and finality issues, but ultimately not deciding whether the court is authorized to review an interim award); *Dealer Computer Services, Inc. v. Randall Ford, Inc., et al.,* 2009 WL 277557 (S.D. Tex. 2009) (not ripe). [3]

3      The Panel thus finds little merit in Respondents' argument that the Texas District Court decision holding there was no jurisdiction to vacate the Clause Award because the issue was not "ripe" also means that the Clause Award cannot be reconsidered in this arbitration. (Response, p. 11.) In support, the Dealers cite AAA Supplementary Rule 1(c) which states: "Whenever a court has, by order, addressed and resolved any matter that would otherwise be decided by an arbitrator under the Supplementary Rules, the arbitrator shall follow the order of the court." However, the issues presented to the court were not the same as that now presented to this *Panel,* and therefore Supplementary Rule 1(c) does not apply. The District Court was not asked to determine whether a panel has jurisdiction to reconsider the Clause Award; the District Court decided only whether it had jurisdiction to review it under federal principles of ripeness.

One federal court decision, however, in concluding that the review of a clause construction award "is not ripe for adjudication," did say that the clause construction award was not sufficiently final and reviewable under Seventh Circuit interpretations of Section 10(a) of the FAA. *Corinthian Colleges, Inc. v. McCague,* 2010. WL 918074 (N.D.Ill. 2010) (concluding that "finality is required before judicial review is appropriate". and that the clause construction award was, at most, "an early step" toward the more consequential determination whether the class could be certified.) Thus, the cases support our reading that the Clause Award is not a final award for purposes of the *functus officio* doctrine. [4]

4      This conclusion is not in conflict with many of the parties' arbitration clauses, which state, in part:
       "The award of the arbitrator or arbitration panel shall be final and binding, and there shall be no appeal therefrom. Judgment upon the award rendered by the arbitrator or arbitration panel may be entered in any court having jurisdiction." (See Clause Award, Exhibit A, Clauses 1-3, 6-8.)
       This provision, precluding review, must refer to only the final award, not any interim award, because the parties adopted the AAA Rules, including the AAA Supplementary Rules, which provide for interim judicial review of the Clause Award and Class Determination Award. Thus, the agreement to have "no appeal therefrom" necessarily only refers to the final award. The Panel expresses no views on the enforceability of the "no appeal" provisions.

Accordingly, since the Clause Award is not a final determination on the merits, the Panel concludes that *functus officio* does not bar the Panel's reconsideration of the merits of the Clause Award.

   This Panel Incorrectly Based The Clause Construction Award Upon Two Rationales That *Stolt-Nielsen* Held Were Improper

As noted above, two reasons set forth by this Panel for permitting class arbitration were: (1) that class arbitration is permitted under this arbitration clause because it was not expressly barred, and (2) class arbitration delivers the arbitration goals of speed and efficiency. (Clause Award, pp. 7-9.) As *Stolt-Nielsen* now makes clear, neither of those grounds was proper because neither was based upon terms of the parties' contract, a rule of law, or a rule of decision. Accordingly, if this Panel had jurisdiction to reconsider the Clause Award, the Panel would vacate those two grounds of the Clause Award.

Regarding the first, *Stolt-Nielsen* made clear that the parties' mere silence on the issue of class action arbitration did not constitute consent or show that the parties intended to resolve their disputes in class proceedings. 130 S. Ct. at 1775-1776. There is nothing nuanced about that holding, and that aspect of *Stolt-Nielsen* overrides the prior Supreme Court authority on which this Panel relied. (Clause Award, pp. 7-8.) Thus, *Stolt-Nielsen* undermines that rationale of the Clause Award.

Second, while the Supreme Court did not expressly discuss the goals of speed and efficiency of arbitration, those public policy reasons fall squarely within the "brand of industrial justice" that the Court criticized as indicia of exceeded authority. Such economic reasons are not a contractual basis, rule of law, or rule of decision that the Supreme Court

RANDALL FORD, INC., et al, v. DEALER COMPUTER..., 2011 WL 7628925...

requires as a footing for class arbitration. Thus, this Panel's finding that a class proceeding is permitted because it will be more efficient and "sensible" than piecemeal arbitrations was erroneous under *Stolt-Nielsen*.

### Counter-Claimants Do Not Present Other Grounds To Avoid *Stolt-Nielsen*

The Dealers contend that *Stolt-Nielsen* is distinguishable because this case is about Michigan and Texas law, not federal maritime law or New York law." (Resp., p. 13.) But the Dealers did not show in their Clause Award briefs, and do not no show in their pleadings on reconsideration, what Michigan or Texas rule of law or rule of decision affirmatively authorizes class arbitration here. Indeed, the Panel specifically found that there was no basis under the Texas Deceptive Trade Practices Act -- a claim that was dropped in the Second Amended Counterclaim and Demand for Class Arbitration -- that explicitly provided for class actions. (Clause Award, p. 6.) And now, since there is no Texas or Michigan consumer protection statute at issue, even if one or both of those laws expressly granted the right to bring a class action, that could not be a rule of law or rule of decision applicable here. (See Clause Award, p. 6.) Thus, Respondents raise no new basis for this Panel to conclude that class arbitration was permitted under the arbitration clauses. [5]

[5]   The Dealers' reliance on Congressional findings made in connection with the passage of the Motor Vehicle Franchise Contract Arbitration Fairness Act of 2001 is also misplaced. (Resp., pp. 3-5; Renewed Objection, p. 3.) At most, those findings generally criticize mandatory binding arbitration clauses in dealer contracts, but the findings say nothing about class arbitration, let alone provide some rule of law. Indeed, the cited Congressional findings refer to vehicle franchise contracts between manufacturers and dealers. Here, however, the contract is not between a manufacturer and the dealers. Rather, it is between the dealers and the computer system provider, about which Congress made no findings. Moreover, the Dealers elsewhere contend that Claimants were truly not affiliated with Ford Motor Company (Renewed Objection, p. 4.), creating even more distance between the Congressional findings and the contracts at issue here.

   *Stolt-Nielsen* does clearly apply here, and it was incumbent upon the Dealers to set forth a contractual basis, rule of law or rule of decision that supports class arbitration. Having looked at both the Dealers' prior Clause Award briefs and their new pleadings here, this Panel finds no compelling authority upon which to either deny reconsideration or confirm the Clause Award.

In their Renewed Objection filed on August 12, 2010, the Dealers alternatively contend that, if this Panel asserts jurisdiction, the Panel should now hold that the arbitration clauses in the various Agreements were procured by fraud and are therefore unenforceable. The Respondents essentially seek a dismissal of these proceedings so that Respondents can instead proceed with their claims in court

The Panel denies such extreme and ill-founded relief. For approximately three years, Randall Ford and the putative class affirmatively sought arbitration based upon the language in the various computer system agreements. Ever since this Panel confirmed its jurisdiction in November 2007 (see Pre-Hearing Order No. 3.), Respondents have aggressively arbitrated the case. Indeed, in response to Claimants' Motion to Stay proceedings, Respondents filed an objection, urging this Panel to move forward in this proceeding. (See Pre-Hearing Order No. 7.) Respondents/Counter-Claimants' November 12, 2008 Second Amended Counterclaim and Demand for Class Arbitration -- their most recent counterclaim -- affirmatively alleged that each named Respondent and class member had substantially similar, if not identical, agreements and arbitration clauses under which all of the parties' disputes are properly arbitrable. (§ 9.1.) The Randall class has also alleged that this present Panel is properly constituted and that this Panel can properly hear this matter. (§§9.4-9.5.) Finally, just prior to this Motion to Reconsider, Respondents pressed for class certification based upon the validity of the similar arbitration clauses for all class members.

Thus, this Panel will not now entertain Respondents' reversal of position that the arbitration agreements are unenforceable. First, the Randall class is estopped from so arguing. Second, the Randall class provides no plausible factual basis for its argument that they suddenly discovered that Claimants were not actually part of Ford Motor

Case 4:17-cv-03042   Document 1-5   Filed on 10/11/17 in TXSD   Page 74 of 173

RANDALL FORD, INC., et al, v. DEALER COMPUTER..., 2011 WL 7628925...

Company. The Randall class likely knew that long ago, and they could have then asserted a fraud claim to rescind the various Computer Service Agreements. Indeed, the Randall class asserted consumer fraud claims in the original September 2007 Statement of Counterclaims and the November 2007 Amended Counterclaims. Yet, those were based only upon Claimants' alleged misrepresentations regarding the ability of the computer system to perform, the nature of the replacement hardware, and the contractual obligations to purchase the updated computer hardware or components. At no time did the putative class assert that the class members were fraudulently induced to enter into the many computer service agreements by reason of DCS's separateness from Ford Motor Company.

In sum, the Randall class cannot suddenly disavow its contractual obligations to arbitrate. On this record and with these pleadings, the Panel does not find that the arbitration clauses are unenforceable.

### Conclusion

As set forth above, the Panel finds and concludes:
● it has jurisdiction to consider Claimants' Motion for Reconsideration, and

● the Panel's June 3, 2008 Clause Award does not satisfy the standards for class arbitration set forth in *Stolt-Nielsen*.

Therefore, the Panel grants the Motion for Reconsideration, vacates the Clause Award, and enters this Supplemental Partial Final Clause Construction Award, which holds that the parties' arbitration agreements do not permit this matter to proceed as a class arbitration. As a necessary corollary, the Panel need not address Counter-Claimants' Motion for Class Certification.

This matter is stayed for 30 days to permit any party to move a court of competent jurisdiction to confirm or vacate this Supplemental Clause Construction Award. (See discussion at page 5 regarding interim judicial review.) No later than April 15, 2011, counsel shall notify this Panel by joint letter if such action has or has not been taken and, if taken, the status of the matter before the court.

Also by April 15, 2011, counsel shall provide submissions discussing: (i) the continuing jurisdiction of this Panel over the individual claims of the named dealerships (which include the eight prior class representatives), and (ii) case management. Counsel are urged to meet, confer and (to the extent possible) agree on some or all of those issues.

Regarding the Panel's jurisdiction, counsel should discuss (between yourselves and in your submissions): (i) that the case originated as individual claims with this Panel; (ii) that the 66 individual dealerships are identified as "parties to this action" and not just putative class members; (iii) that the counterclaims were brought "individually" as well as on behalf of similarly situated Dealers; (iv) the parties' prior positions regarding the Panel's jurisdiction over the claims asserted here; and (v) any other issues or factors germane to the Panel's jurisdiction.

Regarding case management, counsel should discuss: (i) additional discovery needed from or to be taken by the individual dealerships; (ii) a calendar for completion of discovery, pre-hearing matters, and hearing dates; (iii) possible bifurcation of claims or issues; (iv) possible division of the individual dealerships into groups based upon choice of law, venue for hearing, or other common contract provisions or evidentiary elements; (v) presenting proofs at the hearings regarding representative dealerships, coupled with stipulations regarding the extension or extrapolation of those hearing results onto the other dealerships' claims; (vi) the logistics of the hearing(s) if such are to cover five or more individual dealerships; and (vii) designation of lead counsel for the dealerships.

This decision may be signed in counterparts.

Dated: March 8, 2011

<<Signature>>

Stuart M. Widman, Chair

<<Signature>>

Peter, R. Siberman

<<Signature>>

John M. Marshall

---

End of Document                                                   © 2017 Thomson Reuters, No claim to original U.S. Government Works,

2012 WL 5385054 (S.D.Tex.) (Arbitration Award)
United States District Court, S.D. Texas.

DEBOSE,

v.

SMITH & WOLLENSKY RESTAURANT GROUP, INC.

Nos. 12CV03030, 70 160 000722 11.
October 10, 2012.

Editor's Note: This document was acquired from a Court file.

**Case Type: Labor**
**Award Amount: Unknown**
**Attorney for Petitioner: Richard J. Burch**
~~**Attorney for Respondent: Unknown**~~
**Award Date: 07/13/2012**
**Arbitrator: Susan S. Soussan**

### Partial Final Award on Arbitration Clause Construction

Arbitrator: Susan S. Soussan

## AMERICAN ARBITRATION ASSOCIATION

On October 12, 2011, Claimants, Peter DeBose, on behalf of himself and all others similarly situated ("Claimants"), filed their Class Action Complaint alleging that Respondent, Smith & Wollensky Restaurant Group, Inc. ("Smith & Wollensky" or "Respondent"), improperly took a "tip credit" against the minimum wage for its wait staff employees and thereby paid its Houston employees who worked for the Respondent, Smith & Wollensky, less than the required minimum wage. Claimants seek certification of this arbitration as a class action pursuant to the American Arbitration Association's ("AAA") Commercial Rules and Supplementary Rules for Class Arbitrations.

On January 27, 2012, Respondent, Smith & Wollensky, filed its Answer to Claimants' Complaint by way of a General Denial and additional defenses. Respondent specifically denied it had consented to arbitrate the claims asserted on a class-wide, collective and/or multi-claimant basis;

On February 2, 2012, by way of a Notice of Appointment, the AAA appointed the undersigned as the sole arbitrator in this matter. The parties did not object to this appointment.

On March 19, 2012, a conference call took place between counsel for the parties and the Arbitrator. Counsel, on behalf of their respective clients, agreed that pursuant to the AAA Supplementary Rules for Class Arbitrations, the first order of business for the Arbitrator was to issue a Partial Final Award on the construction of the arbitration clause. Specifically, counsel for the parties agreed that the Arbitrator was to determine whether this matter could proceed as a class arbitration notwithstanding the fact that the arbitration clause is silent on the same. In making this Partial Final Award the Arbitrator has taken into consideration the following materials submitted by counsel:
1. Claimants' Opening Memorandum on Clause Construction;

2. Respondent's Memorandum of Law Regarding Clause Construction;

3. Claimants' Response on Clause Construction;

4. Respondent's Reply Memorandum on Clause Construction;

5. Claimants' Supplemental Letter Brief;

6. Respondent's Letter Brief;

7. Respondent's Supplemental Letter Brief;

8. All case law authority cited; and,

9. Other Arbitration Awards.

Since the arbitration clause at issue is silent on class claims, the issue presented at this time is whether the parties otherwise consented to class arbitration and whether there is a contractual basis to so find. Because silence alone will not dictate a finding of consent to arbitration on a class basis, nor can a party be forced into a class arbitration pursuant to federal or state statutes, the arbitrator must then "give effect to the contractual rights and expectations . . . of the parties to the agreement." *Stolt-Nielsen, S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758, 1755 (2010).

Pursuant to Texas law, a contract is interpreted within its four corners. All terms are to be read together and given full force and effect. It is not the place of an arbitrator to write in additional words to effect a different meaning of the plain words in a contract. No party has alleged that the arbitration clause is ambiguous. Therefore, the arbitrator need not go beyond the four corners of the contract to interpret its meaning.

### FACTUAL BACKGROUND

Claimants allege that Smith & Wollensky's wait staff employees in Houston, Texas received a "service minimum wage" which was less than the standard federal minimum wage and were not permitted to retain all of their gratuities because Smith & Wollensky claimed a "tip credit" against its minimum wage obligations. Claimants further allege that the wait staff was required to pay over a portion of their gratuities to employees who were not authorized to receive tips, including managerial employees and employees who did not serve food and beverages as their primary duty, or who were not traditionally tipped employees, all in violation of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"). Additionally, Claimants allege that the wait staff was required to be at work for other hours during which they did not receive tips; therefore, Claimants argue that Respondent was not eligible to claim the "tip credit" against the minimum wage for its wait staff employees in Houston, Texas for which Claimants seek restitution.

Claimants filed their Arbitration Demand seeking a class action on behalf of all wait staff employees who have worked at the Smith & Wollensky Restaurant in Houston, Texas. Respondent argues that class action status should not be allowed for various reasons, but most importantly because it never consented to arbitrate the claims asserted in the Demand on a class-wide, collective and/or multi-claimant basis.

Claimant, Peter DeBose, and Respondent, Smith & Wollensky, executed a Dispute Resolution Agreement ("DRA") which contains an arbitration clause which is entirely silent on class action arbitration.

The DRA provides in pertinent part:

... By accepting or continuing employment with the Company, you agree and understand that both you and the Company mutually agree to resolve and (sic) binding arbitration any claim that, in the absence of this Agreement, would be resolved in a court of law under applicable state or federal law. The claims governed by this agreement are those that you or the Company may have relating to your employment with, behavior during or termination from, the Company....

By accepting or continuing employment with the Company, you and the Company both agree to resolve such claims through **final and binding arbitration.** This includes, but is not limited to, claims of employment discrimination because of race, sex, religion, national origin, color, age, disability, medical condition, marital status, gender identity, sexual preference or any other characteristic protected by applicable law. It also includes any claim you might have for unlawful harassment including sexual harassment and unlawful retaliation; any claims under contract or tort law, any claim for wages, compensation or benefits. . . . The Company will pay all types of costs that are unique to arbitration.

You and the Company agree that the dispute will be resolved by **final and binding arbitration.** You and the Company will select a single arbitrator. . . .

The arbitrator will decide all claims under applicable local laws where you work or last worked for the Company. . . . The arbitrator may award any remedy or relief as a court could award on the same claim....

### DISCUSSION

Once again, Respondent, finds itself faced with the issue of whether the DRA permits class action notwithstanding its silence on the issue. This same issue was arbitrated recently in Massachusetts with a finding by the arbitrator that the Smith & Wollensky DRA did indeed permit class arbitrations. *See* Partial Arbitration Award on Class Construction, *Passow v. Smith & Wollensky Restaurant Group, Inc.*, AAA No. 11-160-00357-08. However, this arbitrator does not find that Smith & Wollenksy should be collaterally estopped from arguing that the DRA does not permit class arbitration as a result of the AAA *Passow* opinion, especially in light of the Fifth Circuit's recent opinion in *Reed v. Florida Metropolitan Univ. Inc.*, 681 F.3d 630, 2012 WL 1759298 (5th Cir. May 18, 2012). [1]

[1]      Collateral estoppel may be appropriate in certain instances in arbitration proceedings. Collateral estoppel may even be applicable in proceedings involving different claimants, as we have here; however, this issue need not be addressed because there has been a dispositive intervening change in the law. (*Reed*).

Arbitration is a matter of consent, not coercion and as such, "a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party agreed to do so." *Stolt-Nielsen, S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758, 1775 (2010). A major tenet of the FAA ("Federal Arbitration Act") is that arbitration is a matter of contract consented to by the parties. The differences between bilateral and class arbitration are too substantial to presume parties contractually agreed or consented to class arbitration when the contract is silent. *Stolt-Nielsen*, at 1775. In class arbitration, the arbitrator "no longer resolves a single dispute between the parties to a single agreement, but instead resolves many disputes between hundreds or perhaps even thousands of parties," and the presumption of privacy and confidentiality that applies in many bilateral arbitrations would not apply in class arbitrations. *Id.* at 1776. Further, "[t]he arbitrator's award no longer purports to bind just the parties to a single arbitration agreement, but adjudicates the rights of absent parties as well." *Id.* The *Stolt-Nielsen* Court explained that these differences and disadvantages give reason to doubt mutual consent when an arbitration clause is silent on the permissibility of class-wide arbitration. *See AT&T Mobility, LLC v. Concepcion*, 131 S. Ct. 1740 (2011); *see also Reed v. Florida Metropolitan Univ. Inc.*, 681 F.3d 630, 2012 WL 1759298 (5th Cir. May 18, 2012). Therefore, in light of the significant disadvantages of class arbitration as discussed in both *Stolt-Nielsen* and *Concepcion*, the arbitrator (or a court)

DEBOSE, v. SMITH & WOLLENSKY RESTAURANT..., 2012 WL 5385054...

"should not conclude that parties--and defendants in particular-- consented to class arbitration absent a contractual basis for doing so." *Reed* at 16.

This understanding is consistent with Texas law which provides, "[F]or a court to read additional provisions into [a] contract, the implication must clearly arise from the language used, or be indispensable to effectuate the intent of the parties. *It must appear that the implication was so clearly contemplated by the parties that they deem it unnecessary to express it. Reed* at 16 FN10 (emphasis added); citing *Fuller v. Phillips Petroleum Co.*, 872 F.2d 655, 658 (5th Cir. 1989); *see Danciger Oil & Ref. Co. of Tex. v. Powell*, 154 S.W.2d 632, 635 (Tex. 1941). The recent United States Supreme Court decisions mentioned herein together with the Fifth Circuit's *Reed* opinion just issued on May 18, 2012, instruct this arbitrator that without a contractual or other legal basis for class arbitration, when an arbitration clause is silent on the issue, an arbitrator has no authority to order parties to submit to class arbitration. *Id.* at 17. The breadth of an arbitration clause, and the absence of any provision waiving or banning class proceedings, will not support class arbitration. *Stolt-Nielsen*, at 1783; *see also Reed* at 17.

Thus, class treatment of arbitration claims is *sui generis*. The Fifth Circuit and the Supreme Court have, in effect, created what is essentially a rebuttable presumption against class action procedures where an arbitration agreement is silent on the issue. *Reed* at 17. An arbitrator is without authority to impose class treatment as a policy or to imply it as a matter of contract in the absence of significant indicia that the parties so intended.

There is no evidence that Mr. DeBose and Smith & Wollensky ever discussed whether class arbitration was available. And, as stated, the DRA arbitration clause fails to address class arbitration; therefore, one must consult Texas law and/or federal law to determine if a "default" class action arbitration rule exists in the absence of an agreement.

Claimants argue that the "staggeringly broad" wording "any dispute" and "any remedy" in the DRA can only be interpreted to mean: "any claim for wages, including any class dispute." Claimants suggest that the DRA can "only be reasonably construed as encompassing and allowing arbitration of class claims." *See* Claimants' Clause Construction Memorandum at 17-27 and Claimants' Response on Clause Construction Memorandum at 16. Because "any dispute" or "any claim" is standard language in many, if not most, arbitration agreements, it merely implies an agreement between the parties to arbitrate. This terminology cannot be a valid contractual basis upon which to conclude that the parties agreed to submit to class arbitration. *Reed* at 20. *See Stolt-Nielsen*, 130 S. Ct. at 1765. There can be no finding of an implied agreement to submit to class arbitration when the arbitration clause is silent on the subject absent some contractual or legal basis for doing so. *Reed* at 25-26. *See Stolt-Nielsen*, 130 S. Ct. at 1775. The fact that the parties might otherwise be subject to class action as a procedural device under Texas law, Federal law and AAA Supplementary Rules for Class Arbitrations is not a sufficient basis to conclude that the parties agreed to class arbitration when they entered into the arbitration agreement. *Reed* at 21-22. There is no "default rule," which would provide otherwise. Furthermore, the failure to include an explicit provision precluding class action in the arbitration agreement when other causes of action are excluded from the arbitration provision does not constitute the required "clear intent" to permit such proceedings. *Reed* at 22. *See also Stolt-Nielsen*, 130 S. Ct. at 1776.

Class action is not a substantive remedy. It is *procedural* in nature only. The DRA provides that the "arbitrator may award **any remedy or relief** as a court could award on the same claim." (emphasis added). This language clearly refers only to the **relief** in the form of an award based on a violation of the law or damages as a result of breach of contract and not to the availability of procedures used to pursue such relief. *See Jock v. Sterling Jewelers, Inc.*, 646 F.3d 113, 129 (2nd Cir. 2011)--dissenting opinion of Circuit Judge Winter. The Fifth Circuit Court in *Reed* expressly rejected the majority opinion in *Jock* and endorses the dissent. [2] *Reed* at 25.

---

[2]      It may well be the case that an arbitrator in the Second Circuit would-and perhaps should-reach a different result. That does not, however, change the fact that this arbitrator is constrained to follow Fifth Circuit law.

DEBOSE, v. SMITH & WOLLENSKY RESTAURANT..., 2012 WL 5385054...

Claimants' argument that a reference in the DRA to "any remedy or relief as a court could award on the same claim . . . provides a clear contractual basis for class proceedings, since the claim here is one brought under a statute that itself specifically contemplates class actions as a form of substantive relief" (Claimants' Supplemental Letter Brief dated June 1, 2012 at 7) is not persuasive and is not the law in the Fifth Circuit. For the reasons stated herein, this arbitrator rejects Claimants' interpretation of the meaning "any remedy."

In an effort to distinguish *Reed*, Claimants argue that the claim of Peter DeBose individually is very modest and well below the $51,000.00 claim in *Reed*. As such, they contend it would be too costly for Mr. DeBose and others similarly situated to litigate or arbitrate their "modest claims" on an individual basis and, that they would be disincentivized to pursue such a claim. However, the DRA provides that Smith & Wollensky must "pay all types of costs that are unique to arbitration." *See* p. 4 herein. Furthermore, should Mr. DeBose prevail in this proceeding against Smith & Wollensky, he would recover back wages, an equal amount in liquidated damages, reasonable attorneys' fees and costs without having to come out-of-pocket for AAA administration costs or the arbitrator's fee. Therefore, this arbitrator disagrees that claimants, such as Mr. DeBose, will have little, if any, incentive to seek vindication of their rights unless the dispute can proceed on a class basis. The size of the claim is virtually irrelevant when the respondent is responsible for all arbitration-related expenses and attorneys' fees are recoverable should the claimant prevail.

*Passow* is not instructive nor will it be followed by this Arbitrator. *Reed v. Florida Metropolitan Univ. Inc.*, together with *Stolt-Nielsen, S.A. v. AnimalFeeds Int'l Corp.* and *AT&T Mobility, LLC v. Concepcion*, are controlling. *Reed* "was decided by the Circuit court with authority for the jurisdiction in which this arbitration is pending, and is directly on point as to the issues now before the Arbitrator. . . ." Respondent's Letter Brief dated June 1, 2012 at 1. The DRA instructs this arbitrator to "decide all claims under applicable local law," which in this case is Texas and Fifth Circuit law. *Reed*, being intervening law since the decision in *Passow*, is the controlling authority. *Passow* will not serve as collateral estoppel on any issue in this arbitration. The Respondent has not waived any defense in this arbitration as a result of *Passow*. Nor did *Passow* create a pattern and practice or custom and usage between the parties.

Claimants also rely on *In re: D.R. Horton, Inc.*, 2012 WL 36274, 357 NLRB No. 184 (2012) in support of their arguments. However, this decision has no relevance in this arbitration proceeding. *D.R. Horton* is a National Labor Relations Board ("NLRB") decision which is on appeal to the Fifth Circuit. It does not meaningfully apply to the facts or law in the present case. [3] Most importantly, an NLRB decision cannot overrule controlling Fifth Circuit authority, nor detract from this arbitrator's obligation to follow *Reed*. If the Fifth Circuit were to affirm *D.R. Horton*, that could potentially effect the disposition of an issue like this in the future.

---

[3]    Note that several recent Federal District Courts have rejected the holding in *D.R. Horton*. See, *Sanders v. Swift Transp. Co. of Ariz., LLC*, ___ F. Supp. 2d ___, No. 10--cv--03739,2012 WL 523527 (N.D. Cal. Jan. 17, 2012); *Palmer v. Convergys Corp. No. 7; 10--cv--145 HL, 2012 WL 425256 (M.D. Ga. Feb. 9, 2012).*

### CONCLUSION

The DRA arbitration clause is silent on class arbitration. For the reasons stated herein, there is no contractual or legal basis to conclude that the parties agreed to class arbitration. There is no "default rule" under which this arbitration clause can be interpreted to allow class arbitration in the absence of express consent. *See Stolt-Nielsen, S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758, 1755 (2010); *AT&T Mobility, LLC v. Concepcion*, 131 S. Ct. 1740 (2011); *Reed v. Florida Metropolitan Univ. Inc.*, 681 F.3d 630, 2012 WL 1759298 (5th Cir. May 18, 2012). "An implicit agreement cannot be inferred from an arbitration agreement's silence or failure to preclude class arbitrations...." *Reed* at 14.

### PARTIAL FINAL AWARD

1. The arbitration clause in the Dispute Resolution Agreement executed by Peter DeBose herein does not permit this arbitration to proceed on a class basis. This arbitration will proceed as a bilateral arbitration.

2. Pursuant to AAA Supplementary Rules for Class Arbitrations Rule 3 relating to the construction of the arbitration clause, all proceedings following the issuance of this Partial Final Award on Arbitration Clause Construction shall be stayed for a period of at least 30 days to permit any party to move a court of competent jurisdiction to confirm or vacate this Arbitration Clause Construction Award. The parties shall comply with Rule 3 as it directs them to keep the AAA and the Arbitrator advised of any such court proceedings or the waiver thereof.

3. As soon as matters involving any court review of this Partial Final Award are completed, the AAA will arrange a case management conference to determine the schedule and manner in which this Arbitration will continue.

SIGNED this the 13th day of July 2012.

<<signature>>

Honorable Susan S. Soussan

Arbitrator

---

**End of Document** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Reed v. Florida Metropolitan University, Inc., 681 F.3d 630 (2012)

280 Ed. Law Rep. 586

681 F.3d 630
United States Court of Appeals,
Fifth Circuit.

Jeffrey H. REED, Plaintiff–Appellee,

v.

FLORIDA METROPOLITAN UNIVERSITY,
INCORPORATED; Corinthian Colleges,
Incorporated, Defendants–Appellants.

No. 11–50509.
|
May 18, 2012.

**Synopsis**

**Background:** Student filed putative class action alleging that online university violated Texas Education Code by soliciting students in Texas without appropriate certifications. Following removal, arbitration was ordered, and arbitrator determined that parties had implicitly agreed to class arbitration. The United States District Court for the Western District of Texas, Lee Yeakel, J., confirmed award. University appealed.

**Holdings:** The Court of Appeals, King, Circuit Judge, held that:

[1] district court correctly referred to arbitrator issue of whether parties' agreement allowed for class arbitration, but

[2] arbitrator exceeded his powers by ordering parties to submit to class arbitration.

Reversed and remanded with instructions.

Dennis, Circuit Judge, filed specially concurring opinion

West Headnotes (8)

[1]  **Alternative Dispute Resolution**
    👉 Scope of submission

    25T   Alternative Dispute Resolution
    25TII   Arbitration

    25TII(C)   Submission
    25Tk170   Construction and Operation
    25Tk173   Scope of submission
    Student did not agree to submit to district court issue of whether his agreement with online university allowed for class arbitration of his claim, rather, he requested that court find that there was no valid, enforceable arbitration agreement.

    1 Cases that cite this headnote

[2]  **Alternative Dispute Resolution**
    👉 Mode and course of proceedings in general

    25T   Alternative Dispute Resolution
    25TII   Arbitration
    25TII(F)   Arbitration Proceedings
    25Tk251   Mode and course of proceedings in general
    Provision of enrollment agreement, whereby student agreed that any dispute would be resolved by binding arbitration under Federal Arbitration Act conducted by American Arbitration Association (AAA) under its Commercial Rules also constituted consent to the separate Supplementary Rules for Class Arbitration. 9 U.S.C.A. § 1 et seq.

    10 Cases that cite this headnote

[3]  **Alternative Dispute Resolution**
    👉 Matters to Be Determined by Court

    25T   Alternative Dispute Resolution
    25TII   Arbitration
    25TII(D)   Performance, Breach, Enforcement, and Contest
    25Tk197   Matters to Be Determined by Court
    25Tk198   In general
    Under American Arbitration Association's (AAA) Supplementary Rules for Class Arbitration, threshold matter of whether enrollment agreement between student and online university provided for class arbitration of student's claim was for arbitrator.

    26 Cases that cite this headnote

Reed v. Florida Metropolitan University, Inc., 681 F.3d 630 (2012)

280 Ed. Law Rep. 586

**[4]**    **Alternative Dispute Resolution**
    🔑 Scope and Standards of Review

25T   Alternative Dispute Resolution
25TII   Arbitration
25TII(H)   Review, Conclusiveness, and Enforcement of Award
25Tk366   Appeal or Other Proceedings for Review
25Tk374   Scope and Standards of Review
25Tk374(1)   In general

Court of Appeals' review of district court's confirmation of arbitral award is de novo, using same standard as district court.

1 Cases that cite this headnote

**[5]**    **Labor and Employment**
    🔑 Interpretation of collective bargaining agreement in general

231H   Labor and Employment
231HXII   Labor Relations
231HXII(H)   Alternative Dispute Resolution
231HXII(H)4   Proceedings
231Hk1577   Authority of Arbitrators
231Hk1580   Interpretation of collective bargaining agreement in general

Arbitrator is confined to interpretation and application of collective bargaining agreement; he does not sit to dispense his own brand of industrial justice.

1 Cases that cite this headnote

**[6]**    **Alternative Dispute Resolution**
    🔑 Contractual or consensual basis

25T   Alternative Dispute Resolution
25TII   Arbitration
25TII(A)   Nature and Form of Proceeding
25Tk112   Contractual or consensual basis
    (Formerly 25Tk210)

In light of significant disadvantages of class arbitration, neither arbitrator nor court should conclude that parties consented to such a proceeding absent contractual basis for doing so.

13 Cases that cite this headnote

**[7]**    **Alternative Dispute Resolution**

    🔑 Operation and Effect

25T   Alternative Dispute Resolution
25TII   Arbitration
25TII(B)   Agreements to Arbitrate
25Tk150   Operation and Effect
25Tk151   In general

Provisions of enrollment agreement for online university that "[t]he student agrees that any dispute arising from my enrollment at [the] University, no matter how described, pleaded or styled, shall be resolved by binding arbitration under the Federal Arbitration Act conducted by the American Arbitration Association ... under its Commercial Rules," and that "[a]ny remedy available from a court under the law shall be available in the arbitration" did not authorize class arbitration; "any dispute" clause merely reflected agreement between parties to arbitrate their disputes, "any remedy" clause said nothing about class arbitration, and agreement's silence with respect to class arbitration did not constitute consent to it.

35 Cases that cite this headnote

**[8]**    **Alternative Dispute Resolution**
    🔑 Construction

25T   Alternative Dispute Resolution
25TII   Arbitration
25TII(B)   Agreements to Arbitrate
25Tk136   Construction
25Tk137   In general
    (Formerly 25Tk134(1))

Provision of Texas Education Code allowing for class action lawsuits to address violations of the Code was not "default rule" under which an arbitration clause could be construed as allowing class arbitration in absence of express consent. V.T.C.A., Education Code § 132.121(a).

1 Cases that cite this headnote

Reed v. Florida Metropolitan University, Inc., 681 F.3d 630 (2012)
280 Ed. Law Rep. 586

**Attorneys and Law Firms**

**\*631** Jonathan B. Cohen, Sean Patrick Keefe (argued), James, Hoyer, Newcomer, Smiljanich & Yanchunis, P.A., Tampa, FL, for Plaintiff–Appellee.

Peter Winslow Homer (argued), Christopher John King, HomerBonner, P.A., Miami, FL, John J. McKetta, III, Matthew Christopher Powers, Lit. Counsel, Graves, Dougherty, Hearon & Moody, P.C., Austin, TX, for Defendants–Appellants.

Appeal from the United States District Court for the Western District of Texas.

Before KING, BENAVIDES and DENNIS, Circuit Judges.

**Opinion**

KING, Circuit Judge:

Defendants–Appellants Florida Metropolitan University and Corinthian Colleges **\*632** appeal the district court's confirmation of an arbitral award that requires them to submit to class arbitration. They contend that the district court, not the arbitrator, should have decided whether the parties' agreement provided for class arbitration, and that the district court should have vacated the arbitrator's class arbitration award. Because the parties agreed that the arbitrator should decide the class arbitration issue, we conclude that the district court correctly referred that issue to the arbitrator. The district court erred, however, in confirming the award because the arbitrator exceeded his powers. We therefore REVERSE the district court's order and REMAND for further proceedings.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

In 2008, Plaintiff–Appellee Jeffrey Reed ("Reed") enrolled in Everest University Online's ("Everest") distance learning program, [1] and subsequently obtained a bachelor's degree in paralegal studies. Reed planned to attend law school upon graduation, and enrolled in Everest after receiving assurances from school officials that the college's degree would be accepted by educational institutions and employers. Reed soon discovered, however, that law schools would not recognize his bachelor's degree, nor would the local police department,

where he sought employment. Reed accrued more than $51,000 in student loan debt while attending Everest.

[1]    Everest is a brand of Defendant–Appellant Corinthian Colleges, Inc. Defendant–Appellant Florida Metropolitan University, Inc. is a subsidiary of Corinthian Colleges.

Dissatisfied with his experience at Everest, Reed filed a putative class action in Texas state court, alleging that Defendants–Appellants Corinthian Colleges and Florida Metropolitan University (together, the "School") had violated certain provisions of the Texas Education Code by soliciting students in Texas without the appropriate certifications. [2] Reed sought approximately $51,000 in damages, plus attorney's fees. Reed defined the putative class as "[a]ny person who contracted to receive distance education from Everest University Online while residing in Texas."

[2]    Specifically, Reed alleged violations of Texas Education Code § 132.051(a), which requires that schools not advertise or solicit in Texas until they receive the appropriate certificate of approval from the Texas Workforce Commission, and Texas Education Code § 132.059(a), which requires employees of career schools or colleges to register with the Commission.

The School removed the action to the district court, and then moved to compel individual arbitration pursuant to the arbitration provision of the Enrollment Agreement. The arbitration provision provides, in relevant part:

The student agrees that any dispute arising from my enrollment at Everest University, no matter how described, pleaded or styled, shall be resolved by binding arbitration under the Federal Arbitration Act conducted by the American Arbitration Association ("AAA") under its Commercial Rules. The award rendered by the arbitrator may be enforced in any court having jurisdiction.

**Terms of Arbitration**

1. Both student and Everest University irrevocably agree that any dispute between them shall be submitted to Arbitration.

2. Neither the student nor Everest University shall file or maintain any lawsuit in any court against the other, and agree that any suit filed in violation of

this Agreement shall be dismissed by **\*633** the court in favor of an arbitration conducted pursuant to this Agreement.

...

4. The arbitrator's decision shall be set forth in writing and shall set forth the essential findings and conclusions upon which the decision is based.

5. Any remedy available from a court under the law shall be available in the arbitration.

...

*Acknowledgment of Waiver of Jury Trial and Availability of AAA Rules*

By my signature on the reverse, I acknowledge that I understand that both I and Everest University are irrevocably waiving rights to a trial by jury, and are selecting instead to submit any and all claims to the decision of an arbitrator instead of a court. I understand that the award of the arbitrator will be binding, and not merely advisory.

The district court granted the School's motion to compel arbitration and stayed the action pending arbitration. It found that a valid arbitration agreement existed, that the parties' dispute was within the scope of the agreement, and that the arbitration clause was not unconscionable. The district court declined, however, to address whether the parties' agreement provided for class arbitration, concluding that the issue is "more appropriately decided by the arbitrator."

The case then proceeded before an American Arbitration Association ("AAA") arbitrator. Reed moved for a Clause Construction Award under the AAA Supplementary Rules for Class Arbitration, seeking class arbitration. The arbitrator determined that the parties implicitly agreed to class arbitration and entered an award to that effect. Reed then sought to confirm the arbitration award in the district court, and the School moved to vacate the award on the basis that the arbitrator exceeded his powers. The School argued that the award conflicted with the recent Supreme Court decisions in *Stolt–Nielsen S.A. v. AnimalFeeds International Corp.,* —— U.S. ——, 130 S.Ct. 1758, 176 L.Ed.2d 605 (2010), and *AT&T Mobility LLC v. Concepcion,* —— U.S. ——, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011). The district court confirmed the

award, finding it to be consistent with recent precedent and a "reasonable interpretation of the contract in light of the [Federal Arbitration Act] and Texas law." The School appealed.

## II. DISCUSSION

This appeal requires us to address two issues. Our first task is to determine whether the district court erred when it allowed the arbitrator to decide whether the parties agreed to class arbitration. Second, we must decide whether the district court properly denied the School's motion to vacate the arbitrator's award.

*1. The District Court Properly Referred the Class Arbitration Issue to the Arbitrator*

The School contends that the district court erred when it allowed the arbitrator to determine whether the parties' arbitration agreement allowed for class arbitration, instead of deciding the issue itself. We disagree.

The Supreme Court has not definitively decided this issue. In *Green Tree Financial Corp. v. Bazzle,* 539 U.S. 444, 123 S.Ct. 2402, 156 L.Ed.2d 414 (2003), four Justices concluded that the class arbitration issue did not constitute a "gateway" or arbitrability matter that is generally decided by a court, but was instead a procedural matter for the arbitrator. *Id.* at 452, 123 S.Ct. 2402. In *Stolt–Nielsen,* the Court confirmed that *Green Tree* "did not yield a **\*634** majority decision" on this issue. 130 S.Ct. at 1772. The *Stolt–Nielsen* Court declined to revisit the question because the parties in that case had agreed to submit the question to the arbitrator rather than the court. *Id.* At least at the Supreme Court level, therefore, the question remains open.[3]

[3]    In *Pedcor Management Co., Inc, Welfare Benefit Plan v. Nations Personnel of Texas, Inc.,* 343 F.3d 355 (5th Cir.2003), a panel of this court held that the class arbitration decision should be made by an arbitrator rather than a court. The *Pedcor* panel premised its decision upon *Green Tree,* which it interpreted to hold that class arbitration determinations "should be for the arbitrator, not the courts, to decide." *Id.* at 359. The Supreme Court in *Stolt–Nielsen,* however, emphasized that, on this point, *Green Tree* was only a plurality decision. 130 S.Ct. at 1772. Because the parties here consented to the Supplementary Rules,

Reed v. Florida Metropolitan University, Inc., 681 F.3d 630 (2012)

and therefore agreed to submit the class arbitration issue to the arbitrator, we need not and do not revisit this issue.

**[1]**   According to the School, the district court should have resolved the class arbitration issue because the parties expressly submitted that issue to the court for resolution. We disagree. Reed's opposition to the School's motion to compel arbitration was restricted largely to issues of the applicability and unconscionability of the arbitration clause. Reed, in fact, requested that the court "find that no valid, enforceable arbitration agreement exists, and that Plaintiff may proceed with this case before [the district court]." Reed's discussion of class arbitration came only when he argued that requiring individual arbitration would render the arbitration agreement unconscionable. Although Reed argued that the case should proceed as a class even if it were referred to arbitration, he did so only in response to the School's motion to compel arbitration. Nor did the district court understand Reed to make a class arbitration argument. It summarized, "Reed ... argues that his claims are not within the scope of the arbitration agreement, that Defendants are not parties to the arbitration agreement, that Texas law makes the arbitration agreement unenforceable, and that the arbitration agreement is illusory and unconscionable, and thus unenforceable." Indeed, as Reed sought to avoid arbitration altogether and to proceed as a class action, we cannot conclude that he intended to submit the class arbitration issue to the district court.

We now turn to the arbitration rules to which the parties agreed. As noted above, the parties explicitly agreed to adopt the AAA's Commercial Rules when they entered into their agreement in 2008. These rules do not contain class arbitration procedures; rather, such procedures are provided in the separate Supplementary Rules for Class Arbitration, which were enacted in October 2003 after the Supreme Court's *Green Tree* decision. *See Stolt–Nielsen,* 130 S.Ct. at 1765 (discussing development of Supplementary Rules). Shortly before it issued the Supplementary Rules, the AAA explained, "[t]he Association's various rules are silent on the issue of class arbitration and the Association has taken no position on the availability of class arbitrations. To accommodate these types of cases, the Association has commenced drafting supplementary rules that will govern the Association's administration of class arbitrations." AAA Policy Statement, *available at* http://www.adr.org/

index2.1. jsp?JSPssid=15753&JSPaid=43425. By their terms, these Supplementary Rules apply "to any dispute arising out of an agreement that provides for arbitration pursuant to any of the rules of the American Arbitration Association ('AAA') where a party submits a dispute to arbitration on behalf of or against a class or **\*635** purported class, and shall supplement any other applicable AAA rules." Suppl. R. 1(a). They also apply "whenever a court refers a matter pleaded as a class action to the AAA for administration." *Id.*

**[2]**   Commentators and AAA arbitral tribunals have consistently concluded that consent to any of the AAA's substantive rules also constitutes consent to the Supplementary Rules. [4] A major arbitration treatise concludes that "[t]hese AAA Supplementary Rules for Class Arbitrations ... supplement any other applicable AAA rules. For example, if a dispute that otherwise would be arbitrated under the Commercial Arbitration Rules involves a purported class, then the proceeding is governed by both the AAA Commercial Arbitration Rules and the AAA Supplementary Rules for Class Arbitrations." Thomas H. Oehmke, 1 COMMERCIAL ARBITRATION § 16:16 (Apr. 2012). The few courts to have considered this issue have agreed. *See Bergman v. Spruce Peak Realty, LLC,* No. 2:11–CV–127, 2011 WL 5523329, at *3 (D.Vt. Nov. 14, 2011) (relying upon Supplementary Rules when referring class arbitration issue to the arbitrator, where parties agreed to "the Commercial Arbitration Rules of the AAA"); *S. Comm'cns Servs., Inc. v. Thomas,* 829 F.Supp.2d 1324, 1336–38, 2011 WL 5386428, at *10 (N.D.Ga. Nov. 3, 2011) (holding that AAA Wireless Industry Arbitration Rules "incorporate the AAA Supplementary Rules for Class Arbitrations, which gave the arbitrator the power to decide whether the Arbitration Clause implicitly authorized class proceedings"; *Yahoo! Inc. v. Iversen,* 836 F.Supp.2d 1007, 1011–12, 2011 WL 4802840, at *4 (N.D.Cal. Oct. 11, 2011) (holding that parties' agreement to AAA National Rules for the Resolution of Employment Disputes also constituted agreement to the Supplementary Rules). Consistent with these authorities, we conclude that the parties' agreement to the AAA's Commercial Rules also constitutes consent to the Supplementary Rules. [5]

4       One arbitral tribunal confronted with this issue concluded that the Supplementary Rules applied to an arbitration commenced in 2004, even

Reed v. Florida Metropolitan University, Inc., 681 F.3d 630 (2012)
280 Ed. Law Rep. 586

though the parties' arbitration agreement—which was governed by "the Rules of the American Arbitration Association"—was signed approximately five years before the Supplementary Rules were enacted. *See Presidents and Fellows of Harvard College v. JSC Surgutneftegaz,* 770 PLI/Lit. 127, 135 n. 5 (2008). The panel, relying upon Supplementary Rule 1, explained, "[s]ince the AAA rules apply here—something clear on the face of the [parties'] Agreement—the Supplementary Rules also apply." *Id.* One member of the panel dissented from this conclusion, reasoning that the Supplementary Rules could not be incorporated into the parties' arbitration clause because the Supplementary Rules did not exist at the time the parties entered into their agreement. *Id.* at 170 (Zykin, dissenting).

5    In so holding, we note that the parties have never specifically disputed the applicability of the Supplementary Rules. The School, in its motion to vacate the clause construction award, in fact represented to the district court that it had agreed to those Rules. *See* R. 341 ("The AAA rules *to which these parties agreed* provide that a clause construction award would be subject to a motion to vacate ....") (citing Supplementary Rule 3) (emphasis added).

**[3]**  With this conclusion, we now turn to the substance of the Supplementary Rules. Under Supplementary Rule 3, "the *arbitrator* shall determine as a threshold matter ... whether the applicable arbitration clause permits the arbitration to proceed on behalf of or against a class ...." AAA Suppl. R. 3 (emphasis added). The parties' consent to the Supplementary Rules, therefore, constitutes a clear agreement to allow the arbitrator to decide whether the party's agreement provides **\*636** for class arbitration. As such, we need not determine whether, in the absence of such an agreement, the threshold matter of bilateral or class arbitration should be decided by a court or an arbitrator.[6]

6    The parties' adoption of the AAA Commercial Rules and the Supplementary Rules cannot, however, be considered in deciding whether they agreed to arbitrate as a class. *See* AAA Suppl. R. 3 ("In construing the applicable arbitration clause, the arbitrator shall not consider the existence of these Supplementary Rules, or any other AAA rules, to be a factor either in favor of or against permitting the arbitration to proceed on a class basis.").

In light of the foregoing, we conclude that the district court correctly referred the class arbitration issue to the

arbitrator. We now must decide whether the district court properly confirmed the arbitrator's class arbitration award.

### 2. The District Court Erred in Confirming the Arbitration Award

After a hearing, the arbitrator issued an award in which he determined that the parties' arbitration provision allowed for class arbitration. The district court granted Reed's motion to confirm the award and denied the School's cross-motion to vacate the award. The School contends that the arbitration award is inconsistent with *Stolt–Nielsen,* and that the arbitrator exceeded his authority by ordering the parties into class arbitration without a sufficient contractual basis. Reed responds that the award is compatible with *Stolt–Nielsen,* and that the exceedingly deferential standard of review applicable to arbitration awards precludes us from vacating the award. For the reasons discussed below, we agree with the School and conclude that the district court erred in failing to vacate the award pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 10(a)(4).

### A. Standard of Review

**[4]**  Our review of the district court's confirmation of an arbitral award is de novo, "using the same standard as the district court." *DK Joint Venture 1 v. Weyand,* 649 F.3d 310, 314 (5th Cir.2011). Because we have concluded that the district court properly referred the class arbitration issue to the arbitrator, our review of the arbitration award itself is governed by the FAA.[7] Under the FAA, a party to an arbitration may apply to a court for an order confirming an arbitration award, and the court "must grant such an order unless the award is vacated, modified, or corrected ...." 9 U.S.C. § 9. Section 10 of the FAA lists four grounds upon which to vacate an award, the last of which allows for vacatur "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4).

7    The School contends that de novo review of the award is proper because the class arbitration issue is one of arbitrability that should have been considered by the district court. Because we have concluded that the parties agreed to submit the issue to the arbitrator, we need not consider whether class arbitration constitutes an arbitrability issue. Nor would the

Reed v. Florida Metropolitan University, Inc., 681 F.3d 630 (2012)
280 Ed. Law Rep. 586

arbitrability determination necessarily be conclusive, as parties may agree to submit arbitrability questions to an arbitrator. *See Rent–A–Center, West, Inc. v. Jackson,* —— U.S. ——, 130 S.Ct. 2772, 2777, 177 L.Ed.2d 403 (2010) ("We have recognized that parties can agree to arbitrate 'gateway' questions of 'arbitrability' ....") (citing *Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 83–85, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002)).

**[5]** Of the various grounds for vacating an arbitral award provided in Section 10, this fourth ground has received the most attention. In *Wilko v. Swan,* 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), *overruled* **\*637** *on other grounds by Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989), the Supreme Court explained that the "[p]ower to vacate an award is limited," but an arbitrator's failure to decide a case in accordance with the applicable law may constitute grounds for vacating the award if that failure is "made clearly to appear." *Id.* at 436, 74 S.Ct. 182. On several occasions, the Court has considered whether a lower court properly set aside an arbitrator's interpretation of a collective bargaining agreement or other contract. The Court has consistently made clear that a court may not decline to enforce an award simply because it disagrees with the arbitrator's legal reasoning. *See, e.g., Major League Baseball Players Ass'n v. Garvey,* 532 U.S. 504, 509, 121 S.Ct. 1724, 149 L.Ed.2d 740 (2001); *E. Associated Coal Corp. v. United Mine Workers of Am.,* 531 U.S. 57, 62, 121 S.Ct. 462, 148 L.Ed.2d 354 (2000). Nevertheless, an arbitrator's award is not entirely beyond reproach:

> [A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. *He may of course look for guidance from many sources, yet his award is legitimate only as long as it draws its essence from the collective bargaining agreement.* When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

*United Steelworkers of Am. v. Enter. Wheel & Car Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960) (emphasis added).[8] In *United Steelworkers,* the Court

explained that "[i]t is the arbitrator's construction [of the contract] which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." *Id.* at 599, 80 S.Ct. 1358. This principle was echoed in *United Paperworkers International Union v. Misco, Inc.,* 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987), where the Supreme Court again discussed the limited role of a court in reviewing an arbitrator's interpretation of a contract. The Court explained that "[t]he arbitrator may not ignore the plain language of the contract; but the parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract." *Id.* at 38, 108 S.Ct. 364. Thus, "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *Id.* The Supreme Court's recent decision in *Stolt–Nielsen,* —— U.S. ——, 130 S.Ct. 1758, 176 L.Ed.2d 605 (2010), which we discuss further below, reaffirmed this exceptionally deferential standard of review. *See id.* at 1767–68.

8   We have explained that an arbitrator's award "draws its essence" from the contract where the award "ha[s] a basis that is at least rationally inferable, if not obviously drawn, from the letter or purpose of the ... agreement.... [T]he award must, in some logical way, be derived from the wording or purpose of the contract." *Anderman/Smith Operating Co. v. Tenn. Gas Pipeline Co.,* 918 F.2d 1215, 1218 (5th Cir.1990) (citations and internal quotation marks omitted) (alteration in original); *see also Executone Info. Sys., Inc. v. Davis,* 26 F.3d 1314, 1320 (5th Cir.1994).

Consistent with this precedent, we have recognized that "judicial review of an arbitration award is extraordinarily narrow" and "exceedingly deferential." **\*638** *Rain CII Carbon, LLC v. ConocoPhillips Co.,* 674 F.3d 469, 471 (5th Cir.2012) (citation and internal quotation marks omitted). We will therefore not set aside an award for "a mere mistake of fact or law." *Id.* (citation and internal quotation marks omitted); *see also Apache Bohai Corp. LDC v. Texaco China BV,* 480 F.3d 397, 401 (5th Cir.2007).

Reed v. Florida Metropolitan University, Inc., 681 F.3d 630 (2012)
280 Ed. Law Rep. 586

### B. The Arbitrator Exceeded his Powers

With this understanding of our limited review, we now consider whether the arbitrator in this case exceeded his powers when he concluded that the parties' agreement permitted class arbitration. Because we find that the arbitrator forced the parties into class arbitration without a contractual basis for doing so, we conclude that the arbitrator exceeded his powers and that the award must be vacated.

### i. Stolt–Nielsen

This appeal comes before us in the wake of the Supreme Court's recent decision in *Stolt–Nielsen v. AnimalFeeds International Corp.,* —— U.S. ——, 130 S.Ct. 1758, 176 L.Ed.2d 605 (2010). In that case, Stolt–Nielsen and AnimalFeeds had entered into an agreement for the shipment of goods. The parties' agreement contained an arbitration provision that provided in part: "[a]ny dispute arising from the making, performance or termination of this Charter Party shall be settled in New York .... Such arbitration shall be conducted in conformity with the provisions and procedure of the United States Arbitration Act [*i.e.,* the FAA], and a judgment of the Court shall be entered upon any award made by said arbitrator." *Id.* at 1765. After a Department of Justice criminal investigation revealed that Stolt–Nielsen was engaged in an illegal price-fixing conspiracy, AnimalFeeds brought a putative class action in federal court. *Id.* AnimalFeeds subsequently served Stolt–Nielsen with a demand for class arbitration, and the parties agreed to submit the class arbitration question to a panel of three arbitrators. *Id.* The parties also stipulated that their agreement was "silent" with respect to class arbitration, meaning that they had reached "no agreement" on the issue. *Id.* at 1766. The arbitrators concluded that the parties' agreement provided for class arbitration. On Stolt–Nielsen's motion, the district court vacated the award, but the Second Circuit reversed. *Id.*

On appeal, the Supreme Court held that the district court properly vacated the award. The Court first reemphasized that a party seeking vacatur must "clear a high hurdle," as it is "not enough for petitioners to show that the panel committed an error—or even a serious error." *Id.* at 1767. As the Court explained, "[i]t is only where [an] arbitrator strays from interpretation and application of the agreement and effectively dispense[s] his own brand of industrial justice that his decision may be unenforceable." *Id.* (citations and internal quotation marks omitted). Where that happens, an arbitration award may be vacated on the basis that the arbitrator exceeded his powers, "for the task of an arbitrator is to interpret and enforce a contract, not to make public policy." *Id.*

The Court explained that, because the parties stipulated that their agreement was silent on class arbitration, the arbitrators' "proper task was to identify the rule of law that governs," presumably "the FAA itself or to one of the two bodies of law that the parties claimed were governing, *i.e.,* either federal maritime law or New York law." *Id.* at 1768. However, instead of "inquiring whether the FAA, maritime law, or New York law contains a 'default rule' under which an arbitration clause is construed as allowing class arbitration **\*639** in the absence of express consent, the panel proceeded as if it had the authority of a common-law court to develop what it viewed as the best rule to be applied in such a situation." *Id.* at 1768–69. The arbitrators perceived a consensus favoring class arbitration, and considered only whether there was a "good reason not to follow that consensus."[9] *Id.* at 1769. Finding no such reason, the arbitration panel determined that the parties' agreement permitted class arbitration. The Court concluded that "the panel simply imposed its own conception of sound policy," and thereby exceeded its powers. *Id.* Finding that there was only one possible outcome—bilateral arbitration—the Court vacated the award and declined to direct a rehearing by the arbitrators. *Id.* at 1770.

[9]     In this respect, the Court faulted the arbitrators for discounting expert evidence that bilateral rather than class arbitration was customary in maritime agreements. The Court also explained that, "[u]nder both New York law and general maritime law, evidence of 'custom and usage' is relevant to determining the parties' intent when an express agreement is ambiguous." *Stolt–Nielsen,* 130 S.Ct. at 1769 n. 6.

The Court then addressed the "standard to be applied by a decision maker in determining whether a contract may permissibly be interpreted to allow class arbitration," a question left undecided by *Green Tree. Id.* at 1772. The Court based its analysis on the FAA's basic precept that arbitration "is a matter of consent, not coercion." *Id.* at 1773. In this respect, parties are "generally free to structure their arbitration agreements as they see fit,"

Reed v. Florida Metropolitan University, Inc., 681 F.3d 630 (2012)

280 Ed. Law Rep. 586

and to "specify *with whom* they choose to arbitrate their disputes." *Id.* at 1774 (emphasis in original) (citations and internal quotation marks omitted). As such, the Court held that "a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so." *Id.* at 1775 (emphasis in original). The arbitrators had erred by "impos[ing] class arbitration even though the parties concurred that they had reached 'no agreement' on that issue." *Id.* In fact, the panel had faulted the parties for failing to preclude class arbitration, and "regarded the agreement's silence on the question of class arbitration as dispositive." *Id.* This conclusion, the Court found, was "fundamentally at war with the foundational FAA principle that arbitration is a matter of consent." *Id.*

In so deciding, the Court explained that arbitrators may properly presume authorization to impose certain procedural requirements, but "[a]n implicit agreement to authorize class-action arbitration ... is not a term that the arbitrator may infer solely from the fact of the parties' agreement to arbitrate." *Id.* This is so, the Court explained, "because class-action arbitration changes the nature of the arbitration to such a degree that it cannot be presumed the parties consented to it by simply agreeing to submit their disputes to an arbitrator." *Id.* The Court then described several fundamental differences between bilateral and class arbitration. For example, in class arbitration, the arbitrator "no longer resolves a single dispute between the parties to a single agreement, but instead resolves many disputes between hundreds or perhaps even thousands of parties," and the presumption of privacy and confidentiality that applies in many bilateral arbitrations would not apply in class arbitrations. *Id.* at 1776. Further, "[t]he arbitrator's award no longer purports to bind just the parties to a single arbitration agreement, but adjudicates the rights of absent parties as well." *Id.* Additionally, although the stakes are similar to those in class action litigation, "the scope of judicial review is much more **\*640** limited." *Id.* The Court explained that these differences and disadvantages "give reason to doubt the parties' mutual consent to resolve disputes through class-wide arbitration." *Id.* at 1775–76. The Court therefore concluded that "the differences between bilateral and class-action arbitration are too great for arbitrators to presume, consistent with their limited powers under the FAA, that the parties' mere silence on the issue of class-action arbitration constitutes consent to resolve their disputes in class proceedings." *Id.* at 1776. In

light of these "crucial differences," the majority saw the question as "being whether the parties *agreed to authorize* class arbitration." *Id.* (emphasis in original). Because the parties had agreed that their contract was silent on the subject, they could not be "compelled to submit their dispute to class arbitration." *Id.* The Court, however, declined to "decide what contractual basis may support a finding that the parties agreed to authorize class-action arbitration," in light of the parties' stipulation of silence. *Id.* at 1776 n. 10.

Justice Ginsburg, joined by Justices Stevens and Breyer, dissented. The dissent criticized the majority for not affording the arbitration award the proper deference. Because the parties had agreed to submit the class arbitration issue to the arbitrators, the arbitrators did not exceed their authority in resolving the dispute. *Id.* at 1780 (Ginsburg, J., dissenting). Rather, they properly addressed the "procedural mode available for presentation of AnimalFeeds' antitrust claims." *Id.* at 1781.

The Supreme Court reiterated many of the same concerns regarding class arbitration a year later in *Concepcion,* ––– U.S. ––––, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011), wherein it held that a state law prohibiting class action waivers in arbitration agreements was preempted by the FAA. *Id.* at 1753. In so holding, the *Concepcion* Court explained that class arbitration "includes absent parties, necessitating additional and different procedures and involving higher stakes. Confidentiality becomes more difficult. And while it is theoretically possible to select an arbitrator with some expertise relevant to the class-certification question, arbitrators are not generally knowledgeable in the often-dominant procedural aspects of certification ...." *Id.* at 1750. The Court also emphasized that arbitral awards are subject to limited appellate review, and raised concerns that defendants might feel increased pressure to settle questionable claims when confronted with class arbitration. *Id.* at 1752. Given these disadvantages, the Court found "it hard to believe that defendants" would agree to class arbitration and thereby "bet the company with no effective means of review." *Id.* As such, *Concepcion* held that "class arbitration, to the extent it is manufactured by [state law] rather than consensual, is inconsistent with the FAA." *Id.* at 1751–52.

**[6]**   Therefore, in light of the significant disadvantages of class arbitration as discussed in both *Stolt–Nielsen* and

*Concepcion,* an arbitrator (or a court) should not conclude that parties—and defendants in particular—consented to such a proceeding absent a contractual basis for doing so. Although the agreement to submit to class arbitration may be implicit, it should not be lightly inferred. [10] *See* **\*641** 130 S.Ct. at 1775; *id.* at 1782 (Ginsburg, J. dissenting) ("The breadth of the arbitration clause, and the absence of any provision waiving or banning class proceedings, will not [support class arbitration].") (footnote omitted); *id.* at 1783 ("[T]he Court does not insist on express consent to class arbitration."); *see also* Christopher R. Drahozal & Peter B. Rutledge, *Contract and Procedure,* 94 MARQ. L.REV. 1103, 1151 (2011) ("[In *Stolt–Nielsen* ], [t]he Supreme Court held that the default rule is that class arbitration is not permitted, explaining that class arbitration is sufficiently different from individual arbitration that the parties must agree as a contractual matter to override that default rule."); Terry F. Moritz & Brandon J. Fitch, *The Future of Consumer Arbitration in Light of* Stolt–Nielsen, 23 LOY. CONSUMER L.REV. 265, 270 (2010) ("*Stolt–Nielsen* seems to signal the end of inferred class arbitration .... A court cannot compel class arbitration without a contractual basis for concluding that the parties agreed to it; and presumably no potential defendant would agree to it."). In the absence of a contractual agreement, an arbitrator should inquire into "whether the FAA, [or state law] contains a 'default rule' under which an arbitration clause is construed as allowing class arbitration," instead of simply "develop[ing] what [he] view[s] as the best rule to be applied in such a situation." *Stolt–Nielsen,* 130 S.Ct. at 1768–69. Without a contractual or other legal basis for class arbitration, an arbitrator has no authority to order the parties to submit to class arbitration. *See Concepcion,* 131 S.Ct. at 1750 ("In [*Stolt–Nielsen*] we held that an arbitration panel exceeded its powers under § 10(a)(4) of the FAA by imposing class procedures based on policy judgments rather than the arbitration agreement itself or some background principle of contract law that would affect its interpretation."); *see also United Steelworkers of Am. v. Enter. Wheel and Car Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960) (stating that an arbitrator's award is "legitimate only as long as it draws its essence" from the contract).

[10]  This understanding is consistent with Texas law, which provides: "[F]or a court to read additional provisions into [a] contract, the implication must clearly arise from the language used, or be indispensable to effectuate the intent of the parties.

It must appear that the implication was so clearly contemplated by the parties that they deem it unnecessary to express it." *Fuller v. Phillips Petroleum Co.,* 872 F.2d 655, 658 (5th Cir.1989); *see Danciger Oil & Ref. Co. of Tex. v. Powell,* 137 Tex. 484, 154 S.W.2d 632, 635 (1941).

With this understanding of *Stolt–Nielsen,* we now turn to whether the arbitrator in this case exceeded his powers by ordering the parties to submit to class arbitration.

*ii. Arbitrator's Award*

[7]   In his award, the arbitrator began by acknowledging that the class arbitration issue presented a "close case," and was primarily governed by *Stolt–Nielsen.* After determining that the FAA and Texas law applied, [11] he then focused on two provisions of the parties' arbitration agreement: (1) the "any dispute" provision, which provides, "[t]he student agrees that any dispute arising from my enrollment at Everest University, no matter how described, pleaded or styled, shall be resolved by binding arbitration under the Federal Arbitration Act conducted by the American Arbitration Association ... under its Commercial Rules;" and (2) the "any remedy" provision, which provides, "[a]ny remedy available from a court under the law shall be available in the arbitration." The arbitrator concluded that, "[w]hen these two provision[s] are read in the context of the entire Agreement, the [School] implicitly agreed to class arbitration," and there was a sufficient " 'contractual basis' for class arbitration." The arbitrator based his conclusion in part upon Section 132.121(a) of the Texas Education Code, which provides for class action litigation **\*642** to address certain violations of the Education Code. He reasoned that, if the arbitration clause had not been included in the contract, then the School "would have clearly been required to submit to a class action lawsuit." While he acknowledged that this provision of Texas law was not controlling, he explained that it is "not inconsistent with the FAA," and it "provides guidance in interpreting the contract language agreed to by the Parties." The arbitrator also relied upon the School's failure to expressly ban class arbitration, reasoning that the School "drafted the Agreement in question," and they "could have clearly set forth that class arbitration was barred if they so chose," but they "chose not to do so."

Reed v. Florida Metropolitan University, Inc., 681 F.3d 630 (2012)

280 Ed. Law Rep. 586

11     The parties agreed that Texas law governed.

Upon our deferential review of the award, we conclude that the arbitrator exceeded his authority by ordering the parties into class arbitration without a sufficient basis for concluding that the parties agreed to resolve their dispute in this manner. *Stolt–Nielsen,* 130 S.Ct. at 1775. Although the parties here did not stipulate that their agreement was silent on class arbitration, unlike the parties in *Stolt– Nielsen,* Reed admitted before the arbitrator that "the parties clearly did not discuss whether class arbitration was authorized," and that "[t]he arbitration agreement at issue here fails to address class arbitration." In light of these concessions, the arbitrator should have consulted state or federal law to determine if a certain "default" class arbitration rule existed in the absence of an agreement. *Id.* at 1770.[12] Instead, the arbitrator focused upon the terms of the parties' contract. None of the provisions the arbitrator identified, however, even remotely relates to or authorizes class arbitration.

12     The parties do not provide any such "default rule" under federal or Texas law, nor are we aware of such a rule. The Texas General Arbitration Act makes no reference to class arbitration. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 171.001 *et seq.* The FAA also has no such default rule.

First, the arbitrator improperly relied upon the "any dispute" clause of the arbitration agreement. The "any dispute" clause is a standard provision that may be found, in one form or another, in many arbitration agreements. *See Stolt–Nielsen.* 130 S.Ct. at 1765 (arbitration agreement provided: "[a]ny dispute arising from the making, performance or termination of this Charter Party shall be settled [by arbitration]"); *Jock v. Sterling Jewelers Inc.,* 646 F.3d 113, 116 (2d Cir.2011) (arbitration agreement provided: "I hereby utilize the Sterling RESOLVE [arbitration] program to pursue any dispute, claim, or controversy ... against Sterling"); *Complaint of Hornbeck Offshore (1984) Corp.,* 981 F.2d 752, 755 (5th Cir.1993) (explaining that "any dispute" clauses are very broad, and collecting cases involving such clauses); *see also* American Arbitration Association, Drafting Dispute Resolution Clauses: A Practical Guide 7 (Sept. 1, 2007) (suggesting following clause: "[a]ny controversy or claim arising out of or relating to this contract ... shall be settled by arbitration"); JAMS ADR Clauses, *available at* www.jamsadr. com/clauses/# Standard (suggesting the following clause: "[a]ny dispute,

claim or controversy arising out of or related to this Agreement ... shall be determined by arbitration ...."). On its face, the "any dispute" clause merely reflects an agreement between the parties to arbitrate their disputes. *Stolt–Nielsen* makes clear, however, that an "implicit agreement to authorize class-arbitration ... is *not* a term that the arbitrator may infer solely from *the fact of the parties' agreement to arbitrate.* **\*643** " 130 S.Ct. at 1775 (emphasis added). This clause is therefore not a valid contractual basis upon which to conclude that the parties agreed to submit to class arbitration. *See, e.g.,* Christopher R. Drahozal & Peter B. Rutledge, *Contract and Procedure,* 94 MARQ. L.REV. 1103, 1155 (2011) (arguing that a class arbitration award based upon an "any dispute" clause would be "insufficient" under *Stolt– Nielsen,* and stating that "[a] general arbitration clause, according to the *Stolt–Nielsen* Court, does not authorize class arbitration because class arbitration differs too much from individual arbitration").

Second, the arbitrator's reliance upon the "any remedy" clause was also improper. The "any remedy" clause, which merely allows the arbitrator to grant any "remedy available from a court under the law," says nothing whatsoever about class arbitration, and does not constitute an "agree[ment] to authorize class arbitration." *Stolt–Nielsen,* 130 S.Ct. at 1776 (emphasis omitted). A "remedy" is "anything a court can do for a litigant who has been wronged or is about to be wronged." BLACK'S LAW DICTIONARY 1320 (8th ed. 2004); *see also Knapp, Stout & Co. v. McCaffrey,* 177 U.S. 638, 644, 20 S.Ct. 824, 44 L.Ed. 921 (1900) ("A remedy is defined ... as the means employed to enforce a right, or redress an injury.") (internal quotation marks omitted). Remedies may include, for example, equitable relief such as an injunction or restitution, or legal relief such as monetary damages. *See Mertens v. Hewitt Assocs.,* 508 U.S. 248, 255, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993). In contrast, we have characterized a class action as "a procedural device." *Blaz v. Belfer,* 368 F.3d 501, 505 (5th Cir.2004); *see also Sw. Refining Co. v. Bernal,* 22 S.W.3d 425, 437 (Tex.2000) ("The class action [under Texas Rule of Civil Procedure 42] is a procedural device intended to advance judicial economy by trying claims together that lend themselves to collective treatment."). Thus, while a class action may lead to certain types of remedies or relief, a class action is not *itself* a remedy. *See Jock,* 646 F.3d at 132 (Winter, J., dissenting) ("My colleagues also rely upon the provision in the present agreement that the arbitrator

280 Ed. Law Rep. 586

may award any legal or equitable relief generally available in courts. Clearly, this provision refers only to relief in the form of an award based on a violation of law or contract —damages, injunctions, etc.—and not to the availability of procedures used to pursue such relief. A class can be certified and yet not get 'relief,' i.e. it may lose.").

**[8]** The arbitrator concluded that class arbitration was a potential remedy here because Section 132.121(a) of the Texas Education Code allows for class action lawsuits to address violations of the Code. Even aside from the fact that a class action cannot properly be considered a "remedy" under state or federal law, Section 132.121(a) addresses only class action litigation in state court, and does not support the conclusion that the parties agreed to class arbitration. Indeed, the central purpose of the arbitration agreement is to *avoid* such provisions of state law, not to incorporate them into the arbitration agreement. In other words, the mere fact that the parties would otherwise be subject to class action in the absence of an arbitration agreement is not a sufficient basis to conclude that they agreed to class arbitration when they entered into an arbitration agreement. Nor can the Texas Education Code class action provision be considered "a 'default rule' under which an arbitration clause is construed as allowing class arbitration in the absence of express consent." *Stolt–Nielsen,* 130 S.Ct. at 1768–69.

Finally, the arbitrator erroneously based his conclusion on the agreement's silence **\*644** with respect to class arbitration. The arbitrator suggested that the School, as the drafter of the agreement, had an obligation to affirmatively state that the agreement precluded class arbitration. This rationale, however, is directly contrary to *Stolt–Nielsen*'s holding that arbitrators should not "presume, consistent with their limited powers under the FAA, that the parties' mere silence ... constitutes consent" to class arbitration. *Id.* at 1776. *Stolt–Nielsen* requires that the parties "agree[ ] to authorize" class arbitration, not merely that they fail to bar such a proceeding. *Id.* (emphasis omitted).

We conclude, therefore, that the arbitrator lacked a contractual basis upon which to conclude that the parties agreed to authorize class arbitration. At most, the agreement in this case could support a finding that the parties did not preclude class arbitration, but under *Stolt–Nielsen* this is not enough. The arbitrator therefore exceeded his authority in ordering the parties to submit

to a class arbitration proceeding, and the district court should have vacated the award. 9 U.S.C. § 10(a)(4); *see Stolt–Nielsen,* 130 S.Ct. at 1776.

The Second Circuit, applying *Stolt–Nielsen,* has come to a different conclusion. [13] In *Jock v. Sterling Jewelers Inc.,* 646 F.3d 113 (2d Cir.2011), *cert. denied* Mar. 19, 2012, a group of female employees filed both a class action lawsuit and a class arbitration complaint, alleging that their employer, Sterling Jewelers, engaged in gender discrimination. *Id.* at 115–16. The district court referred the class action lawsuit to arbitration and the parties submitted to the arbitrator the question of whether their agreement permitted class arbitration. *Id.* at 116. The arbitrator found that the agreement permitted class arbitration because it "cannot be construed to prohibit class arbitration," and there was "no mention of class claims." *Id.* at 117. The arbitrator interpreted the agreement under applicable state law, and "construed the absence of an express prohibition on class claims against the contract's drafter, Sterling." *Id.* The arbitrator also reasoned that Sterling had declined to revise the contract "despite several arbitral decisions permitting class claims in the absence of an express prohibition." *Id.* The district court denied Sterling's motion to vacate the award, and Sterling appealed. In the interim, the Supreme Court issued *Stolt–Nielsen,* and Jock moved the district court for relief from its order. The district court then vacated the award based upon *Stolt–Nielsen.* The plaintiffs appealed. *Id.* at 118.

[13]    The Third Circuit has also recently addressed this issue. *See Sutter v. Oxford Health Plans LLC,* 675 F.3d 215 (3d Cir.2012). Like the Second Circuit, the Third Circuit in *Sutter* confirmed an arbitrator's class arbitration award, finding it consistent with *Stolt–Nielsen. Id.* at 223–25. We disagree with *Sutter* for essentially the reasons stated herein with respect to the Second Circuit's *Jock* decision.

On appeal, a panel of the Second Circuit, with one judge dissenting, reversed the district court's order and remanded with instructions to confirm the award. The majority explained that the district court erroneously "focused ... on whether the arbitrator had correctly interpreted the arbitration agreement itself." *Id.* at 123. Instead, it should have restricted its analysis to whether the parties had submitted the class arbitration issue to the arbitrator and "whether the agreement or the law

Reed v. Florida Metropolitan University, Inc., 681 F.3d 630 (2012)
280 Ed. Law Rep. 586

categorically prohibited the arbitrator from reaching that issue." *Id.* at 123.

The majority distinguished the case before it from the stipulation of silence in *Stolt–Nielsen,* explaining "[t]he plaintiffs' concession that there was no explicit **\*645** agreement to permit class arbitration ... is not the same thing as stipulating that the parties had reached no agreement on the issue." *Id.* The district court erred when it substituted its own judgment for the arbitrator's in deciding whether the record demonstrated an implicit class arbitration agreement. *Id.* at 124. The majority reasoned that, because the class arbitration issue was submitted to the arbitrator, and neither the law nor the agreement barred the arbitrator from deciding the issue, the arbitrator did not exceed her powers in resolving the issue. *Id.*

In so holding, the majority "reemphasiz[ed] that the primary thrust of [its] decision is whether the district court applied the appropriate level of deference when reviewing the arbitration award." *Id.* The majority criticized the dissent for focusing on the "correct" interpretation of *Stolt–Nielsen* rather than whether the arbitrator exceeded her powers. *Id.* at 125. Ultimately, the majority concluded, regardless of "whether the arbitrator was right or wrong in her analysis, she had the authority to make the decision, and the parties to the arbitration agreement are bound by it." *Id.* at 127 (footnote omitted).

Judge Winter dissented. He first noted that the same "silence" at issue in *Stolt–Nielsen* was present in *Jock,* as neither party claimed that the arbitration clauses at issue either "specifically authorize[d] or specifically preclude[d] class arbitration." *Id.* at 128 (Winter, J., dissenting). He acknowledged that an implicit agreement to arbitrate is permissible under *Stolt–Nielsen,* but argued that an implicit agreement cannot be inferred from an arbitration agreement's silence or failure to preclude class arbitrations, "much less from thin air." *Id.* at 129. Nowhere in the arbitrator's opinion, Judge Winter reasoned, did the arbitrator "purport to identify any provision of the agreement supporting the existence of an implied agreement"; in fact, many provisions of the agreement supported the conclusion that only bilateral arbitration was permissible. *Id.* In this regard, Judge Winter discounted the arbitrator's reliance on the "any relief" provision of the arbitration agreements, concluding that it could not support an implicit agreement to submit

to class arbitration, as class arbitration is a "procedure [ ] used to pursue ... relief," not relief itself. *Id.* at 132. Finally, Judge Winter rejected the majority's reliance on the deferential standard of review, noting that the same standard of review was applicable in *Stolt–Nielsen,* but it did not prevent the Court from vacating the award. *Id.* at 133.

We respectfully disagree with the Second Circuit's decision in *Jock.* We read *Stolt–Nielsen* as requiring courts to ensure that an arbitrator has a legal basis for his class arbitration determination, even while applying the appropriately deferential standard of review. 130 S.Ct. at 1775. Such an analysis necessarily requires some consideration of the arbitrator's award and rationale. Instead of examining the arbitrator's award, the *Jock* majority confirmed the award even though the award based its conclusion in part upon the agreement's failure to expressly prohibit class arbitration, a rationale that is incompatible with *Stolt–Nielsen.* [14] To the extent **\*646** that the Second Circuit decided not to undertake an inquiry into the arbitrator's reasoning, we must part ways.

14    We note that the arbitral award in *Jock* was issued before the Supreme Court's *Stolt–Nielsen* decision. This led the *Jock* majority to explain that the "arbitrator faithfully followed the law as it existed at the time of her decision," and an "intervening change of law, standing alone, [does not] provide[ ] grounds for vacating an otherwise proper arbitral award." 646 F.3d at 125. It is not clear, however, whether the court would have reached the same result if the arbitrator's award had been issued after *Stolt–Nielsen.*

Nor can we agree that the deferential standard of review applicable to arbitration awards precludes such an inquiry. Indeed, the same standard of review was at issue in *Stolt–Nielsen,* but it did not prevent the Court from examining and vacating the arbitrator's award. Furthermore, we are persuaded by the Supreme Court's lengthy discussion of the significant disadvantages of class arbitration, *id.* at 1776, a discussion that the *Jock* majority largely ignored. [15] Together, *Stolt_Nielsen* and *Concepcion* indicate that arbitrators should not find implied agreements to submit to class arbitration, and courts should not confirm arbitral awards that order parties into such a proceeding, without a contractual or legal basis for doing so. While we cannot substitute our own judgment for that of an arbitrator, we also cannot

Reed v. Florida Metropolitan University, Inc., 681 F.3d 630 (2012)
280 Ed. Law Rep. 586

confirm an award that Supreme Court precedent requires us to vacate.

15      Only the dissent in *Jock* discussed at length the Supreme Court's recent concerns about class arbitration. 646 F.3d at 131 (Winter, J., dissenting).

To summarize, we conclude that the arbitrator in this case exceeded his powers by ordering the parties to submit to class arbitration without a contractual or legal basis. The district court thus erred in denying the School's motion to vacate the award. 9 U.S.C. § 10(a)(4); *see Stolt–Nielsen,* 130 S.Ct. at 1775–76. Pursuant to Section 10(b) of the FAA, we must either " 'direct a rehearing by the arbitrators' or decide the question that was originally referred to the panel." *Stolt–Nielsen,* 130 S.Ct. at 1770 (internal quotation marks omitted). Because we conclude, as did the *Stolt–Nielsen* Court, that "there can be only one possible outcome on the facts before us," there is no need to direct a rehearing by the arbitrator. *Id.* This arbitration must proceed bilaterally.

## III. CONCLUSION

For the reasons stated above, we REVERSE the order of the district court and REMAND this case with instructions to refer the parties to bilateral arbitration.

DENNIS, Circuit Judge, specially concurring:
I join the majority's opinion, except Part II.1, and write separately to add some observations regarding *Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.,* —— U.S. ——, 130 S.Ct. 1758, 176 L.Ed.2d 605 (2010), which might prove to be crucial in future cases.

## 1.

I agree with the majority's conclusion in Part II.1 of its opinion that the district court did not err in referring the issue of class arbitration *vel non* to the arbitrator, but I am not persuaded that "the parties' agreement to the AAA's Commercial Rules also constitutes consent to the Supplementary Rules." Majority Op. 8. Instead, I believe that reference of the question to the arbitrator is required by our circuit precedent in *Pedcor Management Co., Inc. Welfare Benefit Plan v. Nations Personnel of Texas, Inc.,*

343 F.3d 355 (5th Cir.2003), which held that, "pursuant to *Green Tree [Financial Corp. v. Bazzle,* 539 U.S. 444, 123 S.Ct. 2402, 156 L.Ed.2d 414 (2003) ], arbitrators should decide whether class arbitration is available or forbidden." *Pedcor,* 343 F.3d at 363.

In *Pedcor,* this court considered the upshot of the splintered decision in *Green* **\*647** *Tree Financial Corp. v. Bazzle,* 539 U.S. 444, 123 S.Ct. 2402, 156 L.Ed.2d 414 (2003). In *Green Tree,* Justice Breyer wrote a plurality opinion, joined by Justices Scalia, Souter, and Ginsburg, which concluded that the arbitrator, not the court, should decide the class arbitration question. *Id.* at 453, 123 S.Ct. 2402. [1] Justice Stevens cast the fifth vote for the judgment to vacate and remand the state court's decision; but he did not join Justice Breyer's opinion. *Id.* at 454–55, 123 S.Ct. 2402 (Stevens, J., concurring in the judgment and dissenting in part). Justice Stevens noted that "[a]rguably the interpretation of the parties' agreement [to permit class arbitration or not] should have been made in the first instance by the arbitrator, rather than the court." *Id.* at 455, 123 S.Ct. 2402. However, because Justice Stevens believed that the state court's "decision to conduct a class-action arbitration was correct as a matter of law, and because petitioner has merely challenged the merits of that decision without claiming that it was made by the wrong decisionmaker," he did not think that remanding the case was necessary. *Id.* Nonetheless, Justice Stevens concurred in the plurality's judgment "[i]n order to avoid [there being no controlling judgment of the Court], and because Justice BREYER's opinion expresses a view of the case close to my own." *Id.*

1      Chief Justice Rehnquist, joined by Justices O'Connor and Kennedy, dissented on the grounds that "this determination is one for the courts, not for the arbitrator," *Green Tree,* 539 U.S. at 455, 123 S.Ct. 2402 (Rehnquist, C.J., dissenting); and Justice Thomas dissented separately on the basis that he "believe[d] that the [FAA] does not apply to proceedings in state courts," 539 U.S. at 460, 123 S.Ct. 2402 (Thomas, J., dissenting).

In analyzing *Green Tree,* the *Pedcor* panel applied the well-established principle that "when we are confronted with a plurality opinion, we look to that position taken by those Members who concurred in the judgments on the narrowest grounds." 343 F.3d at 358 (internal quotation marks omitted). The panel reasoned that Justice Stevens' opinion "fails to constitute the most narrow grounds on

Reed v. Florida Metropolitan University, Inc., 681 F.3d 630 (2012)

280 Ed. Law Rep. 586

which the case was decided." *Id.* at 358. Instead, the *Pedcor* panel concluded that the narrowest grounds for the *Green Tree* judgment were those expressed by Justice Breyer's plurality opinion. *Id.* at 358–59. Thus, the panel held that "pursuant to *Green Tree,* arbitrators should decide whether class arbitration is available or forbidden." *Id.* at 363. Although the *Pedcor* panel indicated that Justice Stevens might have tacitly agreed with the plurality on this point, *see* 343 F.3d at 358–59, that view was not necessary to or part of the *Pedcor* panel's holding.

In *Stolt–Nielsen,* the Court recognized that Justice Stevens' opinion in *Green Tree* did not decide the question of whether the arbitrator or the court should decide the class arbitration question, and "[t]hus, [*Green Tree* ] did not yield a majority decision on" that issue. 130 S.Ct. at 1771–72. However, the *Stolt–Nielsen* Court explicitly declined to address this issue: "[W]e need not revisit that question here because the parties' supplemental agreement expressly assigned this issue to the arbitration panel, and no party argues that this assignment was impermissible." *Id.* Thus, *Stolt–Nielsen* does not alter the status of the *Green Tree* plurality opinion, and does not affect our holding in *Pedcor* that the *Green Tree* plurality provided the narrowest grounds for the judgment in that case. Accordingly, in my view we are still bound to follow our precedent in *Pedcor. See Martin v. Medtronic, Inc.,* 254 F.3d 573, 577 (5th Cir.2001) ("[T]he Supreme Court decision must be more than merely illuminating with respect to the **\*648** case before us, because a panel of this court can only overrule a prior panel decision if 'such overruling is unequivocally directed by controlling Supreme Court precedent.' " (quoting *United States v. Zuniga–Salinas,* 945 F.2d 1302, 1306 (5th Cir.1991))). Similarly, the Seventh Circuit recently concluded that *Stolt–Nielsen* did not upset that court's post-*Green Tree* holding in *Employers Ins. Co. of Wausau v. Century Indem. Co.,* 443 F.3d 573 (7th Cir.2006), that the arbitrator should decide whether an arbitration agreement allows for class arbitration. *Blue Cross Blue Shield of Mass., Inc. v. BCS Ins. Co.,* 671 F.3d 635, 639 (7th Cir.2011) (Easterbrook, C.J.) ("*Stolt–Nielsen* did not [address whether an arbitrator should decide the class arbitration question]. This leaves in place our post-[*Green Tree* ] decision in *Wausau.*"). [2]

---

[2] *See also Quilloin v. Tenet HealthSystem Phila., Inc.,* 673 F.3d 221, 232 (3d Cir.2012) ("Silence regarding class arbitration generally indicates a

prohibition against class arbitration, but the actual determination as to whether class action is prohibited is a question of interpretation and procedure for the arbitrator." (citing *Stolt–Nielsen,* 130 S.Ct. at 1775)); *Vilches v. The Travelers Companies, Inc.,* 413 Fed.Appx. 487, 492 (3d Cir.2011) (unpublished) (following *Green Tree* plurality and *Stolt–Nielsen* in holding, "[w]here contractual silence is implicated, 'the arbitrator and not a court should decide whether a contract [was] indeed silent on the issue of class arbitration,' and 'whether a contract with an arbitration clause forbids class arbitration.' " (alteration in original) (quoting *Stolt–Nielsen,* 130 S.Ct. at 1771–72) (internal quotation mark omitted)).

Therefore, I would follow *Pedcor* to uphold the district court's referral of the class arbitration question to the arbitrator.

**2.**

I agree with the majority that under the principles of *Stolt–Nielsen* that are clearly applicable to this case, we must reverse the district court's affirmance of the arbitrator's class arbitration award and remand the case with instructions to refer the parties to bilateral arbitration. However, a careful reading and assessment of *Stolt–Nielsen* reveals that it is distinguishable from the present case in respects that may be significant in future cases.

First, as the majority notes, Majority Op. 11, *Stolt–Nielsen* fully reaffirmed the exceedingly deferential standard that federal courts must apply when reviewing arbitration decisions. Indeed, the Court began its analysis in *Stolt–Nielsen* by restating this deference in no uncertain terms: "Petitioners contend that the decision of the arbitration panel must be vacated, but in order to obtain that relief, they must clear a high hurdle." 130 S.Ct. at 1767. The Court explained this exceptionally narrow standard of judicial review of arbitral decisions: "It is not enough for petitioners to show that the [arbitration] panel committed an error—or even a serious error." *Id.* (citing *E. Associated Coal Corp. v. Mine Workers,* 531 U.S. 57, 62, 121 S.Ct. 462, 148 L.Ed.2d 354 (2000); *United Paperworkers Int'l Union AFL–CIO v. Misco, Inc.,* 484 U.S. 29, 38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987)). Instead, the Court stated, "[i]t is only when [an] arbitrator strays from interpretation and application of the agreement and effectively 'dispense [s] his own brand of industrial

Reed v. Florida Metropolitan University, Inc., 681 F.3d 630 (2012)

280 Ed. Law Rep. 586

justice' that his decision may be unenforceable.' " *Id.* (alterations in original) (quoting *Major League Baseball Players Ass'n v. Garvey,* 532 U.S. 504, 509, 121 S.Ct. 1724, 149 L.Ed.2d 740 (2001) (per curiam), in turn quoting *United Steelworkers of Am. v. Enter. Wheel & Car Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)); *see also United Paperworkers,* 484 U.S. at 38, 108 S.Ct. 364 ("[A]s long as the arbitrator is even arguably construing or applying the contract and **\*649** acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision."); *United Steelworkers,* 363 U.S. at 597, 80 S.Ct. 1358 (an arbitration award must be upheld "so long as it draws its essence" from the agreement). Thus, *Stolt–Nielsen* reaffirmed the Court's longstanding precedent that courts must review arbitration decisions with the utmost deference.

The Court's decision to vacate the arbitrator's class arbitration decision in *Stolt–Nielsen* did not alter this exceptionally deferential standard of review. There, the Court, in deciding that the arbitration panel had exceeded its power, relied upon and repeatedly called attention to the fact that the parties had expressly stipulated that they had reached no agreement on the issue of class arbitration. 130 S.Ct. at 1768 ("[T]he parties agreed their agreement was 'silent' in the sense that they had not reached any agreement on the issue of class arbitration."); *id.* at 1766 ("The parties ... stipulated that the arbitration clause was 'silent' with respect to class arbitration. Counsel for [the Respondent] explained to the arbitration panel that the term 'silent' did not simply mean that the clause made no express reference to class arbitration. Rather, he said, '[a]ll the parties agree that when a contract is silent on an issue there's been no agreement that has been reached on the issue.' "). Thus, "the [arbitration] panel had no occasion to ascertain the parties' intention" regarding class arbitration "because [their stipulation stated that] the parties were in complete agreement regarding their intent." *Id.* at 1770 (internal quotation marks omitted) ("Th[eir] stipulation left no room for an inquiry regarding the parties' intent, and any inquiry into that settled question would have been outside the panel's assigned task."). The Court did not need to undertake a deferential review of the arbitration contract or the arbitration panel's class arbitration decision; but instead, merely "held that [the] arbitration panel exceeded its power under the FAA by imposing class arbitration procedures based on policy judgments rather than the arbitration agreement itself

or some background principle of contract law." *AT&T Mobility LLC v. Concepcion,* —— U.S. ——, 131 S.Ct. 1740, 1750, 179 L.Ed.2d 742 (2011) (citing *Stolt–Nielsen,* 130 S.Ct. at 1773–76). Thus, the Court did not alter the usual, exceedingly deferential standard of judicial review that courts must apply to arbitrators' contract interpretations based on the parties' written agreement itself or on some background principle of contracts law.

Second, *Stolt–Nielsen* does not require that there be an express agreement to class arbitration in order for arbitrators, within their powers, to find that the parties agreed to class arbitration. *See Stolt–Nielsen,* 130 S.Ct. at 1775 ("[A] party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party agreed to do so."); *id.* at 1776 n. 10 ("We have no occasion to decide what contractual basis may support a finding that the parties agreed to authorize class-action arbitration."); *see also id.* at 1783 (Ginsburg, J., dissenting) ("[T]he Court does not insist on express consent to class arbitration."). There simply is no basis for the arbitrator to find such an implicit agreement to class arbitration in the present case; however, there may be such a basis in the parties' agreements in other cases.

Third, *Stolt–Nielsen* did not address a case in which a party is unsophisticated and the arbitration agreement is part of a **\*650** contract of adhesion;[3] and in which "adjudication is costly and individual claims are no more than modest in size, [in which case,] without [class proceedings], potential claimants will have little, if any, incentive to seek vindication of their rights." *See id.* at 1783 (Ginsburg, J., dissenting) (citing *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 617, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)); *see also id.* (" 'The realistic alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30.' " (quoting *Carnegie v. Household Int'l, Inc.,* 376 F.3d 656, 661 (7th Cir.2004))). In other cases, the Court has "recognized [arbitration] as an effective vehicle for vindicating statutory rights, but only 'so long as the prospective litigant may effectively vindicate its statutory cause of action in the arbitral forum.' " *In re Am. Express Merchants' Litig.,* 667 F.3d 204, 214 (2d Cir.2012) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 636–37, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)). That is, the Court has "noted that should clauses in a contract operate 'as a

Reed v. Florida Metropolitan University, Inc., 681 F.3d 630 (2012)
280 Ed. Law Rep. 586

prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy.' " *In re Am. Express Merchants' Litig.,* 667 F.3d at 214 (quoting *Mitsubishi,* 473 U.S. at 637 n. 19, 105 S.Ct. 3346). Such considerations led the Second Circuit recently to conclude that a class arbitration waiver provision was unenforceable, and that *Stolt–Nielsen* does not hold otherwise. *Id.* at 216–19. [4] Although the instant case involves an adhesive consumer contract, the stakes—roughly $51,000 in student loan debt—are high enough that we may not be justified in determining that "potential claimants," such as Reed, "will have little, if any, incentive to seek vindication of their rights." *Stolt–Nielsen,* 130 S.Ct. at 1783 (Ginsburg, J., dissenting). However, in different kinds of future cases, courts may need to consider whether an arbitrator can properly find an implicit agreement to class arbitration procedures because bilateral arbitration would otherwise offer claimants to modest amounts no practicable or realistic remedy.

[3]     In *Stolt–Nielsen* the arbitration agreement was between "sophisticated business entities," where

the form of the agreement was selected by the entity seeking class arbitration, and high-stakes, international antitrust claims were involved. 130 S.Ct. at 1775; *id.* at 1764–65; Joint Appendix at 73a, *Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.,* 130 S.Ct. 1758, 176 L.Ed.2d 605 (2010) (No. 08–1198), 2009 WL 2777896.

[4]     *Cf. Cruz v. Cingular Wireless, LLC,* 648 F.3d 1205, 1215 (11th Cir.2011) (noting "the possibility that in some cases, an arbitration agreement may be invalidated on public policy grounds where it effectively prevents the claimant from vindicating her statutory cause of action" because of a class arbitration waiver (citing *Mitsubishi,* 473 U.S. at 637, 105 S.Ct. 3346)).

Subject to my disagreement with the majority's reasoning in Part II.1, and with the foregoing observations on the Court's decision in *Stolt–Nielsen,* I concur in the remainder of the majority opinion.

**All Citations**

681 F.3d 630, 280 Ed. Law Rep. 586

---

End of Document                     © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 2153430 (AAA)

AMERICAN ARBITRATION ASSOCIATION (AAA)

[CLAIMANT], Claimant

v.

PROCEDURAL ORDER NO. 2
(DETERMINATION OF RESPONDENT'S MOTION TO DISMISS)
[RESPONDENT] (Services, Not Elsewhere Classified), Respondent

AAA Case No. [REDACTED]
June 12, 2012

**Industry: Services, Not Elsewhere Classified**
**Case Type: Employment**
**Award Amount: Equitable**
**Award Date: June 12, 2012**
**Arbitrator: Yaroslav Sochynsky, Arbitrator**

Preliminary Statement:

**\*1** This arbitration is initiated by Claimant [CLAIMANT] ("Claimant") as a collective action alleging a policy and practice by [RESPONDENT] ("[RESPONDENT]") of failing to pay overtime in violation of the Fair Labor Standards Act ("FSLA"), 29 U.S.C. §201 et seq. Claimant originally filed his claim in the U.S. District Court for the Southern District of California (Case No. 11-CV-825-JM (BGS), but in an Order Granting in Part and Denying in Part Defendant's Motion to Compel Arbitration, dated August 3, 2011 ("August 3, 2011 Order"), the District Court stayed the action and ordered the parties to arbitrate their dispute. The District Court, however, denied TNA's request for an order requiring Claimant to pursue his claims on an individual and not a class-wide or collective basis, but stated that "the court declines to take a position on whether [Claimant] should be permitted to proceed on a collective basis". [1]

---

[1]   The District Court in its Order Denying Defendant's *Ex Parte* Application to Stay Arbitration Pending Appeal, dated August 31, 2011, at fn. 1, made clear that it had "expressly reserved the question of whether the action could proceed on a collective basis for the arbitrator."

[RESPONDENT] present motion asks this tribunal to dismiss Claimant's "cause of action brought under the Fair Labor Standards Act ("FSLA") to the extent it seeks to recover damages for alleged overtime on behalf of other [RESPONDENT] employees." The motion is based primarily on the relatively recent U.S. Supreme Court decisions in *Stolt-Nielsen v. AnimalFeeds Int'l Corp.*, S.Ct. 1758, 1775 (2010) and *AT&T Mobility LLC v. Concepcion*, 131 S.Ct. 1740 (2011) and the contention that the parties' arbitration agreement does not authorize collective or class arbitration.

The motion has been fully briefed and argued in a telephone hearing held on February 17, 2012 in which Claimant was represented by Kyle R. Nordrehaug with Blumenthal, Nordrehaug and Bhowmik and by Alexander I. Dychter with Dychter Law Offices, APC, and [RESPONDENT] was represented by Ronald W. Novotny with Atkinson, Andelson, Loya, Ruud & Romo. Various post-hearing submittals by the parties have addressed issues that arose in oral argument and have commented on subsequent court decisions that could have a bearing upon issues presented by [RESPONDENT] motion.

Respondent [RESPONDENT] Motion to Dismiss:

[CLAIMANT], Claimant v. PROCEDURAL ORDER NO...., 2012 WL 2153430...

Contentions of the Parties:

[RESPONDENT] moves to dismiss Claimant's claim under the FLSA to the extent he seeks to recover damages for alleged unpaid overtime on behalf of other [RESPONDENT] employees. The motion is made on the grounds that under the U.S. Supreme Court decisions in *Stolt-Nielsen v. AnimlFeeds, Int'l Corp.*, 130 S.Ct. 1758 (2010) ("*Stolt-Nielsen*") and *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011) ("*Concepcion*") a collective action is foreclosed (and this tribunal is without jurisdiction to entertain such an action) because the parties did not expressly agree to arbitrate a representative action. [RESPONDENT] contends that under *Stolt-Nielsen* claimants who are bound to arbitration agreements governed by the Federal Arbitration Act ("FAA") must pursue their claims individually unless their agreements expressly provide for arbitration on a class-wide or collective basis. Also, that under *Concepcion* "[a]n implicit agreement to authorize class-action arbitration is not a term that the arbitrator may infer solely from the fact of the parties' agreement to arbitrate... [because]...the differences between bilateral and class-action arbitration are too great for arbitrators to presume, consistent with their limited powers under the FAA, that the parties' mere silence on the issue of class-action arbitration constitutes consent to resolve their disputes in class proceedings." 130 S.Ct at 1775-76. [RESPONDENT] also relies on language in *Concepcion* in which the Court, based on FAA pre-emption, upheld an express class action waiver (a feature not present in our case) that had been invalidated by the California Supreme Court and in which Justice Scalia noted certain risks to which defendants would be exposed resulting from non-consensual class arbitrations - such as large unreviewable damage awards, the processing of large numbers of claims by arbitrators who are unfamiliar with the class action process, and group litigation devices which undermine the speed and informality of arbitration. [RESPONDENT] also cites appellate decisions in various Circuits decided before *Stolt-Nielsen* in which FLSA collective actions were precluded where the parties had agreed to arbitrate.

**\*2**  Claimant argues that the parties' arbitration agreement expressly permits collective arbitration under FLSA, noting that it provides broadly that "[t]he arbitrator may grant any remedy or relief that the arbitrator deems just and equitable, including any remedy that would have been available if the matter had been heard in court." Claimant notes that the Supreme Court has never held that a class arbitration agreement must expressly state that the parties consent to class or collective arbitration. Claimant distinguishes *Stolt-Nielsen* because in that case the parties had stipulated that the arbitration agreement was silent as to class arbitration, whereas here Claimant contends otherwise. Claimant also distinguishes *AT&T Mobility* because unlike the holding in that case, there is no express waiver of class arbitration here. Claimant also cites various District Court and Circuit Court of Appeals decisions since *Stolt-Nielsen* in which that case has been distinguished or not followed or in which arbitral awards construing language in broad arbitration agreements as authorizing class arbitration have been upheld in the face of a petition to vacate. Claimant also contends that disallowing a collective action in this case would be contrary to the recent holding of the National Labor Relations Board ("NLRB") in *D. R. Horton*, 2012 NLRB LEXIS 11 (January 3, 2012) that an employer violates Section 8(a)(1) of the National Labor Relations Act by requiring employees to waive their right to collectively pursue employment-related claims in all forums, arbitral and judicial. In addition, Claimant contends that failure to allow this matter to proceed as a collective action would deprive Claimant of a federal statutory right to pursue such actions under Section 216(b) of the FLSA, citing a recent Second Circuit decision in *In re American Express Merchants Litigation*, 667 F.3d 204 (2d.Cir 2012) in which the court held that an arbitration clause that would entirely preclude a merchant's federal antitrust claims was unenforceable under the FAA.

[RESPONDENT], in its reply, makes a jurisdictional argument that the decision as to whether this matter may proceed as a collective action is a substantive or "structural" one (not a procedural one as the District Court has ruled in its Order referring the decision to this tribunal) and therefore is a matter for the District Court and not this arbitral tribunal to decide. [RESPONDENT] also takes issue with the District Court's reference to the Association's Supplementary Rules for Class Arbitration as providing support for the referral of the collective action issue to this tribunal, noting that the Supplementary Rules themselves state in Rule 3 that their existence should not be considered in determining whether an arbitration agreement permits class arbitration. [RESPONDENT] cites several cases in which district courts have ordered individual claims to arbitration over class allegations, including *Hayes v. Servicemaster Global Holdings, Inc.*,

which is cited for the proposition that "when the parties agree that an arbitration clause is enforceable regardless of whether it permits or precludes class certification, the question is for the arbitrator to decide, but that when a plaintiff argues that the arbitration clause is unenforceable, as Claimant did at length in this case [before the District Court], the question is to be decided by the court." In the same vein, [RESPONDENT] cites *Skirchak v. Dynamics Research Corp.*, 508 F.3d 49, 55-56 (1 $^{st}$ Cir. 2007) to the effect that once the parties have decided that the court should decide the issues of whether an arbitration agreement is invalid or unconscionable, the question of whether an arbitration agreement is invalid or unconscionable, the question of whether the arbitration agreement may be enforced under the FAA is then for the court. Respondent also disputes whether the NLRB's decision in *D. R. Horton* is legally binding on anyone as it has not been enforced by any federal court, noting also that several courts that have addressed the issue both before and after the NLRB's ruling have held otherwise. Finally, [RESPONDENT] disputes Claimant's argument based on *In re American Express Merchants Litigation, supra*, on the grounds that several federal court decisions have held that the procedural device of a collective action under the FLSA is not a statutory "right" to which FAA policy favoring arbitration is subordinate.

**\*3** Each side has cited in support of its position published arbitrator clause construction awards determining whether the arbitration agreement authorizes class arbitration. Because arbitrator awards are not binding legal precedent, those awards have not been a factor in the present ruling.

The District Court's Order:

The District Court, in its August 3, 2011 Order, denied [RESPONDENT] motion for a declaration prohibiting Claimant from proceeding with his claim on a collective basis at arbitration on the grounds that *Stolt-Nielsen* and *AT&T Mobility* were distinguishable. It held that *Stolt-Nielsen* "did not appear applicable under the circumstances currently before this court" because the parties' Agreement was a contract of adhesion, citing Justice Ginzburg's dissent in that case. The District Court also distinguished *AT&T Mobility* because the FLSA permits class members to participate in a suit on an opt-in basis only. [RESPONDENT] filed an appeal and motion to stay this arbitration, which appeal was dismissed and motion to stay was denied by the Ninth Circuit on December 7, 2011. As previously indicated, the District Court has referred the issue of whether Claimant may pursue his FLSA claims on a collective basis to this tribunal.

Discussion and Determination of the Motion:

1. Respondent's Objection to the Jurisdiction of this Tribunal To Determine Whether This Matter Can Proceed as a Collective Action:

Respondent has objected to this arbitral tribunal deciding whether this arbitration may proceed on a collective basis, taking issue with the District Court's ruling that this an issue appropriately referred to the arbitrator for determination. Although Respondent may be correct that the American Arbitration Association's Supplementary Rules for Class Arbitration cited by the District Court in its August 3, 2011 Order are inapposite by their own terms (nor could they by their express terms apply to collective FLSA claims which are 'opt-in" only [2]), the District Court's referral to this tribunal of the decision whether this matter may proceed as a collective action is legally correct given the parties' agreement and applicable law.

---

[2]    The Supplementary Rules by their express terms and procedures they require appear to apply solely to opt-out class arbitrations (see, e.g. Rule 5(c) which provides that the Class Determination Award shall state when and how members of the class may be excluded from the class arbitration); also, Rule 7 provides that the final award shall specify those "who have elected to opt out of the class." [Emphasis added]. Moreover, the American Arbitration Association does not administer FLSA collective actions pursuant to the Supplementary Rules.

**\*4** The Association's Employment Arbitration Rules which are expressly provided for in the parties' arbitration agreement clearly state in R-6 (a) that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." By incorporating those rules into their arbitration agreement, the parties clearly and unmistakably agreed that this tribunal would have the power to determine the procedural question of whether class or collective claims were arbitrable. *See, Yahoo!, Inc. v. Iversen, 2011 WL 4802840 (N.D. Cal.) at \*4* ("Incorporation of the AAA rules by reference constitutes 'clear and unmistakable evidence' that the parties intended to submit the question of arbitrability to the arbitrator..."); *see, also, Contec Corp. v. Remote Solution, Co.,* 398 F.3d 205, 208 (2d Cir. 2005) (Incorporation of AAA Rule 7 authorizes the arbitrator to determine whether a non-signatory can enforce the arbitration provision).

In *Vasquez v. Servicemaster Global Holding Inc.,* 2011 WL 2565574 (N.D. Cal.) Judge Illston concluded that "[a]lthough some courts interpreted the *Bazzle* [*Green Tree Financial Corp. v. Bazzle,* 539 U.S. 444 (2003)] concurrence as requiring the submission of the question of class-wide arbitrability to the arbitrator, the Supreme Court has recently clarified that the question remains open. *See Stolt-Nielsen S. A. v. AnimalFeeds International Corp.,* [citations omitted] (explaining that '*Bazzle* did not yield a majority decision' on the question, and declining to answer it)." She therefore turned to "more general law regarding what questions are for the Court and what questions are for the arbitrator" as follows:
The Ninth Circuit has recently clarified that "when a plaintiff's legal challenge is that a contract as a whole is unenforceable, the arbitrator decides the validity of the contract, including derivatively the validity of its constituent provisions (such as the arbitration clause)," but "when a plaintiff argues that an arbitration clause, standing alone, is unenforceable - for reasons independent of any reasons the remainder of the contract may be invalid - that is a question to be decided by the court." *Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.,* 622 F.3d 996, 1000 (9th Cir. 2010). The question of waiver, for example, which is a question of enforceability, has long been seen in the Ninth Circuit as a question for courts. [citations omitted] If, then, the question of class arbitration needed to be answered in order for the Court to determine whether a party waived its right to arbitrate, it would be a question for the Court. Here, however, the arbitration clause is enforceable regardless of whether it permits or precludes class certification. The question is therefore for the arbitrator to decide.

**\*5** This tribunal therefore agrees with the District Court's determination that the issue of whether the parties' agreement in this case authorizes collective arbitration is a matter for the arbitrator to decide.

==3. Does the Parties' Agreement Authorize Collective Action of Claimant's FLSA Claims?==

==Given this tribunal's charge to determine whether this arbitration can proceed on a collective basis, the next step is to examine by good faith application of contract interpretation principles whether the parties' arbitration agreement either expressly or impliedly so provides.== [3]

---

[3]   Respondent contends that *Stolt-Nielsen* and *Concepcion* require a finding that the parties <u>expressly</u> provided for class or collective arbitration. However, that is not the prevailing view. *Jock v. Sterling Jewelers, Inc.,* 646 F.3d 113, 124 (2d.Cir2011) ("*Stolt-Nielsen* ... did not create a bright-line rule requiring that arbitration agreements can only construed to permit class arbitration where they contain express provisions permitting class arbitration."); *Vasquez, supra,* at 10: ("The Supreme Court has never held that a class arbitration clause must explicitly mention that the parties agree to class arbitration in order for a decisionmaker to conclude that the parties consented to class arbitration."); *Yahoo! Inc. v Iversen, 2011 U.S. Dist. LEXIS 117149 (N.D.Cal 2011):* ("Nor does the Supreme Court's recent decision in *AT&T Mobility LLC v. Concepcion,* 131 S.Ct. 1740, 179 L.Ed. 742 (2011), support Yahoo's position that an express authorization of class arbitration is required in order to find that the parties consented to such a procedure."); *Mork v. Loram Maintenance of Way. Inc.,* 2012 WL 38628 (D. Minn.) ("In *Stolt-Nielsen,* the Supreme Court's statement that an intention to authorize class arbitration cannot be 'infer[red] *solely* from the fact of the parties' agreement to arbitrate,' [citation omitted], indicates that such an intention may be inferred and need not be explicitly stated.") Also, the parties in *Stolt-Nielsen* had stipulated that the arbitration provision was "silent"

with respect to class arbitration, i.e. that the parties had not reached any agreement, one way or the other, regarding class arbitration; therefore, the Court in *Stolt-Nielsen* did not address the issue of what kind of agreement is necessary to authorize class arbitration, leaving open the possibility that such an agreement may be implied. This tribunal, therefore, does not read *Stolt-Nielsen* as adopting a *per se* rule that requires express reference to class arbitration, or, as precluding an arbitrator or court from inferring an implied agreement to authorize class arbitration from the terms of the parties' agreement.

**\*6** The parties' arbitration agreement ("Agreement to Binding Arbitration") is contained in a document titled "The 'Resolve' Program" (Respondent [RESPONDENT] mandatory conflict resolution program) and provides, in pertinent part, as follows:

Any controversy, claim or dispute between a partner and [RESPONDENT] (hereinafter "[RESPONDENT]") based upon or arising out of at-will employment, contract, tort, fraud, statute, misrepresentation, and claims of harassment or discrimination, including but not limited to race, color, sex, religion, national origin, disability, sexual orientation, marital status or age will be resolved by Binding Arbitration administered by the American Arbitration Association (hereinafter known as "AAA"), under its National Rules for the Resolution of Employment Disputes, including its Optional Rules for emergency measures of protection..... The arbitrator may grant any remedy or relief that the arbitrator deems just and equitable, including any remedy that would have been available if the matter had been heard in court. The arbitrator's decision may be enforced in court.

The only legal claims between the partner and [RESPONDENT] which are not included within the Agreement for Arbitration are claims for worker's compensation, unemployment compensation benefits and/or claims for benefits under [RESPONDENT] benefit plan if the plan is with an independent provider which does not provide for arbitration of such disputes.

\* \* \*

Before any claim may be brought to arbitration, the partner must participate in mediation of the dispute, in accordance with the "Mediation" process stipulated in [RESPONDENT] RESOLVE program.

Claimant's principal argument based on contract interpretation is that by providing that the arbitrator may grant "any remedy or relief that the arbitrator deems just and equitable, including any remedy that would have been available if the matter had been heard in court", the parties impliedly agreed to the same collective action procedure that would be available under FLSA §216(b) as if the matter were litigated in court. Upon examination, however, a difficulty with this argument is that the terms "remedy" and "relief" as commonly used and understood are not easily susceptible to an interpretation that encompasses collective or class action. Looking to the plain and ordinary meaning of the term, "remedy" in a legal context is defined in Webster's New Collegiate Dictionary as "the legal means to recover a right or to prevent or obtain redress for a wrong." [4] Black's Law Dictionary (2d Ed.) defines "remedy" as "the means by which the violation of a right is prevented, redressed, or compensated." "Relief" in the legal context is defined in Webster's as "legal remedy or redress", and in Black's Law Dictionary as "deliverance from oppression, wrong, or injustice. In this sense it is used as a general designation of the assistance, redress, or benefit which a complainant seeks at the hands of a court, particularly in equity. It may thus be used of such remedies as specific performance, or the reformation or rescission of a contract, but it does not seem appropriate to the awarding of money damages." The foregoing definitions uniformly connote redress of injury to a specific legal right, as distinguished from procedures or processes for the redress of injury to such rights.

> [4]    "Redress" in this context is defined in Webster's as "compensation for wrong or loss". Black's Law Dictionary defines "redress" as "receiving satisfaction for an injury sustained."

**\*7** Indeed, courts have drawn just such a distinction between remedies provided by the FLSA, such as back wages, liquidated damages to redress certain rights that may not be waived or abridged by contract, on the one hand, and

[CLAIMANT], Claimant v. PROCEDURAL ORDER NO...., 2012 WL 2153430...

dispute resolution mechanisms or procedures, such as collective action, on the other hand, that merely are a means for determining the legal entitlement to such remedies. In *Aracri v. Dillard's, Inc., 2011 U.S. Dist. LEXIS 41596 (S.D. Ohio 2011)*, the court cited the decision in *Winn, 2011 U.S. Dist. Lexis 8085* with approval, as follows:

The [*Winn*]court noted that the Supreme Court [in *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 32 (1991)] has rejected the contention that a class waiver in an arbitration agreement is unenforceable merely because the relevant statute allows for class or collective actions. [citation omitted] The court concluded that even in the absence of a collective action, the arbitration provision was enforceable.

The Supreme Court has held that FLSA rights, such as the right to basic statutory minimum wages, and the right to liquidated damages, "may not be abridged by contract or otherwise waived." [citations omitted] However, the "mere fact that class actions are mentioned within §216(b) does not create a 'right' for a plaintiff to bring a class action." *Brown v. Sears Holding Mgmt. Corp.*, No. 09 C 2203, 2009 U.S. Dist. LEXIS 72502, 2009 WL 2514173, at *3 (N.D. Ill. Aug. 17, 2009 (concluding that "it is the underlying availability of remedies provided in the FLSA, such as back wages, liquidated damages, etc., that constitute rights that cannot be abridged by private agreement, rather than the dispute resolution mechanisms that can be employed to determine legal entitlement to those remedies"). The Court finds that none of Plaintiff's potential FLSA remedies are jeopardized if she is deemed to have released her ability to proceed in a class action.

Even assuming one could reasonably and in good faith interpret the "any remedy or relief" language as Claimant contends, other language in the parties' arbitration agreement points to a conclusion that the parties neither expressly nor impliedly agreed to collective arbitration. The arbitration agreement requires each partner to participate in a mediation before proceeding with arbitration. Given the opt-in procedure required in collective FLSA actions under §216(b), [5] arranging for such a mediation to take place before proceeding with collective arbitration is impossible because it cannot be known in advance of the arbitration which of the potential class of [RESPONDENT] "partners" would "opt in" to participate in the collective arbitration (not to mention the logistical challenge of assembling a mediation with potentially hundreds of potential [RESPONDENT] partners participating). This fundamental disconnect regarding satisfaction of the mediation condition precedent to a presumed opt-in collective arbitration supports the conclusion that collective arbitration was not contemplated by the parties.

[5]     Section 216(b) states as follows: "An action to recover the liability prescribed in either of the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought."

**\*8** That courts in cases such as *Jock v. Sterling Jewelers, Inc.*, 646 F.3d 113 (2d.Cir 2011), *Smith and Wollensky Restaurant Group, Inc. v. Passow, et al., 2011 U.S. Dist. LEXIS 4495*, and *Sutter v. Oxford Health Plans, 2012 U.S. App. Lexis 6618 (3d. Cir April 3, 2012)* have applied the narrow standard for vacatur in upholding arbitral awards construing broad arbitration provisions (provisions that are different from the present case) to allow class arbitration is not a legitimate basis for this tribunal to depart from sound, good faith contract interpretation principles in order to achieve a different or arguably more desirable result. As much as one may appreciate the policy considerations underlying Congress's grant of collective action under the FLSA, or the inherent inefficiency of proceeding with multiple arbitrations to prosecute multiple small claims (the size of which in this case may not be a sufficient incentive to pursue them individually), the clear message of *Stolt-Nielsen* is that arbitrators who rely on policy considerations rather than on contract interpretation principles in determining whether collective action was agreed to by the parties, exceed their authority and risk vacatur.

Claimant has therefore failed to show based on the language of the arbitration agreement that the parties had agreed, either expressly or impliedly, to arbitration on a collective basis as provided in FLSA § 216(b).

Claimant's argument that to construe the parties' agreement as not authorizing collective arbitration deprives Claimant of a federal statutory right does not lead to a different conclusion. The weight of judicial authority supports [RESPONDENT] position that requiring Claimant (and members of the putative class) to each pursue their claims individually through arbitration does not deprive them of a statutory right. See, *Horenstein v. Mortgage Market, Inc.*, 9 Fed. Appx. 618, 619 (9th Cir. 2001); *Aracri* and *Winn*, *supra*. See, also, *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 503 (4th Cir. 2002) ("Adkins points to no suggestion in the text, legislative history, or purpose of the FLSA that Congress intended to confer a nonwaivable right to a class action under that statute. His inability to bring a class action, therefore, cannot by itself suffice to defeat the strong congressional preference for an arbitral forum."); *Carter v. Countrywide Credit Industries, Inc.*, 362 F.3d 294 (5th Cir., 2004) ("...we reject the Carter Appellants' claim that their inability to proceed collectively deprives them of substantive rights available under the FLSA. The Supreme Court rejected similar arguments concerning the ADEA in *Gilmer*, despite the fact that the ADEA, like the FLSA, explicitly provides for class action suits. [citations omitted]. What is more, the provision for class actions in the ADEA *is* the FLSA class action provision, which the ADEA expressly adopts. 29 U.S.C. § 626(b). Accordingly, *Gilmer*'s conclusion in this respect applies with equal force to FLSA claims.")

**\*9** Nor is this tribunal persuaded that the NLRB's decision in *D. R. Horton* that depriving an employee of the right of collective action in arbitration via written waiver is an unfair labor practice requires a different result. As noted by [RESPONDENT], the NLRB is the only agency empowered under the National Labor Relations Act to prevent and remedy unfair labor practices; this tribunal does not have the authority to determine whether [RESPONDENT] has engaged in an unfair labor practice by requiring its employees to participate in [RESPONDENT] "Resolve" program, which by its terms requires arbitration but, as fairly and objectively construed, does not provide for arbitration of collective claims. While long-standing administrative rulings are entitled to judicial deference, the NLRB's decision in *D. R. Horton* is brand new and untested. Courts that have considered the same issue have ruled otherwise. In one case decided after *D. R. Horton* the court declined to apply it and ordered the parties to individual arbitration of FLSA claims. *Lavoice v. UBS Financial Services, 2012 WL 124590 (S.D.N.Y.)*. Two other court decisions that preceded *D. R. Horton* held that a class action waiver in an arbitration agreement did not violate the rights of employees to engage in concerted activity under the NLRA: *Slawienski v. Nephron Pharm. Corp., 2010 WL 5186622 at \*2 (N.D.Ga.)* ("There is no legal authority to support plaintiff's position" that a class action waiver violates the NLRA by prohibiting employees from engaging in "concerted action to advocate about the terms and conditions of their employment".); *Grabowskiv. C.H. Robinson Co., 2011 WL 4353998 (S.D. Cal.)* (citing *Slawienski*, *supra*: "The Court finds that the NLRA does not operate to invalidate or otherwise render unenforceable the arbitration provisions of the [agreements] signed by Plaintiff."). In a very recent decision, *Iskanian v. CLS Transportation Los Angeles, LLC*, 12 C.D.O.S. 6138 (June 4, 2012), the California Court of Appeals, in affirming an order compelling arbitration and dismissing class claims, declined to follow *D. R. Horton* in an FLSA case in which the arbitration agreement contained a class action waiver:
We decline to follow *D. R. Horton*. In reiterating the general rule that arbitration agreements must be enforced according to their terms, *Concepcion* (which is binding authority) made no exceptions for employment-related disputes. Furthermore, the NLRB's attempt to read into the NLRA's prohibition of class waivers is contrary to another United State Supreme Court decision. In *CompuCredit Corp. v. Greenwood* (2012) __ U.S. __, __ [132 S.Ct. 665, 668] (*CompuCredit*), plaintiff consumers filed suit against a credit corporation and a bank, contending that they had violated the Credit Repair Organizations Act (CROA) (15 U.S.C. §1679, *et seq.*). Fn:5. The plaintiffs brought the matter as a class action, despite having previously agreed to resolve all disputes by binding arbitration. The Supreme Court rejected their efforts to avoid arbitration, finding that unless the FAA's mandate has been 'overridden by a contrary congressional command,'" agreements to arbitrate must be enforced according to their terms, even when federal statutory claims are at issue (*CompuCredit*, at p. 669, citing *Shearson/American Express v. McMahon* (1987) 482 U.S. 220, 226). The Supreme

Court held: "Because the CROA is silent on whether claims under the Act can proceed in an arbitrable forum, the FAA requires the arbitration agreement to be enforced according to its terms." (*CompuCredit*, at p. 673.)

**\*10**  Nor does it seem to matter under current Supreme Court legal precedent that the parties' arbitration agreement is either a contract of adhesion, or, may involve circumstances where the monetary amount of damages sought by individual claims is so small that there is no economic incentive or practical ability to pursue individual claims. Both aspects were present in the consumer claims addressed by the Court in *Concepcion*, and yet the FAA was held to trump California's *Discover Bank* rule which had held unconscionable waivers of class arbitration in consumer contracts of adhesion where claims involved individually small sums of money. The Ninth Circuit, in *Coneff v. AT&T*, No. 2:06-cv-00944, 3151 (9th Cir. Mar. 16, 2012), has interpreted and applied *Concepcion* to the same effect:

We do not read *Concepcion* to be inconsistent with *Green Tree* and similar cases. [2]  Although Plaintiffs argue that the claims at issue in this case cannot be vindicated effectively because they are worth much less than the cost of litigating them, the *Concepcion* majority rejected that premise. Significantly, the arbitration agreement here has a number of fee-shifting and otherwise pro-consumer provisions, identical to those in *Concepcion*. As the Eleventh Circuit said in another case involving a nearly identical arbitration provision, "the *Concepcion* Court examined this very arbitration agreement" and concluded "'that aggrieved customers who filed claims would be essentially guaranteed to be made whole.'" *Cruz v. Cingular Wireless, LLC*, 648 F.3d 1205, 1215 (11th Cir. 2011) (emphasis omitted) (quoting *Concepcion*, 131 S. Ct. at 1753).

The dissent in *Concepcion* focused on a related but different concern-- even if the arbitration agreements guaranteed (via fee-shifting provisions) that complaining customers would be made whole with respect to damages and counsel fees, most customers would not bother filing claims because the amounts are too small to be worth the trouble. *See* 131 S. Ct. at 1761 (Breyer, J., dissenting) (observing that small-value claims will not be made, for example, when they involve "waiting at great length while a call is placed on hold"). That is, the concern is not so much that customers have no effective *means* to vindicate their rights, but rather that customers have insufficient *incentive* to do so. [3]  That concern is, of course, a primary policy rationale for class actions, as discussed by the district court in terms of deterrence. *Coneff v. AT&T Corp.*, 620 F. Supp. 2d 1248, 1259 (W.D. Wash. 2009). But as the Supreme Court stated in *Concepcion*, such unrelated policy concerns, however worthwhile, cannot undermine the FAA. 131 S. Ct. at 1753.

**\*11**  In the same vein, the Ninth Circuit in *Kilgore v. KeyBank, N.A.*, 673 F.3d 947, 2012 WL 718344 (2012) noted that the Court in *Concepcion*:

...rejected the plaintiffs' argument that the savings clause [in the FAA] applied to the *Discover Bank* rule because of the rule's "origins in California's unconscionability doctrine and California's policy against exculpation." [citation omitted] Neither was the Court persuaded by the dissent's policy argument that requiring the availability of class proceedings allows for vindication of small-dollar claims that otherwise might not be prosecuted, concluding that "States cannot require a procedure that is inconsistent with the FAA, even if it is desirable for unrelated reasons." [citation omitted] Even though California might have had a legitimate basis for its public policy against class action waivers, that policy could not save the *Discover Bank* rule from FAA preemption.

Nor is the fact that a collective action under FLSA §216(b) would proceed on an opt-in basis reason enough to distinguish the holding in *Concepcion* or to mute its impact here. The perils of holding class members who did not opt out of a class arbitration bound by an arbitral award or settlement is but one of several aspects of class arbitration that the majority opinion in *Concepcion* found to be of concern.

[CLAIMANT], Claimant v. PROCEDURAL ORDER NO...., 2012 WL 2153430...

For all of the foregoing reasons, [RESPONDENT] motion to dismiss Claimant's claims to the extent they purport to be prosecuted on behalf of others is granted. Claimant shall proceed with his claims in this arbitration solely on an individual basis.

Dated: June 12, 2012

Yaroslav Sochynsky, Arbitrator

(c) American Arbitration Association. All Rights Reserved.

2012 WL 2153430 (AAA)

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

BERNAL et al, v. BURNETT et al., 2010 WL 4025108 (2010)

2010 WL 4025108 (D.Colo.) (Arbitration Award)
United States District Court, D. Colorado.

BERNAL et al,

v.

BURNETT et al.

Nos. 10CV01917, 115160099509.
August 24, 2010.

Editor's Note: This document was acquired from a Court file.

**Case Type: Other**
**Award Amount: $0**
**Attorney for Petitioner:** Alan C. Friedberg; Timothy M. Kratz
**Award Date: 07/16/2010**
**Arbitrator: William H. Baker**

**Partial Final Clause Construction Award**

Arbitrator: William H. Baker

American Arbitration Association

Class and Commercial Arbitration Tribunal

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties and dated September 6, 2007, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, do hereby, AWARD, as follows.

Pursuant to Rule 3 of the Supplementary Rules for Class Arbitrations promulgated by the American Arbitration Association ("AAA"), this matter is before the Arbitrator for the issuance of a Partial Final Award, determining, as a threshold matter, whether the arbitration clause in this case permits the arbitration to proceed on behalf of a class. For reasons which will appear below, the Arbitrator finds that the arbitration clause does not permit the arbitration to proceed on behalf of a class and that the clause is not unconscionable.

**BACKGROUND FACTS**

This arbitration was commenced by a Demand for Class Action Arbitration filed in May of 2009. The named Claimants [1] purport to represent a class of students who have attended Westwood College, Westwood College Online and Redstone College (hereinafter collectively "Westwood" or "the School"). These colleges are operated directly or indirectly by the other named Respondents.

[1]     One of the previously-named Claimants, Courtland Walker, has been dismissed from the case at his own request.

### The Demand for Arbitration and Answering Statement

In their Demand for Class Action Arbitration, Claimants allege that Respondents have violated the Colorado Consumer Protection Act Section 6-1-101 et seq. by, (1) representing that the national accreditation granted to Westwood is equal to or greater than regional accreditation and by misrepresenting or omitting the true value of credits obtained at a nationally-accredited institution, as judged by the transferability of the credits to a regionally-accredited institution; (2) providing misleading, confusing and inconsistent calculations regarding the costs and fees associated with enrollment and by omitting any information or providing false or misleading information about the existence of an internal loan program, and the terms and conditions of a so-called Apex loan offered by Westwood; (3) providing misleading information with respect to a pending candidacy for regional accreditation, routinely omitting or misrepresenting the value of a national accreditation, providing misleading, confusing and inconsistent figures regarding the cost and fees associated with enrollment and providing false or misleading information about job placement opportunities and statistics with the intention to induce the potential student to enroll in a course of study at Westwood; (4) making statements concerning accreditation, costs and fees, and job placement opportunities and statistics, which they knew to be materially false, substantially inaccurate or materially misleading, in violation of Colorado Department of Education policies; (5) materially misleading or deceiving prospective students and the public regarding current practices of the school via the school websites and through information provided by Admissions Representatives in violation of Colorado Department of Education policies; and (6) designating as "Admissions Representatives" individuals whose primary job duties are to recruit students in a manner that may mislead prospective students or the public regarding the authority or qualifications of such employees in violation of Colorado Department of Education policies. *Demand for Arbitration, ¶¶ 104-109.*

Pursuant to the remedies provided under Colorado Revised Statutes, Section 6-1-113, Claimants request the greater of statutory damages, actual damages as deemed appropriate by the arbitrator, or three times the actual damages if the arbitrator finds that Respondents acted with bad faith.

In addition to alleging violations of the Colorado Consumer Protection Act, Claimants also allege that Respondents have violated the Colorado Uniform Consumer Credit Code, C.R.S. §5-1-101, *et seq.* by engaging in the business of making supervised loans without being a supervised financial organization or obtaining a license from the state administrator authorizing Respondents to make supervised loans. *Demand ¶ 115.*

As a remedy, Claimants request, pursuant to C.R.S. Section 5-5-201(1), release from any and all obligations to pay finance charges and that Respondents pay a penalty in an amount not exceeding three times the amount of the finance charge, or 54 % of the amount financed. Pursuant to C.R.S. Section 5-5-201(3), Claimants further allege that Respondents have acted in deliberate violation or reckless disregard of the applicable code and demand that respondents pay a penalty not exceeding 10 times the amount of the excess charge, or 60% of the amount financed. Pursuant to Section 5-5-201(7), Claimants also request an award of attorneys' fees, expenses and costs. *Demand ¶¶ 116-118.*

In The School's Answering Statement, filed July 6, 2009, Respondents deny all of the allegations in the demand and reserve the right to present numerous legal and equitable defenses including, *inter alia,* statutory defenses and exemptions available under the Colorado Uniform Consumer Credit Code.

### Governing Law

Although there is no choice of law clause in the enrollment contracts between the students and Westwood, the parties do not dispute that Colorado law applies to certain aspects of this proceeding. They also agree that the situs of the arbitration is in Denver, Colorado. They further agree that the contracts in question affect interstate commerce and therefore the Federal Arbitration Act, 9 U.S.C. §1, *et seq.,* is applicable.

### The Arbitration Agreements

At the time each Claimant enrolled in Westwood, he or she signed, among other things, an Enrollment Agreement and an Agreement to Binding Arbitration and Waiver of Jury Trial. Respondents cite the Enrollment Agreement of Claimant Rosales as typical of the Enrollment Agreements signed by each Claimant. This Enrollment Agreement provides in relevant part as follows:
I, the applicant

Acknowledge that any disputes relative to this contract or the education and training received by me, no matter how described, pleaded or styled, shall be resolved through binding arbitration under the Federal Arbitration Act conducted by the American Arbitration Association ("AAA") at Anaheim, California, under the Commercial Rules. The award rendered by the arbitrator may be entered in any court having jurisdiction. Refer to "Agreement to Binding Arbitration and Waiver of Jury Trial" form in the application materials.

The separate Agreement to Binding Arbitration and Waiver of Jury Trial which each Claimant also executed contains language substantially similar to the following:

### Agreement to Binding Arbitration and Waiver of Jury Trial

I, ___, ("student") agree that any dispute arising from my enrollment at Westwood College, no matter how described, pleaded or styled, shall be resolved by binding arbitration under the Federal Arbitration Act conducted by the American Arbitration Association ("AAA") under its Commercial Rules. The award rendered by the arbitrator may be entered in any court having jurisdiction.

*Terms of Arbitration*
1. Both Student and the College irrevocably agree that any dispute between them shall be submitted to Arbitration.

2. Neither the Student nor the College shall file or maintain any lawsuit in any court against the other, and agree that any suit filed in violation of this Agreement shall be dismissed by the court in favor of an arbitration conducted pursuant to this Agreement.

3. The costs of the arbitration filing fee, arbitrator's compensation and facilities fees will be paid by the College, to the extent these fees are greater than a Superior Court filing fee.

4. The arbitrator's decision shall be set forth in writing and shall set forth the essential findings and conclusions upon which the decision is based.

5. Any remedy available from a court under the law shall be available in the arbitration.

6. Nothing in this Agreement prohibits the Student from filing a complaint with the Bureau for Private Postsecondary and Vocational Education.

*Procedure for Filing An Arbitration*
1. Students are strongly encouraged, but not required, to utilize the Grievance Procedure described in the Catalog, prior to filing an arbitration.

BERNAL et al, v. BURNETT et al., 2010 WL 4025108 (2010)

2. A student desiring to file an arbitration should first contact the School Director, who will provide the student with a copy of the AAA Commercial Rules. A Student desiring to file an arbitration should then contact the American Arbitration Association at Anaheim, California, which will provide the appropriate forms and detailed instructions. The Student should bring this form to AAA.

3. A student may, but need not, be represented by an attorney at the Arbitration.

*Acknowledgment of Waiver of Jury Trial and Availability of AAA Rules*

By my signature below, I acknowledge that I understand that both the College and I are irrevocably waiving rights to a trial by jury, and are selecting instead to submit any and all claims to the decision of an arbitrator instead of a court. I understand that the award of the arbitrator will be binding, and not merely advisory.

I also acknowledge that I may at any time, before or after my admission, obtain a copy of the Rules of the American Arbitration Association, at no cost, from the School Director.

Each Claimant also received a catalog upon enrollment. Each catalog contained a student grievance procedure substantially similar to the following, which culminates in arbitration, as noted in the chart which follows the explanation of the grievance procedure:

**STUDENT COMPLAINT/GRIEVANCE PROCEDURE**

Westwood College recognizes that, on occasion, a student may have a concern or issue that necessitates a prompt and fair resolution. To address this issue, the student is to follow the prescribed series of steps in an effort to obtain a mutual and satisfactory resolution of the student's concern or issue.

If a student has an academic issue or concern (e.g. make up work, instruction), the first person to talk to is the Instructor. If talking with the Instructor does not result in a satisfactory resolution, the next steps are to talk with the Program Director, and the Director of Education. These staff members can resolve a vast majority of concerns or issues.

If a student has a nonacademic issue or concern, with the exception of the Student Harassment Policy, referenced above, (e.g. parking, ID cards), the first person with whom the student should talk is the manager of the department where the concern is focused. Talking to the Director of Student Services is the next step in the process. The Director will attempt to coordinate a mutual and satisfactory resolution with the individuals or departments involved.

If a student still can not find a satisfactory resolution, he/she can take the next step and initiate a grievance process by presenting a written and signed grievance to the Executive Director. In the event a mutual and satisfactory resolution has not been achieved at this level, the student may take his/her written and signed grievance to subsequent levels within the Westwood College organization. The steps in resolving a grievance are summarized in Table 1 [below].

If a student does not feel that the College has adequately addressed a complaint or concern, the student may consider contacting the accrediting agency. All complaints considered by the agency must be in written form, with permission from the complainant(s) for the agency to forward a copy of the complaint to the College for a response. The agency will keep the complainant(s) informed as to the status of the complaint as well as the final resolution. A copy of the agency's Complaint Form is available at the College and may be obtained by contacting the Director of Education or the Director of Student Services.

BERNAL et al, v. BURNETT et al., 2010 WL 4025108 (2010)

TABLE

**The Parties' Clause Construction Arguments Prior to the Stolt-Nielsen Opinion**

Claimants filed a Motion for Clause Construction Award on November 11, 2009. ("Motion"). Respondents filed an Opposition and a Motion to Stay Proceedings Pending The United States Supreme Court's Decision in *Stolt-Nielsen S.A. v. Animalfeeds International Corp.* ("Opposition"). Claimants then filed a Reply to Respondents' Opposition and an Opposition to the Motion to Stay on December 9, 2009. ("Reply") Thereafter, there was further briefing by both parties on the desirability of staying the current proceedings pending the Supreme Court's issuance of its opinion in the *Stolt-Nielsen*. On January 12, 2010, the Arbitrator issued an order staying the issuance of his Clause Construction Award until a ruling by the United States Supreme Court in the *Stolt-Nielsen* case.

Although the *Stolt-Nielsen* case has clarified what principles an arbitrator must apply in determining whether an arbitration agreement should be construed so as to permit class arbitration, it is worth summarizing some of the parties' pre-*Stolt-Nielsen* arguments, either because they still have a bearing on the analysis which the arbitrator must undertake, or, in some instances, illustrate a pre-*Stolt-Nielsen* viewpoint which is now contrary to the test that *Stolt-Nielsen* has laid down.

**Claimants' Motion**

Claimants note that in Colorado, "arbitration is a favorite means of dispute resolution," such that "any doubts about the scope of an arbitration clause should be resolved in favor of arbitration." Motion at 4. (emphasis added) Claimants state that any analysis of an arbitration agreement is a matter of contract interpretation that must be evaluated based on "state law principles governing contract formation," and further notes unremarkably that the "arbitrator must construe the terms of the agreement in a manner that allows each party to receive the benefit of the bargain, and the scope of the agreement must faithfully reflected the reasonable expectations of the parties. In other words, we must interpret the agreement in a manner that best effectuates the intent of the parties." Motion at 4 (citations omitted).

Elsewhere, however, Claimants argue that the existence of an arbitration agreement and the absence of a class ban is sufficient to establish the intent of the parties: "The parties are in agreement as to the existence of a valid and binding arbitration agreement. **The disagreement lies in whether there is a class ban in the agreement.** Motion at 4.

Moreover, Claimants concede that the arbitration agreement is silent with respect to class arbitration: "**The agreement in question is silent in specific regard to class arbitration. Accordingly, the plain language of the agreement is indicative that there was no intention to waive the right to pursue class arbitration.**" Motion at 5. (bolding added).

As will appear more fully below, the Arbitrator is of the opinion that the above are incorrect tests to apply in light of subsequent decision of the Supreme Court in *Stolt-Nielsen*. *Stolt-Nielsen* teaches that one cannot infer intent to resolve a dispute in class arbitration from "mere silence." Rather the test is "whether the parties agreed to authorize class arbitration." *Stolt-Nielsen, S.A. v. AnimalFeeds, International Corp.,* 130 S. Ct. 1758, 1776 (2010) (emphasis in the original). Stolt-Nielsen also points out that the correct inquiry is not whether there was no class ban, *Id.* at 1775, but, again, whether there was an agreement to authorize class arbitration. *Id.* at 1776.

Although proceeding from the mistaken presumption that silence is enough if the language demonstrates no intention to waive the right to pursue class arbitration, Claimants note correctly that the arbitration agreement provides that any dispute must be resolved through arbitration "no matter how described, pleaded or styled," and that it also states that "any remedy available from a court under law shall be available in the arbitration." Motion at 5.

BERNAL et al, v. BURNETT et al., 2010 WL 4025108 (2010)

Claimants also argue that:

> The plain language of the contract must be evaluated in the context of existing law at the time of contract formation. Claimants entered into their respective contracts between January 2005 and September 2007, with no substantive changes made to the arbitration agreements during that time. The contracts were formed several years after the *Bazzle* decision put corporations on notice that a silent arbitration clause *could* be construed to allow class arbitrations and the subsequent formation of the AAA Supplementary Rules. If the School had any remaining uncertainties about its potential exposure, several other for-profit schools were challenged with class arbitrations based on substantively similar, if not identical, arbitration agreements. Without exception, every arbitrator granted the Motion for Clause Construction Award in favor of the respective Claimants.

Motion at 6 (emphasis in the original).

### Respondents' Opposition

Respondents in their brief argue that (1) each arbitration agreement reflects the intent to provide individualized arbitration, (2) intent to provide for class arbitration cannot be implied in the face of silence, and (3) due process concerns favor a presumption that, absent express consent to class arbitration by all parties, an agreement should be construed to prohibit class arbitration.

### Respondents' Argument That Each Arbitration Agreement Reflects the Intent to Provide Individualized Arbitration

Respondents note that 9 U.S.C. § 2 reflects Congress's purpose of "ensuring that private agreements to arbitrate are enforced according to *their terms." Volt Info.*

*Sciences, Inc. v. Board of Trs.,* 489 U.S. 468, 479 (1989) (emphasis added by Respondents).

Respondents then point out that the language throughout the several, integrated agreements between the School and the individual Claimants refers in the singular to the parties who will be involved in the arbitral proceeding. "For example, the relevant provision in the enrollment agreement refers to 'any disputes relative to this contract or the education training received *by me.*'" (Opposition at 22) (emphasis added)

Respondents also note that the first sentence of each arbitration agreement begins "I ___... agree that any dispute arising from my enrollment...," Id. at 23 (emphasis added by Respondents), and that the use of the singular to describe interested parties continues throughout the agreement: "Both Student and the College;" "Neither the Student nor the College;" "the Student;" "A Student;" and so on. Id. At 23

Respondents also point out that each arbitration agreement signed by each Claimant provides for arbitration to occur local to the student and his or her physical campus or in Denver if the student attended the School's online college. *Id.* at 24.

Respondents further argue that the Family Educational Rights and Privacy Act of 1974, 20 U.S.C. § 1232g, 34 C.F.R. § 99 ("FERPA"), requires that educational institutions, including the School, protect student information from disclosure and prohibits the school from disclosing a student's information without written consent. If an institution discloses personal student information in violation of FERPA, the U.S. Department of Education has the right to cut off the School's eligibility to participate in crucial government financial aid programs. Respondents argue that traditional arbitration, which is both bilateral and confidential, does not present FERPA issues, but Claimants' arbitration does,

BERNAL et al, v. BURNETT et al., 2010 WL 4025108 (2010)

given the public nature of class arbitrations. *Id.* at 25. Respondents point out that the arbitration agreements are devoid of any language that even attempts to provide the notice or consent for disclosure required by FERPA. When considered in light of the School's FERPA obligations, and potential penalties for violation, Respondents argue that it is all the more unreasonable to conclude that the agreements intended anything other than traditional, bilateral, confidential arbitration.

Respondents also respond to Claimants' contention that "any dispute" indicates the intent to provide for class arbitration. Respondents argue that Claimants' contention perverts the plain meaning of the term "dispute." Respondents contend that class actions are not a type of dispute, but instead are a procedural mechanism through which "disputes" may be litigated. Respondents argue that in the instant case the types of disputes are about transferability of credits and other disputes arising under the Colorado Consumer Protection Act and the Uniform Consumer Credit and that the individual arbitration agreements plainly cover these disputes, as they relate to each particular student's enrollment. *Id.* at 26.

Respondents also reply to Claimants' contention that the phrase "no matter how described, pleaded or styled" includes class arbitration. Respondents note that this phrase modifies the word "dispute," which is between the student and the School. According to Respondents, this means not that the bilateral disputes can be "described, pleaded or styled" as a multi-lateral one, but rather that the bilateral dispute can be presented in any form. According to Respondents, its obvious intent is to permit the bilateral dispute to be "described, pleaded or styled" as a counterclaim, an equitable claim, a claim at law, a declaratory judgment claim, or any other style of an action between the student and the School *Id.* at 26. (emphasis added by Respondents)

Respondents further contend that the individualized grievance procedure, required as a precursor to arbitration, is inconsistent with class arbitration in that it expresses an intent that views disputes as personal. Respondents also point out that paragraph 3 of the arbitration procedure portion of the arbitration agreement, which advises the student that it is not necessary to hire an attorney to participate in an arbitration, also cuts against the contention that the parties envisioned a class arbitration. Respondents state that for obvious reasons there can be no such thing as a *pro se* class action arbitration. *Id.* at 28.

Respondents also respond to Claimant's contention that doubts about the scope of arbitration should be resolved in favor of arbitration. Respondents reply that this familiar presumption does not apply where, as here, the argument is not about whether there is going to be arbitration or not but rather what kind of arbitration there will be. (citing *Mass. Highway Dep't. v. Perini Corp.,* 828 N.E.2d 34, 42 (Mass. 2005)) (delineating between questions answered by the courts and guided by the presumption of arbitrability and those decided by arbitrators concerning the type and kind of arbitration). Respondents argue that there are no presumptions that favor a finding of the intent to permit class arbitration over individual arbitration. Opposition at 34.

### Respondents' Argument That Class Arbitration Cannot Be Implied in the Face of Silence

Foreshadowing the later decision in *Stolt-Nielsen,* Respondents make their most vociferous argument against the proposition that class arbitration can be implied in the face of silence. Respondents note that "claimants... categorize each arbitration agreement as 'silent,' and then "ask the Arbitrator to interpret this silence to mean that there has been no express waiver of the supposed 'right' to a class action 'remedy.'" Opposition. at 28. Respondents argue, however, that "this badly misunderstands the nature of class actions, which are neither a right nor a remedy. Class actions are a specialized mechanism for seeking redress of grievance.... They do not and cannot define the substantive rights or remedies available to either party." *Id.* at 28. More specifically, Respondents argue:
The answer to the question of how to interpret a purportedly silent arbitration agreement does not begin by presuming that there is some "right" to the class action "remedy" that is reserved if not expressly waived. Instead, interpretation of true silence in an arbitration agreement is governed by generally applicable contract law. *See Mastrobuono,* 514

U.S. at 58. And that law provides that a contract may not be rewritten to add terms that fundamentally transform the agreement into something the parties have not agreed to do. An additional term may be supplied only when "essential to a determination of [the parties'] rights and duties" and "reasonable in the circumstances." RESTATEMENT (SECOND) OF CONTRACTS § 204 (1981); *see also* 11 Samuel Williston & Richard A. Lord, A TREATISE ON THE LAW OF CONTRACTS § 31:7 (4th ed. 1999) (stating that terms may be added in the face of silence only where "the parties must have intended them and must have failed to express them only because of sheer inadvertence or because they are too obvious to need expression"). It is neither essential nor reasonable under the circumstances to assume - in the face of silence - that the parties to these arbitration agreements intended to authorize a single arbitrator to conduct a class arbitration of the purported size and structural complexity, and with the amount of damages at issue, here.


*Id.* at 29.


Respondents argue that, far from being "essential to a determination of [the parties'] rights and duties," forcing the individual disputes in this case into a class action format unnecessarily complicates the disputes with the extensive procedures class action would require and the due process and related questions raised for the School and unnamed putative class members unaware their silent arbitration agreement might result in an arbitration that resolves issues for or against their interests. *Id.* at 30. According to Respondents, class arbitration cuts against the speed and efficiency of traditional, bilateral arbitration and is the antithesis of the informality and confidentiality involved in traditional arbitration. *Id.* at 30.

Nor, according to Respondents, is the imposition of class arbitration in the face of a silent agreement "reasonable in the circumstances:"

> Class arbitration is a Frankenstein that can potentially put a company's life in the hands of a single, virtually unreviewable arbitrator and implicate the due process rights of both named and unnamed parties. This freakish form of arbitration has all the downsides of traditional litigation, such as delay, complicated procedure, and broad discovery, and none of the advantages, such as cost reduction, meaningful appellate review, the predictability that prevails in an arena of binding precedent, and judges paid by government entities whose decisions on the appropriateness of class litigation are not at risk of influence by financial gain. This may be fine when all parties expressly agree to it, but surely it is not "reasonable in the circumstances" to assume an intent to submit to this in the face of silence.


*Id.* at 32.


### Respondents' Argument That, Absent Express Consent to Class Arbitration by All Parties, Due Process Concerns Favor A Presumption against Class Arbitration

Respondents conclude with due process arguments, noting, among other things, that there are limited rights to appeal a class action arbitration:

Although the AAA intended that the automatic stays following clause construction and class certification would provide parties with the opportunity to seek judicial review, the results have been mixed. Some courts have accepted the invitation to review clause construction or class certification awards. *E.g., Cheng v. Oxford Health Plans,* 846 N.Y.S.2d 16 (N.Y. App. Div. 2007). Others have not. *E.g., Dealer Computer Servs., Inc. v. Dub Herring Ford,* 547 F.3d 558 (6th Cir. 2008) (holding that district court lacked jurisdiction to consider motion to vacate arbitrator's clause construction award because the matter was not ripe for judicial review); *Marron v. Snap-On Tools, Co., LLC,* No. Civ. 03-4563, 2006 WL 51193 (D.N.J. Jan. 9, 2006).

BERNAL et al, v. BURNETT et al., 2010 WL 4025108 (2010)

Even with interim judicial review, the limited standards by which a court may vacate an award are troubling in light of published statistics on clause construction and class certification awards. The AAA reports that only approximately five percent (5%) of arbitration agreements have been found not to permit class arbitration. AAA Brief at 22. It appears that arbitrators have almost uniformly interpreted silent arbitration agreements to permit class arbitration. Yet, prior to *Bazzle*, most federal courts held just the opposite. *See, e.g., Dominion Austin Partners, LLC v. Emerson,* 248 F.3d 720 (8th Cir. 2001); *Johnson v. West Suburban Bank,* 225 F.3d 366 (3d Cir. 2000); *Champ v. Siegel Trading Co.,* 55 F.3d 269 (7th Cir. 1995). And contrary to the construction arbitrators have placed on silent arbitration agreements since *Bazzle,* the Supreme Court did not change the state of the law with *Bazzle.*

Just as curious, the AAA reports that fifty percent (50%) of the time class certification is granted. This compares with a national average of twenty percent (20%) of federal court cases. Thomas E. Willging & Shannon R. Wheatman, ATTORNEY REPORTS ON THE IMPACT OF *AMCHEM* AND *ORTIZ* ON CHOICE OF FEDERAL OR STATE FORUM IN CLASS ACTION LITIGATION, 8-9 (Federal Judicial Center 2004). This statistical disparity is disturbing by itself.

*Id.* at 36-38.

Finally, Respondents attack delicately but forcefully, the perverse incentives which, in their view, are built into class arbitrations:

> At both the clause construction phase and the class certification phase, a decision against the respondent inures to the significant financial advantage of the arbitrator. The Supplementary Rules provide that the arbitrator who decides clause construction remains the arbitrator if the arbitration agreement is interpreted to permit class arbitration. *See* Supplementary Rule 4. If the arbitrator decides that the agreement does not permit class arbitration, AAA practice is to close the matter upon the expiration of the stay period. AAA Class Arbitration Information Sheet. The class arbitrator has no further involvement in the matter. This repeats itself at the class certification stage. *Id.; see* Supplementary Rule 5(d). If Claimants wish to pursue individual claims, they must re-file their individual disputes. *See* AAA Class Arbitration Information Sheet. It is a delicate issue to raise, particularly when the School's financial life lays in the hands of one, nearly unreviewable arbitrator, but the fact that the Supplementary Rules create large financial incentives to move a matter towards and through class certification must be considered in any discussion of whether the Supplementary Rules adequately protect due process rights and should be presumed to apply in the face of silence. *See, e.g., Caperton v. A.T. Massey Coal Co.,* 129 S. Ct. 2252 (2009) (holding that due process required state supreme court justice to recuse himself from a case involving a party who had contributed substantially to his campaign); *Tumey v. Ohio,* 273 U.S. 510 (1927) (holding that it was a denial of due process to be convicted by a judge with a financial stake in the outcome of the case); AAA Consumer Due Process Protocol Principle 1. It also adds another weight to the scale tipping in favor of a presumption that parties who did not expressly agree to class arbitration did not intend it.

*Id.* at 39-40. (footnotes omitted)

### Claimants' Reply

In their Reply Brief, Claimants reiterate their contention that "Respondents fail to identify any portion of the plain language of the agreement that would suggest an intention to prohibit class arbitration, and the silence should serve to permit class arbitration. Reply at 1.

BERNAL et al, v. BURNETT et al., 2010 WL 4025108 (2010)

Claimants also make various statements that can arguably be construed as concessions that there was no meeting of the minds, at least regarding whether the parties had agreed to ban class arbitration:

**At the extreme, the silence could be viewed as creating an ambiguity,** which should be interpreted in accordance with well-settled state law to be construed against the drafter.

The plain language clearly reveals that neither party intended to prohibit class arbitration, so no such ban could be construed. But, assuming, *arguendo,* that the School did intend certain terms to prohibit class arbitration, **there has been no showing that this was the intent of all the parties to the contract.** The School makes no offering and that the students would have intended to leave class arbitration or that students even knew of the School's supposed intent to do so.

The elephant in the room that the Respondents are desperately trying to avoid discussing is that the School created the arbitration agreement, the School selected exactly what language to include and what to leave out, and the School ultimately fails to craft any clear and **unambiguous** provisions prohibiting class arbitration.

**Claimants do not contend that class arbitration is required by the agreement,** nor that the existence of individual and class arbitration is in any way mutually exclusive. Yet, Respondents somehow interpret the potential availability of both class and individual arbitrations to be indicative of their intent to prohibit class arbitrations.

Reply at 1, 4-6.

Claimants also argue that the use of pronouns such as "I," "my," "me," and "them" is a necessary part of any contract because:

> a very basic tenet of contract formation... [dictates] that a party cannot contract for another without some sort of authority or proxy agreement... (citation omitted). This, however, is the very basis for the development of class actions, which provide a small group of individuals with the opportunity to bring suit under a contract on behalf of a larger class of people affected in the same manner (citations omitted). Thus, no single Claimant or Class Member is bringing suit under another's contract, nor seeking remedies available only to another party. Rather Claimants are exercising the right of each individual Class Member against the School on behalf of that individual. The use of individualized terms is only indicative of the identity of the parties to the contract; it does not dictate the bounds of the agreement, nor any imagined restriction on class arbitration.

*Id.* at 2-3 (emphasis in the original).

Claimants argue that, contrary to Respondents' assertion that the reference to a particular location for arbitration nearest to the school of the particular claimant supports a finding of intent to permit only bilateral arbitration, the provision cited by Respondents does nothing other than tell a student were to seek information regarding how to bring a suit. The agreement, according to Claimants, does not direct that a student must submit to arbitration at the location provided. Claimants also note that it would be particularly unfair to require the students who are enrolled in Westwood College Online, and who may live hundreds or thousands of miles from Denver, Colorado, to have to participate in arbitration proceedings at that location. *Id.* at 4.

Claimants also contended that the privacy restrictions contained in FERPA do not prohibit a class arbitration. They cite the case of *Rios v. Read,* 73 F.R.D. 589 (E.D. N.Y. 1977) for the proposition that courts may use a balancing test in the release of school records through legal proceedings and that a school is not subject to sanctions because it discloses personal information if it does so in compliance with a judicial order. *Id.* at 9.

BERNAL et al, v. BURNETT et al., 2010 WL 4025108 (2010)

Claimants also repeat their argument that Respondents drafted the clause at a point in time when they were fully on notice that class arbitrations could be permitted and also note with respect to Respondents' due process argument that the rules governing class arbitration permit any party to opt out of the class arbitration. *Id.* at 10-12.

### The *Stolt-Nielsen* Decision

In April of 2010, the Supreme Court rendered its decision in the case of *Stolt-Nielsen, S.A. v. AnimalFeeds International Corp.* The Stolt-Nielsen case sets forth the test which arbitrators must apply in determining whether a contractual provision permits class arbitration. Specifically, it holds that a party may not be compelled to submit to a class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so. *Id.* at 1774. Silence on the issue is not sufficient to permit class arbitration. *Id.* at 1776. This decision dramatically changes the legal landscape inasmuch as many, if not most, arbitrators had been proceeding under the assumption that the right to a class arbitration could, in appropriate circumstances, be inferred from an arbitration agreement's silence on the subject.

Because of its importance, it is worthwhile analyzing the components of the Court's decision to separate its findings regarding the facts of the particular case before it from the test, applicable to all cases, which it ultimately sets forth.

### Analysis of Stolt-Nielsen

The opening paragraph of the decision states, "We granted certiorari in this case to decide whether imposing class arbitration on parties whose arbitration clauses are 'silent' on that issue is consistent with the Federal Arbitration Act (FAA), 9 U.S.C §1 *et seq."*

The substantive portion of the decision is then divided into four sections. Section I sets forth the facts of the case. The Court notes that Stolt-Nielsen is a shipping company that serves a large share of the world market for parcel tankers--seagoing vessels with compartments that are separately chartered to customers wishing to ship liquids in small quantities. One of its customers was AnimalFeeds, which supplies raw ingredients, such as fish oil, to animal-feed producers around the world. AnimalFeeds ships its goods pursuant to a standard contract known in the maritime trade as a charter party. The particular charter party between Stolt-Nielsen and AnimalFeeds contained an arbitration clause which provided, "*Any dispute* arising from the making, performance or termination of this Charter Party shall be settled in New York... [by arbitration]." *Id.* at 1765. (emphasis added). AnimalFeeds subsequently brought a putative class-action alleging that Stolt-Nielsen was violating the antitrust laws by charging super competitive prices. This was consolidated with other antitrust actions and ultimately referred to arbitration.

According to the majority, the parties after selecting a panel of arbitrators "stipulated that the arbitration clause was 'silent' with respect to class arbitration." *Id.* at 1765. The Court noted that counsel for AnimalFeeds stated, "[a]ll the parties agree that when a contract is silent on an issue there is then no agreement that has been reached on the issue." *Id.* at 1766

Judge Ginsburg points out in her dissent, however, that the parties had not truly entered into a "stipulation" that the arbitration clause was "silent," but instead the Court had taken out of context a portion of a statement by counsel for AnimalFeeds that was more in the nature of an argument than a stipulation. The entire statement by counsel for AnimalFeeds was as follows: "All the parties agree that when a contract is silent on the issue there's been no agreement that has been reached on that issue. Therefore, there has been no agreement to bar class arbitrations. It is also undisputed that the arbitration clause here contains broad language and this language should be interpreted to permit class arbitrations." *Id.* at 1781.

BERNAL et al, v. BURNETT et al., 2010 WL 4025108 (2010)

It is also worth noting that the above statement by Counsel does not say that "all parties agree that the contract is silent." Instead, it says that "all the parties agree that *when* a contract is silent..." (emphasis added).

In Section II (A) the Court sets forth the test that must be met before the decision of the arbitration tribunal can be reversed by an appellate court:
Petitioners contend that the decision of the arbitration panel must be vacated, but in order to obtain that relief they must clear a high hurdle. It is not enough for petitioners to show that the panel committed an error-or even a serious error. (Citations omitted). "It is only when [an] arbitrator strays from interpretation and application of the agreement and effectively 'dispense [s] his own brand of industrial justice' that his decision may be unenforceable." (Citations omitted). In that situation, an arbitration decision may be vacated under §10(a)(4) of the FAA on the ground that the arbitrator "exceeded [his] powers," for the task of an arbitrator is to interpret and enforce a contract, not to make public policy.

*Id.* at 1767.

In Section (II)(B), the Court applies the above test and concludes that the tribunal acted in excess of its powers. The Court notes that AnimalFeeds made three arguments: (a) the clause is silent, and without express prohibition class arbitration is permitted; (b) the clause should be construed to permit class arbitration as a matter of public policy; and (c) the clause would be unconscionable and unenforceable if it forbade class arbitration. *Id.* at 1768.

The Court notes that the arbitrators expressly rejected the first argument above and said nothing about the third. Instead, the Court found that the panel rested its decision on AnimalFeeds' public policy argument. The court states that because the parties' "agreement was 'silent' in the sense that they had not reached any agreement on the issue of class arbitration, the arbitrators proper task was to identify the rule of law that applied in such situations (either the FAA itself, federal maritime law, New York law, or some combination), but the arbitrators failed to engage in such a analysis and instead imposed its own policy choice and thus exceeded its powers. *Id.* at 1767-73.

During the process of reaching its conclusion that the arbitration tribunal exceeded its powers, the Court also noted that the panel was not persuaded by court cases denying consolidation of arbitrations, by the undisputed evidence that this particular charter party form had never been the basis of a class action, or by expert opinion that sophisticated, multinational commercial parties of the type of the sort to be included in the class would never intend that the arbitration clauses would permit a class arbitration. *Id.* at 1769.

After setting forth the reasons why the tribunal exceeded its powers, the Court in Section III analyzes the Court's previous *Bazzle* decision and notes, among other things, that that case **"did not establish the rule to be applied in deciding whether class arbitration is permitted. The decision in *Bazzle* left that question open, and we turn to it now."** *Id.* at 1774. (bolding added).

Thus, a fair reading of the initial parts of the *Stolt-Nielsen* decision is that in Sections I and II the Court sets forth the facts and decides on these unique facts that the arbitrators conduct rose to the level of exceeding their powers, thereby making their decision judicially reviewable on that ground. Having found that the decision was reviewable, the Court then notes in Section III that *Bazzle* never set forth a test to be applied in deciding whether class action is permitted. The Court then proceeds to set forth the proper test in Section IV of its decision (discussed below).

The significance of the structure of the Court's decision is that, although the fact pattern in this case may be different than in *Stolt-Nielsen* (e.g., the parties in *Stolt-Nielsen* were sophisticated companies; they dealt with a maritime arbitration agreement that had never been interpreted to permit class arbitration, etc.), all of that goes to the Court's basis for finding that the tribunal exceeded its powers. It does not go to the test that must be applied in any case (e.g., whether involving

sophisticated parties are not) in order to determine if an arbitration agreement permits class arbitration. That test, which is the core of the Court's decision, is set forth in Section IV of the decision.

The Court begins Section IV of its opinion with an introductory paragraph which notes that "[w]hile the interpretation of an arbitration agreement is generally a matter of state law... (citations omitted), the FAA imposes certain rules of fundamental importance, including the basic precept that arbitration 'is a matter of consent, not coercion,' *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468, 479 (1989)." *Id.* at 1774-75.

In Section IV(A) the Court then proceeds to set forth the principles that govern interpretation of an arbitration contract: Consistent with these provisions [of the FAA], we have said on numerous occasions that the central or "primary" purpose of the FAA is to ensure that "private agreements to arbitrate are enforced according to their terms." *Volt, supra,* at 479; *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 57, 58 (1995); *see also Doctor's Associates, Inc. v. Casarotto,* 517 U.S. 681, 688 (1996). See generally 9 U.S.C. §4.

Whether enforcing an agreement to arbitrate or construing an arbitration clause, courts and arbitrators must "give effect to the contractual rights and expectations of the parties." *Volt, supra,* at 479. In this endeavor, "as with any other contract, the parties' intentions control." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 626 (1985).

*Id.* at 1774-75.

The Court further notes:
We think it is also clear from our precedents and the contractual nature of arbitration that parties may specify *with whom* they choose to arbitrate their disputes. See *EEOC v. Waffle House, Inc.,* 534 U.S. 279, 289 (2002) ( "[N]othing in the [FAA] authorizes a court to compel arbitration of any issues, or by any parties, that are not already covered in the agreement" (emphasis added)); *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.,* 460 U.S. 1, 20 (1983) ("[A]n arbitration agreement must be enforced notwithstanding the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement"); *Steelworkers, supra,* at 581 (an arbitrator "has no general charter to administer justice for a community which transcends the parties")....

*Id.* at 1774.

In Section IV(B) of its decision, the Court then applies the foregoing principles to arrive at a test that must be applied in determining whether a particular arbitration agreement permits class action arbitration:

> From these principles, it follows that a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party agreed to do so.

*Id.* at 1775 (emphasis in the original).

The Court criticizes the decision of the tribunal in the case before it because the panel did not establish that the parties had agreed to class arbitration but instead concluded that Stolt-Nielsen failed to establish that the parties intended to preclude class arbitration based on the fact that the agreement was silent on the question of class arbitration. *Id.* at 1775.

Noting that the "panel's conclusion is fundamentally at war with the foundational FAA principle that arbitration is a matter of consent," (*Id.* at 1775), the Court goes on to note that "[a]n implicit agreement to authorize class-action arbitration ... is not a term that the arbitrator may infer solely from the fact of the parties' agreement to arbitrate. This

is so because class-action arbitration changes the nature of arbitration to such a degree that it cannot be presumed that parties consented to it by simply agreeing to submit their disputes to an arbitrator." *Id.* at 1775.

Echoing the arguments in the School's brief in this matter, the court then goes on to note several respects in which class-action arbitration is fundamentally different from bilateral arbitration. This includes the facts that (1) the arbitrator no longer resolves a single dispute between the parties to a single agreement, but instead resolves many disputes between hundreds or perhaps even thousands of parties; (2) under the Class Rules, the presumption of privacy and confidentiality that applies in many bilateral arbitration does not apply to class arbitrations; (3) the arbitrator's award purports to bind not just the parties to single arbitration claimant, but adjudicates the rights of absent parties as well; and (4) the commercial stakes of class arbitration are comparable to those of class-action litigation even though the scope of judicial review is much more limited. *Id.* at 1776.

The Court concludes:
We think that the differences between bilateral and class action arbitration are too great for arbitrators to presume, consistent with their limited powers under the FAA, that the parties' mere silence on the issue of class-action arbitration constitutes consent to resolve their disputes in class proceedings

Contrary to the dissent, but consistent with our precedents emphasizing the consensual basis of arbitration, we see the question as being whether the parties *agreed to authorize* class arbitration.

*Id.* at 1776

Although dissenting from the opinion, Justice Ginsburg accurately summarizes the test laid down by the majority as follows:
For arbitrators to consider whether a claim should proceed on a class basis, the Court apparently demands contractual language one can read as affirmatively authorizing class arbitration. See *ante,* at 20 ("[A] party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so."); *ante,* at 23. The breadth of the arbitration clause, and the absence of any provision waiving or banning class proceedings, will not do. *Ante,* at 20-23.

*Id.* at 1782

## DISCUSSION

### Application of the Parties' Arguments and Stolt-Nielsen To the Arbitration Clause in This Case

Following the Supreme Court's decision in Stolt-Nielsen I asked the parties to submit supplemental briefs regarding the impact of that decision on the present case. Claimant submitted a Supplemental brief on May 17, 2010 ("Claimants' Stolt Brief"); Respondents submitted a supplemental brief on the same date ("Respondents' Stolt Brief"); and both parties submitted Reply Briefs on May 20, 2010 (respectively, "Claimants' Stolt Reply" and "Respondents' Stolt Reply").

Respondents argue that Claimants have admitted that the agreement in question is silent. Respondents' Brief at 2. This is true. As noted previously, supra at 9, Claimants stated in their original Motion: **"The agreement in question is silent in specific regard to class arbitration. Accordingly, the plain language of the agreement is indicative that there was no intention to waive the right to pursue class arbitration."** Motion at 5. (Bolding added.)

BERNAL et al, v. BURNETT et al., 2010 WL 4025108 (2010)

But what do Claimants mean when they state that the agreement in question is silent in specific regard to class arbitration? Do they mean that there is no explicit reference to class arbitration, such as a clause expressly allowing it? Or do they mean instead that there is not sufficient evidence to establish that there has been a meeting of the minds between the parties on the subject of class arbitration?

Claimants' statement that the agreement is silent with respect to class arbitration is no different than the statement that the Court categorized as a "stipulation" in the *Stolt-Nielsen* case. *Id.* at 1775. But this simply raises the identical question of what the Court in *Stolt-Nielsen* meant by the term "silence" when it placed significant emphasis on its finding that the parties had "stipulated" that the agreement was silent. The Court gives no guidance regarding "what contractual basis may support a finding that the parties agreed to authorize class-action arbitration." *Id.* at 1776, fn. 10. Nonetheless, I do not believe that the Court meant that one has to find a clause explicitly authorizing class arbitration, or something close thereto, but rather that one has to find sufficient evidence from which one can infer that the parties had a meeting of the minds with respect to permitting a class arbitration. This is certainly consistent with the test which the Court laid down, namely, that there must be sufficient evidence to find that the parties "*agreed to authorize* class arbitration." *Id.* at 1776.

Claimants argue that the *Stolt-Nielsen* case only dealt with "sophisticated business entities" using contracts "specific to the particular traits and business needs of the parties," Claimants' Stolt Brief at 2, and further argue that in this case Claimants entered into contracts of adhesion in which they had no choice as to the terms and simply were presented with a "take it or leave it" contract.

Claimants also note that Justice Ginsburg in her dissent identifies the limitations that allegedly result from the language employed by the majority:
[B]y observing that 'the parties [here] are sophisticated business entities,' and 'that it is customary for the shipper to choose the charter party that is used for a particular shipment,' the Court apparently spares from its affirmative-authorization requirement contracts of adhesion presented on a take-it-or-leave-it basis.

*Id.* at 1783.

As noted previously, though, the Court's discussion of the sophistication of the parties and the uniqueness of the charter party arbitration agreement was in the context of applying its holding to the particular facts of the case before it in order to conclude that the tribunal had exceeded its authority. The party sophistication played very little part in the rule which the Court establishes in Section IV of the opinion. In particular, as previously noted, the court held that there must be "a contractual basis for concluding that the party *agreed* to [class arbitration]." *Id.* at 1775. This would appear to be true regardless of whether the parties are sophisticated or not sophisticated. In either event, one must establish that there was a "meeting of the minds" on the issue of class arbitration.

In determining whether there is a contractual basis for concluding that the parties agreed to class arbitration, one must look first to the objective manifestation of the parties' intentions as expressed in the language of the contract. It may well be that a party to a contract of adhesion had no intent to *preclude* a class arbitration. Conversely, it may well be that such a party had no intent to *include* a class arbitration. In many cases, parties to an arbitration agreement may well have given no thought, one way or the other, to the possibility of a class action. I suspect that the "sophisticated" parties in *Stolt-Nielsen* never gave any thought to the possibility that their arbitration clause could either permit or preclude a class action. The point is that the parties' subjective intent is not what is relevant. Under black letter contract law, one must look to the parties' objective manifestation of their intent.

Put another way, I see no analytical basis for distinguishing between contracts of adhesion and contracts between "sophisticated" parties in terms of the contractual analysis of intent that must be performed. In either case, under the

BERNAL et al, v. BURNETT et al., 2010 WL 4025108 (2010)

rule laid down by the *Stolt-Nielsen* Court, one must find evidence that the parties *agreed* to permit class arbitration. Mere *silence* on the subject will not do.

If there is something unfair about having arbitration clauses in contracts of adhesion that prohibit consumers from having a class action remedy, then this is an issue of public policy, which I discuss below. It is not, however, relevant to a contractual analysis of the parties' intent.

Claimants in their pre-*Stolt-Nielsen* Motion for Clause Construction argue, as previously noted, that the language of the contract must be evaluated in the context of existing law at the time of the contract. Claimant's note that they entered into their respective contracts between January 2005 and September 2007 with no substantive changes made to the arbitration agreement during this period even though this was several years after the *Bazzle* decision, which put corporations on notice that a silent arbitration clause could be construed to allow class arbitrations. Motion at 6. In light of the *Stolt-Nielsen* decision, however, this argument, at least by itself, is not sufficient. Mere silence on the subject of class arbitration (including the failure to put in a clause prohibiting class arbitration) is not sufficient. One must instead find evidence that the parties *agreed to authorize* class arbitration.

Claimants also argue that the instant arbitration clause was drafted in the shadow of numerous class arbitrations against for-profit schools, thereby establishing a "custom and usage" that arbitration clauses in contracts between for-profit schools and students are understood to permit class arbitrations. Claimants' Stolt Brief at 3. Although there may have been several class arbitrations against for-profit schools, in the Arbitrator's opinion, Claimants' proof on this issue falls well short of establishing some "custom and usage" in the industry.

As previously noted, Claimants also argue in their original motion that the intent to provide for class arbitration can be inferred from the language of the arbitration agreement which provides that "any dispute" must be resolved through arbitration "no matter how described, pleaded or styled," and which further states that "any remedy available from a court under law shall be available in the arbitration." Claimants argue that the phrase "no matter how described, pleaded or styled," includes a claim that is styled as a class action Motion at 5. In the Arbitrator's opinion, this is Claimants' strongest argument.

If there were no other indication of the parties' intent, this argument might be sufficient to carry the day. This argument, however, must be balanced against Respondents' multiple counter-arguments.

First, as noted, Respondents point out that the phrase "no matter how described, pleaded or styled" modifies the word "dispute," which is between the student and the School. According to Respondents, this means not that the bilateral disputes can be "described, pleaded or styled" as a multi-lateral one, but rather that the bilateral dispute can be presented in any form such as a counterclaim, an equitable claim, a claim at law etc., between *the* student and the School. Opposition at 26. This is a credible argument, although I am not certain that it is any stronger than Claimants' contrary interpretation. This interpretation, however, is supported, at least marginally, by Respondents' argument that the enrollment agreement and arbitration clause consistently refer to parties in the singular such as "I," "me," "my," and the like.

Respondents further point out that the individual nature of the grievance procedure envisions separate resolution of individual disputes between the School and any Claimant, Opposition at 22, that a class arbitration implicates FERPA concerns in a way that bilateral arbitration does not, Opposition at 23-25, and that one would not have provided the option of pro se representation if one had envisioned the possibility of class arbitration. Opposition at 28.

They further note, in essence, that no General Counsel in his right mind would have provided for only one arbitrator and forgone any meaningful appellate review if he had had any intention of being exposed to a multi-lateral arbitration of unlimited size and scope. Opposition at 31-32.

BERNAL et al, v. BURNETT et al., 2010 WL 4025108 (2010)

Respondents also argue, and I find, that "any dispute" most naturally describes the type of dispute (e.g., contract, tort, statutory violation) and not the procedural mechanism (i.e. class action) for having that dispute resolved. Respondents also note that the argument that "any dispute" is meant to include class arbitration was rejected in the *Stolt Nielsen* case and that Justice Ginsburg observed in dissent that the "breadth of the arbitration clause" will not suffice to support a finding of intent to permit class arbitration." *Id.* at 1782.

In addition, Respondents argue, and I find, that the reference to "any remedy" is most naturally read as referring to the different types of remedies such as damages, punitive damages, injunctive relief and the like-- and not to a procedural mechanism (i.e., a class action) for obtaining that remedy.

Finally, Claimants have made numerous statements, supra at 17, that can arguably be construed as concessions that there was no meeting of the minds, at least regarding whether the parties had agreed to ban class arbitration: (1) At the extreme, **this silence could be viewed as creating an ambiguity; (2) there has been no showing that this was the intent of all the parties to the contract;** (3) the School ultimately fails to craft any clear and unambiguous provisions prohibiting class arbitration; and (4) **Claimants do not contend that the class arbitration is required by the agreement....**

In sum, there are certainly facts which support each side's arguments. The test, however, is whether there is sufficient evidence from which one can conclude that both parties had a meeting of the minds with respect to permitting a class-action arbitration. It takes "two to tango," so to speak, in determining if there was a meeting of the minds.

I find this to be a very difficult case, but I believe that on the totality of the facts, there is insufficient evidence to establish that the parties mutually intended to permit a class arbitration. Given the significant emphasis placed by the majority in the Stolt-Nielsen opinion on the fundamental and substantial differences between bilateral arbitration and class-action arbitration, *Id.* at 1775-76, it would seem appropriate to require more substantial evidence than exists in the present case in order to reach a clear conclusion that the parties "agreed to authorize class arbitration." *Id.* at 1776. (emphasis in the original)

### Unconscionability and Public Policy

During oral argument the Arbitrator indicated to the parties that from an analytical point of view his preliminary feeling was that the same contractual analysis of intent must be applied regardless of whether one is dealing with a contract between sophisticated parties or a contract of adhesion. As noted above, in either case, *Stolt Nielsen,* requires one to determine whether there is evidence that the parties "*agreed to authorize* class arbitration." *Id.* at 1776 (emphasis in the original).

The Arbitrator indicated that if there were to be a distinction between an analysis involving a contract of adhesion and a contract between sophisticated parties, such analysis should more properly be directed to whether the contract of adhesion, on the particular facts of the case, is unconscionable. Accordingly, he asked the parties to submit supplemental briefs regarding (1) whether the issue of unconscionability should be decided by the Arbitrator or by a court, and (2) if the contract in this case can be deemed a contract of adhesion, whether it is unconscionable under governing Colorado law.

On June 7, 2010 Claimant submitted their brief on unconscionability ("Claimants' Unconscionability Brief"). On June 14, 2010, the School submitted its opposition brief on unconscionability. ("Respondents' Unconscionability Brief"). On June 16, 2010, Claimants submitted a reply brief ("Claimants' Unconscionability Reply Brief).

### Who Decides Unconscionability

BERNAL et al, v. BURNETT et al., 2010 WL 4025108 (2010)

Claimants argue that under Tenth Circuit law, "where the making of an arbitration agreement is at issue the analysis is one for the court rather than the arbitrator.... (citations omitted) and that "[b]ecause the issue of unconscionability, such as the one at issue here, concerns the making of the contract itself, this issue is for the court to decide." Claimants' Unconscionability Brief at 2.

Respondents reply that the Arbitration Agreements in this case incorporates the AAA Commercial Rules, which include a rule (Rule 7(a)) that specifically assigns the question of the 'scope, existence, and validity' of an arbitration agreement to the Arbitrator"; that the issue of "validity" includes whether a contract is unenforceable or unconscionable; and that numerous circuit court decisions have held that the adoption of the AAA Commercial Rules means that threshold questions of the "validity" of an arbitration agreement is for the arbitrator. Respondents' Unconscionability Brief at 7. See also Respondents' Stolt Reply at 6.

Respondents further argue that if unconscionability is an issue for the court, it is an issue for the court at the inception of the case and before it is referred to arbitration. Respondents note that the AAA policy prohibiting the acceptance of cases which contain an express prohibition of class arbitration is merely a "policy [that] refuses at inception (absent direction from a court) demands for arbitration where there is an express ban of

> In order to support a finding of unconscionability, there must be evidence of some overreaching on the part of one of the parties such as that which results from inequality of bargaining power or under other circumstances in which there is an absence of meaningful choice on the part of one of the parties, together with contract terms which are unreasonably favorable to that party.

*Id.* at 991.

The Colorado Supreme Court enumerated the following seven, non-exclusive factors that it found relevant to a finding of unconscionability:

(1) a standardized agreement executed by parties of unequal bargaining strength;

(2) a lack of opportunity to read or become familiar with the document before signing it;

(3) use of fine print in the portion of the contract containing the provision;

(4) absence of evidence that the provision was commercially reasonable or should have been reasonably anticipated;

(5) the terms of the contract, including substantive unfairness;

(6) the relationship of the parties, including factors of assent, unfair surprise and notice; and

(7) all the circumstances surrounding the formation of the contract, including its commercial setting, purpose and effect.

*Id.* at 991. See also Claimants' Unconscionability Brief at 9.

Respondents do not dispute that the above factors constitute the governing test for determining whether a contract is unconscionable under Colorado law, but note that an unconscionability argument is hard to win in Colorado:

> People should be entitled to contract on their own terms without the indulgence of paternalism by courts in the alleviation of one side or another from the effects of a bad bargain. Also, they should be permitted to enter into contracts that actually may be unreasonable or which may lead to hardship on one side. It is only where it turns out that one side or the other is to be penalized by the enforcement

of the terms of a contract so unconscionable that no decent, fair[-]minded person would view the
ensuing result without being possessed of a profound sense of injustice, that equity will deny the use
of its good offices in the enforcement of such unconscionability.

*Lincoln General Ins. Co. v. Bailey,* 224 P.3d 336, 341 (Colo. App. 2009), cert, denied, No. 09SC527, 2010 WL 597816
(Feb. 22, 2010). Respondents' Unconscionability Brief at 10.

The Arbitrator finds three Colorado decisions particularly instructive on the issue of unconscionability. Although each
case deals with an express ban on class actions, as opposed to a finding that silence on that issue constitutes a bar to class
arbitrations, I do not find this distinction compelling for reasons which I will discuss further below.

The first case that the arbitrator finds instructive is *Orrnelas v. Sonic-Denver T, Inc.,* No. 06CV00253, 2007 WL 274738
(D. Colo. Jan. 29, 2007). In that case the plaintiff, who did not speak English well, purchased a Toyota automobile. He
contended that because of his lack of English ability he was induced by defendants' misrepresentations and concealment
into executing documents for the lease of the vehicle, rather than for a purchase, at a price higher than he had agreed
to pay, and on terms less favorable than he had negotiated. *Id. at *1.* He thereafter brought a class action on behalf of
all racial or ethnic individuals whose principal or first language is other than English. Included in his claims was a claim
under the same Colorado Consumer Protection Act asserted in this case.

The arbitration provision provided that all claims must be arbitrated on an "individual basis." *Id.* at *2. Plaintiff argued,
similar to what Claimants argue in this case, that there was no contract formed because there was a failure to arrive at a
meeting of the minds and that the arbitration provision was unenforceable because of a lack of mutual assent. *Id.* at *3

The court found that the provision prohibiting arbitration on a class wide basis did not preclude sending the plaintiff
to arbitration:

> Although the Tenth Circuit has not addressed the issue of whether a bar against class wide arbitration
> is enforceable or whether it may invalidate otherwise enforceable arbitration agreement, at least five
> other circuit courts of appeal have held such class wide arbitration bans to be enforceable. Citing
> these cases at least one district court in the Tenth Circuit has held that a consumer agreement's
> prohibition on participation in a class action, or class arbitration proceedings, does not render
> the agreement unenforceable or unconscionable. *See Edwards v. Blockbuster, Inc.,* 400 F. Supp.2d
> 1035, 1309 (E.D. Okla. 2005). The court there found that such provisions are a common feature of
> consumer arbitration agreements, and numerous courts have recognized that they are valid and fully
> enforceable... (citations omitted).

*Id.* at *5.

The court took note of earlier decisions that rejected an argument that a ban would be unconscionable because the
plaintiff would be unable to maintain his legal representation given the small amount of individual damages. The court
also took note of plaintiffs argument that the agreement was "procedurally unconscionable" because it was presented in
a form agreement on a take-it-or-leave-it basis. Nonetheless, it rejected these arguments and referred him to arbitration.
*Id.* at *8.

The second instructive case is *Rains v. Foundation Health Systems Life & Health,* 23 P.3d 1249 (Colo. App. 2001). In
that case the plaintiff filed a class action complaint on behalf of herself and other individuals covered under defendant's
health plans. The arbitration clause in question limited the power of the arbitrator to the determination of the terms
of the applicable health plan contract and also prohibited the arbitrator from awarding punitive damages. *Id.* at 1252.

Plaintiff argued that the cost of individual arbitration would preclude enforcement of her statutory rights. The court found that the fact that plaintiff only sought recovery of $9,520.47 would not prohibit enforcement of her rights if she were required to go to arbitration because of specialized arbitration procedures which minimize the cost for small claims. *Id.* at 1253. The court went on to note:

> We recognize that plaintiff was attempting to bring her claims in court as a class action. However, arbitration clauses are not unenforceable simply because they might render a class action unavailable. *See Bowen v. First Family Financial Services, Inc.,* 233 F.3d 1331 (11th Cir. 2000); *Stout v. J.D. Byrider,* 228 F.3d 709 (6th Cir. 2000); *Johnson v. West Suburban Bank,* 225 F.3d 366 (3d Cir. 2000)... (remaining citations omitted).

*Id.* at 1253-54.

The court concluded that the arbitration provision was neither unconscionable nor unenforceable and remanded the plaintiff to arbitration. *Id.* at 1254-55.

The third instructive case, which is both the most directly relevant and the most current, is No. 06CV02358, *Bonanno v. Quizno's Franchise Co. LLC,* No. 06CV02358, 2009 WL 1068744, at *15 (D. Colo. Apr. 20, 2009). In that case a franchisee attempted to bring a class action in court against a franchisor despite a clause in the contract that constituted a bar against any class action. The plaintiffs claims were based on alleged misrepresentations regarding the benefits of franchise ownership, much like the present action is based on misrepresentations regarding the benefits of attending the School.

The court first noted that plaintiffs bore the burden of showing that the class action bar was unenforceable or unconscionable. *Id.* at *11-12. The court then specifically examined each of the seven factors enumerated by the Colorado Supreme Court in *Davis* to determine whether the class action bar was unconscionable.

## Factor 1

With respect to factor number 1, whether the agreement is a standardized form agreement executed by parties with unequal bargaining power, the court noted that the franchisor had indeed offered its franchisees a standard form franchise agreement on a take-it-or-leave-it basis, but noted that "unlike the California cases upon which Plaintiffs rely, under Colorado law, a take-it-or-leave-it contract does not automatically render the agreement unconscionable... (citations omitted)." *Id.* at *18. The court also noted that plaintiffs did not have to enter into the franchise agreement with the particular franchisor but were free to purchase a different franchise. Likewise, Respondents in this case argue that Claimants were not obligated to attend the School but could have attended other schools. Nonetheless, the court concluded that the franchisee could not truly negotiate or re-write any provision of the franchise agreement, including the class action bar and therefore the first *Davis* factor cut mildly in plaintiffs' favor. Likewise, here, the first *Davis* factor is in Claimants' favor.

## Factor 2

With respect to the second *Davis* factor, whether plaintiffs had ample opportunity to read the franchise agreement before signing it, the court found that such an ample opportunity existed. Likewise, no one has suggested that the Claimants in this case did not have the opportunity to read the agreement. Therefore the court found in that case, as I find in this case, that the second Davis factor cuts in Respondents' favor.

## Factor 3

BERNAL et al, v. BURNETT et al., 2010 WL 4025108 (2010)

With respect to the question of whether the document buried the provision in fine print, the court found that franchisor did not do so even though the class action bar was in the middle of a paragraph near the end of a 40-page agreement. In this case the facts are even stronger. The arbitration clause was a stand-alone document in regular print with the caption stating in larger-than-normal print "Agreement to Binding Arbitration and Waiver of Jury Trial." Thus, like the *Bonanno* court, I find that this factor cuts in favor of Respondents

### Factor 4

With respect to the question of whether the provision was commercially reasonable the *Bonanno* court found that it was. The court noted that "the class action bar makes litigation more difficult for... franchisees. *Id.* at *20. "But, the fact that the class action bar discourages litigation, even if it is a somewhat nefarious goal from Plaintiffs' perspective, does serve a commercial purpose from... [the franchisor's] perspective." *Id.* at *20. Therefore, it found that this factor favored enforcement of the class action bar, if only slightly. Likewise, in this case, I cannot say that the bar is commercially unreasonable from the Respondents' perspective.

### Factor at 5

The *Bonanno* court categorizes this factor -- whether the provision is substantively unfair -- as "perhaps the most important to the discussion on unconscionability." *Id.* at *20-21, and the Arbitrator agrees. The *Bonanno* notes that each franchisee spent between $20,000 to $25,000 for their franchises and that they have claimed a right to attorney's fees. Under these circumstances, it found that the class action bar would not preclude them from obtaining legal redress and, therefore, it was not substantively unfair.

Likewise in this case Claimants' action is not for small dollar amounts-the individual Claimants have five figure claims (not counting exemplary damages) and have asked for attorney's fees under the governing statutes. Apart from the restriction on class arbitrations, the agreement allows the Claimants to bring "any dispute" or obtain any "remedy" that would be "available from a court." Respondents also note that the AAA's Supplementary Procedures for Consumer-Related Disputes provide for a virtually costless method of arbitration. Respondents Unconscionability Brief at 12. Moreover, the arbitration provisions provide that "[t]he cost of the arbitration filing fee, arbitrator's compensation and facilities fee will be paid by the College, to the extent these fees are greater than a Superior Court filing fee." They also envision a procedure whereby the student can bring the arbitration in the jurisdiction closest to its school. Thus, like the Bonanno court, I do not find the arbitration clause to be substantively unfair.

### Factor 6

The *Bonanno* court examines the sixth factor, the relationship between the parties and whether there was notice or surprise, and concludes that the franchisor retained the bulk of the bargaining power. The court notes, however, that "this is only one factor of seven.... Therefore, the Court finds that this factor alone does not render the class action bar unconscionable." *Id.* at *22. The Arbitrator finds likewise in this case.

### Factor 7

In examining the seventh factor--other circumstances surrounding formation of the agreement - the *Bonanno* court notes plaintiffs argument that the franchisor used a scripted marketing pitch and induced them into signing the franchise agreement with various misrepresentations. The court notes, however, that plaintiffs did not identify any alleged misrepresentation concerning the dispute resolution clause in the franchise agreement. It also notes that under Colorado

BERNAL et al, v. BURNETT et al., 2010 WL 4025108 (2010)

law this factor requires targeted allegations of fraud against the dispute resolution clause. Therefore, it finds that this factor does not support a finding of unconscionability. *Id.* at *22

Likewise, in this case Claimants argue that the School made misrepresentations in its sales pitch which fraudulently induced them to matriculate, but none of the alleged misrepresentations are targeted against the arbitration clause. Thus, like the *Bonanno* court, I find that this factor does not support a finding of unconscionability.

Adding all of the seven factors together, the *Bonanno* court concludes that plaintiffs have failed to demonstrate any unreasonable overreaching that would render the class action bar provision unconscionable.

Likewise, the Arbitrator finds that the totality of the *Davis* factors, when added together, do not render the arbitration clause in this case unconscionable simply because it does not permit a class-action arbitration.

### Silence as Unconscionable

Claimants attempt to distinguish an express class action ban, present in each of the three cases discussed above, from the implicit ban that arises from a finding of silence on the subject. Claimants note that "[a]n implicit class arbitration ban works solely to Respondents' benefit. It was not brought to the attention of the Claimants or class members at the time they entered into the arbitration agreement so claimants and class members had no meaningful choice or ability to negotiate with Respondents regarding availability of class arbitration." Claimants' Unconscionability Brief at 17. *See also Id.* at *14-15.

Respondents reply that Claimants' argument is, in effect, an attack on the *Stolt Nielsen* opinion itself:
The common denominator here is Claimants' intractable belief that Stolt itself is unfair. Stolt requires no express preclusion of class arbitration. *Stolt* requires an affirmative agreement to class arbitration. The lack of an agreement cannot be "overreaching," or a failure of a "meeting of the minds," or an unfair trick to subvert Claimants' supposed expectations of class arbitration. It is simply proof that there is no agreement to class arbitration. If an express agreement to *preclude* class arbitration were necessary to prevent the agreement from being unconscionable, then *Stolt* implausibly makes all arbitration agreements under the FAA unconscionable unless they do what *Stolt* expressly says is unnecessary - expressly preclude class arbitration. This is merely another way of disagreeing with *Stolt* and refusing to accept its basic holding. It is not a plausible unconscionability argument.

*Stolt is* built on the understanding that parties do not have a *right* to a class arbitration unless they agree to it. Claimants' argument (now and throughout) depends on the law being the complete opposite - there is a right, and it can only be taken by agreement. *Stolt* cannot be read to support this.

Respondents' Unconscionability Brief at 14-15.

The Arbitrator agrees with Respondents' argument. The fact that the arbitration agreement is silent on the subject of class arbitration and there is no other indicia sufficient to find an "agreement to authorize" class arbitration, cannot lead to an argument that such "silence" itself is unconscionable without turning *Stolt Nielsen* on its head.

Although the Arbitrator finds on the particular facts of this case (1) that the arbitration agreement cannot be read as supporting a finding that the parties "agreed to authorize" class arbitration, and (2) that the arbitration clause is not "unconscionable" under applicable Colorado law, one can still question whether it is good public policy to permit corporations to place arbitration agreements which would preclude class arbitration in consumer contracts of adhesion.

BERNAL et al, v. BURNETT et al., 2010 WL 4025108 (2010)

If consumers are barred by the arbitration clause from proceeding with a class action in court and then are barred by the arbitration clause from proceeding with a class action in the arbitration, they are left without any class-action remedy at all. In the opinion of the Arbitrator, however, such public policy issues should be addressed by appropriate, narrowly-drawn [2] legislation regulating the use of arbitration clauses in contracts of adhesion between certain classes of parties which have unequal bargaining power. This is better than an arbitrator stretching the normal rules of contractual construction in determining the parties' intent, or stretching established case law regarding what is necessary to find a contract both procedurally and substantively unconscionable, in order to reach what the arbitrator may view as a desired result.

[2]     It is important to emphasize that such legislation should be "narrowly-drawn." There are currently two bills pending in Congress which would regulate the use of arbitration clauses in contracts between commercial entities, on the one hand, and employees, franchisees, or consumers who lack equal bargaining power. See H.R. 1020 and S. 1782. Both bills contain substantially identical language, but both go far beyond regulating arbitration agreements in contracts of adhesion.
For example, Sec. 4 of H.R. 1020. at 4, states, "Except as otherwise provided in this chapter, the validity or enforceability of an agreement to arbitrate shall be determined by the court, rather than the arbitrator...." This would overturn years of carefully crafted precedent by the Supreme Court regarding what "gateway" issues are properly for the courts and which are properly for the arbitrator.
Determining what issues are for the court and which are for the arbitrator is not an unimportant matter. For many years, an effective arbitration remedy proved elusive because any party who did not desire to go to arbitration pursuant to and agreed-upon arbitration clause would challenge the clause in court on some basis and, in essence, have a full trial on the issue before arbitration could ever begin,. This effectively defeated arbitration's ability to provide a speedier, more efficient and less expensive alternative to court litigation.
New York and other American cities have now become a favored sites for international arbitrations because of its arbitration law, which prevents undue court interference in the process. Excessively broad legislation, which goes beyond protecting consumers and others with unequal bargaining power, would greatly damage the continued viability of deciding international arbitrations in the United States.

## CONCLUSION

As required by Supplementary Rule 3, I hereby render my "reasoned, partial final award on the construction of the arbitration agreement" and determine that the arbitration clause in this case does not permit this arbitration to proceed on behalf of a class. I further determine that the clause is not unconscionable.

All further proceedings in this arbitration are stayed for 30 days from the date of this Partial Final Clause Construction Award to permit any party to move a court of competent jurisdiction to confirm or to vacate this award. Any party who makes such an application to a court shall simultaneously notify the Arbitrator of the application and the party that seeks court review of this award shall also promptly inform the Arbitrator of the court's ruling.

SO ORDERED

Dated: July 16, 2010

<<Signature>>

William H. Baker, Arbitrator

2012 WL 5385039 (N.D.Ga.) (Arbitration Award)
United States District Court, N.D. Georgia.

DIRECTV, LLC,

v.

ARNDT et al.

Nos. 12CV03233, 77 160 00096 12.
October 18, 2012.

Editor's Note: This document was acquired from a Court file.

**Case Type: Contract**
**Award Amount: $0**
**Attorney for Petitioner: Halima Horton**
**Attorney for Respondent: Andrew W. Funk**
**Award Date: 10/10/2012**
**Arbitrator: Merlyn W. Clark**

**Partial Final Award on Clause Construction**

**Arbitrator: Merlyn W. Clark**

**AMERICAN ARBITRATION ASSOCIATION**

I, Merlyn W. Clark, the undersigned arbitrator, having been designated in accordance with the arbitration agreement entered into between the above-named Claimants and Respondent, having been duly sworn, having read and considered the parties' submissions on clause construction, and having heard and considered the oral arguments of counsel for the parties, issue the following Partial Final Clause Construction Award under Rule Three (3) of the Supplemental Rules for Class Actions of the American Arbitration Association ("AAA"):

**I.**

**FACTUAL BACKGROUND**

The named Claimants are former Boise call center customer service representatives of Respondent, DirecTV Customer Services, Inc., ("DIRECTV") who allege that DIRECTV violated Idaho wage law by suffering or permitting them to work off the clock, and failing to compensate them for the time worked. Claimants allege, *inter alia*, that DIRECTV required its employees to arrive at the worksite early and perform a variety of tasks before they were able or permitted to clock in and begin being compensated for their time. Each Claimant seeks unpaid wages and penalties under the Idaho Wage Claim Act, Idaho Code § 45-601, *et seq.* Claimants are not seeking relief under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA").

As a condition of their employment, each Claimant has entered into a "Mutual Agreement to Arbitrate Claims" (the "Mutual Agreement") with Respondent. Under the Mutual Agreement, the parties agree to submit covered disputes to arbitration for final resolution. The Mutual Agreement provides that the arbitration of a covered dispute shall be conducted "in accordance with the Arbitration Procedure General" ("Arbitration Procedure"), which provides for

DIRECTV, LLC, v. ARNDT et al., 2012 WL 5385039 (2012)

specific procedures to be followed during the arbitration of any covered dispute between the parties. The Mutual Agreement and the Arbitration Procedure are collectively referred to herein as the "Arbitration Agreements." The Mutual Agreement provides as follows:

## MUTUAL AGREEMENT TO ARBITRATE CLAIMS

The DIRECTV Group (hereafter referred to as the "Company") acknowledges that a quick, fair and cost effective internal dispute resolution procedure for employee/employer complaints is one method of creating an environment that provides each employee the "opportunity to contribute and develop to his or her full potential" The Company's Arbitration Procedure is intended to be an impartial, cost effective and speedy mechanism for resolving employment or other disputes between the Company and its employees.
Disputes which shall be submitted to binding arbitration for final resolution include: all claims or controversies, past, present or future, except claims identified in the Arbitration Procedure under the heading "Claims Not Covered by the Agreement," arising out of an employee's employment or its termination, that the Company may have against an employee or that an employee may have against any of the following (1) the Company; (2) its officers, directors, employees or agents in their capacity as such or otherwise, (3) the Company's parent, subsidiary and affiliated entities, (4) the benefit plans or the plans' sponsors, fiduciaries, administrators, affiliates and agents, and or (5) all successors and assigns of any of them ("claims").

Claims and disputes by employees hired after January 1, 1993 shall be governed by this Agreement. Employee understands that any reference to this Agreement to the Company will be a reference only to the DIRECTV Group subsidiary and affiliated entities who have adopted mandatory arbitration, and all successor and assigns of any of them.

Except as set forth in the Arbitration Procedure, the decision of the Arbitrator shall be final and binding upon all parties. The parties' mutual promise to arbitrate differences, rather than litigate them before courts or other tribunals, provides adequate consideration for each other.

By entering into this Agreement, Employee does not waive his/her right to file an administrative claim or complaint with the appropriate administrative agency, but does waive his/her right to file a civil action and a jury trial, because the Agreement provides for an adequate and equal opportunity for the vindication of claims and complaints through this arbitration process.

The parties agree that the Company is engaged in transactions involving interstate commerce.

Arbitration under this Agreement may be compelled and enforced according to the Federal Arbitration Act (9 U.S.C. § 1 et seq.) and the California Arbitration Act (California Code of Civil Procedure § 1280 et seq.) and shall be conducted in accordance with the Arbitration Procedure. This Agreement, and/or the Arbitration Procedure, do not create nor are either to be construed to create any contract of employment, expressed or implied, and is in no way intended to alter or affect Employee's status as an employee.

This Agreement shall survive the employer-employee relationship between Employee and the Company, and shall apply to all claims whether they arise or are asserted during or after Employee's employment or after Employee's separation of employment with the Company. This Agreement can be modified or revoked only by a writing signed by both parties that references this Agreement and specifically states an intent to modify or revoke it. If any part of this Agreement or the Arbitration Procedure is found to be void or otherwise unenforceable, the remainder of the Agreement/Arbitration Procedure will continue to be in full force and effect.

This is the complete Agreement of the parties on the subject of arbitration of disputes (except for any arbitration agreement in connection with any pension or benefit plan). This Agreement supersedes any prior or contemporaneous

DIRECTV, LLC, v. ARNDT et al., 2012 WL 5385039 (2012)

oral or written understandings on the subject. No party is relying on any representations, oral or written, specifically set forth in this Agreement.

I ACKNOWLEGE THAT I HAVE READ THIS AGREEMENT AND THE ARBITRATION PROCEDURE, THAT I UNDERSTAND THEIR TERMS AND THAT I HAVE ENTERED INTO THIS AGREEMENT VOLUNTARILY AND NOT IN RELIANCE ON ANY PROMISES OR REPRESENTATIONS BY THE COMPANY OTHER THAN THOSE CONTAINED WITHIN THE AGREEMENT AND THE ARBITRATION PROCEDURE.

Mutual Agreements containing the same terms have been signed by Claimants Nancy Emmett on September 10, 2007, Sandra A. Wager on September 17, 2007 and Raymundo Pena on October 29, 2007.

The Arbitration Procedure that is incorporated into each of the signed Mutual Agreements, contain the following provisions:

### ARBITRATION PROCEDURE GENERAL

The DIRECTV Group (the "Company') Arbitration Procedure is intended to be an impartial, cost effective and speedy mechanism for resolving employment or other disputes between the Company and its employees. Employees may obtain final and binding arbitration of all claims in accordance with the Mutual Agreement to Arbitrate Claims ("Arbitration Agreement") and the procedure described herein. Since January 1, 1993 all new hires of DIRECTV Group companies (formerly Hughes Electronics) that have adopted this Procedure, have been required to execute a Mutual Agreement to Arbitrate Claims as a condition of employment.

### PROCEDURE

The arbitration procedure is applicable to all employees at the Company locations. The reference in the Arbitration Agreement to "Employee" includes eligible current and former employees.

#### Claims Covered by the Agreement

Disputes which shall be submitted to binding arbitration for final resolution include: all claims or controversies ("claims"), past, present or future, arising out of an employee's employment or its termination, that the Company may have against an employee or that an employee may have against any of the following (1) the Company; (2) its officers, directors, employees or agents in their capacity as such or otherwise, (3) the Company's parent, subsidiary and affiliated entities, (4) the benefit plans or the plans' sponsors, fiduciaries, administrators, affiliates and agents, and or (5) all successors and assigns of any of them.
The only claims that are arbitrable are those that, in the absence of the Arbitration Agreement, would have been Justiciable under applicable state or federal law. The claims covered by the Arbitration Agreement include, but are not limited to claims for wages or other compensation due; claims for breach of any contract or covenant (express or implied); tort claims; claims for discrimination (including, but not limited to, race, sex, sexual orientation, religion, national origin, age, marital status, physical or mental disability, or medical condition); claims for benefits (except claims under an employee benefit or pension plans that either (1) specifies that its claims procedure shall culminate in an arbitration procedure different from this one, or (2) is underwritten by a commercial insurer which decides claims); and claims for violation of any federal, state, or other governmental law, statute, regulation, or ordinance, except claims excluded below under the heading "Claims Not Covered by the Agreement."

DIRECTV, LLC, v. ARNDT et al., 2012 WL 5385039 (2012)

## Claims Not Covered by the Agreement

Claims for Workers' Compensation or Unemployment Compensation benefits cannot be submitted to binding arbitration under the Arbitration Agreement. Also not covered are claims by the Company or by the employee for temporary restraining orders or preliminary injunctions ("temporary equitable relief") in cases in which such temporary equitable relief would be otherwise authorized by law. Such resort to temporary equitable relief shall be in aid of arbitration only, and in such cases the trial on the merits of the action will occur in front of, and will be decided by, the Arbitrator, who will have the same ability to order legal or equitable remedies as could a court of general jurisdiction.

## Required Notice of Claims and Time Limits

The aggrieved party must give written notice of any claim to the other party no later than the expiration of the statute of limitations (deadline for filing) that the law prescribes for the claim. For example, an employee's request for arbitration of claims processed through the Ethics Program must be made within any applicable federal or state statute of limitations. The aggrieved party is encouraged to give written notice of any claim as soon as possible after the decisions of the Ethics Corporate Responsibility Committee (or its designee) are issued or, as soon as possible after the event or events in dispute occur so that arbitration of any differences may take place promptly. However, any request for arbitration of claims made beyond the applicable federal or state statute of limitations shall be considered "late." Late claims shall be deemed void, waived and not arbitrable. An employee may file an administrative agency charge of discrimination, provided however, that such a filing shall not affect this Arbitration Procedure, or the running of the applicable federal or state statute of limitations periods.

Written notice to the Company, or its officers, directors, employees or agents, shall be sent to employee's local Human Resources Department at the Company's then current address. Any notice of claim by the Company against an employee shall be sent to the employee's last address of record.

The written notice shall identify and describe the nature of all claims asserted and the facts upon which the claims are based and the relief or remedy sought. The notice shall be sent to the other party by certified or registered mail, return receipt requested or by personal delivery to a designated Human Resources representative or the employee.

## Representation

Any party may be represented at arbitration by an attorney or other representative selected by the party, provided however, that no current or former supervisory or managerial employee of the Company shall represent another employee.

## Discovery

Each party shall have the right to take the deposition of one individual and any expert witness designated by another party. Each party also shall have the right to make requests for production of documents to any party and to subpoena documents from third parties. Requests for additional discovery may be made by mutual agreement or to the Arbitrator selected pursuant to the Agreement. Unless additional discovery is agreed to by mutual agreement between the parties, the Arbitrator shall grant an order for the requested additional discovery that the Arbitrator finds the party requires to adequately arbitrate a claim, taking into account the parties' mutual desire to have a fact, cost-effective dispute resolution mechanism.

DIRECTV, LLC, v. ARNDT et al., 2012 WL 5385039 (2012)

### Designation of Witnesses

At least, thirty (30) days before the arbitration, the parties must exchange lists of witnesses, including any experts, and copies of all exhibits intended to be used at the arbitration.

### Subpoenas

Each party shall have the right to subpoena witnesses and documents for the arbitration as well as documents relevant to the case from third parties.

### Arbitration Process

The arbitration will be conducted either by the American Arbitration Association ("AAA"), the Judicial Arbitration & Mediation Services ("JAMS") or as otherwise mutually agreed upon by the parties ("Tribunal").

The parties agree that, except as provided in the Arbitration Agreement, the arbitration shall be in accordance with the selected Tribunal's then-current employment arbitration rules/procedures. The Arbitrator shall be either a retired judge, or an attorney who is experienced in employment law and licensed to practice law in the state in which the arbitration is convened (the "Arbitrator"). The arbitration shall take place in or near the city in which employee is or was last employed by the Company. However, if the employee is or was last employed on a long or short term domestic or foreign assignment, the arbitration shall take place at the city in which the "home" employing organization is located.

The Arbitrator shall be selected as follows. If the parties cannot agree on an arbitrator, the selected Tribunal shall give each party a list of seven (7) arbitrators drawn from its panel of employment dispute arbitrators. Each party shall have ten (10) calendar days from receipt of the list to strike all names on the list it deems unacceptable. If only one common name remains on the lists of all parties, that individual shall be designated as the. Arbitrator. If more than one common name remains on the lists of all parties, the parties shall strike names alternately from one list of common names until only on[e] remains. The party who did not initiate the claim shall strike first. If no common name exists on the lists of all parties, the selected Tribunal shall furnish an additional list of seven (7) arbitrators from which the parties shall strike alternately, with the party initiating the claim striking first, until only one name remains. That person shall be designated as the Arbitrator.

The Arbitrator shall apply the substantive law (and the law of remedies, if applicable) of the state in which the claim arose, or federal law, or both, as applicable to the claim(s) asserted. The Arbitrator is without jurisdiction to apply any different substantive law or law of remedies. The Federal Rules of Evidence shall apply. The Arbitrator shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of the Arbitration Agreement, including but not limited to any claim that all or any part of the Arbitration Agreement is void or voidable. The arbitration shall be final and binding upon the parties, except as provided herein.

The Arbitrator shall have jurisdiction to hear and rule on pre-hearing disputes and is authorized to hold pre-hearing conferences by telephone or in person, as the Arbitrator deems advisable. The Arbitrator shall have the authority to entertain a motion to dismiss and/or a motion for summary judgment by any party and shall apply the standards governing such motions under the Federal Rules of Civil Procedure.

Either party, at its expense, may arrange for and pay the cost of a court reporter to provide a stenographic record of proceedings.

Should any party refuse or neglect to appear for, or participate in, the arbitration hearing, the Arbitrator shall have the authority to decide the dispute based upon whatever evidence is presented.

DIRECTV, LLC, v. ARNDT et al., 2012 WL 5385039 (2012)

Either party, upon request at the close of hearing, shall be given leave to file a post-hearing brief. The time for filing such a brief shall be set by the Arbitrator.

The Arbitrator shall render an award and written opinion in the form typically rendered in labor arbitrations no later than thirty (30) days from the date of the arbitration hearing concludes or the post-hearing briefs (if requested) are received, whichever is later. The opinion shall include the factual and legal basis for the award.

Either party shall have the right, within twenty (20) days of issuance of the Arbitrator's opinion, to file with the Arbitrator a motion to reconsider (accompanied by a supporting brief), and the other party shall have twenty (20) days from the date of the motion to respond. The Arbitrator thereupon shall reconsider the issues raised by the motion and, promptly, either confirm or change the decision, with (except as provided herein) shall then be final and conclusive upon the parties.

### Judicial Review

Either Party may bring an action in any court of competent jurisdiction to compel arbitration under the Arbitration Agreement, to enforce an arbitration award and/or to vacate an arbitration award, in actions seeking to vacate an award, the standard of review to be applied to the arbitrator's findings of fact and conclusions of law will be the same as that applied by an appellate court reviewing a decision of a trial court sitting without a jury.

### Arbitration Fees and Costs

The Company will be responsible for paying any filing fee and the fees and costs of the Arbitrator, provided however, if the employee is the party initiating the claim, the employee shall pay the costs of his/her own filing fees and costs which are normally incurred by a plaintiff in a civil action, filing fees, subpoena fees, jury fees, deposition costs, and transcript services. Each party shall pay for its own costs and attorneys' fees, if any. However, if any party prevails on a statutory claim which affords the prevailing party attorneys' fees and costs, or if there is a written agreement providing for attorneys' fees and/or costs, the Arbitrator may award reasonable attorneys' fees and/or costs to the prevailing party, applying the same standards a court would apply under the law applicable to the claim(s).

### II.

### PROCEDURAL BACKGROUND

Claimants filed a Class Action Complaint for violation of Idaho Wage Claim Act against DIRECTV on April 23, 2009. On April 22, 2010, Claimants moved to certify a class. The district court granted Claimants' motion on July 23, 2010 and certified a class consisting of customer service representatives employed by DIRECTV at least six months prior to the filing of the complaint. Certain members of the putative class had settled their unpaid wage claims before Claimants moved for class certification. On April 20, 2011, the district court decertified the settling employee subclass.

DIRECTV moved to compel arbitration pursuant to the Arbitration Agreement and Federal Arbitration Act ("FAA"). DIRECTV moved for entry of an order decertifying the class and compelling individual arbitration of Claimants' claims. Claimants did not object to arbitration and conceded that "whether this case proceeds as a class-wide arbitration or an individual arbitration is a matter for an arbitrator to decide" if the district court found arbitration is required. See Claimants' Memorandum In Opposition To Motion To Decertify and Compel Arbitration, (Aug. 10, 2011) p.2. On November 3, 2011, the district court granted DIRECTV'S motion to compel arbitration, but refused to compel individual arbitrations.

DIRECTV, LLC, v. ARNDT et al., 2012 WL 5385039 (2012)

On December 14, 2011, Claimants filed their demand for arbitration that is the subject of this proceeding. In this arbitration, Claimants seek to represent all similarly-situated individuals who have worked in non-exempt (hourly) positions at DIRECTV'S Boise call center during the period October 23, 2008 to the present.

Claimants now seek an interim "clause construction" award ruling that this case can proceed on a class basis, in accordance with the American Arbitration Association's Supplementary Rules for Class Arbitration, Rule No. 3. Claimants seek to pursue their claims as class claims on behalf of themselves and all others similarly situated. Respondent has objected to the claims proceeding as class claims, asserting that the Respondent has not agreed to a class arbitration proceeding and that the arbitration agreement of the parties does not provide for a class arbitration of this dispute.

Pursuant to the Preliminary Hearing Scheduling Order No. 1 in this proceeding, the parties submitted simultaneous opening briefs and simultaneous response briefs on the issue that is now before the Arbitrator. Oral arguments of counsel for the parties were heard by the Arbitrator on September 11, 2012. James Piotrowksi of Herzfeld & Piotrowski, LLP and Phillip H. Gordon of Gordon Law Offices Chartered appeared for Claimants. James C. Dale and W. Christopher Pooser of Stoel Rives LLP appeared for Respondent. At the close of the hearing, the clause construction issue was fully submitted to the Arbitrator.

### III.

### ISSUE PRESENTED

Pending before the Arbitrator for the issuance of a Partial Final Clause Construction Award is the issue whether the parties, in their agreement to arbitrate this dispute, have agreed to authorize the arbitration to proceed on behalf of a class of present and former employees of Respondent.

### IV.

### GOVERNING RULES

The Arbitration Agreements that governs this proceeding provide that the "arbitration will be conducted either by the American Arbitration Association ("AAA"), the Judicial Arbitration & Mediation Services ("JAMS") or as otherwise mutually agreed upon by the parties ("Tribunal")." See Arbitration Procedure, p. 2. The parties have selected the AAA Tribunal for this proceeding, including the current AAA employment arbitration rules/procedures.

No reference is made in the Arbitration Agreements between these parties to the AAA's Supplementary Rules for Class Arbitrations ("Supplementary Rules"). Nevertheless, under Rule 1 of the Supplementary Rules, where a party submits a dispute to arbitration on behalf of or against a class or purported class, the Supplementary Rules apply. The federal courts are in agreement that consent to the AAA's rules also constitutes consent to the Supplementary Rules. See, e.g., *Yahoo! Inc. v. Iversen*, 836 F. Supp.2d 1007, 1011-12, 2011 WL 4802840, at *4 (N.D. Cal. Oct. 11, 2011) (holding that parties agreement to AAA National Rules for the Resolution of Employment Disputes also constituted agreement to the Supplementary Rules); *Bergman v. Spruce Peak Realty, LLC*, 2011 WL 5523329, at *3 (D.Vt. Nov. 14, 2011) (relying upon Supplementary Rules when referring class arbitration issue to the arbitrator, where parties agreed to the Commercial Arbitration Rules of the AAA).

Rule 3 of the AAA Supplementary Rules requires the Arbitrator to determine as a threshold matter, in a reasoned, partial final award on the construction of the arbitration clause, whether the applicable arbitration clause permits the arbitration to proceed on behalf of or against a class (the "Clause Construction Award").

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Rule 3 also provides that "[i]n construing the applicable arbitration clause, the arbitrator shall not consider the existence of these Supplementary Rules, or any other AAA rules, to be a factor either in favor of or against permitting the arbitration to proceed on a class basis." See AAA Supplementary Rule 3.

### V.

### GOVERNING LAW

The Arbitration Agreements in this matter provide that the Federal Arbitration Act (9 U.S.C. § 1 et seq.) shall govern this proceeding. See Mutual Agreement, p. 1.

In *Green Tree Financial Corp. v. Bazzle*, 539 U.S. 444, 123 S.Ct. 2402, 156 L.Ed.2d 414 (2003), the Supreme Court held that, where an arbitration agreement was silent regarding the availability of class-wide relief, an arbitrator, and not the court, must decide whether class relief is permitted. The Arbitration Agreements between these parties are silent regarding the availability of class-wide relief.

The Arbitration Procedure in this matter provides that "[t]he Arbitrator shall apply the substantive law (and the law of remedies, if applicable) of the state in which the claim arose or federal law, or both, as applicable to the claim(s) asserted. The Arbitrator is without jurisdiction to apply any different substantive law or law of remedies. ... The Arbitrator shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of the Arbitration Agreement, including but not limited to any claim that all or any part of the Arbitration Agreement is void or voidable. The arbitration shall be final and binding upon the parties, except as provided herein." See Arbitration Procedure, p. 3.

In *Stolt-Nielsen v. AnimalFeeds International Corp.*, ___ U.S. ___, 130 S.Ct. 1758, (2010), the Court explained that, because the parties in that case had stipulated that their agreement was silent on class arbitration, the arbitrators' "proper task was to identify the rule of law that governs," presumably "the FAA itself or one of the two bodies of law that the parties claimed were governing, i.e., either federal maritime law or New York law." *Id.* at 1768. However, instead of "inquiring whether the FAA, maritime law, or New York law contains a 'default rule' under which an arbitration clause is construed as allowing class arbitration in the absence of express consent, the panel in *Stolt-Nielsen* proceeded as if it had the authority of a common-law court to develop what it viewed as the best rule to be applied in such a situation." *Id.* at 1768-69. The arbitrators in *Stolt-Nielsen* perceived a consensus favoring class arbitration, and considered only whether there was a "good reason not to follow that consensus." *Id.* at 1769. Finding no such reason, the arbitration panel determined that the parties' agreement permitted class arbitration. The Court concluded that "the panel simply imposed its own conception of sound policy," and thereby exceeded its powers. *Id.* Finding that there was only one possible outcome-bilateral arbitration- the Court vacated the award and declined to direct a rehearing by the arbitrators. *Id.* at 1770.

The *Stolt-Nielsen* Court addressed the "standard to be applied by a decision maker in determining whether a contract may permissibly be interpreted to allow class arbitration," a question left undecided by *Green Tree. Id.* at 1772. The Court based its analysis on the FAA's basic precept that arbitration "is a matter of consent, not coercion." *Id.* at 1773. In this respect, parties are "generally free to structure their arbitration agreements as they see fit," and to *specify with whom* they choose to arbitrate their disputes." *Id.* at 1774 (emphasis in original)(citations and internal quotation marks omitted). As such, the Court held that a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so." *Id.* at 1775 (emphasis in original). The Court concluded that the arbitrators in *Stolt-Nielsen* had erred by "impos[ing] class arbitration even though the parties concurred that they had reached 'no agreement' on that issue." *Id.* The panel in *Stolt-Nielsen* "regarded the agreement's silence on the

question of class arbitration as dispositive." *Id.* This conclusion, the Court found, was "fundamentally at war with the foundational FAA principle that arbitration is a matter of consent." *Id.*

In so deciding, the Court explained that arbitrators may properly presume authorization to impose certain procedural requirements, but "[a]n implicit agreement to authorize class-action arbitration ... is not a term that the arbitrator may infer solely from the fact of the parties' agreement to arbitrate." *Id.* This is so, the Court explained, "because class-action arbitration changes the nature of the arbitration to such a degree that it cannot be presumed the parties consented to it by simply agreeing to submit their disputes to an arbitrator." *Id.* The Court then described several fundamental differences between bilateral and class arbitration. For example, in class arbitration, the arbitrator "no longer resolves a single dispute between the parties to a single agreement, but instead resolves many disputes between hundreds or perhaps even thousands of parties," and the presumption of privacy and confidentiality that applies in many bilateral arbitrations would not apply in class arbitrations. *Id.* at 1776. Further, "[t]he arbitrator's award no longer purports to bind just the parties to a single arbitration agreement, but adjudicates the rights of absent parties as well." *Id.* Additionally, although the stakes are similar to those in class action litigation, "the scope of judicial review is much more limited." *Id.* The Court explained that these differences and disadvantages "give reason to doubt the parties' mutual consent to resolve disputes through class-wide arbitration." *Id.* at 1775-76. The Court therefore concluded that "the differences between bilateral and class-action arbitration are too great for arbitrators to presume, consistent with their limited powers under the FAA, that the parties' mere silence on the issue of class-action arbitration constitutes consent to resolve their disputes in class proceedings." *Id.* at 1776. In light of these "crucial differences," the majority saw the question as "being whether the parties agreed to *authorize* class arbitration." *Id.* (emphasis in original).

Unlike the facts in this dispute with DIRECTV, the parties in *Stolt-Nielsen* had stipulated that their contract was silent on the subject of class arbitration and that they had no agreement to authorize class arbitration. Thus, the Court ruled they could not be "compelled to submit their dispute to class arbitration." *Id.* In light of this stipulation, the Court in *Stolt-Nielsen* declined to "decide what contractual basis may support a finding that the parties agreed to authorize class-action arbitration." *Id.* at 1776 n. 10.

A year later, in *AT&T Mobility LLC v. Conception,* ___ U.S. ___, 131 S.Ct. 1740 (2011), the Supreme Court reiterated many of the same concerns regarding class arbitration. In *Conception,* the Court held that a state law prohibiting class action waivers in arbitration agreements was preempted by the FAA. *Id.* at 1753. In so holding, the Court in *Conception* explained that class arbitration "includes absent parties, necessitating additional and different procedures and involving higher stakes. Confidentiality becomes more difficult. And while it is theoretically possible to select an arbitrator with some expertise relevant to the class-certification question, arbitrators are not generally knowledgeable in the often-dominant procedural aspects of certification...." *Id.* at 1750. The Court also emphasized that arbitral awards are subject to limited appellate review, and raised concerns that defendants might feel increased pressure to settle questionable claims when confronted with class arbitration. *Id.* at 1752. Given these disadvantages, the Court found "it hard to believe that defendants' would agree to class arbitration and thereby "bet the company with no effective means of review." *Id.* As such, *the Conception* Court held that "class arbitration, to the extent it is manufactured by [state law] rather than consensual, is inconsistent with the FAA." *Id.* at 1751-52.

*Stolt-Nielsen* and *Conception* instruct the arbitrator that without a contractual or other legal basis for class arbitration, an arbitrator has no authority to order the parties to submit to class arbitration. See *Conception,* 131 S.Ct. at 1750 ("In *[Stolt-Nielsen]* we held that an arbitration panel exceeded its powers under § 10(a)(4) of the FAA by imposing class procedures based on policy judgments rather than the arbitration agreement itself or some background principle of contract law that would affect is interpretation.").

In *CompuCredit Corp. v. Greenwood,* ___ U.S. ___, 132 S. Ct. 665 (2012), the Supreme Court held that courts must enforce agreements to arbitrate according to their terms, "even when the claims at issue are federal statutory claims, unless the

DIRECTV, LLC, v. ARNDT et al., 2012 WL 5385039 (2012)

FAA's mandate has been overridden by a contrary congressional command." 132 S. Ct. at 669 (internal quotations omitted).

The interpretation of an arbitration agreement is generally a matter of state law. See 130 S.Ct. at 1773, citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624 (2009); *Perry v. Thomas*, 482 U.S. 483, 493, n. 9 (1987). Thus, in determining whether the parties in this matter have agreed to permit a class proceeding, the arbitrator must apply general contract principles that govern in this jurisdiction.

*Stolt-Nielsen* does not require that there be an express agreement to class arbitration in order for arbitrators, within their powers, to find that the parties agreed to class arbitration. The Court acknowledged that "[i]n certain contexts, it is appropriate to presume" that the parties "implicitly authorize [d] class arbitration. 130 S.Ct. at 1775. However, this implicit authorization may not be inferred from the mere "fact of the parties' agreement to arbitrate." *Id.* See also, 130 S.Ct. at 1783 (Ginsburg, J. dissenting) ("[T]he Court does not insist on express consent to class arbitration."); *Fantastic Sams Franchise Corp. v. FSRO Association Ltd.*, 683 F.3d 18, 2012 U.S. App. LEXIS 13175 (1st Cir., 2012) (acknowledged that *Stolt-Nielsen* does not require a express agreement for class arbitration and that it may be implied from the agreement of the parties, citing in accord, *Sutter v. Oxford Health Plans LLC*, 675 F.3d 215 (3d Cir. 2012) and *Jock v. Sterling Jewelers Inc.*, 646 F.3d 113 (2d Cir. 2011), *cert denied*, 132 S. Ct. 1742 (2012)).

The Supreme Court has stated that "[w]hether enforcing an agreement to arbitrate or construing an arbitration clause, courts and arbitrators must 'give effect to the contractual rights and expectations of the parties. (Citation omitted.) In this endeavor, 'as with any other contracts, the parties' intentions control.' (Citation omitted.) This is because an arbitrator derives his or her powers from the parties' agreement to forgo the legal process and submit their disputes to private dispute resolution." 130 S.Ct. at 1774.

The Supreme Court's decision in *AT&T Mobility LLC v. Concepcion* obligates courts to compel individual arbitration even where the plaintiff has proven that doing so would make it impossible to vindicate statutory rights. *See, e.g., Pendergast v. Sprint Nextel Corporation*, 2012 U.S. App. LEXIS 17512 at *26 (11th Cir., August 20, 2012) ("The Supreme Court in *Concepcion* expressly rejected the notion that the state law should not be preempted because the class action waiver would effectively shield the defendant from liability. *See Concepcion*, 131 S.Ct. at 1753."); *Cruz v. Cingular Wireless, LLC*, 648 F.3d 1205 (11th Cir. 2011).

Idaho law is consistent with the Supreme Court's view that arbitration is a consensual process. *See, e.g., Hecla Mining Company v. The Bunker Hill Company*, 101 Idaho 557, 564, 617 P.2d 861, 868, 1980 Ida. LEXIS 504 (1980) ( "The essential nature of arbitration is that the parties, by consensual agreement, have decided to substitute the final and binding judgment of an impartial entity conversant with the business world for the judgment of the courts.") ("It is beyond cavil that arbitrator's powers stem from the agreement of the parties."). *See also, Norton v. California Insurance Guarantee Assoc*, 143 Idaho 922, 925, 155 P.3d 1161, 1164, 2007 Ida. LEXIS 43 (2007) ("An arbitrator's authority is derived from the parties' arbitration agreement.") (citing *Hecla Mining Co. v. Bunker Hill Co., supra*).

In light of the fact that the Arbitration Agreements fail to address class arbitration, it behooves the arbitrator to consult state or federal law to determine if a certain "default" class arbitration rule exists in the absence of an agreement. *Stolt-Nielsen*, 130 S. Ct. 1775. *Stolt-Nielsen* makes clear that no default rule exists under federal law. The parties in this arbitration have not cited any such default rule under Idaho law and this Arbitrator has been unable to locate one.

**VI.**

**ANALYSIS**

DIRECTV, LLC, v. ARNDT et al., 2012 WL 5385039 (2012)

It is clear that the parties in this dispute agreed that the claims that are the subject of this arbitration would be submitted to binding arbitration. The Arbitration Agreements expressly cover claims for wages or other compensation due. It is also clear that the Arbitration Agreements do not expressly address whether the claims can be presented in a class arbitration proceeding. As instructed by the Supreme Court in *Stolt-Nielsen*, the failure of the parties to expressly address the class arbitration question does not support a finding that a class arbitration is authorized. The arbitrator, applying general contract law, must determine whether the parties agreed to authorize class arbitration. 130 S.Ct. at 1758, 1775-76.

Claimants argue that there are multiple contractual bases to determine that DIRECTV'S arbitration agreements permit class arbitration. Claimants correctly assert that "it is a fundamental principle of contract law that all the terms in an agreement should be given effect. See Restatement (Second) of Contracts § 203(a) (1981) ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect"). Claimants' Opening Memorandum on Clause Construction ("Claimants' Opening Memo."), p. 13.

In support of their argument, Claimants cite to the language in the Arbitration Agreements that the disputes which shall be submitted to binding arbitration include "all claims or controversies, past, present or future, except claims identified in the Arbitration Procedure under the heading 'Claims Not Covered By The Agreement,' arising out of an employee's employment or its termination." Id. at 13-14. This argument fails to recognize that the language cited from the Arbitration Agreements is a reference to substantive claims that are subject to arbitration and not to the procedures that are available to pursue such substantive claims and remedies.

A class action is a form of lawsuit in which a group of claimants may pursue their substantive claims to court. It is a procedural device intended to advance judicial economy by trying claims together that lend themselves to collective treatment. *See Blaz v. Belfer*, 368 F.3d 501, 505 (5th Cir. 2004). In the United States federal courts, class actions are governed by the Federal Rules of Civil Procedure, Rule 23 and 28 U.S.C.A. § 1332(d). Under the rule and statute, while a class action may lead to certain types of remedies or relief, a class action is not itself a remedy. *See Jock v. Sterling Jewelers, Inc.*, 646 F.3d 113, 132 (Winter, J., dissenting). A class arbitration is a similar procedural device in which a group of claimants may pursue their common substantive claims in an arbitration forum. Class arbitration, like a class action, is a procedure for enforcing substantive rights, but it is not a substantive right in itself. As stated by the United States Supreme Court, there is no right to pursue substantive claims in a class arbitration proceeding unless the parties have agreed to do so. 130 S. Ct. at 1758.

This language merely indicates that the parties agreed to arbitrate their disputes and says nothing about whether they agreed to class proceedings. In *Reed v. Florida Metropolitan University, Inc.*, 681 F.3d 630 (5th Cir., 2012), the Fifth Circuit Court of Appeal addressed this language. The Court wrote: "The 'any dispute' clause is a standard provision that may be found, in one form or another, in many arbitration agreements. (Citations and examples omitted.) On its face, the "any dispute" clause merely reflects an agreement between the parties to arbitrate their disputes." 681 F.3d at 642. The Court added that "*Stolt-Nielsen*2029137462;0122;2021840752;RT;;; makes clear, however, that an 'implicit agreement to authorize class arbitration ... is not a term that the arbitrator may infer solely from the fact of the parties' agreement to arbitrate.' 130 S.Ct. at 17752029137462;0032;2021840752;RP;;708;1775. ... This clause is therefore not a valid contractual basis upon which to conclude that the parties agreed to submit to class arbitration." 681 F.3d at 642-432029137462;0033;2027723962;RP;;506;642.

Claimants also argue that Idaho law requires the Arbitration Agreements to be construed as permitting arbitration of class claims. Claimants correctly assert that "the purpose of the FAA is to put agreements to arbitrate on an equal footing with any other contract" and that "the interpretation or construction of contracts (if the plain language does not resolve a dispute over meaning) is a matter of state law." Claimants' Opening Memo., p. 16. Claimants cite authorities which support their contention that the claims involved in this proceeding are "arbitrable," which is not contested. The issue before the Arbitrator is not whether the wage and compensation claims are arbitrable but rather whether they are

arbitrable in a class arbitration proceeding. The authorities cited by Claimants in support of this argument do not address this argument. Moreover, neither the authorities cited nor logic support the Claimants' contention that merely because the claims were brought as a class action, "if the arbitration agreement does not cover class actions, then this matter should be remanded to the District Court." *Id.* The alternative, if the arbitration agreements do not cover class actions, is to require individual arbitration proceedings in compliance with the Arbitration Agreements rather than remand this matter to the District Court. *See, e.g., Stolt-Nielsen,* 130 S.Ct. at 1770. Where the Arbitration Agreements in this matter are silent on whether claims under the Agreements can proceed as class claims, the FAA requires the Arbitration Agreements be enforced according to their terms, meaning this arbitration must proceed bilaterally. *See, e.g., Reed v. Florida Metropolitan University, Inc.,* 681 F.3d 630, 646 (5th Cir. 2012) (where the arbitration cannot proceed as a class arbitration it must proceed bilaterally).

Claimants contend that the express incorporation of AAA rules of arbitration demonstrates the intent to arbitrate class claims. Claimants argue that because the Arbitration Procedures provisions state that the arbitration will be conducted by either the AAA or the Judicial Arbitration & Mediation Services ("JAMS") and because both AAA and JAMS have rules that provide procedures for class claims, then it follows that the parties must have intended to allow the claims of Claimants to be pursued in a class arbitration proceeding. The fact that the rules would provide procedures for processing class claims in cases where the parties have agreed to allow class claims does not mean that the parties have in fact agreed to allow class claims. That is putting the cart before the horse. First, one must determine whether the parties have agreed to allow class claims before one can determine whether the class claims rules are applicable to resolve the dispute. The provision that the arbitration will be conducted by either the AAA or the JAMS rules does not constitute an agreement to authorize class arbitration, particularly when the rules themselves expressly provide that "[i]n construing the applicable arbitration clause, the arbitrator shall not consider the existence of these Supplementary Rules, or any other AAA rules, to be a factor either in favor of or against permitting the arbitration to proceed on a class basis." AAA Supplementary Rule 3.

Claimants further argue that "Respondent's desire to avoid a class arbitration in this case ... is an attempt to evade the consequences of the legal violations alleged here that impacted all of DIRECTV'S workers who were affected by the challenged policies" and that "[b]y limiting any potential liability to only individual claimants, Respondent could easily pay off these claims only to those individuals with the temerity to pursue their claims individually and then continue to violate the law with relative impunity, knowing that they could never be subject to a widespread action to provide restitution to all affected employees." Claimants' Opening Memo., p. 18. This public policy argument may have merit, but it is not relevant to the issue before the Arbitrator. The Supreme Court in *Stolt-Nielsen,* made clear that the Arbitrator may not consider nor make public policy in determining whether the parties have agreed to allow class arbitration of claims. To quote the Court, "... an arbitrator's task is to interpret and enforce a contract, not to make public policy." 130 S. Ct. at 1774. The Court rejected the argument that the arbitration clause should be construed to permit class arbitration as a matter of public policy. *Id.*

The arbitrator is aware that in the case of *Murphy v. Mid-West Nat'l Life Ins. Co.,* 139 Idaho 487, 80 P.3d 1088 (2003), the Idaho Court held that an agreement to arbitrate was unenforceable where large arbitration costs precluded the insured from effectively vindicating his federal statutory rights in the arbitral forum, finding that the arbitration provision, which required each party to bear the cost of the arbitrator, plus the costs of witnesses and attorney fees, was unconscionable based upon the relatively small amount claimed under the policy by the insured. The arbitrator finds that this unconscionability doctrine as articulated in *Murphy* is no longer good law because *Conception* held that state rules requiring the availability of class-wide arbitration were preempted by the Federal Arbitration Act.

The U. S. Supreme Court noted that when a state law prohibits outright the arbitration of a particular type of claim, the state rule is preempted by the FAA. 131 S. Ct. at 1747. The more difficult issue is "when a doctrine normally thought to be generally applicable, such as ... unconscionability, is alleged to have been applied in a fashion that disfavors arbitration." *Id.* In such cases, the FAA can still preempt state law, for "a court may not rely on the uniqueness of an agreement to

DIRECTV, LLC, v. ARNDT et al., 2012 WL 5385039 (2012)

arbitrate as a basis for a state-law holding that enforcement would be unconscionable, for this would enable the court to effect what [] state legislature cannot." *Id.* (quotation marks and citation omitted). *See also, Brown v. Trueblue, Inc.*, No. 1:10-cv-514, 2011 U.S. Dist. LEXIS 134523, at *2-6 (M.D. Pa. Nov. 22, 2011) (reconsideration of order compelling arbitration denied in *Brown v. TrueBlue*, Inc., 1:10-cv-0514-YK, 2012 U.S. Dist. LEXIS 52811, at *5-8 (M.D. Pa. April 16, 2012) ("A fair reading of *Conception* must lead the court to conclude that [the *Thibodeau* rule, which stood for the proposition that if costs associated with arbitrating a single claim effectively deny consumer redress, prohibiting class action litigation or class action arbitration is unconscionable"] cannot serve to invalidate an arbitration agreement. ...") *Id.* at *6. *See also, Quilloin v. Tenet HealthSystem Phila., Inc., 673* F.3d 221, No. 11-1393, 2012 U.S. App. LEXIS 5353 (3d Cir. Pa. March 14, 2012) (holding *Thibodeau* "is clearly preempted under Concepcion") (*Quilloin*, 2012 U.S. App. LEXIS 5353, *25).

Claimants also contend that DIRECTV'S failure to exclude class claims demonstrates its intent to arbitrate such claims. Claimants argue that under the doctrine of *expressio unius est exclusio alterius*, the exclusion of certain disputes in the Arbitration Agreements, naturally suggests that there exist other types of disputes that the parties do not intend to exclude and that would include class claims. The argument is not persuasive because it fails to take into account the fact that excluded claims are substantive claims. The exclusions do not address the procedures applicable to the pursuit of the substantive claims.

Moreover, the agreements' silence with regard to class arbitration does not justify an inference that the drafter of the agreement must have intended to agree to class arbitration because it failed to expressly exclude class arbitration. This rationale is contrary to the holding in *Stolt-Nielsen* that arbitrators should not "presume, consistent with their limited powers under the FAA, that the parties mere silence ... constitutes consent" to class arbitration. *Id.* At 1776. *Stolt-Nielsen* requires that the parties "agree to authorize class arbitration not merely that they fail to bar such a proceeding." *Id.* At most, the Arbitration Agreements in this case could support a finding that the parties did not preclude class arbitration, but under *Stolt-Nielsen*, this is not enough.

Claimants cite to *Jock v. Sterling Jewelers, Inc.,* 646 F.3d 113 (2nd Cir., 2011), *cert denied*, 132 S. Ct. 1742 (2012), which involved a question whether an arbitral award should be affirmed. The Second Circuit Court applied a deferential standard to uphold the district court's decision to confirm the award allowing class arbitration. The Court concluded that the arbitrator had the authority, whether right or wrong in her analysis, to make the decision. This arbitrator disagrees with the decision in *Jock* because this arbitrator reads *Stolt-Nielsen* as requiring the arbitrator to have a contractual or legal basis for the class arbitration determination. 130 S. Ct. at 1770.

Claimants also cite to *Fantastic Sams Franchise Corporation v. FSRO Association Ltd.*, 683 F.3d 18 (1st Cir. 20112), which involved claims by an association of franchisees. The Court distinguished *Stolt-Nielsen* because it did not involve associational action and the Court could not say as a matter of law that FSRO's associational action in that case was equivalent to a class action. The Court held that the parties' associational dispute should be decided by the arbitrators but did not decide whether the matter could proceed as a class arbitration. The decision is no help to this arbitrator in determining whether the parties in this dispute agreed to authorize class arbitration.

Claimants also cite *Sutter v. Oxford Health Plans LLC*, 675 F.3d 215 (3rd Cir. 2012), in which neither the arbitration clause nor any other provision of the parties' agreement made express reference to class arbitration. Nevertheless, the arbitrator construed the broad text of the arbitration clause to authorize class arbitration. The Third Circuit Court refused to apply *Stolt-Nielsen* to vacate the award and affirmed the district court decision denying Oxford's motion to vacate the award. In its analysis the Court began with the presumption that the award was enforceable and could be vacated only upon one of the four narrow grounds enumerated in the FAA. The Court determined that *Stolt-Nielsen* did not operate to bar class arbitration because the arbitrator had made his determination based upon the text of the arbitration clause. The arbitrator reasoned that the clause's first phrase, "No civil action concerning any dispute arising under this Agreement shall be instituted before any court," is broad enough to include class actions. Thus, its second

DIRECTV, LLC, v. ARNDT et al., 2012 WL 5385039 (2012)

phrase, "and all such disputes shall be submitted to final and binding arbitration in New Jersey, pursuant to the Rules of the American Arbitration Association with one arbitrator," sends all conceivable civil actions-- including class actions-- to arbitration. In other words, the phrase "no civil action...shall be instituted in any court" meant that a class action may not be instituted in a court of law. "All such disputes" must go to arbitration.

The Third Circuit Court noted that '[i]n his clause construction award, the arbitrator remarked that the parties' arbitration clause was unique in its breadth. Construing the broad text and structure of the clause, he concluded that the parties affirmatively intended to authorize arbitration on a class-wide basis. ..." *Id. At* *8. The Arbitration Agreements in this arbitration before this Arbitrator contain no such language. Thus, *Sutter* is clearly distinguishable.

Claimants point out that DIRECTV excludes class arbitration in its contracts with its customers and argue that because DIRECTV knew it could exclude class arbitration in the Arbitration Agreements with employees, but failed to do so, then it must have intended to authorize class arbitration of employee claims. The inference proffered by Claimants is not logical. They are separate contracts with separate parties and have no relevance to the issue whether DIRECTV agreed to authorize class arbitrations in disputes with its present or former employees.

Claimants argue that if the agreements do not permit class arbitration then this claim is not cognizable under the agreement and there is no agreement at all with respect to class claims like those made in this case. In support of this argument, Claimants assert that, "[i]n the absence of a waiver of the right to bring a class suit, the arbitrator has only two sensible choices: first, to find that class arbitrations are permitted because the right to bring class actions was pre-existing and such claims are among those "which would have been justiciable under applicable state or federal law." and are this subject to arbitration (Ex. E to Respondent's Clause Construction Brief): or, second that class claims are simply not covered by the arbitration agreement, in which case no agreement to arbitrate exists and this proceeding should be returned to the District Court where it originated." Claimants Reply Memo., pp. 4-5.

The fact that the parties failed to agree to authorize enforcement of claims in a class proceeding does not mean the parties had no agreement to authorize enforcement of claims in individual arbitration proceedings. Class arbitration is not a remedy under state or federal law. The fact that the Arbitration Agreements in this matter provide that a party may pursue claims that are justiciable under state or federal law does not mean the party can pursue such claims in a class proceeding. The mere fact that a party may pursue claims in a class action in court does not mean that the party can pursue claims in a class arbitration when the party has agreed to waive the right to pursue claims in a court.

Moreover, the failure to expressly exclude class claims in the Arbitration Agreements does not mean that they are to be allowed by presumption or inference. This rationale is directly contrary to *Stolt-Nielsen's* holding that arbitrators should not "presume", consistent with their limited powers under the FAA, that the parties' mere silence ... constitutes consent to class arbitration. The Arbitrator must find a contractual basis that the parties agreed to authorize class arbitration, not merely that they failed to bar such a proceeding. 130 S.Ct. at 1776.

The arbitrator has thoroughly examined the Arbitration Agreements to determine whether there is evidence in the Arbitration Agreements that the parties intended to authorize class arbitration. The Arbitration Agreements are not ambiguous; rather they are silent on the subject whether class arbitration is authorized. The arbitrator is unable to conclude that the parties agreed to authorize class arbitration of the covered disputes.

The language in the Mutual Agreement, "The Company's Arbitration Procedure is intended to be an impartial, cost effective and speedy mechanism for resolving employment or other disputes between the Company and its employees" implies that the parties intended bilateral arbitration which would be a much more cost effective and speedy mechanism for resolving employment or other disputes between employees and the Company than would be a class arbitration for the reasons discussed by the U.S. Supreme Court in *Stolt-Nielsen* and *Conception*. See Mutual Agreement, p. 1. Similar language appears in the Arbitration Procedure. See Arbitration Procedure, p. 1.

DIRECTV, LLC, v. ARNDT et al., 2012 WL 5385039 (2012)

The references to "employees" in the Mutual Agreement and the Arbitration Procedure merely make clear that the Arbitration Agreements apply to all employees, rather than a select group of employees. It says nothing about allowing employees to pursue claims in class arbitration proceedings and creates no inference that the parties agreed to authorize class arbitration of claims. See, e.g., Arbitration Procedure, p. 1, f 2, "The arbitration procedure is applicable to all employees at the Company locations. The reference in the Arbitration Agreement to "Employees" includes eligible current and former employees." Respondent argues that the use of the term "employee" throughout the Arbitration Agreement implies that bilateral arbitration was intended. I find this argument equally unpersuasive.

The language in the "Claims Covered" clause addresses only the substantive claims that are subject to binding arbitration. It makes no reference to class arbitration as a procedure that is available to pursue the substantive claims. On its face, the "Claims Covered" clause merely reflects an agreement between the parties to arbitrate the covered claims. *Stolt-Nielsen* makes clear, however, that an "implicit agreement to authorize class arbitration ... is not a term that the arbitrator may infer solely from the fact of the parties' agreement to arbitrate." 130 S. Ct. at 1775. This clause is not a valid contractual basis upon which to conclude that the parties agreed to authorize class arbitration. Similarly, nothing in the "Claims Not Covered by the Agreement" clause permits an inference that the parties agreed to authorize class arbitration procedures.

Conferring on the arbitrator the "ability to order legal or equitable remedies as could a court of general jurisdiction" does not justify an inference that class arbitration procedures are authorized because class arbitration procedures are not legal or equitable remedies. Class arbitration is a procedural device for enforcing substantive rights and obtaining legal or equitable remedies. The procedure is not itself a remedy.

The "Required Notice of Claims and Time Limits" clause contains no language from which one might imply that the parties agreed to authorize class arbitration. The same may be said for the remaining clauses of the Arbitration Procedure. In fact, the restriction of the right to take depositions to one individual for "[e]ach party, would support an inference that bilateral arbitration was intended.

As discussed above, the fact that the arbitration is to be conducted either by the AAA, JAMS or as otherwise mutually agreed upon by the parties does not create an inference that class arbitration was authorized, particularly when the rules specify that no such inference can be drawn from the fact that such rules exist.

Claimants contend that a finding that the Arbitration Agreements cover this dispute, but constitute a waiver of the right to bring a class action would violate federal law rendering such a contract void and unenforceable and in violation of the National Labor Relations Act. Claimants rely upon *D.R. Horton, Inc.*, 357 NLRB No. 184, 2012 WL 36274 (Jan. 3, 2012) to support their contention. Claimants also cite *Herrington v. Waterstone Mortgage*, 2012 U.S. Dist. LEXIS 36220 (W.D. Wis. March 16, 2012), which applied *D.R. Horton* to hold a class waiver unenforceable, finding that *Conception* was distinguishable and not on point because the class action waiver in that case did not conflict with the substantive right of a federal statute, but rather the question was whether the FAA preempted a ruling under state law by the California Supreme Court. See also *Owen v. Bristol Care Corp.*, No. 11-cv-779-bbc, 2012 U.S. Dist. LEXIS 33671, 2012 WL 1192005, at *4 (W.D. Mo. Feb. 28, 2012) (finding, in the employment context, that *Concepcion* is not controlling; that in the employment context waivers of class arbitration are not permissible under *D.R. Horton* and that the employee would be unable to vindicate a statutory cause of action in the arbitral forum if denied class arbitration).

First, it must be noted that this dispute does not involve a class waiver. The issue here is not whether the parties agreed to a class waiver or whether a class waiver is enforceable. Rather, the issue here is whether the parties agreed to authorize class arbitration and if not, whether the failure to agree to class arbitration is enforceable in light of *D.R. Horton*. Put another way, would the enforcement of an agreement that precludes class arbitration violate the National Labor Relations Act ("NLRA")?

In *D.R. Horton*, the National Labor Relations Board ("NLRB") held that requiring employees to sign a private arbitration agreement that prohibits collective actions under the Fair Labor Standards Act ("FLSA") as a condition of employment is an unfair labor practice in violation of Section 7 of the NLRA. *D.R. Horton*, 2012 WL 36274, at *5. Section 7 of the NLRA provides, in relevant part, that employees have the right to "engage in ... concerted activities for the purpose of ... mutual aid or protection." 29 U.S.C. § 157. After noting that the right to collective action under the NLRA is a substantive right, the NLRB found that its determination did not present a conflict between the NLRA and the FAA policy favoring the enforcement of arbitration agreements because Congress did not intend for the FAA to disturb substantive rights. *Id.* at *10-16. It further found that even if a conflict did exist, its ruling was consistent with the policies of both statutes and the Supreme Court's FAA jurisprudence. *Id.* at *16-17.

Since *D.R. Horton* was decided, federal courts around the country have disagreed over its effect, and many have declined to adopt its rationale altogether in the face of existing Supreme Court precedent, statutory schemes, and questions over its precedential value. *See, e.g., Delock v. Securitas Security Servs. USA, Inc.*, No. 11-520, 2012 U.S. Dist. LEXIS 107117, 2012 WL 3150391, at *1-6 (E.D. Ark Aug. 1, 2012)(observing the conflict between the rights guaranteed by the NLRA as discussed in *D.R. Horton* and the strong federal policy favoring arbitration especially following the Supreme Court's decisions in *Stolt-Nielsen, Concepcion, and CompuCredit Corp.*, but determining that "the NLRA bends to the FAA"). In *CompuCredit*, decided one week after *D.R. Horton*, the Supreme Court held that courts must enforce agreements to arbitrate according to their terms, "even when the claims at issue are federal statutory claims, unless the FAA's mandate has been overridden by a contrary congressional command." 132 S. Ct. at 669 (internal quotations omitted).

Other federal courts that have declined to apply *D.R. Horton* include *Morvant v. P.F. Chang's China Bistro, Inc.*, No. 11-5405, 2012 U.S. Dist. LEXIS 63985, 2012 WL 1604851, at *8-12 (N.D. Cal. May 7, 2012) (holding that the reasoning of *D.R. Horton* does not overcome the direct, controlling authority holding that arbitration agreements, including class action waivers contained therein, must be enforced according to their terms"); *Jasso v. Money Mart Express, Inc.*, No. 11-5500, 2012 U.S. Dist. LEXIS 52538, 2012 WL 1309171, at *8-10 (N.D. Cal. Apr. 13, 2012) (holding that, in light of *CompuCredit*, because "Congress did not expressly provide that it was overriding any provision in the FAA, the Court cannot read such a provision into the NLRA"); *LaVoice v. UBS Financial Servs., Inc.*, No. 11-2308, 2012 U.S. Dist. LEXIS 5277, 2012 WL 124590, at *6 (S.D.N.Y. Jan 13, 2012) (declining to follow *D.R. Horton*, and interpreting *Conception* to stand for the proposition that an absolute right to collective action is inconsistent with the FAA's overarching purpose"); *Coleman v. Jenny Craig, Inc.*, No. 3:11-cv-1301-MMA-DHB, 2012 U.S. Dist. LEXIS 70789 (S.D. Cal May 15, 2012) (class arbitration waiver does not violate the NLRA); *Palmer v. Convergys Corp.*, No. 7:10-cv-145 (HL), 2012 U.S. Dist. LEXIS 16200, 2012 WL 425256, at *3 (MD. Ga. Feb. 9 2012)(accord.); *Tenet HealthSystem Philadelphia, Inc. v. Rooney*, No. 12-mc-58, 2012 U.S. Dist. LEXIS 116280 (E.D. PA. August 14, 2012) (finding *D.R. Horton* not controlling law); *De Oliveira v. Citicorp North America, Inc.*, No. 8:12-cv-251-T-26TGW, 2012 U.S. Dist. LEXIS 69573 (M.D. FLA. May 18, 2012) (rejected *D.R. Horton*, stating the court is bound to follow *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1459 (11th Cir. 2005), which held the class action waiver in an employment contract to be enforceable); *Spears v. Mid-America Waffles, Inc.*, No. 11-2273-CM, 2012 U.S. Dist. LEXIS 90902 (KS July 2, 2012) (refused to distinguish *Conception* and held arbitration agreements are enforceable even when they prohibit the use of a class action); *Brown v. TrueBlue, Inc.*, No. 1:10-cv-0514-YK, 2011 U. S. Dist. LEXIS 134523, reconsideration denied, 2012 U.S. Dist. LEXIS 52811(M.D. Pa. 2012) (refused to apply *D.R. Horton* on procedural grounds, on the ground the court lacked jurisdiction over Plaintiff's National Labor Relations Act claims, and on the ground the decision did not apply to the agreement at issue because the agreement, while baring class-wide arbitration, did not bar all class or collective actions).

This Arbitrator declines to adopt the rationale of *D.R. Horton* in the face of conflicting Supreme Court precedent and the reasoning of the above courts that have disagreed with its rationale.

## VII.

**DIRECTV, LLC, v. ARNDT et al., 2012 WL 5385039 (2012)**

## CONCLUSION

Upon review of all the arguments, the Arbitrator must deny Claimants' motion for class arbitration and grant Respondent's motion to compel individual arbitrations. There is no dispute that an Arbitration Agreements exist and that this dispute is governed by the Arbitration Agreements. Claimants' arguments for class arbitration are foreclosed by the United States Supreme Court's decisions in *Stolt-Nielsen, Concepcion* and *CompuCredit*.

Pursuant to Supplementary Rule 3 of the Class Arbitration Rules, all proceedings in this arbitration are stayed for a period of 30 days from the date hereof to permit any party to move a court of competent jurisdiction to confirm or vacate this Partial Final Award on Clause Construction.

IT IS SO ORDERED.

Dated: October 10, 2012.

<<signature>>

Merlyn W. Clark, Arbitrator

**End of Document**                                        © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:17-cv-03042   Document 1-5   Filed on 10/11/17 in TXSD   Page 148 of 173

HIWAY 87 STOP, INC. et al, v. POWER BUYING..., 2014 WL 7894630...

2014 WL 7894630 (N.D.Ill.) (Arbitration Award)
United States District Court, N.D. Illinois.

HIWAY 87 STOP, INC. et al,
v.
POWER BUYING DEALERS USA, INC. et al.

Nos. 12CV02199, 1340009542.
September 29, 2014.

Editor's Note: This document was acquired from a Court file.

**Case Type: Contract**
**Award Amount: Unknown**
**Attorney for Petitioner: Will Foley**
**Attorney for Respondent: Dean J. Lurie**
**Award Date: 02/10/2014**
**Arbitrator: David Coar**

### Partial Final Award

**Arbitrator: David Coar**

The dispute arises from a Class Action Complaint filed in the Circuit Court of Cook County Illinois on February 16, 2012. On March 26, 2012, Respondents removed the case to the District Court for the Northern District of Illinois pursuant to the Class Action Fairness Act. On or about April 23, 2012, Respondents filed a Motion to stay Proceedings and Compel Arbitration. On May 15, 2012, the District Court entered an order granting Respondents' motion and requiring arbitration proceedings be initiated within 30 days. By agreement, JAMS was selected as the arbitration agency. Thereafter, a dispute arose between the parties as to whether or not the arbitration would proceed as a class arbitration. On August 15, 2012 Claimants filed a Motion to Compel Respondents' Participation in Arbitration. In that motion, Claimants argued that because Illinois law governs the Agreement's arbitration provision, the arbitration could proceed on class-wide basis under Illinois law. The Respondents opposed the motion, again arguing that class-wide arbitration was not addressed in the arbitration agreement and therefore was not authorized. On March 28, 2013 (after briefing by the parties), the District Court issued an opinion in which it granted claimant's motion but left the issue as to whether the arbitration would proceed on a class-wide basis to the arbitrator, in the first instance. Thereafter, the undersigned was selected as the arbitrator in the case.

### BACKGROUND

Major tobacco manufacturers, including R.J. Reynolds, Philip Morris and Lorillard offer programs in which retailers are permitted to sell cigarettes to the public at a discount from the customary price as part of in-store promotions. For example, if a retailer commonly sells a pack of cigarettes for $6, the tobacco companies have programs that allow the retailer to sell the same pack for $5, with the tobacco company reimbursing the retailer for the difference ($1 per pack in this example). These reimbursement programs (commonly referred to as "by-downs") attract customers to stores to buy cigarettes at lower prices. Once in the stores, the hope is that those customers will buy additional items such as food or gasoline, thus benefitting the retailer. Likewise, the tobacco manufacturers benefit through increased sales and in-store advertising of their tobacco products.

Case 4:17-cv-03042   Document 1-5   Filed on 10/11/17 in TXSD   Page 149 of 173

HIWAY 87 STOP, INC. et al, v. POWER BUYING..., 2014 WL 7894630...

Historically, the tobacco manufacturers have limited participation in these programs to national convenience store chains, thus excluding independent convenience store owner such as the Claimants in this arbitration. In order to encourage the tobacco companies to extend participation to small independent operators, Respondents implemented a national tobacco program system that essentially pooled hundreds of independent convenience store owners, thus allowing Power Buying Dealers, USA Inc. (PBD) to negotiate with the tobacco companies to open the buy-down program to stores represented by PBD that would otherwise be ineligible to participate in the program. In order to become a "member store", an independent convenience store was required to pay a membership fee and sign a 3-year contract with PBD, called the Vision 21 Master Agreement (PBD Agreement or the Agreement"). That document purported to authorize PBD "to collect, administer, and remit rebate and funding payments" to the member dealers, including merchandising payments, rebates, and funding or promotional payments. By pooling the independent convenience stores, PBD created a large enough group that the tobacco companies were willing to offer the same status to the PBD dealers as those offered to chain retailers. The complaint posits that the motivation for the program was that from the perspective of the tobacco companies, it was not cost effective to deal with hundreds of individual retailers, given the logistics associated with entering individual contracts, tracking sales and issuing reimbursements. PBD eliminated those inefficiencies by promising to administer the program and deal with the independent convenience store owners directly. As the intermediary between its member stores in the tobacco manufacturers, PBD collected the sales reports from the member stores and provided the manufacturers with consolidated data, thus greatly reducing the burden of tracking hundreds of individual retailers. PBD was to collect the reimbursement funds from the tobacco manufacturers and distribute the proceeds to members stores based upon the PBD Agreement.

Around mid-2008, PBD and the Claimants began discussing the prospect of their becoming member stores. Thereafter, each plaintiff executed a PBD agreement. The complaint alleges that from the 3rd quarter of 2008 through the 2nd quarter 2009, Claimants purchased and sold packs of cigarettes that they believe entitled them to receive money from the tobacco manufacturers in the formal buy-down rebates and/or marketing funds pursuant to the PBD agreement. Claimants assert that PBD, as their agent, owed them a duty to collect, administer, and remit the rebate and funding payments. Plaintiffs assert that PDB has failed to do so, and has wrongfully retained the reimbursement funds. As a result Claimants have been made unable to recoup the losses sustained from selling cigarettes at below-retail prices. In addition, PBG also failed to provide Claimants with an accounting and other data related to the member cigarette buys, buy-down rebates, and marketing funds for this time.

Claimants, and all other similarly situated corporations, the ("class"), are each members of one of three merchant associations: South Texas Merchants Association, Tri-State Trade Association, and Alabama merchants Association, the ("associations"). The associations together are represented by a cooperative. Neither the associations, nor the Cooperative are parties to this action. The individual members of the putative class are independent owner/operators of convenience stores which are typically co-located with gas stations. Each of the named Claimants is a Texas corporation with its principal place of business in Texas. Respondent PBD is a Delaware corporation with its principal place of business in Illinois. Respondent, Odeh is an Illinois resident and is the founder and president of PBD.

### POSTURE OF THE ARBITRATION

As noted above, the District Court ordered arbitration and thereafter Claimant filed a Demand For Arbitration and served a notice of intent to proceed as a class-wide arbitration. Respondents argued before the District Court that class arbitration was unavailable and has resisted paying its share of the arbitration costs especially if that arbitration is to be conducted on a class-wide basis.

Rule 2 of the JAMS Class Action Procedures provides as follows:

Case 4:17-cv-03042   Document 1-5   Filed on 10/11/17 in TXSD   Page 150 of 173

HIWAY 87 STOP, INC. et al, v. POWER BUYING..., 2014 WL 7894630...

> "Once appointed, the Arbitrator, following the law applicable to the validity of the arbitration clause
> as a whole, or the validity of any of its terms or any court order applicable to the matter, shall
> determine as a threshold matter whether the arbitration can proceed on behalf of or against a class."

To that end, the parties have briefed the issue of the availability of class-wide arbitration in this matter and the issue is ripe for decision.

The parties agree that the arbitration clause of the Agreement is silent on the question of the availability of class arbitration: the clause neither provides that class arbitration is available nor prohibits class arbitration. The Agreement provides:

> "*17. Arbitration.* The Parties agree that any claim or dispute arising out of this Agreement will be
> submitted to non-binding arbitration pursuant to the rules and procedures of the State of Illinois
> Arbitration Board."

The parties agree that the State of Illinois Arbitration Board does not exist and has not existed for many years.

The parties have not suggested that there is other language in the Agreement that evidences intent as to the availability of class arbitration. The issue then is whether, in the face of an agreement that is silent on the issue, class arbitration is available.

## *CHOICE OF LAW*

Respondents take the position that federal common law under the Federal Arbitration Act (FAA) provides the rule of interpretation of the arbitration clause, and under those rules, class arbitration is not available when the arbitration clause is silent as to the availability of class arbitration. Alternatively, Respondents argue that even if Illinois law supplies the rule of interpretation, Illinois law and federal law are to the same effect.

Claimants' position is that federal law is irrelevant and that the parties have agreed that Illinois law applies, citing a different provision of the Agreement:

> "*16. Governing Law.* This agreement shall be interpreted with and governed by the laws of the State
> of Illinois to which jurisdiction the parties hereto irrevocably submit themselves.

As Claimants read the Agreement, Paragraph 16 is dispositive on the question of which law applies.

Respondents acknowledge the fact of Paragraph 16, but argue that the absence of a specific choice of law provision in the arbitration clause (paragraph 17) means that the federal common law of the FAA is to be applied. In taking this position, Respondents cite no authority in support of such a formalistic approach.

Although it is advisable (and perhaps a best practice) to include a specific choice of law provision in the arbitration clause, failure to so include is not dispositive in this case. The paragraph immediately preceding the arbitration clause specifies that the entire agreement is to be interpreted with and governed by Illinois law. Respondents have not offered neither textual basis nor a reasoned argument that paragraphs 16 and 17 of the Agreement should be read in such an odd way. The parties could have provided that paragraph 17 was to be interpreted under the FAA and that the rest of the Agreement interpreted under Illinois law, but that is not what the Agreement says. I conclude that Illinois law provides a rule of interpretation of the arbitration clause.

HIWAY 87 STOP, INC. et al, v. POWER BUYING..., 2014 WL 7894630...

### *DISCUSSION -- CLASS ARBITRATION*

To put the issue of choice of law in context, it is helpful to review the framework summarized by the United States Supreme Court in *Stolt-Nielsen v. AnimalFeeds International Corp.*, 130 S. Ct. 1758 (2010). In *Stolt*, the Supreme Court noted that interpretation of an arbitration agreement is generally a matter of state law, however the central purpose of the FAA is to ensure that agreements to arbitrate are enforced according to their terms. To the extent the parties have agreed to arbitrate in accordance with state law, the FAA is generally not applicable (even when the agreement affects interstate commerce), unless, there is a conflict between the FAA and the state law or interpretation. Where there is such a conflict, the FAA controls under principles of preemption. Where the parties have agreed to arbitrate in accordance with state law, he FAA does not apply generally apply, even where interstate commerce is involved. *Tortoriello v. Gerald Nissan of North Aurora, Inc.* 379 Illinois App 3rd 214. But even where the parties have agreed to the application of state law, if the arbitration falls under the coverage of the FAA, due regard must be given to federal policy under the FAA. See *Mitsubishi Motors Corporation v. Soler Chrysler-Plymouth, Inc.* 473 US 614 (1985).

If the agreement does not provide that arbitration is to be in accordance with state law, then the federal common law of the FAA provides the interpretive rule.

### *WHAT ILLINOIS LAW SAYS*

Claimants argue that under Illinois law, class arbitration is available unless the parties have agreed to waive it. In support of that position, claimants cite the decision of the Illinois Supreme Court in *Kinkel v. Cingular Wireless, LLC.* 857 N.E. 2nd. 250 (Ill 2006). In that case, the court addressed an arbitration clause that contained an express waiver of class arbitration and which provided that Cingular and its customer "acknowledge that the agreement evidences a transaction in interstate commerce and that the United States Arbitration Act and federal arbitration law shall govern the interpretation and enforcement of and proceedings pursuant to this or a prior agreement." The agreement contained an arbitration clause expressly waiving a waiver of class or consolidated arbitration. The Illinois Supreme Court refused to enforce the express arbitration waiver, relying upon the savings clause in section 2 of the FAA:
"...a written provision in any maritime transaction involving commerce to settle by arbitration a controversy arising out of such contract or transaction... shall be valid, irrevocable, and enforceable *save upon such grounds as exist at law or in equity for the revocation of any contract.*" (emphasis added)

Applying general Illinois rules of unconscionability the court struck the class arbitration waiver and severed it from the arbitration clause. The result was that the dispute could be arbitrated as a class matter. Claimants conclude from this result that Illinois courts and have approved class arbitration, at least implicitly. Claimants" reliance on *Kinkel* is misplaced. The arbitration clause there had two features that are relevant to our analysis- a provision calling for arbitration of disputes and a clause providing that the arbitration could not be class arbitration. The Illinois Supreme Court struck the latter clause, leaving the former. The question then became whether an agreement to arbitrate said nothing about class arbitration (the waiver provision having been stricken). The Illinois Supreme Court read the 2003 decision of the US Supreme Court in *GreenTree Financial Corp., v. Basil,* 539 U.S. 444 (2003) to say that class arbitration was available when the agreement between the parties was silent on the question. It certainly cannot be said that *Kinkel* supports the proposition that Illinois courts have adopted an Illinois rule of interpretation that where the arbitration agreement is silent, class arbitration is permitted. The most they can be said about the *Kinkel* is that the Illinois Supreme Court, relying on its reading of *Green Tree* concluded that class arbitration is available where the agreement is silent on the issue and, that express waivers of class arbitration are subject to the savings clause of the FAA. As we shall see, that interpretation of *Green Tree* was subsequently rejected by the Supreme Court in *Stolt-Nielsen*.

Case 4:17-cv-03042  Document 1-5  Filed on 10/11/17 in TXSD  Page 152 of 173

HIWAY 87 STOP, INC. et al, v. POWER BUYING..., 2014 WL 7894630...

Claimants also rely on the facts that the Illinois Arbitration Act, 710 ILCS 5/ does not prohibit class arbitration and that the JAMS rules contemplate class arbitration. Claimants are correct that the Illinois Arbitration Act does not address class arbitrations - neither authorizing nor prohibiting them. This argument is based on a negative-pregnant analysis and begs the question of whether the absence of a provision barring class arbitration implies the right to that procedure, or whether the absence of a provision authorizing class arbitration implies that the procedure is unavailable. The answer to the question is referred to as the "default rule". As will be discussed below, I believe that the default rule is that, unless agreed to by the parties, class arbitration is not available.

The JAMS Class Action Procedures contemplate the possibility of class arbitration but provide no support for the position of either party here: in construing the applicable arbitration clause, Rule 2 of the JAMS Procedures provides:

> "The arbitrator shall not consider the existence of these supplementary rules to be affected either in favor of and or against permitting the arbitration to proceed on a class basis. The arbitrator shall set forth his or her determination with respect to the matter of clause construction in a partial final award subject to immediate court review."

Thus, no inference of availability or non-availability may be drawn from the existence of class arbitration procedures in the JAMS Rules.

Finally, claimants argue that class resolution of this dispute is the most efficient and cost-effective and effective way to proceed. Indeed, Claimants argue that the economics of individual arbitrations make class arbitration the only effective way to protect their rights. Those arguments will be addressed below.

Respondent argues that the law under FAA applies, but that even if Illinois law provided the rule of interpretation the result would be the same as under federal common law. Claimant relies heavily on the decisions of the U S Supreme Court *Stolt-Nielsen* and *AT&T Mobility LLC v. Concepcion*, 130 S. Ct. 1740 (2011). Both these decisions emphasize the notion that the right to arbitrate derives from the consent of the parties. In *Stolt-Nielsen,* the Supreme Court held that, where the agreement was silent as to the availability of class arbitration, there was no consent to class-wide arbitration. The court observed that the parties to an agreement calling for arbitration of disputes could certainly agree to authorize class-wide arbitration, however, that procedure is not something that can properly be inferred solely from the fact of the parties agreement to arbitrate. This is so because class-action arbitration changes the nature of arbitration to such a degree that it cannot be presumed that the parties consented to it simply by agreeing to arbitrate. In arriving at this conclusion, the Court turned on its head the policy arguments in favor of class arbitration raised by the Claimants.

The Court noted that the primary policy evidenced in the FAA is that "in bilateral arbitration, the parties forgo the procedural rigor in appellate review of the courts in order to realize the benefits of private disputes dispute resolution: low cost, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes...." *Stolt-Nielsen* at 1775-1776. Class arbitration undermines those efficiencies and the ability of each party to select the decision-maker by expanding the number of parties, the number of agreements to be considered and "no longer resolves a single dispute between the parties to a single agreement, but instead resolves many disputes between hundreds or perhaps even thousands of parties." id. To be sure, *Stolt-Nielsen* did not involve an agreement wherein state law provided rule of decision, therefore the common law the FAA was applicable. Under the FAA, the Supreme Court held that, absent consent to class arbitration, that procedure was not available under the FAA.

In *Concepcion,* the California courts had adopted a rule invalidated certain provisions of most consumer contracts, including (but not limited to) portions of arbitration clauses. The agreement in question provided for arbitration of disputes and provided that the arbitrator could not consolidate more than one person's claims and may not otherwise preside over any form of a representative or class proceeding. In rejecting the California rule under FAA preemption, the Court continued its interpretation of what consent to arbitration means in the FAA. As in *Stolt-Nielsen,* the Supreme

Case 4:17-cv-03042   Document 1-5   Filed on 10/11/17 in TXSD   Page 153 of 173

HIWAY 87 STOP, INC. et al, v. POWER BUYING..., 2014 WL 7894630...

Court rejected the claimant's argument that class arbitration is more efficient and economical than individual arbitration. Instead *Concepción* acknowledged that the watchword under the FAA was *consent* and therefore, the question to be answered is whether the parties have agreed to class arbitration. The parties could consistent with the FAA agree to class arbitration. But, absent consent, class-wide arbitration is not available. The parties may agree to class arbitration, but that procedure is so different from what was contemplated under the FAA, that authorization for it cannot be implied solely from the agreement to arbitrate. This is true, even if Claimants are correct that the economics of the situation are such that parties to the agreement are unlikely to seek vindication of their rights through individual arbitrations because it would be too costly in relation to the available individual recovery.

All in all, *Stolt-Nielsen* and *Concepcion* proclaim the Supreme Court's view that, where the agreement to arbitrate is silent as to class-wide arbitration, it is improper to imply the availability of class arbitration. The Court did not say that consent to class arbitration must be express, however, here, the parties have not pointed to any language within the four corners of the Agreement that would evidence consent, the only finding must be that there has been no *agreement* to class arbitration.

Both *Stolt-Nielsen* and *Conception* were decided under the FAA, and not pursuant to an agreement to state rules of interpretation. Under the FAA, silence requires individual, not class-wide arbitration. What the Illinois rule is unclear. *Kinkel* rested, in part on an interpretation of federal law (*Green Tree*) that has not survived *Stolt-Nielsen*. Claimants have cited no other authority supporting their argument that, under Illinois law, silence means that class arbitration is available. In the absence of clear Illinois law, I will adopt the interpretation of the FAA by the Supreme Court in *Stolt-Nielsen*. This is appropriate in light of Respondents' reference to Illinois cases that say that under the Illinois rules of interpretation of arbitration clauses follows the same methodology the federal courts use under the FAA. The first step is to determine the intent of the parties from the language of the agreement. Under Illinois law, arbitration agreements are to be interpreted applying the same principles as other contracts. *Gipson v. Neighborhood Health Clinics, Inc.* 121 F. 3rd 1126 (Seventh Circuit 1997) is as important in contract interpretation under Illinois law as it is under the FAA. For the reasons expressed in *Stolt-Nielsen,* I am persuaded that, if confronted the with the issue of silence, the Illinois courts would follow *Stolt-Nielsen.*

There is another reason why I conclude that class arbitration is not available here. If I am incorrect that, as a matter of simple contract interpretation, the Illinois courts would reach the same result as the Court in *Stolt-Nielsen*, there is the question of preemption.
"The FAA contains no express preemptive provision, nor does it reflect a congressional intent to occupy the entire field of arbitration. But even when Congress has not completely displaced state regulation in an area, state law may nonetheless be preempted to the extent that it actually conflicts with federal law -- that is, to the extent that it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Volt Inf. Sciences v. Stanford Univ.* 489 U.S. 468, 489 (1989)

After *Stolt-Nielsen*, it is difficult to argue that requiring class arbitration in the face of silence is anything other than an obstacle to Congressional intent under the FAA. Although the Supreme Court did not expressly provide that state courts were preempted from concluding that, in the face of silence, it follows that if Illinois concluded that, under state law the default rule went the other way, (i.e., that the default rule was that in the absence of a prohibition against class arbitration, class arbitration is available), I believe that the state interpretation would be at odds with the FAA) and therefore preempted.

## *RESOLUTION*

As noted above, Illinois law applies to the interpretation of the arbitration clause, the arbitration clause is silent as to the availability of class arbitration in this dispute. Under Illinois law the courts would look to the language of the 4 corners

**HIWAY 87 STOP, INC. et al, v. POWER BUYING..., 2014 WL 7894630...**

of the agreement to determine the parties intention. If the Illinois courts have occasion to reconsider *Green Tree* in light of *Stolt-Nielsen* and *Concepcion*, it is likely that they will conclude that, in the face of silence as to the availability of class arbitration, the arbitration clause must be read to preclude class arbitration. If that conclusion is incorrect, then as to any arbitration agreement affecting commerce and therefore falling under the FAA, it is likely that the Supreme Court of the United States will conclude that a rule permitting class arbitration where the parties have not consented to that procedure is preempted.

### *CONCLUSION*

This arbitration may not proceed as a class-wide arbitration because, although Illinois law provides the interpretive rule, Illinois law would not permit class arbitration where that procedure has not been agreed to by the parties. There has been no such agreement in this matter. Alternatively, if the Illinois courts permit class arbitration absent the parties consent to that procedure, such a determination would conflict with the decisions of the United States Supreme Court and on the principles of preemption, the Illinois determination would be invalid.

Pursuant to rule 2 of the JAMS Class Action Procedures this partial final award is subject to immediate court review.

Decided this 10th Day of February, 2014 in Chicago, Illinois:

<<signature>>

Hon. David Coar (Ret.)

Arbitrator

---

End of Document

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:17-cv-03042   Document 1-5   Filed on 10/11/17 in TXSD   Page 155 of 173

TENET HEALTH SYSTEM PHILADELPHIA, INC, v. Francis..., 2012 WL 1520830...

2012 WL 1520830 (E.D.Pa.) (Arbitration Award)
United States District Court, E.D. Pennsylvania.

TENET HEALTH SYSTEM PHILADELPHIA, INC,

v.

Francis ROONEY.

Nos. 12MC00058, 71-160-00255-10.
February 16, 2012.

Editor's Note: This document was acquired from a Court file.

**Case Type: Contract**
**Award Amount: $0**
**Award Date: 01/17/2012**
**Arbitrator: Deborah G. Hankinson**

**Clause Construction Award**

**Arbitrator: Deborah G. Hankinson**

AMERICAN ARBITRATION ASSOCIATION

I, the undersigned Arbitrator, having been designated in accordance with the parties' arbitration agreement, having been duly sworn, and having duly examined the proofs and al legations of the parties, do hereby, AWARD as follows:

This Clause Construction Award is issued pursuant to Rule 3 of the American Arbitration Association's Supplementary Rules for Class Arbitrations. Based upon my review of the arbitration clause, the relevant law, the record, and the submissions of counsel, I conclude that the arbitration clause in question does not permit the arbitration to proceed on behalf of a class.

**Background**

Claimant Francis Rooney commenced this arbitration against Respondents Tenet Healthcare Corp., two of its officers, and twenty-four of its subsidiaries (collectively, "Respondent"). He asserted claims individually and on behalf of a putative class of persons employed by hospitals within Tenant Healthcare Corp.'s system. Claimant, who works as a nurse in the emergency room at St. Christopher's Hospital for Children in Philadelphia, Pennsylvania, alleges that Respondent failed to pay him and other similarly situated employees all wages owed them due to their having worked "off-the-clock" as a result of Tenet's meal-break-deduction, unpaid-preliminary-and-postliminary work, unpaid-training, and overtime-calculation policies. He asserts claims under the Fair Labor Standards Act, 29 USC §§ 201-219, the Employee Retirement Income Security Act, 29 USC §§ 1001-1461, the Racketeer Influenced and Corrupt Organizations Act, 18 USC §§ 1961-1968, and "the laws of the various states in which Tenet Healthcare does business."

When he began working at St. Christopher's, Claimant signed an Employee Acknowledgment in which he acknowledged receipt of Respondents' Open Door Policy and Fair Treatment Process ("FTP") and voluntarily agreed to use that process for all disputes arising out of his employment, subject to certain exceptions that do not apply here, and to arbitrate any such claims or disputes. The FTP is a multi-step dispute-resolution program, which, assuming all of the steps are

Case 4:17-cv-03042   Document 1-5   Filed on 10/11/17 in TXSD   Page 156 of 173

TENET HEALTH SYSTEM PHILADELPHIA, INC, v. Francis..., 2012 WL 1520830...

complied with, provides for an aggrieved party to arbitrate unresolved complaints. The FTP is bilateral; that is, both the employee and his or her employer must use it to resolve disputes. The FTP requires an employee to proceed through four separate dispute-resolution steps before proceeding to arbitration. The Steps allow for the resolution of employee disputes at the local level with the direct involvement of a claimant and his or her management team and, if unsuccessful, by an FTP committee comprised of the claimant's colleagues at the facility in question. During Steps 1 through 4, legal counsel may not participate in the actual FTP process. At Step 5 (arbitration), counsel are free to participate and the FTP encourages employees to seek counsel of their own in arbitration. Should a claimant proceed to arbitrate his or her dispute, the FTP caps the claimant's expenses. It further prohibits a party from unilaterally selecting an arbitrator and requires instead that the that the employee-claimant and the employer agree jointly to the arbitrator who will resolve the dispute. The FTP expressly provides that is governed by the Federal Arbitration Act and the procedural rules of the American Arbitration Association.

After Claimant commenced the arbitration, the arbitration was stayed pursuant to the parties' agreement that Claimant would first comply with the FTP. The stay was lifted when the parties advised the AAA and the Arbitrator that the FTP had been concluded. Respondent then filed its Motion for Initial Arbitration Clause Construction Dismissing and/or Striking the Class and Collective Action Allegations from Claimant's Demand for Arbitration. Claimant filed his Response to Respondents' Request to Preclude Class or Collective Claims, and Respondent in turn filed a Reply Memorandum in support of its motion. Finally, Claimant filed a supplemental letter brief in further opposition to the motion.

### Issue Presented

Whether the arbitration clause permits this arbitration to proceed on behalf of a class.

### Findings And Conclusions

In *Stolt-Nielsen S.A. v. AnimalFeeds International Corp.*, 130 S.Ct. 1758 (2010), the United States Supreme Court established the rule for deciding whether class arbitration is permitted under an arbitration agreement. According to the Court, consent is at the heart of the rule, *id.* at 1773; that is, the question is whether "the parties *agreed to authorize* class arbitration," *id.* at 1776. The Court grounded this rule in its jurisprudence interpreting the Federal Arbitration Act and provided guidance for applying the rule. The Court concluded that "[a]n implicit agreement to authorize class-action arbitration... is not a term the arbitrator may infer solely from the fact of the parties' agreement to arbitrate." *Id.* at 1775. The Court also cautioned arbitrators from presuming that "the parties' mere silence on the issue of class-action arbitration constitutes consent to resolve their disputes in class proceedings." *Id.* at 1775. Because the parties in *Stolt-Nielson* stipulated that there was "no agreement on the issue of class-action arbitration," the Court concluded that they could not be compelled to submit their dispute to class arbitration and did not decide "what contractual basis may support a finding that the parties agreed to class-action arbitration." *Id.* at 1776. Most recently, in *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1750 (2011), the Court explained its holding in *Stolt-Nielsen*: "We then held that the agreement at issue, which was silent on the question of class procedures, could not be interpreted to allow them because the 'changes brought about by the shift from bilateral arbitration to class-action arbitration' are 'fundamental.'

Relying upon this holding, Respondent contends that the arbitration clause at issue - the FTP - is silent on a party's ability to pursue a class, collective, or group claim in arbitration. According to Respondent, the FTP does not expressly authorize class, collective, or group actions, and instead when read as a whole and in its entirety, actually evidences a contrary intent, permitting only the arbitration of individual claims. Respondent also urges that allowing class, collective, or group claims to be processed under the FTP would frustrate its express terms. Accordingly, Respondent contends that consistent with *Stolt-Nielsen*, Claimant may only pursue his claims in arbitration on an individual basis. Claimant disagrees and argues that the contract-interpretation question is instead answered by the parties' agreement to arbitrate

"any and all claims and disputes." According to Claimant, this contract language requires that an arbitrator enforce the arbitration agreement to the full extent of its terms, including class or collective claims. The Arbitrator agrees with Respondent.

Claimant argues that the Arbitrator must construe the FTP against Respondents in the face of ambiguity. Claimant presumes that Pennsylvania law applies, and given that presumption and the absence of a choice-of-law provision, Respondent cites to Pennsylvania contract law as the applicable state law. Because Pennsylvania applies the "plain-meaning approach" to contract interpretation, the starting point is the language of the contract itself. *See Steuart v. McChesney,* 498 Pa. 45, 444 A.2d 659, 661-63 (1982). "[Where language is clear and unambiguous, the focus of interpretation is upon the terms of the agreement as manifestly expressed..." *Id.* at 661. "A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Hutchison v. Sunbeam Coal Corp.,* 513 Pa. 192, 519 A.2d 385, 390 (1986). Claimant has not explained how the language of the parties' arbitration agreement is "reasonably susceptible of different constructions." After reviewing the language of the FTP, the Arbitrator concludes that the "terms are clear and unambiguous"; therefore, the intent of the parties is to be ascertained from the contract itself, rather from extrinsic evidence or through the use of rules of construction. *See id.*

The FTP is "silent on the question of class-action arbitration." *See Stolt-Nielsen,* 130 S. Ct. at 1776; *AT&T Mobility,* 131 S. Ct. at 1750. Moreover, the language of the FTP cannot be read to expressly or implicitly permit class-arbitration. This is because the FTP instead expressly provides for bilateral arbitration. *See Stolt-Nielsen,* 130 S. Ct. at 1776; *AT&T Mobility,* 131 S. Ct. at 1750.

Pursuant to the FTP, as a precondition to arbitration, a claimant-employee must comply with FTP Steps 1 through 4. All these Steps are written in the singular by using the words "you" and "your" to refer to an individual claimant. Steps 1 and 2 require that if an employee has a dispute with his or her employer, all claims must first be brought to the attention of "your supervisor," and if "you" are not satisfied with the supervisor's response, "you" may take the problem or dispute to "your Department Head." In turn, at Step 3, if the response from "your Department Head in *Step*

2 does not resolve your problem or dispute," then "you" may submit the dispute to a Facility Administrator. If the problem is not resolved by the Facility Administrator's Step 3 response, then the employee may request in Step 4 that his or her problem or dispute be submitted to the FTP Committee. The FTP Committee comprises a committee of five persons employed at the same facility as the employee. Next, pursuant to the FTP, if "you" (the employee) do not accept the FTP Committee's decision in Step 4, then "you have the right to submit the problem or dispute to final and binding arbitration." Thus, as with the other FTP steps, Step 5's arbitration provision refers to an individual arbitration claimant. Step 5 prescribes the scope of an arbitration as "limited to disputes, claims or controversies that a court of law would be authorized or have jurisdiction over to grant relief and that in any way arise out of, or relate to or are associated with your employment with the company or the termination of your employment." If the matter proceeds to arbitration, then the employee-claimant and the company-respondent jointly select an arbitrator to "make a final decision on your dispute or claim." All this language expresses the parties' consent to bilateral arbitration.

The clear and unambiguous terms of the FTP evidence a dispute-resolution process designed to address claims individually and not collectively. By agreeing to the FTP, Claimant agreed to arbitrate any claims he may have against Respondent that are not resolved to his satisfaction through the first 4 Steps of the FTP, and Respondent agreed to arbitrate only with employees, like Claimant, who have completed Steps 1 through 4 of the FTP. Respondent has not agreed to arbitrate with each and every employee that agreed to the FTP regardless of whether the employees have asserted a claim under its provisions, followed its procedures, and decided to arbitrate pursuant to Step 5 because they are not satisfied with the results of their participation in Steps 1-4. As a result, the FTP's arbitration clause can be interpreted to authorize arbitration on behalf of a class of employees who all signed the same agreement only by disregarding the FTP's express language or by countenancing a conflict with that language.

Case 4:17-cv-03042  Document 1-5  Filed on 10/11/17 in TXSD  Page 158 of 173

TENET HEALTH SYSTEM PHILADELPHIA, INC, v. Francis..., 2012 WL 1520830...

Contrary to Claimant's primary argument, the language in his Employee Acknowledgment obligating him to arbitrate "any and all claims and disputes ... that are related in any way to my employment or the termination of my employment with Tenant" cannot supply the missing agreement to authorize class-arbitration. Language such as "any and all claims and disputes" refers to the breadth of an arbitration clause and is routinely interpreted to mean that any dispute arising out of the designated subject matter must be referred to arbitration. It says nothing about the procedural mechanism for resolving that claim or dispute. And in *Stolt-Nielsen,* the Supreme Court refused to construe an arbitration clause that required the parties to settle in arbitration "any dispute" arising out of the subject matter of the contract as authorizing class-action arbitration. *Id.* at 1765, 1775. Instead, the Supreme Court required more to support a conclusion that the parties "agreed to authorize" a class action. *Id.* at 1775. Justice Ginsburg, in her dissent, acknowledged that under the Court's ruling, "the breadth of the arbitration clause" is not a sufficient contractual basis for concluding that the parties agreed to authorize class arbitration. *Id.* at 1782. Thus, the FTP's broad arbitration provision does not manifest the parties' agreement to authorize class-arbitration.

Claimant's other arguments are similarly unpersuasive. Claimant turns *Stolt-Nielsen* on its head by arguing for the recognition of an agreement to arbitrate class and collective claims when the arbitration clause is at best silent on the issue of whether the parties agreed to class or collective arbitration, and when read as a whole and in its entirety, actually evidences a contrary intent.

First, the Arbitrator rejects Claimant's argument that because class and collective claims are statutorily authorized remedies available to him in court, the FTP effectively incorporates federal and state wage-and-hour law, and as a result, the parties have implicitly authorized class and collective arbitration. The mere inclusion of language providing for remedies available at law does not incorporate a procedural mechanism such as class or collective actions. A class or collective action is not a "remedy." Rule 23 is contained in the Federal Rules of Civil Procedure, and neither Rule 23 nor Section 216(b) of the FLSA (the collective-action device) affords parties any substantive rights. *See Westerfield v. Washington Mut. Bank,* 2007 WL 2162989, *2 (E.D.N.Y. 2007). That such procedural rights are not "remedies" is further demonstrated by the Supreme Court's explanation in *Stolt-Nielsen* that class arbitration so drastically changes the nature and course of bilateral-arbitration proceedings that one cannot simply assume the parties agreed to such a procedural mechanism. *See* 130 S. Ct. at 1775-76. Similarly, the FTP's requirement that any claims be arbitrated pursuant to the FAA and the procedural rules of the American Arbitration Association do not manifest the parties' agreement to authorize class arbitration.

Finally, Claimant argues that the parties authorized class arbitration because "commonplace" class and collective wage claims are not included on the list of claims excepted from the FTP. At best, this is a further indication that the agreement is silent on the question of class arbitration, and silence is not enough under *Stolt-Nielsen.* There can be no presumption of the parties' consent to class arbitration from that silence, and there can be no presumption of consent when making such a presumption would frustrate the express terms of the parties' agreement to bilateral arbitration.

### Conclusion

Nothing in the FTP evidences the parties' agreement, whether explicit or implicit, to authorize class or collective arbitration, and given the parties' express and unambiguous agreement to bilateral arbitration, no rules of construction can supply the missing consent. Moreover, construing the parties' arbitration agreement to authorize class arbitration would create a conflict with the express terms of the agreement. The arbitration clause in question does not permit the arbitration to proceed on behalf of a class.

### Clause Construction Award

For the above state reasons, Respondent's Motion for Initial Arbitration Clause Construction Dismissing and/or Striking the Class and Collective Action Allegations from Claimant's Demand for Arbitration is GRANTED and Claimant's class and collective action allegations are DISMISSED.

Pursuant to the Supplementary Rules for Class Arbitration, the Arbitrator retains jurisdiction of this arbitration. These proceedings shall be stayed for thirty days to permit any party the opportunity to move a court of competent jurisdiction to confirm or vacate this Clause Construction Award. If all parties inform the Arbitrator in writing during the period of the stay that they do not intend to seek judicial review of this Clause Construction Award, or once the requisite time period expires without any party having informed the Arbitrator that it has sought judicial review, the AAA shall promptly arrange a case-management conference.

Dated this 17th day of January, 2012.

<<Signature>>

Deborah G. Hankinson

---

End of Document                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

SEQUOIA EDUCATION, INC., v. RIVERA., 2011 WL 9369114 (2011)

2011 WL 9369114 (Cal.Super.) (Arbitration Award)
Superior Court of California.
Alameda County

SEQUOIA EDUCATION, INC.,

v.

RIVERA.

Nos. RG11597698, 11434107508.
September 29, 2011.

Editor's Note: This document was acquired from a Court file.

**Case Type:** Contract
**Award Amount:** $0
**Attorney for Petitioner:** Jeffrey K. Brown
**Attorney for Respondent:** James G. Schwartz
**Award Date:** 09/29/2011
**Arbitrator: John C. Fleming**

### Petition to Confirm Arbitration Award and Enter Final Judgment Thereon

Jeffrey K. Brown, Bar No. 162957, jkb@paynefears.com, Matthew J. Cute, Bar No. 265158, mjc@paynefears.com, Payne & Fears LLP, 4 Park Plaza, Suite 1100, Irvine, California 92614, Telephone: (949) 851-1100, Facsimile: (949) 851-1212.

Peter W. Homer (Pro Hac Vice Application Pending), phomer@homerbonnerlaw.com, HomerBonner, 1200 Four Seasons Tower, 1441 Brickell Avenue, Miami, FL 33131, Telephone: (305) 350-5192, Facsimile: (305) 372-2738, Attorneys for Petitioners, Sequoia Education, Inc., et al.

**Arbitrator: John C. Fleming**

## PETITION TO CONFIRM ARBITRATION AWARD

Petitioners Sequoia Education, Inc., d/b/a Wyotech-Fremont and Wyotech-Oakland, and Corinthian Colleges, Inc. (collectively, "Petitioners" or "the School"), through undersigned counsel, submit this Petition to Confirm the final clause construction award issued by an independent arbitrator, John C. Fleming ("the arbitrator"), before the American Arbitration Association on September 22, 2011 in the action entitled *David Rivera, Susan Schrank, Kawaldeep Singh, Mark Bianchini, Jose Gonzalez, Franklin Aramburo, Jacob Lopez, Victor Rodriguez, and Ruben Martinez, Jr., et al. v. Sequoia Education, Inc., d/b/a WyoTech-Freemont and WyoTech-Oakland, and Corinthian Colleges, Inc.* (Arbitration No. 11434 1075 08) (the "Arbitration Proceeding"). This Petition is filed pursuant to the parties' agreements to submit to arbitration and the Federal Arbitration Act, 9 U.S.C. § 9

## PARTIES, JURISDICTION AND VENUE

1. Petitioner Corinthian Colleges,Inc., is a Delaware corporation which owns and operates proprietary schools throughout the country. At all relevant times, Corinthian Colleges, Inc. was the parent company of its subsidiary, Sequoia Education, Inc., a California corporation which owned and operated Wyotech-Fremont and Wyotech-Oakland, two

individual school campuses operating in Fremont, California and Oakland, California, respectively. The headquarters and principal place of business for Corinthian Colleges, Inc. and its subsidiary, Sequoia Education, Inc., is Santa Ana, California.

2. Respondent David Rivera resides in San Leandro, California and is a citizen of California. Respondent Susan Schrank resides in Concord,California and is a citizen of California. Respondent Kawaldeep Singh resides in Livermore, California and is a citizen of California. Respondent Mark Bianchini resides in Fremont, California and is citizen of California. Respondent Jose Gonzales resides in Hayward, California and is a citizen of California. Respondent Franklin Aramburo resides in Hayward, California and is a citizen of California. Respondent Jaco Lopez resides in Brentwood, California and is a citizen of California. Respondent Victor Rodriguez resides in San Francisco, California and is a citizen of California. Respondent Ruben Martinez, Jr. resides in Redwood City, California and is a citizen of California. Collectively, the nine respondents shall be referred to as "Respondents"

3. As a court of general jurisdiction, this Court has jurisdiction over this Petition and Respondents, as Respondents entered into an agreement to arbitrate the dispute forming the basis of the Petition, and indeed did arbitrate such dispute in California. See Cal. Civ. Proc. Code §410.10 ("a court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States"); Cal. Civ.Proc. Code § 1293 ("The making of an agreement in this State providing for arbitration to be had within this State shall be deemed a consent of the parties thereto to the jurisdiction of the courts of this State").

4. Venue is proper in this Court because a majority of the Respondents reside in Alameda County, California. See Cal. Civ. Proc. Code § 395 ("the superior court in the county where the defendants or some of them reside at the commencement of the action is the proper court for trial of the action"). In addition, not only were the interntional and tortious acts alleged in the underlying Arbitration Proceeding supposedly committed in whole, or in part, in the County of Alameda, California, but pursuant to agreement of the parties, this is the arbitral situs where the subject arbitration award was entered. See Cal. Civ. Proc. Code § 1292.2; 9 U.S.C § 9.

## STATEMENT OF FACTS

5. Respondents are former students of the School. As part of their enrollment with the School, Respondents each executed individual enrollment agreements containing arbitration agreements. The arbitration agreements provided for the resolution of any dispute(s) arising from the enrollment agreement by binding arbitration under the Federal Arbitration Act ("FAA") conducted by the American Arbitration Association ("AAA")

**ARBITRATION AGREEMENT:** The student agrees that any dispute arising from my enrollment at the school, no matter how described, pleaded, or styled, shall be resolved by binding arbitration *under the Federal Arbitration Act conducted by the American Arbitration Association ("AAA") under its Commercial Rules.* The award rendered by the arbitrator may be entered in any court having jurisdiction. Both student and the school irrevocably agree that any dispute between them shall be submitted to Arbitration. Neither the student nor the school shall file or mantain any lawsuit in any court against the other, and agree that any suit filed in violation of this Agreement shall be dismissed by the court in favor of an arbitration conducted pursuant to this Agreement. The costs of the arbitration filing fee, arbitrator's compensation and facilities fees will be paid by the school, to the extent these fees are greater than a Superior Court filing fee. The arbitrator's decision shall be set forth in writing and shall set forth the essential findings and conclusions upon which the decision is based. Any remedy available from a court under the law shall be available in the arbitration. Nothing in this Agreement prohibits the student from filing a complaint with the state regulatory agency. Students are strongly encouraged, but not required, to utilize the Grievance Procedure described in the catalog, prior to filing an arbitration. A Student desiring to file an Arbitration should first contact the school President, who will provide the student with a copy of the AAA Commercial Rules. A Student desiring to file an Arbitration should then contact the AAA which will provide the appropriate forms and detailed instructions. The student should bring this form to the AAA. A student may, but need not, be represented by an attorney at the Arbitration. I acknowledge that I understand that both I and

the School are irrevocably waiving rights to a trial by jury, and are selecting instead to submit any and all claims to the decision of an arbitrator instead of a court. I understand that the award of the arbitrator will be binding, and not merely advisory. I also acknowledge that I may at any time, before or after my admission, obtain a copy of the Rules of the American Arbitration Association, at no cost, from the school President.

(Emphasis added.)

6. On May 28, 2008, Respondents commenced the underlying Arbitration Proceeding before the AAA. In the Arbitration Proceeding, Respondents attempted to assert various statutory and common law claims under California law on behalf of a putative class.

7. Pursuant to Rule 3 of the AAA's Supplementary Rules for Class Arbitration, the arbitrator set forth to determine, "as a threshold matter...whether the applicable arbitration clause permits the arbitration to proceed on behalf of or against a class (the 'Clause Construction Award')."

8. On September 22, 2011, the arbitrator issued the Award on Motion to Reconsider Clause Construction Award (the "Clause Construction Award"), a true and correct copy of which is attached hereto as Exhibit A and incorporated herein by reference. In conclusively determining that "the arbitration agreement in the School enrollment contracts between Claimants and Respondents does not permit class arbitration," the Clause Construction Award effectively puts an end the putative class Arbitration Proceeding. The Clause Constuction Award is therefore final, and thus ripe for confirmation.

9. In accordance with Rule 3 of the AAA's Supplementary Rules for Class Arbitration, by which the parties agreed to be bound, the Clause Construction Award stayed further proceedings for a period of thirty days in order to permit either party to proceed in a court of competent jurisdiction to confirm or vacate the Clause Construction Award.

## ARGUMENT

10. Rule 3 of the AAA's Supplementary Rules for Class Arbitration specifically contemplates judicial review of interim final award such as this one. *See Genus Credit Management Corp. v. Jones,* 2006 WL 905936 (D. Md.Apr. 6, 2006) (rejecting contention that court lacked jurisdiction to review partial final clause construction award). Indeed, the Supreme Court very recently reviewed a clause construction award. *See Stolt-Nielsen, S.A.,* 130 S.Ct. at 1767 (vacating clause construction award where arbitration panel determined class arbitration was permitted despite applicable arbitration provision's silence on the matter).

11. The FAA provides that "a court 'must' confirm an arbitration award 'unless' it is vacated, modified, or corrected 'as prescribed'" by the FAA. *Central Montana Rail v. BNSF Ry. Co.,* 422 Fed.Appx. 636, 637 (9th Cir. 2011) (citing *Hall St. Assoc., LLC v. Mattel, Inc.,* 552 U.S. 576, 582 (2008)). Indeed, the standard of review of arbitral awards is exceedingly narrow-under the FAA, confirmation is required "even in the face of erroneous findings of fact or misinterpretations of law." *Lagstein v. Certain Underwriters at Lloyd's, London,* 607 F.3d 634, 640 (9th Cir.2010).

12. Therefore, because it is ripe for confirmation, and because there is no basis for vacating or modifying the Clause Construction Award, the Court, respectfully, should issue an order confirming the Clause Construction Award pursuant to 9 U.S.C. § 9, and enter judgment consistent with same.

WHEREFORE, Petitioners respectfully pray for and request that the Court enter an Order confirming the Clause Construction Award, that the Court enter a final judgment in favor of the School and against Respondents in conformity

with the Clause Construction Award, that the Court grant fees and costs incurred to bring this petition, and that the Court grant such other and further relief as the Court may deem just and proper.

DATED: September 29, 2011

PAYNE & FEARS LLP

<<Signature>>

MATTHEW J. CUTE

Attorneys for Petitioners

SEQUOIA EDUCATION, INC., et al.

**AMERICAN ARBITRATION ASSOCIATION**

**COMMERCIAL AND CLASS ARBITRATION TRIBUNAL**

### AWARD ON MOTION TO RECONSIDER CLAUSE CONSTRUCTION AWARD

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into by the parties, and having been duly sworn and having duly heard the oral arguments of the parties, and having duly considered the briefs filed by the parties, pursuant to Rule 3 of the Supplementary Rules for Class Arbitrations hereby issue this Award on Motion to Reconsider Clause Construction Award.

The Claimants in this case are David Rivera, Susan Schrank, Kawaldeep Singh, Mark Bianchini, Jose Gonzales, Franklin Aramburo, Jacob Lopez, Victor Rodriguez; and Ruben Martinez, Jr., who have brought this proceeding on behalf of themselves and all others similarly situated. The Respondents are Sequoia Education, Inc., which conducts business as WyoTech-Fremont and WyoTech-Oakland, and Corinthian Colleges, Inc. Each of the Claimants is enrolled in a technical degree program for HVAC repair and installation at WyoTech-Fremont.

Previously, I determined in a Clause Construction Award dated September 11, 2009 that the arbitration agreement contained in the school enrollment agreements between Claimants and Respondents permitted class arbitration based upon applicable California law (see *Keating v. Superior Court* (1982) 31 Cal.3d 584, 608-614, 183 Cal.Rptr. 360, 645 P.2d 1192, revd. other grounds in *Southland Corp. v. Keating, supra,* 465 U.S. at p. 16, 104 S.Ct. 852; *Blue Cross of California v. Superior Court* (1998) 67 Cal. App. 4th. 42, 78 Cal. Rptr. 2d 779). I continue to believe that this would be the correct conclusion to the extent this case could rest on principles of contract interpretation under the law of California.

However, two recent Supreme Court decisions have caused me to conclude that where an arbitration agreement that is subject to the Federal Arbitration Act does not explicitly contain language permitting class arbitration, class arbitration is not permitted. This is so even if applicable state law would dictate otherwise.

In *Stolt-Nielsen S.A. v. Animal Feeds Int'l Corp,* 559 U.S. ___,130 S.Ct. 1758 176 L.Ed 2d 605 (U.S. 2010), the Supreme Court vacated a clause construction award that determined class arbitration was permitted by an arbitration agreement embeded in a charter party agreement between shipping companies and shippers. The Court concluded that the panel's construction of a clause that was silent on the matter of class arbitration was based upon the panel's public policy preference and without proper regard to industry custom and practice or principles of New York contract law.

SEQUOIA EDUCATION, INC., v. RIVERA., 2011 WL 9369114 (2011)

Importantly in *Stolt*, the Court noted that not only was the agreement silent on the issue, but that the parties had stipulated that they had reached an agreement on the issue of class arbitration (*Stolt* 130 S.Ct. 1758, 1774).

I was requested to reconsider my earlier clause construction award in light of the *Stolt* decision. *Stolt* left numerous questions in my mind: To what extent was the Court influenced by the parties' concurrence that they had not reached agreement on class arbitration? Would the outcome have been different if the arbitrators had made it clear that they were basing their award on principles of state law contract interpretation? Unlike *Stolt*, where the all of the parties conceded there was no agreement on class arbitration, in the subject case Claimants insist that there is an agreement to permit class arbitration. Claimants contend that although class arbitration is not explicity mentioned in the arbitration agreement, the agreement is properly construed under applicable California contract principles to permit class arbitration. Unlike the arbitration panel in *Stolt*, in this case my initial clause construction award did not rest on the arbitrator's public policy preference or upon other arbitral awards. My decision was based on the application of contract interpretation based upon California state law precedents as I understood them.

Whatever questions I may have had following *Stolt*, now seem to be answered in *AT&T Mobility LLC v. Concepcion* 131 S.Ct.1740 at 1750, 179 L.Ed. 2d 749 (U.S. 2011). *Concepcion* is important here because of the Court's explication of what it meant in *Stolt*:
"Although we have had little occasion to examine classwide arbitration, our decision in *Stolt-Nielsen* is instructive. In that case we held that an arbitration panel exceeded its power under § 10(a)(4) of the FAA by imposing class procedures based on policy judgments rather than the arbitration agreement itself or some background principle of contract law that would affect its interpretation. 559 U.S., at ___, 130 S.Ct. at 1773-1776. We then held that the agreement at issue, which was silent on the question of class procedures, could not be interpreted to allow them because the "change brought about by the shift from bilateral arbitration to class-action arbitration" was "fundamental." *Id.*, at ___, 130 S.Ct. at 1776. This is obvious as a structual matter: Classwide arbitration includes absent parties, necessitating additional and different procedures and involving higher stakes. Confidentiality becomes more difficult."

Based upon this statement, I am compelled to conclude that the Supreme Court has determined that an agreement that is silent as to class arbitration cannot be construed to permit class arbitration without violating the objectives of the Federal Arbitration Act. Even though California contract law would call for me to affirm my earlier award, *Stolt* and *Concepcion* dictate a different result. In *Concepcion*, the Court reiterates the long established rule that the Federal Arbitration Act requies enforcement of an arbitration agreement according to its terms. The Court then address to what extent state law contract principles can be used to limit or defeat provisions of an arbitration agreement. Admittedly, *Concepcion* addresses a different question than the one before this arbitrator.

*Concepcion* presents a case where the arbitration agreement contained an express waiver of class action. To the extent that this waiver was an integral part of the arbitration agreement, to ignore this provision would be to ignore the dictate of the Federal Arbitration Act that an arbitration agreement is to be enforced according to its terms. Therefore, the Court ruled that Federal Arbitration Act considerations must trump a state law determination that such class waivers were unconscionable and not enforceable.

In contrast, this matter presents the question of how to reconcile state law principles of contract interpretation to the Federal Arbitration Act where the agreement does not expressly address class arbitration and the parties disagree as to how that silence is to be interpreted. *Stolt* seemed to leave open the possibility that state contract law principles could interpret the clause to permit class arbitration. However, the Court's further explication of *Stolt* contained in the majority opinion of *Concepcion* strongly suggests that the Court believes that class arbitration is so fundamental a structural shift that it is not to be ordered in the absence of an express and explicit agreement. To the extent that parties have not explicitly addressed the issue, the silence must be construed as a prohibition.

**SEQUOIA EDUCATION, INC., v. RIVERA., 2011 WL 9369114 (2011)**

In conclusion, I determine that the arbitration agreement in the school enrollment contracts between Claimants and Respondents does not permit class arbitration. In accordance with Supplementary Rule 3, I stay further proceedings in this matter for a period of thirty days from the date of this award in order to permit either party to proceed in a court of competent jurisdiction to confirm or vacate this Clause Construction Award.

Signed this *22* day of September, 2011

<<Signature>>

John C. Fleming, Arbitrator

---

**End of Document**                                           © 2017 Thomson Reuters. No claim to original U.S. Government Works.

HARRISON, v. LEGAL HELPERS DEBT RESOLUTION,..., 2014 WL 5284848...

2014 WL 5284848 (D.Minn.) (Arbitration Award)
United States District Court, D. Minnesota.

HARRISON,

v.

LEGAL HELPERS DEBT RESOLUTION, LLC et al.

Nos. 12CV02145, 11-194-01162-13.
May 8, 2014.

Editor's Note: This document was acquired from a Court file.

**Case Type:** Contract
**Award Amount:** $0
**Attorney for Petitioner:** Brian J. Ellsworth
**Attorney for Respondent:** Charles L. Philbrick
**Award Date:** 03/16/2014
**Arbitrator: Edith N. Dinneen**

### Partial Final Clause Construction Award

**Arbitrator: Edith N. Dinneen**

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the parties' arbition agreement, and having heard the allegations and arguments of the parties, do hereby issue this partial Final Clause Construction Award:

In relevant part, the parties' June 1, 2010 Attorney Retainer Agreement ("the Agreement") contains an arbitration clause ("the Arbitration Clause"), which states that "any claim or dispute between [Claimant] and [Respondent] related to the Agreement or related to any performance of any services related to this Agreemtn shall be submitted to binding arbitration," and the "matter may be arbitrated by [AAA] subject to the then current rules of[its] arbitration service."

In accordance with the Arbitrion Clause, the case is proceeding under AAA's Commerical Arbitration Rule in effect as of August 29, 2013 (the "Commerical Rules" or "Rule"), as supplemented by AAA's Supplementary Rules for Clas Arbitrations (the "Supplementary Rules"). [2] Under Supplementary Rule 3, the first step in the resolution off this dispute is for the "arbitrator [to] determine... whether the applicable arbitration clause permits the arbitration to proceed on behalf of... a class," which is an issue known as "clause construction."

[2]    *See* discussion and legal authorities crited in *Southern Communications Services, Inc.* v. Thomas, 829 F. Supp.2d 1324, 1337-38 (N.D. Ga. 2011),*aff'd on* *other grounds,* 720 F.3d 1352 (11th Cir.2013).

### Issues to Be Determined

1. Have the parties given the arbitrator arbitrator authority to decide this Supplementary Rule 3 clause contstruction issue?

2. If they have given that authority, does the Agreement allow for the possibility that this arbitration could proceed on a class basis?

### *1. The Arbitrator Has Authority to Decide Clause Construction In this Case*

AAA's Commercial Rule 7 states that the "arbitrator shall have the power to rule on... her own jurisdiction, including any objections with respect to he existence, scope or validity to the arbitration agreement...[,and] that any objection to he the jurisdiction of the arbitrator or to the arbitrability of a claim" must be made "no later than the filing of the answering statement that gives rise to the objection." In its February 14, 2014 Clause Construction Brief, Respondent raised for the first time [3] an objetion to my deciding clause construction, contending that the parties have not already granted authrity to the arbitrator to render a clause construction award, and that only a court may do so. [4] Giving Respondent the doubt as to the timeliess of this objection, I will address the merits of this new jurisdictional objection.

[3]   Under Commercial Rule 4(c), Respondent had previously chosen not to file an answering statement asserting affirmative defenses defenses (such as lack of jurisdiction), and had not raised any jurisdictional issue when the clause construction briefing schedule was set on December 12, 2013.

[4]   The question as to who should decide clause construction is not new in the law of arbitrability. In *Stolt-Nielsen v. AnimalFeeds Int'l Corp., 559 U.S. 662, 680 (2010)*, the Suprement Court "made clear that [it had] not yet decided whether the availability of class arbitration is a question of arbitrability, and confirmed that the issue remains an open question. 133 S. Ct. at 2068 n.2 Sutter thus did not change the law on this question of arbitrability, it merely articulated what had been for years a question unanswered by the Supreme Court.

I find that Respondent's contention is wrong because here, as in *Southern Communications Services, Inc. v. Thomas, 829 F. Supp. 2d 1324*(N.D. Ga.2011), aff'd on other grounds,720 F.3d 1352 (11th Cir. 2013), "the parties. specifically granted the arbitrator the power to interpret their agreement and decide whether it authorized class arbitrations" The Arbitration Clause expressly provides for arbitration to be administered by AAA under "the rules of its arbitration service", which include AAA's Supplementary Rules for Class Arbitrations. [5] Supplementary Rule 3 expressly commits the clause construction issue to the arbitrator: "the arbitrator shall determine as a threshold matter, in a reasoned, partial final award on the construction of the arbitration clause, whether the arbitration clause permits the arbitration to proceed on behalf of. a class" (emphasis added). [6]

[5]   See n.1, supra.

[6]   The protion of Supplementary Rule 3 prohibiting reliance on the existence of any AAA rules in making a clause construction determination does not apply where the issue being decided is a preliminary one relating to arbitrial jurisdiction.

Thus, in choosing to arbitrate under AAA's Rules, Respondent has already agreed to have clause construction decided by the arbitrator, not by the court. although an issue of arbitrability is generally one for a court to decide, "when, as here, the parties explicitly incouporate rules that empower an arbitrator to decide of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." *Contec Corp. v. Remote Solution Co., Ltd., 398 F.3d 205, 208*(2d Cir. 2005); *Southern Communications, supra,* 829 F.Supp. 2d at. 1337-39. [7]

[7]   To the extent that *Reed Elsevier, Inc. v. Crockett, 734 F.3d 594, 599 (6th Cir. 2013)*, may appear to be inconsistent with this conclusion, I decline to follow it in light of the other above-cited decisions that are based on situations more analogous to the one presented here. The Sixth Circuit made no reference to the text of Commercial Rule 7, and provided no analysis or explanation of why it would not authorize the arbitrator to decide clause construction. Indeed, it is not clear that anyone even raised an argument based on Rule 7, or that the Sixth Circuit had in opportunity to consider it. Furthermore, even without

relying on Rule 7 or a similar counterpart, a different Circuit, Court of Appeals has stated the entirely opposite conclusion that a "determination as to whether class action is prohibited is a question of interpetation and procedure for the arbitrator." *Quillion v. Tenet HealthSystem Philadelphia, Inc.*, 673 F. 3d 221, 232 (3d Cir. 2012) (emphasis added); *accord, e.g., Vilches v. The Travelers Companies, Inc.*, 413 F. App., 487, 492-94 (3d Cir. 2011); *Guida v. Home Savings of America, Inc.*, 793 F. Supp. 2d 611, 614-17 (E.D.N.Y. 2011); *Araeri v. Dillard's, Inc.*, 2011 U.S. Dist. LEXIS 41596, at * 10-11 (S.D. Ohio 3/29/11). *Smith v. The Cheesecake Factory Restaurants, Inc.*, 2010 U.S. Dist. LEXIS 121930, at *7-8 (M.D. Tenn. 11/16/10).

The current legal standard for determinging if an arbitration contract allows for class arbitration is found in Stolt-Nielsen v. AnimalFeeds Int'l 559 U.S. 662 (2010). ==The question is not whether the contract forbids class arbitration, but whether it allows it: a "party may not be compelled under the [Federal Arbitration Act, 9 U.S.C. Secs. 1 et seq.] to submit to class arbitration unless there is a contractual basis for concluding that the party agreed to do so." Id. at 684 (emphasis in original). Such an agreement can be explicit or implicit, but the plain existence of an agreement to arbitrate cannot give rise to an inference that there was necessarily an agreement to arbitrate class as well as individual claims. Id.==

In *Stolt-Nielsen*. the parties stipulated both that their arbitration contract was "silent" regarding (i.e., it did not contain any express mention of) class arbitration, and that they had not made any agreement, one way the other, on the subject. [8] because of the latter aspect of their stipulation, the Supreme Court had no occasion to decide "what contractual basis may support a finding that the parties agreed to authorize class-action arbitration," and Stolt-Nielsen thus did not answer that specific question. *Id.* at n. 10. It is clear, however, that the omission of the specific words "class" or class action" is not necessarily determinative of a lack of intent to authorize class arbitration; the rest of the language used may - or may not - point to an agreement that allows for class arbitration. *See e.g., Sutter v. Oxford Health Plans LLC*, 675 F.3d 215, 222-25 (3d Cir.2012), *aff'd*, 133 S. Ct. 2064 (2013); *Fantastic Sams Franchise Corp. v. FSRO Ass'n*, 683 F.3d 18, 22 (1st Cir. 2012); *Jock v. Sterling Jewelers, Inc.*, 646 F.3d 113, 124 (2d Cir. 2011). cert. denied, 132 S. Ct. 1712 (2012); *Southern Communications, supre*, 829 F. Supp.2d at 1335-37.

[8]      There is no such stipulation in this case; although they differ as to what their agreement was, both sides contend there was a consensus as to whether class arbitration would or would not be allowed.

The Federal Arbitration Act ("FAA"), 9 U.S.C. Sec. 2, requires enforcement of the Arbitration Clause according to its own terms, *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985), and the analysis begins with an examination and interpretation of the language actually used in the Arbitration Clause.

Here, the Arbitration Clause, drafted by Respondent, says in relevant part: "In the event of any claim or dispute between Client[Claimant] and LHDR [Respondent] related to the Agreement or related to any performance of any services related to this Agreement, such claim or dispute shall be submitted to binding arbitration upon the request of either party...."

Interpretation of an arbitration commitment such as this requires a determination of the parties' intent -did they or did they not agree that class claims would be subject to arbitration? *Southern Communications, supra*, 829 F. Supp.2d at 1339-40(citing *Stolt-Nielsen, supra*, 130 S.Ct. at 1773,and *Jock v. Sterling Jewelers, Inc., supra*, 646 F. 3d at 126).

==Here, it is obvious that there is no express agreement, and I am also unable to ascertain any implied intent to allow class claims to be asserted in arbitratin. Aside from the breadth of the words "any claim or dispute," [9] Claimant fails to point to anything in this Arbitration Clause to differentiate it from a "garden-variety arbitration clause, lacking any of the terms or features that would indicate an agreement to use class procedures." *See Oxford Health Plans LLC v. Sutter*, 133== S. Ct. 2064, 2070 (2013) *("Sutter")*. Indeed, unlike other contracts construed by arbitrators in cases cited by Claimant, there is nothing in this Arbitration Clause suggesting that the parties were referring to anything other than bilateral, one-on-one arbitration of individual claims or disputes.

9     As Respondents argue, the language used to identify the participants in arbitration as Claimant and Respondent (and no one else) may directly countervail this breadth.

In *Sutter,* for example, the arbitrator could rely on contractual language saying that "[n]o civil action concerning any dispute arising under this Agreement sahll be instituted before any court, and all such disputes shall be submitted to final and binding arbitration." That arbitrator concluded that class arbitration was therefore permitted because the contract committed to arbitration all civil actions (which would include class actions) that might otherwise be brought in court. [10] *Id.* This Arbitration Clause contains no comparable provision.

10     This conclusion was similar to the one in *Jack v. Sterling Jewelers, Inc.,* where the arbitration contract assured that "the arbitrator has the 'power to award any types of...relief that would be available in a court.'" 646 F.3d 113, 126-27 (2dCir. 2011), *cert. denied,* 132 S. Ct. 1742 (2012). No such assurance is contained in this Arbitration Clause.

And in *Opalinski v. Robert Half International, Inc.,* cited as "Case No. 10-2069, decided December 3, 2012 (District N.J. 2012)," [11] the arbitrator could rely on several portions of the contract as suggesting an agreement for collective claims in arbitration, mentioning specifically the express exclusion of some types of claims (but not class or collective actions) and the contractual reference to claims based on any federal employment law (which would include those authorizing class or collective actions such as the Fair Labor Standards Act, which was at issue in that case). No similar language is present here.

11     The decision is also designated as "Not for Publication."

Claimant's reliance on *Southern Communications Services, Inc. v. Thomas* is also unpersuasive on this point. While the arbitration contract there did refer similarly to "any disputes," the arbitrator's decision permitting class arbitration was based on a factor entirely absent from this case - the fact that Georgia law, as articulated in *Dale v. Comcast Corp.* 498 F.3d 1216 (11th Cir. 2007), favors class actions when the claims of individual class members are very small and class treatment is needed in order for them to vindicate their rights. 720 F. 3d (11th Cir. 2013). Here, there is nothing in the record establishing the size of the claims of potential class members or any inability to pursue relief on an indiviaual basis. Moreover, this case is subject to the law of North Carolina, not Georgia, and Claimant made no direct argument that, as a matter of law, a failure to allow class arbitration would necessarily be forbidden in North Carolina. [12]

12     While Claimant's Brief(p.2) speculates as to the extent to which possible unconscionability under North Carolina law may have influenced how Respondent drafted the Arbitration Clause, he did not definitively request (or provide any suitable evidentiary grounds for) a ruling that this Arbitration Clause is unconscionable unless I interpret it so as to allow class arbitration.In light of that, it is not necessary for me to reach Respondent's arguments regarding the current viability of *Tillman v. Commercial Credit Loans, Inc.,* 655 S.E. 2d 362,373(N.C. 2008), or of FAA pre-emption.

Finally,*WMS, Inc. v. Weaver,* 602 S.E. 2d 706, 712-13 (N.C. Ct. App. 2004), is inapposite and does nothing to support Claimant's position.In that case, arbitrators were asked to construe an ambiguity in an arbitration contract-namely, whether the treble damages allowed under a relavent statute constituted "damages not measured by the prevailing party's actual damages," which were expressly precluded by the contract.They concluded that the statutory treble damages did not fall within that contractually-defined category and could therefore be awarded;and the Court simply held that the arbitrators had not exceeded their authority.

**Partial Final Award**

HARRISON, v. LEGAL HELPERS DEBT RESOLUTION,..., 2014 WL 5284848...

In accordance with the mandate of *Stolt-Nielsen,* I have thus examined and interpreted the language of this Arbitration Clause. I find that the class action claims asserted by Claimant in this case do not fall within its scope and are not subject to arbitral jurisdiction. The Arbitration Clause is hereby construed as not allowing Claimant to include in this arbitration any claims on behalf of anyone other than himself.

Under Rule 3 of the AAA's Supplementary Rules for Class Arbitrations, I retain jurisdiction and order that all proceedings herin be stayed for a period of 30 days from issuance of this Partial Final Award so that any party may seek to have this decision confimed or vacated in a court of competent jurisdiction. Lifting of the stay and resumption fo the proceedings will be as spicified in Supplementary Rule 3

DATED March 16, 2014

<<Signature>>

Edith N. Dinneen

Arbitrator

I. Edith N. Dinneen, do hereby affirm, upon my Oath as Arbitrator, that I am the individual described in and who executed this instrument, which is my Partial Final Clause Construction Award.

DATED: March 16, 2014

<<Signature>>

Edith N. Dinneen

Arbitrator

---

**End of Document** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Debose v. Smith & Wollensky Restaurant Group, Inc., Not Reported in F.Supp.2d (2013)

2013 WL 5487939

2013 WL 5487939
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas,
Houston Division.

Peter DEBOSE, Petitioner,
v.
SMITH & WOLLENSKY RESTAURANT
GROUP, INC., Respondent.

Civil Action No. H–12–3030.
|
Sept. 30, 2013.

Attorneys and Law Firms

Brant Casavant, Shannon Liss-Riordan, Lichten and Liss-Riordan, Boston, MA, Richard J. Burch, Bruckner Burch PLLC, Houston, TX, for Petitioner.

Robert J. Carty, Jr, Robert S. Whitman, Seyfarth Shaw LLP, New York, NY, C.J. Eaton, Seyfarth Shaw LLP, Boston, MA, for Respondent.

*MEMORANDUM AND ORDER*

NANCY F. ATLAS, District Judge.

**\*1** Petitioner Peter Debose filed this Petition to Vacate Arbitrator's Partial Final Clause Construction Award ("Petition to Vacate") [Doc. # 1], asking this Court to set aside the Arbitrator's decision that the arbitration could proceed only on an individual basis, not as a class. Respondent Smith & Wollensky Restaurant Group, Inc. ("Smith & Wollensky") filed an Opposition [Doc. # 21], and Petitioner filed a Reply [Doc. # 22].

Soon after the briefing was completed, the United States Supreme Court issued its decision in *Oxford Health Plans LLC v. Sutter*, — U.S. ——, 133 S.Ct. 2064, 186 L.Ed.2d 113 (2013). Both parties filed notices of the Supreme Court's *Sutter* decision, and Petitioner filed a Motion for the Court to Remand this Case to the Arbitrator for Further Consideration ("Motion to Remand") [Doc. # 24], to which Respondent filed an Opposition [Doc. # 27], and Petitioner filed a Reply [Doc. # 31].

The Court has carefully considered the full record in this case. Based on that review and the application of governing legal authorities, the Court denies Petitioner's Petition to Vacate and Motion to Remand.

**I. *BACKGROUND***

Debose filed a "Class Action Complaint" before the American Arbitration Association, alleging that Smith and Wollensky violated the Fair Labor Standards Act ("FLSA") by taking an improper "tip credit" against the minimum wage paid to wait staff, thereby paying these employees less than the permissible minimum wage. Debose sought certification of the arbitration as a class action. Defendant objected, arguing that it had not consented to class arbitration.

After appointment of the Hon. Susan S. Soussan as the Arbitrator, the parties agreed that the class certification issue should be decided by the arbitrator as a preliminary matter. [1] On July 13, 2012, after extensive briefing, the Arbitrator issued her Partial Final Award on Arbitration Clause Construction ("Partial Final Award"), attached as Exhibit 2 to Petitioner's Memorandum in Support of Petition [Doc. # 3]. The Arbitrator found that the arbitration clause was silent on the issue of class arbitration. Finding further that there was no contractual or other legal basis to conclude that the parties agreed to class arbitration, the Arbitrator interpreted the parties' contract to allow arbitration only on an individual claim, not as a class action.

[1]   The parties do not dispute that Debose's individual claims are subject to a binding arbitration provision, or that the question of whether the parties' contract provides for class arbitration was an issue to be decided by the arbitrator.

Petitioner filed his Petition to Vacate and his Motion to Remand, which have been fully briefed and are ripe for decision.

**II. *REVIEW OF ARBITRATOR'S DECISION***

Under the Federal Arbitration Act ("FAA"), "courts may vacate an arbitrator's decision 'only in very unusual circumstances.' " *Oxford Health*, 133 S.Ct. at 2068 (quoting *First Options of Chicago, Inc. v. Kaplan*, 415 U.S. 938, 842 (1995)). In this case, Petitioner relies on 9 U.S.C. § 10(a)(4), which allows a federal court to set aside

Debose v. Smith & Wollensky Restaurant Group, Inc., Not Reported in F.Supp.2d (2013)

2013 WL 5487939

an arbitrator's award where the arbitrator exceeded his powers. "A party seeking relief under that provision bears a heavy burden." *Id.* " 'It is not enough ... to show that the [arbitrator] committed an error—or even a serious error.' " *Id.* (quoting *Stolt–Nielsen S.A. v. Animal Feeds Int'l Corp.,* 559 U.S. 662, 671, 130 S.Ct. 1758, 176 L.Ed.2d 605 (2010)). "Because the parties bargained for the arbitrator's construction of their agreement, an arbitral decision even arguably construing or applying the contract must stand, regardless of a court's view of its (de)merits." *Id.* (internal quotations and citations omitted). "So the sole question for [the court] is whether the arbitrator (even arguably) interpreted the parties' contract, not whether he got its meaning right or wrong." *Id.* "So long as the arbitrator was arguably construing the contract ... a court may not correct his mistakes under § 10(a)(4)." *Id.* at 2070 (internal quotations and citation omitted).

**\*2** In this case, the Arbitrator quoted the arbitration clause from the parties' Dispute Resolution Agreement ("DRA"). The Arbitrator identified the issue as "whether the DRA permits class action notwithstanding its silence on the issue." *See* Partial Final Award, p. 4. The Arbitrator noted correctly that "a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party agreed to do so." *See id.* at 5 (quoting *Stolt–Nielsen,* 559 U.S. at 684). The Arbitrator considered the parties' respective arguments regarding how the arbitration clause of the DRA should be interpreted and, based on the absence of any contractual or legal basis to conclude that the parties agreed to class certification, interpreted the DRA to provide only for individual, not class, arbitration. As was true in *Oxford Health,* the Arbitrator in this case clearly "did what the parties had asked: [S]he considered their contract and decided whether it reflected an agreement to permit class proceedings." *See Oxford Health,* 133 S.Ct. at 2069. As a result, the Arbitrator did not exceed her powers and her decision cannot be vacated pursuant to § 10(a)(4).

Petitioner argues that the Supreme Court in *Oxford Health* abrogated the Fifth Circuit's decision in *Reed v. Florida Metro. Univ. Inc.,* 681 F.3d 630 (5th Cir.2012), and held "that arbitrators can find class arbitration permitted based upon contractual interpretation that does not include express written consent to class arbitration." *See* Motion to Remand, pp. 1–2. The Supreme Court in *Oxford Health* did not, however, overrule the Fifth

Circuit's decision in *Reed* on its merits. Instead, the Supreme Court overruled the Fifth Circuit because the circuit improperly applied § 10(a)(4) to allow a court to vacate an arbitration award. [2] *See Oxford Health,* 133 S.Ct. at 2068 n. 1. In *Oxford Health,* the arbitrator interpreted a parties' arbitration clause to permit class arbitration, notwithstanding its silence on the issue. The Supreme Court stated clearly that nothing in its opinion "should be taken to reflect any agreement with the arbitrator's contract interpretation, or any quarrel with Oxford's contrary reading." *Id.* at 2070. The Supreme Court stated further that "convincing a court of an arbitrator's error—even his grave error—is not enough." *Id.*

[2] In *Reed,* the parties' arbitration agreement was silent on the issue of class arbitration. The arbitrator in *Reed* construed the agreement to allow class arbitration, and the district court confirmed the award. *See Reed,* 681 F.3d at 633. On appeal, the defendant argued that the "exceedingly deferential standard of review applicable to arbitration awards precludes [a court] from vacating the award." *Id.* at 636. The Fifth Circuit reversed the district court, finding that the arbitrator exceeded his powers when he "forced the parties into class arbitration without a contractual basis for doing so," and holding that the district court should have granted the motion to vacate the arbitrator's decision under § 10(a)(4). *Id.* at 638.

Where, as here, the arbitrator interpreted the parties' contract, § 10(a)(4) does not allow a court to vacate the arbitrator's decision. Consequently, the Court denies the Petition to Vacate and the Motion to Remand.

## III. *CONCLUSION AND ORDER*

As made clear by the Supreme Court in *Oxford Health,* the only inquiry before this Court is whether the Arbitrator interpreted the parties' contract. "Under § 10(a)(4), the question for a judge is not whether the arbitrator construed the parties' contract correctly, but whether he construed it at all." *Oxford Health,* 133 S.Ct. at 2017. Because it is clear from her ruling that the Arbitrator in this case in fact interpreted the arbitration clause from the parties' contract, she did not exceed her powers under § 10(a)(4). Accordingly, it is hereby

**Debose v. Smith & Wollensky Restaurant Group, Inc., Not Reported in F.Supp.2d (2013)**

2013 WL 5487939

**\*3 ORDERED** that Petitioner's Petition to Vacate [Doc. # 1] and Motion to Remand [Doc. # 24] are **DENIED.** The Court will issue a separate final order.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5487939

---

© 2017 Thomson Reuters. No claim to original U.S. Government Works.